1021) "...his requirement that the <u>DOT investigate each complaint of an</u> <u>ACAA violation is augmented by a comprehensive administrative enforcement</u> <u>mechanism.</u>" Love v. Delta Air Lines (11th Cir. 2002) 310 F.3d 1347, 1354

1022) From the 5th Circuit....

1023) "As other circuits have explained, although the ACAA prohibits airlines from discriminating on the basis of disability, it "does not expressly provide a right to sue the air carrier." Lopez, 662 F.3d at 597 (construing 49 U.S.C. § 41705). To the contrary, <u>the ACAA combines with other federal aviation statutes to form a</u> <u>comprehensive administrative scheme "designed to vindicate fully the rights of</u> <u>disabled persons.</u>" Id" Stokes v. Southwest Airlines (5th Cir. 2018) 887 F.3d 199, 202–203

1024) Finally, from the Supreme Court (Sandoval case)...

1025) "The methods § 602 <u>expressly provides for enforcing its regulations,</u> <u>which place elaborate restrictions on agency enforcement, also suggest a</u> <u>congressional intent not to create a private remedy through § 602.</u> See, e.g., Karahalios v. Federal Employees, 489 U.S. 527, 533, 109 S.Ct. 1282, 103 L.Ed.2d 539. Pp. 1520–1522." Alexander v. Sandoval (2001) 532 U.S. 275, 276–277 [121 S.Ct. 1511, 1514, 149 L.Ed.2d 517]

1026) EVERYTHING IS BASED ON THE IDEA THAT THERE IS AN ELABORATE COMPREHENSIVE ENFORCEMENT SCHEME, WHICH IS

NON-EXISTENT, AND THE CIRCUIT COURTS CONFIRM THAT THERE IS NO SUCH ENFORCEMENT SCHEME REQUIRED BY CONGRESS.

1027) Plaintiff has substantial evidence that the DOT is not enforcing the ACAA, but rather ignoring everything. Additionally, they themselves are and were participating directly in the violations of the laws. Worse than that, the DOT was never set up to do any real enforcement. They are taking more than a year to respond to each complaint.

1028) They write clearly in their responses that nothing will be done. You can look at the American Airlines and JetBlue responses from the DOT (Exhibit 11), where you can see that it took over a year to respond, and they will do nothing. They're not shy about it.

1029) Plaintiff filed a petition for review in the DC Circuit Court of Appeals, ABADI v. DOT, Case # 22-1012 where the details of the DOT's lack of enforcement, failure to protect the disabled, and their deliberate ambiguous instructions to airlines have been encouraging widespread discrimination, as described herein.

1030) Nothing in that lawsuit or in my words should be taken as a license for defendants to blame the DOT, and be off the hook. The Defendant American and all the other airlines, and defendants, have expensive and intelligent attorneys that can sit down and read the laws, and instruct their people to follow them correctly.

Actually, a child in high school can read the laws and get a pretty clear understanding. This is not their first rodeo.

1031) The DOT do not make the laws, and cannot change the laws. Their job is to enforce them. If they are lax on their job, and never setup an enforcement scheme, and especially since the Circuit Courts said that they cannot review this aspect, that means that there is no such robust enforcement ordered by Congress. If it was ordered by Congress, it would be reviewable by the Circuit Courts, both Circuit Courts threw these cases out, saying this aspect is not reviewable.

1032) Plaintiff should therefore be entitled to a private right of action. Congress most certainly did not want the disabled to suffer discrimination with no recourse whatsoever. Without that fictitious enforcement scheme, there is automatically an implied private right of action.

1033) There was a previous case just like it at the Second Circuit Court of Appeals (CASE #21-2807 Abadi v DOT). The judges wrote, "It is further ORDERED that the other motions and the mandamus petition are DENIED because Petitioner has not demonstrated that exceptional circumstances warrant the requested relief…"

1034) In essence, what the court was saying is that Petitioner cannot get a review of the DOT's actions and inactions with respect to ACAA enforcement, and as a writ of mandamus, the court refused. A writ of mandamus usually does require

exceptional circumstances. A petition for review is a right, and does not require exceptional circumstances.

1035) The DC Circuit Court and the Second Circuit both said they have no right to require the DOT to enforce the ACAA.

1036) Let us let that sink in. If the Circuit Courts of Appeals cannot require the DOT to enforce the ACAA laws, then according to both Circuit Courts, the DOT does NOT have a mandate from Congress to enforce the ACAA laws.

1037) If the Congress was clear that the DOT must enforce the ACAA, and there was an actual robust/comprehensive enforcement scheme, then the Circuit Courts would be required to ensure that they do what Congress required of them. The Petitioner would have every right to demand that, and the court would be required by law to require such enforcement.

1038) ENFORCEMENT is a simple word in the English language. The root of the word is FORCE. Webster defines it as to "CONSTRAIN, COMPEL," amongst other similar definitions. Nowhere is enforcement defined as, "sit back, ignore, and file some papers a year later." There is no question that the current scheme is the furthest from enforcement.

1039) By the fact that the Circuit Courts determined that they have no such power over the DOT, it means that although they have the power and responsibility to review the actions and inactions of the DOT, they cannot do that in this case. The

only possible explanation for that is that the Circuit Courts do not believe that Congress required the DOT to enforce the ACAA.

1040) That brings us back to our issue. If the DOT has no elaborate comprehensive enforcement scheme as all these Circuit Court cases above suggest, then those decisions must be reversed.

1041) It is okay to have made that mistake. We barely had to enforce the discrimination laws in the past. ACAA was relatively dormant. The courts' decisions regarding private right of action and the statement suggesting the DOT enforces these laws, were made in a vacuum. They were mostly hypothetical at the time.

1042) Suddenly, a virus comes in and the fear levels go off the charts and it is like that famous Seinfeld episode, where there's a fire alarm and George Costanza starts trampling over the elderly and/or children just to get out of the door. Americans are normally not like this. Most Americans are still not like this. I found many people to be wonderful and caring.

1043) We shouldn't need laws to tell us to be good decent people. We should have religion or our own morals. But we do have these laws, and Congress made them for a reason. There is no question that Congress wanted them to be enforced.

1044) Considering these facts, being that there is no real DOT enforcement, and certainly not robust nor comprehensive nor elaborate, but Congress certainly

wanted them to be enforced. That means that the Courts all need to acknowledge and correct their mistakes. The Courts need to allow for a private right of action, as is certainly the will of Congress when it wrote these laws.

1045) The District Courts are not bound by circuit court decisions, if the decision was clearly an error, especially in this scenario, where the Circuit Courts are contradicting their own decisions. You cannot on one hand say, I cannot ask DOT to enforce the ACAA disability laws, and then also say there's no private right of action. It is either one or the other.

1046) In this case, this court is bound by the 5th Circuit and the Supreme Court. In Stokes v. Southwest Airlines (5th Cir. 2018) above, the 5th Circuit made it clear that its understanding that there's no private right of action, specifically because of that "comprehensive administrative scheme "designed to vindicate fully the rights of disabled persons." Plaintiff shows how that is not the truth of the DOT.

1047) In Stokes, the Circuit Judge admits that "our circuit previously has held otherwise. See Shinault v. Am. Airlines, Inc., 936 F.2d 796, 800 (5th Cir. 1991)" Stokes v. Southwest Airlines (5th Cir. 2018) 887 F.3d 199, 203–204.

1048) It is well-know that when a Circuit Court has conflicting precedents, the District Court is not bound by the most recent precedent, unless it was decided en banc, which is not the case here with Stokes.

1049) Many cases over the years have been allowed as a private right to action

on ACAA laws. In normal circumstances maybe we have been veering toward relying on the DOT to handle those laws. These are not normal circumstances, and DOT showed that this is not their mandate from Congress.

1050) The Supreme Court case of Sandoval is not the same as ACAA and DOT. The facts here are much different. Sandoval has enforcement, DOT does not enforce ACAA properly. It isn't their mandate.

1051) Sandoval itself is proof. In Sandoval, while the Supreme Court said there is no private right of action for Section 602, it did find a private right of action for Section 601, even though there was no wording explicitly suggesting that in the statute.

1052) The Cause of Action codes table issued April 25, 2021, by the Administrative Office of the U.S. Courts includes a code for a private action under the ACAA: "49:41705 Air Carrier Access Act (discrimination against handicapped individuals)."

1053) The Eighth Circuit is among those that recognize a private right of action under the ACAA.

1054) Congress passes civil-rights laws to protect classes of people subject to discrimination – including the disabled. If the executive department tasked with enforcing the statute neglects its duty, Congress intends for those illegally discriminated against to have a remedy – and in this case, the only remedy is a private

lawsuit. This Plaintiff filed a complaint with the DOT, and the DOT found American in violation (Exhibit 11), yet it refused to require American to stop its discrimination. The DOT refuses to enforce the ACAA.

1055) Therefore, the Airline and all Defendants are liable to Plaintiff for violating the Air Carrier Access Act 14 CFR § 382.19(a). While the airline and certain employees directly denied Plaintiff access to fly, the other defendants aided and abetted and/or facilitated this discrimination.

1056) Defendants' actions and/or inactions were discriminations, as they treated Plaintiff differently than non-disabled people.

1057) These discriminations directly caused Plaintiff's injuries.


**COUNT ELEVEN**

**1058) Violation of ACAA 14 CFR Part 382 § 382.13; carriers have to modify policies, practices, and facilities to ensure nondiscrimination.**

1059) **§ 382.13** "Do carriers have to modify policies, practices, and facilities to ensure nondiscrimination?

1060) (a) As a carrier, you must modify your policies, practices, and facilities when needed to provide nondiscriminatory service to a particular individual with a disability, consistent with the standards of section 504 of the Rehabilitation Act, as amended. (b) This requirement is part of your general

nondiscrimination obligation, and is in addition to your duty to make the specific

accommodations required by this part."

1061) Plaintiff incorporates the facts and allegations of the prior paragraphs,

and further alleges:

1062)   All the Airline Defendants violated this statute by discriminating

against Plaintiff due to his disability, by not modifying their mask policies to

properly accommodate Plaintiff and his disability.

1063)   All other defendants assisted, aided and abetted, and facilitated these

violations.

1064)   Defendants' discriminations were the direct cause of Plaintiff's

injuries.

1065)   The discriminations were intentional and deliberate.  The airlines

took advantage of the lack of enforcement to discriminate freely, all the while

knowing there was no health or safety concerns that warranted such actions.


**COUNT TWELVE**

**1066) Violation of ACAA 14 CFR Part 382 ACAA § 382.15 carriers**

**have to make sure that contractors comply with the requirements of this Part.**

1067) § 382.15 "Do carriers have to make sure that contractors comply with

the requirements of this Part?

1068) As a carrier, you must make sure that your contractors that provide services to the public (including airports where applicable) meet the requirements of this part that would apply to you if you provided the services yourself."

1069) Plaintiff incorporates the facts and allegations of the prior paragraphs, and further alleges:

1070)  All the Airline Defendants violated this statute by discriminating against Plaintiff due to his disability, by not making sure that their contractors were aware of the requirements to properly accommodate Plaintiff and his disability.

1071)  All other defendants assisted, aided and abetted, and facilitated these violations.

1072)  Defendants' discriminations were the direct cause of Plaintiff's injuries.

1073)  The discriminations were intentional and deliberate.  The airlines took advantage of the lack of enforcement to discriminate freely, all the while knowing there was no health or safety concerns that warranted such actions.


## COUNT THIRTEEN

1074) **Violation of ACAA 14 CFR Part 382 ACAA 382.17; carriers cannot limit the number of passengers with a disability on a flight.**

1075) **382.17** "May carriers limit the number of passengers with a disability on a flight?

1076) As a carrier, you must not limit the number of passengers with a disability who travel on a flight."

1077) Plaintiff incorporates the facts and allegations of the prior paragraphs, and further alleges:

1078)  While many of the Airline Defendants violated this statute by limiting disabled on flights, JetBlue made it very clear to Plaintiff that they would limit disabled on flights that he would be interested in taking.

1079)  JetBlue discriminated against Plaintiff due to his disability, by limiting the amount of disabled allowed to fly on the plane. See correspondence from Castleton.

1080)  Federal defendants and JetBlue personnel assisted, aided and abetted, and facilitated these violations.

1081)  Defendants' discriminations were the direct cause of Plaintiff's injuries.

1082)  The discriminations were intentional and deliberate.  JetBlue took advantage of the lack of enforcement to discriminate freely, all the while knowing there was no health or safety concerns that warranted such actions.

## COUNT FOURTEEN

**1083) Violation of ACAA 14 CFR Part 382 ACAA not allowing disabled person to fly due to a disability:**

1084) **382.19** "May carriers refuse to provide transportation on the basis of disability?

1085) As a carrier, you must not refuse to provide transportation to a passenger with a disability on the basis of his or her disability…"

1086) Plaintiff incorporates the facts and allegations of the prior paragraphs, and further alleges:

1087)   All the Airline Defendants violated this statute by discriminating against Plaintiff due to his disability, by not allowing him to fly due to his disability.

1088) Additionally, see 14 CFR § 382.19 (d) "If you refuse to provide transportation to a passenger on his or her originally-scheduled flight on a basis relating to the individual's disability, you must provide to the person a written statement of the reason for the refusal. This statement must include the specific basis for the carrier's opinion that the refusal meets the standards of paragraph (c) of this section or is otherwise specifically permitted by this part. You must provide this written statement to the person within 10 calendar days of the refusal of transportation."

1089)   While some airlines refused him the opportunity to travel outright, others made it so complicated, and/or refused to respond in order that he should not be able to travel.  None of the airlines sent a letter within ten days clarifying how their decision meets the standards of paragraph (c) of the above section or is otherwise specifically permitted by this part.

1090)   All other defendants assisted, aided and abetted, and facilitated these violations.

1091)   Defendants' discriminations were the direct cause of Plaintiff's injuries.

1092)   The discriminations were intentional and deliberate.  The airlines took advantage of the lack of enforcement to discriminate freely, all the while knowing there was no health or safety concerns that warranted such actions.


## COUNT FIFTEEN

1093) **Violation of ACAA 14 CFR Part 382; 382.21 carriers cannot limit access to transportation on the basis that a passenger has a communicable disease or other medical condition.**

1094) ACAA 382.21 "May carriers limit access to transportation on the basis that a passenger has a communicable disease or other medical condition?"

1095) (a) You must not do any of the following things on the basis that a

passenger has a communicable disease or infection, unless you determine that the passenger's condition poses a direct threat: (1) Refuse to provide transportation to the passenger; (2) Delay the passenger's transportation (e.g., require the passenger to take a later flight); (3) Impose on the passenger any condition, restriction, or requirement not imposed on other passengers; or (4) Require the passenger to provide a medical certificate."

1096) Plaintiff incorporates the facts and allegations of the prior paragraphs, and further alleges:

1097)  All the Airline Defendants violated this statute by discriminating against Plaintiff due to his disability, by limiting his access to transportation on the basis that a he may have a communicable disease, even without any evidence that he had one.

1098)  All other defendants assisted, aided and abetted, and facilitated these violations.

1099)  Defendants' discriminations were the direct cause of Plaintiff's injuries.

1100)  The discriminations were intentional and deliberate.  The airlines took advantage of the lack of enforcement to discriminate freely, all the while knowing there was no health or safety concerns that warranted such actions.

**COUNT SIXTEEN**

**1101) Violation of ACAA 14 CFR Part 382; 382.23 carriers cannot require a passenger with a disability to provide a medical certificate.**

1102) ACAA 382.23 "May carriers require a passenger with a disability to provide a medical certificate?"

1103) (a) Except as provided in this section, you must not require a passenger with a disability to have a medical certificate as a condition for being provided transportation. (b) (1) You may require a medical certificate for a passenger with a disability - (i) Who is traveling in a stretcher or incubator; (ii) Who needs medical oxygen during a flight; or (iii) Whose medical condition is such that there is reasonable doubt that the individual can complete the flight safely, without requiring extraordinary medical assistance during the flight."

1104) Plaintiff incorporates the facts and allegations of the prior paragraphs, and further alleges:

1105)  The following Airline Defendants violated this statute by discriminating against Plaintiff due to his disability, by demanding that he provide a medical certificate, knowing full well that it was not applicable to Plaintiff's disability:

| | | | |
|---|---|---|---|
| AMERICAN | AEROMEXICO | AZUL | AUSTRIAN |
| AIR CANADA | EMIRATES | ETIHAD | FINNAIR |

| GULFAIR | IBERIA | JORDANIAN |
| LATAM | LUFTHANSA | QATAR    SAS |
| SOUTHWEST | SPIRIT | SUN COUNTRY |
| SWISS | AIR TAHITI | TAP |

1106)  Federal Defendants, Medical Defendants, and airline employees assisted, aided and abetted, and facilitated these discriminations.

1107)  Defendants' discriminations were the direct cause of Plaintiff's injuries.

1108)  The discriminations were intentional and deliberate.  The airlines took advantage of the lack of enforcement to discriminate freely, all the while knowing there was no health or safety concerns that warranted such actions.


**COUNT SEVENTEEN**

1109) **Violation of ACAA 14 CFR Part 382; ACAA 382.25 A carrier may not require a passenger with a disability to provide advance notice that he or she is traveling on a flight.**

1110) ACAA 382.25 May a carrier require a passenger with a disability to provide advance notice that he or she is traveling on a flight?"

1111) As a carrier, you must not require a passenger with a disability to provide advance notice of the fact that he or she is traveling on a flight."

1112) Plaintiff incorporates the facts and allegations of the prior paragraphs, and further alleges:

1113)  All the Airline Defendants violated this statute by discriminating against Plaintiff due to his disability, by requiring him to reach out to them in advance, and by not allowing him to just purchase a ticket and board the plane, like anyone else without a disability.

1114)  All other defendants assisted, aided and abetted, and facilitated these violations.

1115)  Defendants' discriminations were the direct cause of Plaintiff's injuries.

1116)  The discriminations were intentional and deliberate.  The airlines took advantage of the lack of enforcement to discriminate freely, all the while knowing there was no health or safety concerns that warranted such actions.


**COUNT EIGHTEEN**

1117) **Violation of ACAA 14 CFR Part 382: ACAA 382.33 Carriers cannot impose restrictions on passengers with a disability that they do not impose on other passengers.**

1118) ACAA 382.33 "May carriers impose other restrictions on passengers with a disability that they do not impose on other passengers?

1119) (a) As a carrier, you must not subject passengers with a disability to restrictions that do not apply to other passengers…"

1120) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1121)  All the Airline Defendants violated this statute by discriminating against Plaintiff due to his disability, by requiring him to do multiple things that were different than the requirements for the non-disabled.

1122)  All other defendants assisted, aided and abetted, and facilitated these violations.

1123)  Defendants' discriminations were the direct cause of Plaintiff's injuries.

1124)  The discriminations were intentional and deliberate.  The airlines took advantage of the lack of enforcement to discriminate freely, all the while knowing there was no health or safety concerns that warranted such actions.

## COUNT NINETEEN

**1125) Violation of the Rehabilitation Act ("RA") against airline defendants, and with the other defendants aiding and abetting and facilitating the discrimination.**

1126) The Plaintiff realleges and incorporates by reference herein all of the

facts and allegations contained in paragraphs above, and further alleges:

**1127) DHHS Section 504 regulation at 45 CFR Part 84.**

1128) "*Discriminatory actions prohibited.* (1) A recipient, in providing any

aid, benefit, or service, may not, directly or through contractual, licensing, or other

arrangements, on the basis of handicap:

(i) Deny a qualified handicapped person the opportunity to participate in or benefit

from the aid, benefit, or service;

(ii) Afford a qualified handicapped person an opportunity to participate in or benefit

from the aid, benefit, or service that is not equal to that afforded others;

(iii) Provide a qualified handicapped person with an aid, benefit, or service that is

not as effective as that provided to others..."

1129) Many, if not all of the Airline Defendants have received federal

contracts and/or funding, and most accepted federal financial assistance during the

COVID-19 pandemic, and before that, subjecting them to the Rehabilitation Act.

1130) The agreements signed by those arrangements to get the federal

funding, including but not limited to the payroll assistance program, have specific

clauses in them confirming that the airline must abide by the RA, the ACAA, and all

other relevant laws. These agreement terms are readily available online.

1131) Defendants who are employees of such companies are bound by the

company's responsibilities with regards to RA. The same goes for the attorneys for

the airlines.

1132) The Federal agencies and their employees are required to abide by the RA, as their funding is all federal funding.

1133) Recipients of federal funds are prohibited from discriminating against the disabled. But the Airline Defendants have banned from their aircraft and terminals, all passengers with disabilities that cause them not to be able to wear a mask.

1134) "No otherwise qualified individual with a disability in the United States … shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance…" 29 USC § 794(a).

1135) "[T]he terms 'program or activity' means all of the operations of … an entire corporation, partnership, or other private organization, or an entire sole proprietorship — (i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole…" 29 USC § 794(b).

1136) "The remedies, procedures, and rights set forth in title VI of the Civil Rights Act of 1964 (42 U.S.C. 2000d et seq.) (and in subsection (e)(3) of section 706 of such Act (42 U.S.C. 2000e-5), applied to claims of discrimination in compensation) shall be available to any person aggrieved by any act or failure to act by any recipient of Federal assistance or Federal provider of such assistance under

section 794 of this title." 29 USC § 794a(2).

1137) The rights of the disabled to be free from discrimination in all facets of society were later articulated by Congress in the Americans with Disabilities Act. Although the ADA does not apply to airlines, its statutory purpose should be used in interpreting the RA and ACAA.

1138) "Congress finds that — (1) physical or mental disabilities in no way diminish a person's right to fully participate in all aspects of society, yet many people with physical or mental disabilities have been precluded from doing so because of discrimination; others who have a record of a disability or are regarded as having a disability also have been subjected to discrimination; (2) historically, society has tended to isolate and segregate individuals with disabilities, and, despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem; (3) discrimination against individuals with disabilities persists in such critical areas as... transportation ... (4) ... individuals who have experienced discrimination on the basis of disability have often had no legal recourse to redress such discrimination; (5) individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion... (6) census data, national polls, and other studies have documented that people with disabilities, as a group, occupy an inferior status in our society, and are severely disadvantaged socially, vocationally, economically, and

educationally; (7) the Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals; and (8) the continuing existence of unfair and unnecessary discrimination and prejudice denies people with disabilities the opportunity to compete on an equal basis and to pursue those opportunities for which our free society is justifiably famous, and costs the United States billions of dollars in unnecessary expenses resulting from dependency and nonproductivity." **42 USC § 12101(a).**

1139) "It is the purpose of this chapter — (1) to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities..." **42 USC § 12101(b).**

1140) Defendants discriminated against Plaintiff in violation of the RA.

1141) Defendants' actions and/or inactions directly caused the damages described herein.

1142) This court can offer redress by granting an injunction requiring defendants to abide by the laws, and to allow Plaintiff to travel on the airplanes without any different treatment than other people, but without ever having to wear a mask.

1143) Plaintiff submits to this Court that although the mask mandate is currently not in effect, the federal government is actively pursuing its

reinstatement, and it is very likely that it will be reinstated by many States, municipalities, and even private businesses, therefore nothing in this Complaint should be deemed as moot.

1144) The airlines that this count is referring to are only those companies that are based and incorporated here in the United States. The two attorneys, and the employees of those U.S. airlines are also included in this count. The foreign airlines and their employees are excluded, unless through discovery information is provided that shows otherwise. Above, in the description of the parties, it states which airlines are U.S. based and which are foreign based.

1145) Medaire & STAT-MD also receive federal funding, and are thus subject to the RA, and in violation thereof. See Medaire SEC filing which is readily available online at https://www.sec.gov/Archives/edgar/data/1337301/000095015306000862/p72053e 10vk.htm. It lists income of $572,000 in a previous year, and Medaire indicates that the federal government is a major customer in their market and that Medaire has the largest market share in their industry. Discovery will provide more information and specifics.

1146) STAT-MD is a medical organization that receives significant funds from the federal government, as do almost all hospitals and medical facilities.

1147) While a number of Federal District Courts in similar cases have held that the funds the Airline Defendants received from the government under the CARES ACT — as compensation in response to the economic crises created by COVID-19 — did not constitute a subsidy or federal financial assistance within the meaning of the RA statute, the courts were misled by the airlines into believing this conclusion. The basis for such a position was the specific limited purpose set by the government to use disbursed CARES ACT funds, solely to meet Payroll obligations. In these cases and in many others, the courts have made an error, due to the dishonesty of the airlines. The airlines never submitted to the courts the actual FINAL "Payroll Support Program 3 Agreement and Extension [PSP3 — OMB: 1505-0263]" that set into motion the CARES ACT Loan and Payroll Support Programs for Air Carriers , the same that each and every Airline Defendant signed on January 15, 2021 according to the U.S. Department of the Treasury.

1148) Had any honorable Federal Judge received a copy of the PSP3 Agreement, he or she would have effortlessly seen that on page 11 of that Agreement, there exists a "Non-Discrimination" clause at paragraph 36. This same Agreement will auto-download as a PDF or MS WORD document by clicking on the desired link. The relevant provision is written with this language:

1149) The stipulation is clear and unambiguous. "The Recipient [Airline] shall comply with, and hereby assures that it will comply with, all applicable Federal statutes and regulations relating to nondiscrimination including: (b) Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794)."

---

**Non-Discrimination**

36. The Recipient shall comply with, and hereby assures that it will comply with, all applicable Federal statutes and regulations relating to nondiscrimination including:

    **a.** Title VI of the Civil Rights Act of 1964 (42 U.S.C. § 2000d *et seq.*), including Treasury's implementing regulations at 31 CFR Part 22;

    **b.** Section 504 of the Rehabilitation Act of 1973, as amended (29 U.S.C. § 794);

    **c.** The Age Discrimination Act of 1975, as amended (42 U.S.C. §§ 6101–6107), including Treasury's implementing regulations at 31 CFR Part 23 and the general age discrimination regulations at 45 CFR Part 90; and

    **d.** The Air Carrier Access Act of 1986 (49 U.S.C. § 41705).

11

---

1150) The CARES ACT, by and through its signed PSP3 Agreements with the recipient Airline Defendants actually DID PROVIDE an exception to the Supreme Court's general rule that the Rehabilitation Act does not apply to the airlines. This is no longer speculative or conclusory. It is a factual allegation backed solidly by written physical evidence. The inclusion of this provision in the PSP3 Agreement was deliberate and calculated by the government with a view to reduce and discourage the predictable flood of discrimination incidents the Airlines

were prone to carry out without a built-in fail-safe incentive to abide by Congressional intention.

## COUNT TWENTY

**1151) Violation of STATE OF CALIFORNIA CIVIL CODE SECTION 51 UNRUH CIVIL RIGHTS ACT ("UNRUH"); Discriminating against a person with a disability.**

1152) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1153) California law applies in this case, since all airline defendants discriminated against Plaintiff in regards to any flights he would take from California.

1154) Plaintiff has often flown from California, as seen in the report attached of Plaintiff's last year of flights, and as Plaintiff can provide the necessary evidence.

1155) Plaintiff had an urgent need to fly to and from California, for a business financing opportunity and was denied by all defendant airlines.

1156) As is the case with most states, UNRUH was created to enforce, add to, and make the federal disability laws even more effective in the state. The above shows Defendants were in violation of multiple federal laws and therefore they're

automatically in violation of UNRUH.

1157) All the defendants have violated these laws. Defendants did not accommodate, but rather denied me access to fly, without any recourse, and some with various discriminatory requirements. They discriminated against Plaintiff.

1158)  All other defendants assisted, aided and abetted, and facilitated these violations.

1159) Plaintiff incorporates here all federal laws violated and listed above as violations of the State of California laws.

1160) Therefore, all to-be-named Individual Defendants in addition to the listed defendants are personally liable to Plaintiff for the State of California UNRUH LAWS.

1161) Plaintiff's injuries and damages were a direct result of the Defendants' actions.

1162) Remedies provided are as follows: 52. (a) "Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51, 51.5, or 51.6, is liable for each and every offense for the actual damages, and any amount that may be determined by a jury, or a court sitting without a jury, up to a maximum of three times the amount of actual damage but in no case less than four thousand dollars ($4,000), and any attorney's fees that may be determined by the court in addition thereto, suffered by any person denied the rights provided in

Section 51, 51.5, or 51.6."

UNRUH PREEMPTION CASELAW

1163) UNRUH is not preempted by federal law, because as the Ninth Circuit clarifies, "state law is pre-empted ... if federal law so thoroughly occupies a legislative field 'as to make reasonable the inference that Congress left no room for the States to supplement it.' " *Cipollone,* 505 U.S. at 516, 112 S.Ct. 2608 (quoting *de la Cuesta,* 458 U.S. at 153, 102 S.Ct. 3014)" National Federation of the Blind v. United Airlines Inc., 813 F.3d 718, 733 (C.A.9 (Cal.),2016).  UNRUH is a typical state disability group of laws specifically created to enhance and build on the federal disability laws, not to override or conflict with them.

1164) When a person sends a complaint to the DOT for an ACAA violation, the automated response from the DOT includes the following:

1165) "The Department is limited to issuing cease and desist orders proscribing unlawful conduct by carriers in the future and assessing civil penalties payable to the government. The Department may only take such action through a settlement or after a formal hearing before an administrative law judge. Particularly egregious records of repeated violations may warrant the revocation of a carrier's economic authority to operate. To obtain a personal monetary award of damages, a complainant would have to file a private legal action that may be based

on private contract rights or on civil rights statutes that provide for a private right of action."

1166) The DOT themselves confirm that state civil rights statutes were never intended to be preempted by federal statutes in aspects that the state is not conflicting with the federal. As mentioned above, Plaintiff's exhausted their administrative remedies, and now should be entitled to relief through State Civil Rights laws specifically created for this purpose.

1167) See Segalman, where it says, "The Court first notes that, generally, "federal regulation of a subject—even thoroughgoing federal regulation—does not prevent states from adding remedies to the arsenal established by federal law." Radici v. Associated Ins. Companies, 217 F.3d 737, 742 (9th Cir. 2000) (quoting NAACP v. American Family Mutual Ins. Co., 978 F.2d 287, 296 (7th Cir. 1992)).

1168) Consistent with that general principle, the Ninth Circuit found in Gilstrap v. United Air Lines, "[t]he ACAA does not, however, preempt any state remedies that may be available when airlines violate those standards." 709 F.3d 995, 1010 (9th Cir. 2013)" Segalman v. Southwest Airlines Co., 2016 WL 146196, at *3 (E.D.Cal., 2016)

1169) And further, it says, "Federal regulations "do[ ] not, however, preempt any state *remedies* that may be available when airlines violate those standards." *Id.*

1170) See Foley, where the court states, "the mere existence of a detailed regulatory scheme does not by itself imply preemption of state remedies." *Keams v. Tempe Technical Inst., Inc.,* 39 F.3d 222, 226 (9th Cir.1994) (citing *English v. Gen. Elec. Co.,* 496 U.S. 72, 87, 110 S.Ct. 2270, 110 L.Ed.2d 65 (1990)). In specific areas without pervasive regulations or other grounds for preemption, state law applies." Foley v. JetBlue Airways, Corp., 2011 WL 3359730, at *12 (N.D.Cal.,2011)

1171) See the ninth circuit decision in Gilstrap v. United Air Lines, "The ACAA does not, however, preempt any state *remedies* that may be available when airlines violate those standards" Gilstrap v. United Air Lines, Inc., 709 F.3d 995, 1010 (C.A.9 (Cal.), 2013)

1172) See the Third Circuit's Decision in Elassaad v. Independence Air, Inc., "we are not persuaded that Congress intended the ACAA to preempt *any* state regulation of the interaction between an air carrier and disabled passengers (or disabled persons in general…" Elassaad v. Independence Air, Inc., 613 F.3d 119, 132 (C.A.3 (Pa.),2010)

1173) UNRUH is specific to intentional discrimination. All the Defendants participated in this discrimination intentionally. They decided that although Plaintiff has disabilities and the inability to wear a mask, they will require him to wear a mask or not allow him to fly. Some airlines required him to do things that

other non-disabled passengers were not required to do. The Medical defendants,
and the Federal Defendants participated fully and intentionally in these
discriminations.

## COUNT TWENTY-ONE

**1174) New Jersey Civil Rights Laws, Law Against Discrimination "LAD"
Discriminating against a person with a disability.**

1175) The Plaintiff realleges and incorporates by reference herein all of the
facts and allegations contained in paragraphs above, and further alleges:

1176) New Jersey Civil Rights Laws, Law Against Discrimination "LAD"
defines public accommodations as follows: "A place of public accommodation shall
include...any public conveyance operated on land or water or in the air or any
stations and terminals thereof;" NJSA 10:5-5. (L)

1177) N.J.S.A. 10:5-12 It shall be an unlawful employment practice, or, as the
case may be, an unlawful discrimination: f. (1) For any owner, lessee, proprietor,
manager, superintendent, agent, or employee of any place of public accommodation
directly or indirectly to refuse, withhold from or deny to any person any of the
accommodations, advantages, facilities or privileges thereof, or to discriminate
against any person in the furnishing thereof..."

1178) All defendants either denied Plaintiff access to fly from Newark

Airport, which Plaintiff often flies from, and/or aided and abetted this illegal activity.

1179) Therefore, all to-be-named Individual Defendants in addition to the listed defendants are personally liable to Plaintiff for the violation of the LAD, and of Plaintiff's civil Rights.

1180) Plaintiff's injuries and damages were a direct result of the Defendants' actions.

## COUNT TWENTY-TWO

1181) **New Jersey Human Rights LAD; Sending notices/communications to a disabled person, that he will be refused services and benefits that non-disabled are receiving, due to his disability.**

1182) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1183) Airline defendants all sent email notices and/or communications to Plaintiff conveying that he will not be permitted to travel on their airlines at all and/or without meeting unlawful demands, in violation of the New Jersey LAD.  This referred to all airport locations, including Newark Airport in New Jersey, frequented by Plaintiff.

1184) Plaintiff often flies out of and into Newark Airport in New Jersey, as it is in close proximity to where he lives.

1185) The two attorneys sent such correspondences too.

1186) N.J.S.A. 10:5-12 "It shall be an unlawful employment practice, or, as the case may be, an unlawful discrimination: …directly or indirectly to publish, circulate, issue, display, post or mail any written or printed communication, notice, or advertisement to the effect that any of the accommodations, advantages, facilities, or privileges of any such place will be refused, withheld from, or denied to any person, on account of the race, creed, color, national origin, ancestry, marital status, civil union status, domestic partnership status, pregnancy or breastfeeding, sex, gender identity or expression, affectional or sexual orientation, disability…"

1187) All defendants that were not directly involved in this violation, still aided and abetted this illegal activity.

1188) Therefore, all to-be-named Individual Defendants in addition to the listed defendants are personally liable to Plaintiff for the violation of the LAD, and of Plaintiff's civil Rights.

1189) Plaintiff's injuries and damages were a direct result of the Defendants' actions.

## COUNT TWENTY-THREE

1190) **NYC Civil Rights Laws: Unlawful discriminatory practice by denying Plaintiff equal access to all facilities and to fly from JFK Airport** in Jamaica, New York, which is in the borough of Queens in New York City.

1191) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1192) Plaintiff lives in the State of New York, and often flies out of Kennedy or LaGuardia Airports, that are located in the City of New York.

1193) The airlines denying him the ability to fly, and/or discriminating against him, denied him his rights and discriminated against him in violation of New York City Civil Rights Laws.

1194) The New York City Administrative Code Title 8: Civil Rights § 8-107 (4) "It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation... Because of any person's actual or perceived race, creed, color, national origin, age, gender, disability, marital status, partnership status, sexual orientation, uniformed service or immigration or citizenship status, directly or indirectly: (a) To refuse, withhold from or deny to such person the full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, services, facilities or privileges of the place or provider of public accommodation."

1195) Public Accommodation is defined as follows: "Place or provider of public accommodation. The term "place or provider of public accommodation" includes providers, whether licensed or unlicensed, of goods, services, facilities,

accommodations, advantages or privileges of any kind, and places, whether

licensed or unlicensed, where goods, services, facilities, accommodations,

advantages or privileges of any kind are extended, offered, sold, or otherwise made

available." § 8-102

1196) All defendants denied Plaintiff access to fly at John F. Kennedy

Airport and/or LaGuardia Airport in New York City, which Plaintiff often flies

from, and/or aided and abetted this illegal activity.

1197) Therefore, all to-be-named Individual Defendants in addition to the

listed defendants are personally liable to Plaintiff for the violation of the New York

City Laws, and of Plaintiff's civil Rights.

1198) Plaintiff's injuries and damages were a direct result of the Defendants'

actions.


**COUNT TWENTY-FOUR**

1199) **NYC Civil Rights Laws: Unlawful discriminatory practice by**

**Defendants, as they sent an email notice to Plaintiff conveying that he will not**

**be permitted to travel,** in violation of the NYC Civil Rights Laws.

1200) The Plaintiff realleges and incorporates by reference herein all of the

facts and allegations contained in paragraphs above, and further alleges:

1201) Plaintiff was notified that he could not fly from JFK Airport in

Jamaica, New York, and/or LaGuardia Airport, which are both in the borough of Queens in New York City.

1202) The New York City Administrative Code Title 8: Civil Rights § 8-107 (4) "It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation... 2. Directly or indirectly to make any declaration, publish, circulate, issue, display, post or mail any written or printed communication, notice or advertisement, to the effect that: (a) Full and equal enjoyment, on equal terms and conditions, of any of the accommodations, advantages, facilities and privileges of any such place or provider of public accommodation shall be refused, withheld from or denied to any person on account of race, creed, color, national origin, age, gender, disability."

1203) Public Accommodation is defined as above in the previous count.

1204) All the airline defendants and their employees, and the attorney defendants directly violated this statute.

1205) All defendants that were not directly involved in this violation, still aided and abetted this illegal activity.

1206) Therefore, all to-be-named Individual Defendants in addition to the listed defendants are personally liable to Plaintiff for the violation of the NYC Human Rights Law, and of Plaintiff's civil Rights.

1207) Plaintiff's injuries and damages were a direct result of the Defendants' actions.

## COUNT TWENTY-FIVE

1208) **NYC Civil Rights violation: Failed to engage in a cooperative dialogue within a reasonable timeframe.**

1209) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1210) The New York City Administrative Code Title 8: Civil Rights § 8-107 - 28 (b) Public accommodations. It shall be an unlawful discriminatory practice for any person who is the owner, franchisor, franchisee, lessor, lessee, proprietor, manager, superintendent, agent or employee of any place or provider of public accommodation to refuse or otherwise fail to engage in a cooperative dialogue within a reasonable time with a person who has requested an accommodation or who the covered entity has notice may require an accommodation related to disability as provided in subdivision 15 of this section.

1211) Defendants conveyed their arbitrary rules to the Plaintiff and refused to have any cooperative dialogue.

1212) All defendants that were not directly involved in this violation, still aided and abetted this illegal activity.

1213) Therefore, all to-be-named Individual Defendants in addition to the listed defendants are personally liable to Plaintiff for the violation of the NYC Human Rights Law, and of Plaintiff's civil Rights.

1214) Plaintiff's injuries and damages were a direct result of the Defendants' actions.

## COUNT TWENTY-SIX

1215) **Texas State Civil Rights Laws: refusing to accept as a passenger a person with a disability because of the person's disability.**

1216) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1217) HUMAN RESOURCES CODE: TITLE 8. RIGHTS AND RESPONSIBILITIES OF PERSONS WITH DISABILITIES: CHAPTER 121. PARTICIPATION IN SOCIAL AND ECONOMIC ACTIVITIES.

1218) In its definition of public facility, it says the following; "Public facility" includes a street, highway, sidewalk, walkway, common carrier, airplane, motor vehicle, railroad train, motor bus, streetcar, boat, or any other public conveyance or mode of transportation; a hotel, motel, or other place of lodging; a public building maintained by any unit or subdivision of government; a retail business, commercial establishment, or office building to which the general public

is invited…"

1219) Then it says as follows: "Sec. 121.003. DISCRIMINATION PROHIBITED. (a) Persons with disabilities have the same right as persons without disabilities to the full use and enjoyment of any public facility in the state. (b) No common carrier, airplane, railroad train, motor bus, streetcar, boat, or other public conveyance or mode of transportation operating within the state may refuse to accept as a passenger a person with a disability because of the person's disability, nor may a person with a disability be required to pay an additional fare because of his or her use of a service animal, wheelchair, crutches, or other device used to assist a person with a disability in travel."

1220) I am a person, I was denied the equal enjoyment of goods, services, facilities, privileges, advantages, and accommodations from these airlines in the airports and on their flights.

1221) Texas law applies in this case, since all airline defendants discriminated against Plaintiff in regards to any flights he would take from Texas.

1222) Plaintiff has often flown to and from Texas.

1223) Plaintiff had an urgent need to fly to and from Texas, for a business opportunity and for personal reasons, but was denied by all defendant airlines.

1224) All the defendants have violated these laws. Defendants did not accommodate, but rather denied me access to fly, without any recourse, and some

with various discriminatory requirements. They discriminated against Plaintiff.

1225) All defendants that were not directly involved in these violations, still aided and abetted this illegal activity.

1226) Therefore, all to-be-named Individual Defendants in addition to the listed defendants are personally liable to Plaintiff for the State of Texas Civil Rights laws.

1227) Plaintiff's injuries and damages were a direct result of the Defendants' actions.

## COUNT TWENTY-SEVEN

**1228) Intentional and/or unintentional Tort in Texas, New York, New Jersey, California and/or other states.**

**1229)** The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1230) All defendants caused torts against Plaintiff intentionally by not allowing him to travel and by mistreating him as described above. The injuries and damages caused by their actions and inactions are described herein in detail.

1231) The airlines, medical defendants, attorneys, and employees all are liable for their actions that caused the herein described damages.

1232) The federal agencies, the President, and their employees were equally the causation behind these torts.

1233) In some cases and with some Defendants, if they prove that it was unintentional, they are still liable for their actions, and damages that they caused.

1234) Plaintiff filed directly with the agencies, and was denied, and is therefore entitled by law to sue them in this complaint.

## COUNT TWENTY-EIGHT

**1235) Causing injuries and damages through Negligence, in Texas, New York, New Jersey, California, and many other states.**

1236) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

**1237)** Defendants had a duty to treat Plaintiff with decency, to help him circumvent a policy that would cause him the inability to travel and/or the suffering due to his disability.

1238) All defendants failed to do that which an ordinarily prudent person in the exercise of ordinary care would have done, therefore causing him the injuries and damages caused by their actions and inactions are described herein in detail.

1239) The airlines, medical defendants, attorneys, and employees all are liable for their actions that caused the herein described damages.

1240) The federal agencies, the President, and their employees were equally involved in this negligence.

1241) Plaintiff filed directly with the agencies, and was denied, and is therefore entitled by law to sue them in this complaint.

## COUNT TWENTY-NINE

**1242) Infliction of emotional distress in Texas, New Jersey, New York, and California as well as many other states.**

1243) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

**1244)** Defendants had a duty to treat Plaintiff with decency, to help him circumvent a policy that would cause him the inability to travel and/or the suffering due to his disability.

1245) All defendants failed participated in this joint oppression, intentionally and deliberately inflicting emotional distress on Plaintiff, therefore causing him the injuries and damages caused by their actions and inactions as described herein in detail.

1246) The airlines, medical defendants, attorneys, and employees all are liable for their actions that caused the herein described damages.

1247) The federal agencies, the President, and their employees were equally involved in this negligence.

1248) Plaintiff filed directly with the agencies, and was denied, and is therefore entitled by law to sue them in this complaint.

## COUNT THIRTY

**1249) States of Texas, New York, New Jersey, and California; BREACH OF CONTRACT: Forcing this passenger to wear a mask when not part of the contract; & for Not accommodating passenger's special needs as required in the contract**

1250) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1251) The airlines that Plaintiff purchased tickets on, breached their contract by forcing him to wear a mask, attempting to force him to wear a mask, by not allowing him to fly if he does not wear a mask, and/or by not accommodating his special needs.

1252) In the Statement of Facts above and within the attached exhibits, the details of the specific airlines where Plaintiff purchased a ticket are described.

1253) The airlines included in this count are American, British, Delta, ELAL, and JetBlue.

1254) The Airlines include no provisions in their contract of carriage mandating that passenger wear face coverings. The contract requires them to fly the passenger to his destination. Forcing passengers to wear a mask or else he cannot fly, constitutes a breach of contract.

1255) These airlines breached their contracts by forcing Plaintiff to either wear a mask, or did not allow him to fly without one, and/or by not accommodating his disability as described herein.

1256) Now, if there is a law requiring masks, then those people required by that law to wear a mask, may have to wear a mask. The airline and its employees cannot force someone who is exempt by those laws due to his disability, to wear a mask.

1257) This Claim is not preempted by the ADA, as per the Wolens Exemption, The Supreme Court recognized an exception to the ADA for contract claims "alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's breach of its own, self-imposed undertakings." American Airlines, Inc. v. Wolens, 513 U.S. 219,220 (1995).  This is often referred to as the Wolens exception.

1258) While the airline defendants have erroneously claimed that they refused to transport these passengers based on safety concerns and the implementation of federal executive orders regarding such concerns, the reality is not at all that way.

They say that they're following these federal agencies. The Federal orders initially came from the CDC and then the TSA practically copied them. The CDC clearly exempts people with disabilities and in the recent case in its Appellate Brief, the CDC explains the following:

"'As in Biden v. Missouri, there is no plausible contention that the exceptions to the mask requirement render it useless in curbing the spread of COVID-19... the exceptions in the CDC's transportation mask order are tailored to minimize the risks of transmission. For example, allowing people to remove their masks "for brief periods" when eating or drinking and "temporarily" when unable to breathe, 86 Fed. Reg. at 8027 & n.7, is consistent with the goal of reducing COVID-19 spread in transportation Settings." (Appellate Brief by the CDC, HEALTH FREEDOM DEFENSE FUND, INC. v. Joseph R. Biden et al, In the 11th Circuit Court Case No. 22-11287 Doc. 8)

1259) The CDC was explaining the intentions and the goals of their mask mandate. They said very clearly that the exemptions for people with disabilities who cannot wear a mask would be fine within this process, and would not pose a safety issue. That the goals of their mandate would be successful.

1260) There was no safety concern for the airline. The airlines themselves wrote a letter to President Biden saying this very clearly (see above). They claim that an airplane is one of the safest places with regards to Covid. The only concern that is possible, is that they would have to explain to other passengers why one of them is not wearing a mask. They chose to ban us rather than properly deal with that issue. As the CDC explains, there is no safety concern from allowing exemptions, just like there's no safety concern from allowing babies under two

years old, and there's no safety concern by allowing all passengers to eat their

meals without wearing a mask.  Therefore, the Wolens Exemption applies here and

the Airline Defendants are liable for their breach of contract.

1261) Defendants are responsible for damages and other relief for breach of

contract.

1262) All defendants that were not directly involved in this violation, still

aided and abetted this breach of contract.

1263) Therefore, all listed Defendants in this count liable to Plaintiff for the

breach of contract.

1264) Plaintiff's injuries and damages were a direct result of the Defendants'

actions.

1265) The ADA does not preempt breach of contract, similar to the Wolens

exemption and multiple caselaw where ADA only preempts laws that interfere

with or are in conjunction with ADA laws. For example, if a flight attendant

murders a passenger in flight, would ADA law preempt murder charges? Of course

not. ADA only preempts laws and claims that overlap with or are also contained in

ADA laws.

1266) In this case, the only time ADA law would control these claims,

would be if the airlines' actions were in line with the ADA authorizing airlines to

make decisions for the safety of the passengers.  ADA allows air carriers to "refuse

to transport a passenger . . . the carrier decides is, or might be inimical to safety."

49 U.S.C.A. § 44902(a)(2).  If a carrier takes an action that will clearly protect the

passengers and/or the crew from a safety situation, then, sure, the ADA would

preempt.

1267) The airlines mask actions denying the disabled may seem to be related

to safety, but the evidence proves otherwise. As described herein, the airlines

actions forcing mask wearing and denying the disabled their human rights, have no

connection to the safety or health of anyone.

1268) First, the CDC in its appellate brief clarifies this (as shown above), by

saying that the exemptions for under 2-years old, for the disabled, and for people to

eat, and similar, is within the goals of the mandate and will not reduce from the

benefits and purposes of the mandates goals to reduce transmission. If forcing a

disabled person to wear a mask or ban him from flying, would have significant

benefits to safety and/or health, then the CDC's appeal is automatically wrong and

the judge who determined that the mandate was arbitrary and capricious is proven

correct. The entire basis of the CDC's arguments is based on the idea that

exemptions are in no way a reduction in health or safety of the flights.

1269) Second, the airlines themselves made it very clear in two letters,

where they are very clear that the airplane is one of the safest environments and

wearing a mask is totally unnecessary.

1270) Once it is clear that there is no connection to safety, there's no overlap with ADA laws, and therefore there's no ability for ADA law to preempt these laws.

## COUNT THIRTY-ONE

### 1271) PROMISSORY ESTOPPEL

1272) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1273) Defendants in their advertisements, on their websites, in their brochures and statements all allege that they are decent people, that they will treat those with disabilities and/or special needs with care.

1274) They violated that promise horribly, and mistreated this Plaintiff, causing injuries and damages as described herein.

1275) Even the federal agencies and employees committed to such special treatment for those with disabilities.

1276) Therefore, all listed Defendants in this count are liable to Plaintiff for the breach of their commitments.

1277) Plaintiff's injuries and damages were a direct result of the Defendants' actions.

## COUNT THIRTY-TWO

### 1278) TORTIOUS INTERFERENCE

1279) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1280) Defendants, HHS, CDC, NIH, and the attorneys wrongfully interfered in Plaintiff's contracts with the airlines, both as described in the Breach of Contract cause of action, and in the Estoppel cause of action.

1281) Defendants were aware that there was a contract and/or understanding where the airlines committed to accommodate disabled people including this Plaintiff, and make sure that he can be treated well and be able to fly like non-disabled people.

1282) By creating and encouraging illegal laws and regulations, and by saying that airlines are not required to uphold those commitments, these federal agencies interfered in those contractual obligations causing injuries and damages to Plaintiff.

1283) Therefore, they are liable to Plaintiff for the breach of the airlines' commitments, that they caused and encouraged.

1284) Plaintiff's injuries and damages were a direct result of the Defendants' actions.

## COUNT THIRTY-THREE

### 1285) INJURIOUS FALSEHOODS

1286) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1287) All the Defendants maliciously made false statements recklessly and without regard to their consequences, and that a reasonably prudent person would have or should have anticipated that damage to the plaintiff would result.

1288) Those statements are mostly described above, including, but not limited to the following:

1289) "Masks will protect you from Covid 19."

1290) "People with disabilities who cannot wear a mask pose a direct threat to the passengers and crew."

1291) "Covid 19 is an extremely dangerous disease."

1292) "Disability laws do not require you to accommodate a disabled person who cannot wear a mask.

1293) There were many more false statements as described herein and in the exhibits.

1294) Therefore, they are liable to Plaintiff for the damages caused by their lies.

1295) Plaintiff's injuries and damages were a direct result of the Defendants'

actions.

## COUNT THIRTY-FOUR

**1296) INVASION OF PRIVACY: Requiring Plaintiff to disclose his medical condition in order to travel.**

1297) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1298) All the Defendants either directly or with their guidance and help caused Plaintiff to be forced to disclose his medical condition and describe in detail his disabilities in order to possibly get an opportunity to fly with them.

1299) A violation of a person's privacy is a violation of US Constitution. The First Amendment provides the freedom to choose any kind of religious belief and to keep that choice private.

1300) The Third Amendment protects the zone of privacy in the home.

1301) The Fourth Amendment protects the right of privacy against unreasonable searches and seizures by the government.

1302) The Fifth Amendment provides for the right against self-incrimination, which justifies protection of private information.

1303) The Ninth Amendment, interpreted as justifying a broad reading of the Bill of Rights, protects your fundamental right to privacy in ways not

provided for in the first thru the eighth amendments, which would also include the circumstances here.

1304) The Fourteenth Amendment prohibits states from making laws that infringe upon the personal autonomy protections provided for in the first thirteen amendments.

1305) It is also in the Constitutions of the various states where these violations happened.

1306) For example: Medical information is confidential and private under Calif. Const. Art. I § 1: "All people are by nature free and independent and have inalienable rights. Among these are enjoying and defending life and liberty, acquiring, possessing, and protecting property, and pursuing and obtaining safety, happiness, and privacy."

1307) All Defendants violated Plaintiff's right to privacy, causing shame, discomfort, anxiety, and trauma.

1308) Defendant's actions directly caused Plaintiff's injuries and damages.

1309) As described above in Count 30 regarding breach of contract, since this is not a safety issue, as per the CDC and as per the airlines' letters showing that the airplane is extremely safe, there is no ADA preemption appropriate here.

## COUNT THIRTY-FIVE

**1310) MEDICAL MALPRACTICE against medical defendants.**

1311) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1312) plaintiff has been subjected to illegal medical consultations with STAT-MD and/or MedAire.

1313) STAT-MD and MedAire, with no legal authority, reviews mask-exemption demands submitted by its airline clients without ever talking to the passenger and/or his/her physician.

1314) STAT-MD and MedAire make arbitrary determinations denying mask exemptions without providing any rationale for their decision-making.

1315) The Air Carrier Access Act does not allow STAT-MD and MedAire to provide medical consultations to airlines for disability accommodation requests except in very limited circumstances. Those situations do not include mask waivers.

1316) STAT-MD and MedAire are therefore guilty of medical malpractice.

1317) Their medical consultations that are done in the distance without seeing the patient, and without getting the full information, are then used by them and the airlines as a way and an excuse to ban this Plaintiff from flying, and to authorize the airlines to discriminate in other ways as described herein.

1318) Plaintiff's injuries and damages were a direct result of the Defendants' actions.

## COUNT THIRTY-SIX

**1319) FRAUDULENT MISREPRESENTATION.**

1320) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1321) The Airline Defendants, with the help and coordination of the other Defendants, provide FDA unauthorized or EUA face masks without disclosing that: 1) the masks (if authorized at all) are only designated for emergency use; 2) that there are "significant known and potential benefits and risks of such use" (or "the extent to which such benefits and risks are unknown"); or 3) flyers have the "option to accept or refuse administration of the product."

1322) The Defendants have falsely represented on their websites, in e-mails to passengers, signage at airports, etc. that "federal law" requires airline passengers wear face masks. But Congress has never enacted such a law. There is no statute in the U.S. Code requiring airline passengers to cover our faces. This is a fraudulent misrepresentation of the law.

1323) The Defendants also haven't told their anyone of the dozens of health risks of covering our sources of oxygen or that the scientific consensus is that

masks are totally worthless in reducing COVID-19 spread, as described herein.

1324) Failing to disclose this information pursuant to the FDCA and the Airline Defendants' other legal obligations is a fraudulent misrepresentation.

1325) This tort consists of: 1) There was a material representation made that was false; 2) The person who made the representation knew the representation was false or made it recklessly as a positive assertion without any knowledge of its truth; 3) The person who made the representation intended to induce another to act upon the representation; and 4) The person to whom the material representation was made actually and justifiably relied on the representation, which directly caused the injuries described herein.

1326) Lying about the truth of the masks, assumably for political purposes, created a complete fantasy mask wearing world that was almost insane.

1327) The damages to this Plaintiff by these lies were so severe to a point where his life was destroyed as described above and as further evidence will be provided during the discovery process.

1328) As described above in Count 30, regarding breach of contract, since this is not a safety issue, as per the CDC and as per the airlines' letters showing that the airplane is extremely safe, there is no ADA preemption appropriate here.

## COUNT THIRTY-SEVEN

**1329) Infringement on the constitutional right to travel.**

1330) The Plaintiff realleges and incorporates by reference herein all of the facts and allegations contained in paragraphs above, and further alleges:

1331) The Constitution protects against Americans' infringement on our freedom of movement by government actors and common carriers.

1332) The Airline Defendants deprived this disabled American who cannot wear masks for health reasons, of the ability to fly. All the other defendants assisted, and aided and abetted.

1333) By banning disabled travelers who can't wear face masks and should be exempt from such policies, the Defendants deprived Plaintiff of his constitutional right to freedom of movement.

1334) "As a fundamental right inherent in American citizenship and the nature of the federal union, the right to travel in the United States is basic to American liberty. The right precedes the creation of the United States and appears in the Articles of Confederation. The U.S. Constitution and Supreme Court recognize and protect the right to interstate travel. The travel right entails privacy and free domestic movement without governmental abridgement."

1335) "The original conception of the right to travel embodies it as a broadly based freedom that encompasses all modes of transport. Its explicit articulation in

the Articles of Confederation became implicit in the Privileges and Immunities Clause of the Constitution. … abridgement of any mode of transportation undermines the constitutionally enshrined travel right." Id.

1336) "Travel embodies a broadly based personal, political, and economic right that encompasses all modes of transportation and movement. … The right to travel, inherent in intercourse among the states, is one of the implied and unenumerated rights reserved to the People." Id.

1337) The Supreme Court has held that private companies can also be held liable for interfering with a person's constitutional right to travel: "[T]he decision reaffirmed the right to travel, as 'a right broadly assertable against private interference as well as governmental action.' In short, the travel right protects against both restrictive public and private actions, and it empowers those availing themselves of the right's protections." Id.; see Shapiro v. Thompson, 394 U.S. 618 (1969).

1338) United States v. Guest, 383 U.S. 745 (1966), affirmed the "constitutional right to travel from one State to another, and necessarily to use the highways and other instrumentalities of interstate commerce [such as commercial airlines] in doing so, occupies a position fundamental to the concept of our Federal Union. It is a right that has been firmly established and repeatedly recognized." Id

1339) Congress affirmed the constitutional right to fly for disabled

Americans by enshrining it into statute. 49 USC § 40103.

1340) "[T]he right to travel is not tied to any specific mode of transportation. Consequently, it encompasses all means of travel. ... From the perspective of individual rights, the ability to move freely in the United States is a personal liberty, inherent by birth and U.S. citizenship. The travel right is essential to guaranteeing equality of opportunities, and the pursuit of happiness for citizens of the federal union. Freedom of personal movement is a natural liberty that citizens exercise among fundamental rights and privileges."

1341) "The travel right also includes the right to movement on common carriers. 'A carrier becomes a common carrier when it 'holds itself out' to the public, or to a segment of the public, as willing to furnish transportation within the limits of its facilities to any person who wants it.' That means that any individual or corporation becomes a common carrier by promoting to the public the ability and willingness to provide transportation service, including air travel. Air transport providers operating in, to, or from the United States act under common carrier rules. 'An air carrier ... may not subject a person in air transportation to discrimination...' If there are available places, the charge is paid, and there are no reasonable grounds to refuse the service to an individual, the air carrier is legally bound to provide the transportation of passengers or goods. Denying someone passage violates federal law." Id.

1342) "The air travel network is a part of the public infrastructure open for wide use and enjoyment. The national government advances these goals by ensuring by law that all citizens have adequate access to the air system. ... Therefore, under not only general U.S. sovereignty but also the public right of transit, freedom of travel includes air travel." Id.

1343) "Commercial air service is the only mode of passenger common carrier transportation available between many U.S. locations, especially American states and territories outside the continental union." Id.

1344) "The impact on a citizen who cannot use a commercial aircraft is profound. He is restricted in his practical ability to travel substantial distances within a short period of time, and the inability to fly to a significant extent defines the geographical area in which he may live his life. ... An inability to travel by air also restricts one's ability to associate more generally, and effectively limits educational, employment and professional opportunities." Id.; see Mohamed v. Holder, 2014 WL 243115 (E.D. Va. Jan. 22, 2014).

1345) "Traveling long distances within the contiguous United States relies on only one mode of travel: commercial airlines. Therefore, restricting this single mode of travel, by air, abridges the right to travel and the right to exercise political and personal liberties." Id.

1346) The right to travel includes the right to move from state to state and

abroad without burdens on a person's body such as obstructing his/her breathing: "An individual's liberty may be harmed by an act that causes or reasonably threatens a loss of physical locomotion or bodily control." Id. (emphasis added).

1347) Therefore, they are liable to Plaintiff for the injuries and damages that they caused and encouraged.

1348) Plaintiff's injuries and damages were a direct result of the Defendants' actions.

## COUNT THIRTY-EIGHT

## VIOLATION OF THE UNITED STATE CONSTITUTION Article I, § I: Agency action violates the NON-DELEGATION DOCTRINE.

1349) Plaintiffs incorporate the foregoing paragraphs as if set forth fully herein, and further alleges.

1350) Article I, Section I of the U.S. Constitutions states, "All legislative powers herein granted shall be vested in a Congress of the United States." Beyond exceeding the authority granted to the CDC under 42 U.S.C. § 264 and the relevant regulations, the CDC Mask Mandate also constitutes an unconstitutional delegation of legislative power to the CDC.

1351) To comply with the non-delegation doctrine, a statute must delineate: (1) a general policy; (2) the agency to apply it; and (3) the boundaries of the

delegated authority. See Mistretta v. United States, 488 U.S. 361, 372-73 (1989). The boundaries of the delegated authority must meaningfully constrain the Executive Branch's discretion.

1352) If 42 U.S.C. § 264 could, in fact, be read to authorize the CDC to implement the Mask Mandate (which should not be the case), it does not provide adequate boundaries that meaningfully constrain the agency's authority. Accordingly, it violated the non-delegation doctrine. Plaintiff alleges that both on its face and as applied, the CDC Mask Mandate violated our constitutional rights.

1353) Plaintiffs were irreparably harmed until Judge Mizelle enjoined Federal Defendants from enforcing the CDC Mask Mandate on April 18, 2022. However, Plaintiff still has no plain, speedy, and adequate remedy at law to prevent Federal Defendants from enforcing the next Mask Mandate, if not enjoined by this Court. Federal Defendants will continue to enforce the next Mask Mandate in violation of Plaintiff's rights. Accordingly, declaratory relief is appropriate.

1354) An actual and substantial controversy exists between Plaintiffs and Federal Defendants as to our legal rights and duties with respect to whether the CDC Mask Mandate violated the United States Constitution. The case is presently justifiable because the CDC Mask Mandate applies to Plaintiff on its face, and Plaintiffs will again face sanctions if he does not comply with the next mandate, which can be in effect at any time, Declaratory relief is therefore appropriate to

resolve this controversy.

1355) The U.S. Government Accountability Office is a legislative branch government agency that provides auditing, evaluative, and investigative services for the United States Congress. It is the supreme audit institution of the federal government of the United States.

1356) The Government Accountability Office (GAO) is known as "the investigative arm of Congress" and "the congressional watchdog." GAO supports the Congress in meeting its constitutional responsibilities and helps improve the performance and accountability of the federal government for the benefit of the American people.

1357) GAO has the power to investigate and oversee the activities of the executive branch, the power to control the use of federal funds, and the power to make laws.

1358) Regarding the CDC Mask Mandate, the GAO said, "Accordingly, before it can take effect, the Mask Requirement is subject to the requirement that it be submitted to both Houses of Congress and the Comptroller General for review, which provides Congress a period of 60 days in which it may disapprove the rule using special procedures in accordance with the CRA."

1359) Because CDC and HHS did not submit the CDC Mask Mandate rule to Congress and the comptroller general, it never had any legal effect. Government

Accountability Office Decision B-333,501 (Dec. 14, 2021); Exhibit 82.

1360) This is not a case where "federal courts do not have jurisdiction over statutory claims that arise under the CRA." Ctr. for Biological Diversity v. Bernhardt, 946 F.3d 553, 563 (9th Cir. 2019). The CRA is not involved. NO statutory claims arose under the CRA, because the CDC failed to follow procedures, without which the CDC Mask Mandate could not be enacted at all.

1361) On March 15, 2022, the Senate voted 57-40 to pass Senate Joint Resolution 37 disapproving of CDC's CDC Mask Mandate order. "[S]uch rule shall have no force or effect." Exhibit 82.

1362) A court must "hold unlawful and set aside agency action … found to be … without observance of procedure required by law." 5 USC § 706(2)(D).

1363) This Court has jurisdiction over a claim for declaratory relief. This court should declare that the CDC Mask Mandate is unauthorized and was never in effect as a legal order or mandate.

**PRAYER FOR RELIEF**

WHEREFORE, plaintiff prays for relief as follows:

A.    Declare the President's Executive Order 13998, which directs the heads of certain Federal agencies to take immediate actions to require mask-

wearing in domestic and international transportation, contrary to statute and unconstitutional; vacate the order, and permanently enjoin its enforcement worldwide.

B.    Declare Defendants CDC and HHS' Feb. 1, 2021, Federal Transportation Mask Mandate order "Requirement for Persons to Wear Masks While on Conveyances & at Transportation Hubs" (86 Fed. Reg. 8,025 (Feb. 3, 2021)) contrary to statute and unconstitutional; vacate the order, and permanently enjoin its enforcement worldwide.

C.    Declare that the CDC Mask Mandate was never legal, and never a valid mandate or order.

D.    Issue a permanent injunction that Defendants CDC and HHS shall not issue any other orders requiring any person wear a face mask unless such specific authority is enacted into law by Congress.

E.    Declare that the Airline Defendants' mask policies violate ACAA and the Rehabilitation Act by discriminating against the disabled and issue a permanent injunction prohibiting them from engaging in such future conduct.

F.    Declare that the Airline Defendants' policies requiring passengers not known to have a communicable disease to wear a face covering violate the Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

G.    Declare that the Airline Defendants' policies of refusing to provide mask exemptions to the disabled violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

H.    Declare that the Airline Defendants' policies refusing transportation solely on the basis of a passenger's disability violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

I.    Declare that the Airline Defendants' policies requiring passengers seeking mask exemptions to do so in advance violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

J.    Declare that the Airline Defendants' policies requiring a medical certificate from disabled passengers who ask for a mask exemption violate the Rehabilitation Act and Air Carrier Access Act and issue a permanent injunction prohibiting them from engaging in such future conduct.

K.    Declare that every airline must not request or require the disabled to do anything different than non-disabled passengers, as per ACAA laws, and enjoin them permanently from doing so.

L.    Declare that the Airline Defendants' policies forcing passengers to

wear masks when they never agreed to do so in the contract of carriage constitute a breach of contract and/or the contracts contain provisions that are unenforceable because they violate federal law and regulations.

M.  For all causes of action in which monetary damages are available, award the plaintiff compensatory damages against all Defendants in the amount of up to $4.5 Billion Dollars USD, for discriminating and violating Plaintiff's civil rights, as per the losses described herein. (The above amount is based on Unruh damages available up to three times the losses).

N.  Also, Award Plaintiff nominal damages from each Defendant for discriminating against him and causing him injuries and damages.

O.  Levy on all Defendants punitive damages for the multiple violations of the various statutes that punitive damages are appropriate for, considering each day of violations as another full set of violations. As punitive damages are necessary in order to discourage future violations of the same, and when the violations were so egregious, where the violators are still unapologetic and holding their ground; the punitive damages should be at least ten million dollars per Defendant. Anything less than that would not be very effective in stopping future violations.

P.  Award plaintiff all costs and fees incurred during the prosecution of this lawsuit from all defendants pursuant to 28 USC § 2412, 29 USC § 794a, 42

USC § 1988, Calif. Civil Code §§ 52(a), 54.3(a), & 55, and/or any other applicable statute or authority.

Q.    Award all plaintiff's attorney's fees (if he were to later hire an attorney to represent him in this lawsuit) incurred during the prosecution of this lawsuit from any defendant found to have acted outside its legal and/or constitutional authority pursuant to 28 USC § 2412, 29 USC § 794a, 42 USC § 1988, Calif. Civil Code §§ 52(a), 54.3(a), & 55, and/or any other applicable statute or authority; or, if he continues representing himself, award him in lieu of attorney's fees reimbursement at the rate of $100 per hour for the time he has spent litigating this matter.

R.    Grant such other and further relief as the Court may deem just and proper under the circumstances.


Respectfully submitted this 26th day of April, 2023,


Aaron Abadi, plaintiff
Apt. 140
82 Nassau St.
New York, NY 10038
Telephone: 516-639-4100
E-Mail: aa@neg.com