EXHIBIT 12

 **U.S. Equal Employment Opportunity Commission**

# Pandemic Preparedness in the Workplace and the Americans with Disabilities Act

This technical assistance document was issued upon approval of the Chair of the U.S. Equal Employment Opportunity Commission.

**OLC Control Number:**

EEOC-NVTA-2009-3

**Concise Display Name:**

Pandemic Preparedness in the Workplace and the Americans with Disabilities Act

**Issue Date:**

10-09-2009

**General Topics:**

ADA/GINA

**Summary:**

This document provides information about the ADA and pandemic planning in the workplace.

**Citation:**

ADA, Rehabilitation Act, 29 CFR Part 1630

**Document Applicant:**

Health Care Providers, Employees, Employers, Applicants, HR Practitioners

**Previous Revision:**

No

The contents of this document do not have the force and effect of law and are not meant to bind the public in any way. This document is intended only to provide clarity to the public regarding existing requirements under the law or agency policies.

# I. INTRODUCTORY INFORMATION

## A. PURPOSE

This technical assistance document provides information about Titles I and V of the **Americans with Disabilities Act (https://www.eeoc.gov/statutes/titles-i-and-v-americans-disabilities-act-1990-ada)** (ADA) and Section 501 of the Rehabilitation Act and pandemic planning in the workplace.[1] **(https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#1)** **This document was originally issued in 2009, during the spread of H1N1 virus, and was re-issued on March 19, 2020 and revised thereafter, to incorporate updates regarding the COVID-19 pandemic.** It identifies established ADA principles that are relevant to questions frequently asked about workplace pandemic planning such as:

- How much information may an employer request from an employee who calls in sick, in order to protect the rest of its workforce when an influenza or coronavirus pandemic appears imminent?

- When may an ADA-covered employer take the body temperature of employees during a pandemic?

- Does the ADA allow employers to require employees to stay home if they have symptoms of the pandemic influenza or coronavirus?

- When employees return to work, does the ADA allow employers to require doctors' notes certifying their fitness for duty?

In one instance, to provide a complete answer, this document provides information about religious accommodation and Title VII of the Civil Rights Act of 1964.

## B. BACKGROUND INFORMATION ABOUT PANDEMIC INFLUENZA AND OTHER PANDEMICS

A "pandemic" is a global "epidemic."[2] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#2). The world has seen **four** influenza pandemics in the last century. The deadly "Spanish Flu" of 1918 was followed by the milder "Asian" and "Hong Kong" flus of the 1950s and 1960s. While the SARS coronavirus outbreak in 2003 was considered a pandemic "scare,"[3] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#3). the H1N1 influenza outbreak in 2009 rose to the level of a pandemic.[4] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#4)

**\*On March 11, 2020, the coronavirus disease (COVID-19) was also declared a pandemic.**

The U.S. Department of Health and Human Services (HHS), Centers for Disease Control and Prevention (CDC), and the World Health Organization (WHO) are the definitive sources of information about pandemics. The WHO decides when to declare a pandemic.[5] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#5) Pandemic planning and pandemic preparedness include everything from global and national public health strategies to an individual employer's plan about how to continue operations.[6] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#6)

**\*The new information added to this EEOC technical assistance document in 2020 about COVID-19 focuses on implementing these strategies in a manner that is consistent with the ADA and with current CDC and state/local guidance for keeping workplaces safe during the COVID-19 pandemic.  This document recognizes that guidance from public health authorities will change as the COVID-19 situation evolves.**

# II. RELEVANT ADA REQUIREMENTS AND STANDARDS

The ADA, which protects applicants and employees from disability discrimination, is relevant to pandemic preparation in at least three major ways. First, the ADA regulates employers' disability-related inquiries and medical examinations for all applicants and employees, including those who do not have ADA disabilities.[7] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#7). Second, the ADA prohibits covered employers from excluding individuals with disabilities from the workplace for health or safety reasons unless they pose a "direct threat" (i.e. a significant risk of substantial harm even with reasonable accommodation).[8] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#8). Third, the ADA requires reasonable accommodations for individuals with disabilities (absent undue hardship) during a pandemic.[9] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#9)

This section summarizes these ADA provisions. The subsequent sections answer frequently asked questions about how they apply during an influenza or coronavirus pandemic. The answers are based on existing EEOC guidance regarding disability-related inquiries and medical examinations, direct threat, and reasonable accommodation.[10] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#10)

## A. DISABILITY-RELATED INQUIRIES AND MEDICAL EXAMINATIONS

The ADA prohibits an employer from making **disability-related inquiries** and requiring **medical examinations** of employees, except under limited circumstances, as set forth below.[11] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#11)

### 1. Definitions: Disability-Related Inquiries and Medical Examinations

An inquiry is **"disability-related"** if it is likely to elicit information about a disability.[12] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#12). For example, asking an individual if his immune system is compromised is a disability-related

inquiry because a weak or compromised immune system can be closely associated with conditions such as cancer or HIV/AIDS.**[13] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#13)**. By contrast, an inquiry is not disability-related if it is not likely to elicit information about a disability. For example, asking an individual about symptoms of a cold or the seasonal flu is not likely to elicit information about a disability.

A **"medical examination"** is a procedure or test that seeks information about an individual's physical or mental impairments or health.**[14] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#14)**. Whether a procedure is a medical examination under the ADA is determined by considering factors such as whether the test involves the use of medical equipment; whether it is invasive; whether it is designed to reveal the existence of a physical or mental impairment; and whether it is given or interpreted by a medical professional.

## 2. ADA Standards for Disability-Related Inquiries and Medical Examinations

The ADA regulates disability-related inquiries and medical examinations in the following ways:

- **Before a conditional offer of employment:** The ADA prohibits employers from making disability-related inquiries and conducting medical examinations of applicants before a conditional offer of employment is made.**[15] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#15)**

- **After a conditional offer of employment, but before an individual begins working:** The ADA permits employers to make disability-related inquiries and conduct medical examinations if all entering employees in the same job category are subject to the same inquiries and examinations.**[16] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#16)**

- ***NOTE:  New questions 16-19 below address specific questions about hiring during the COVID-19 pandemic.***

- **During employment:** The ADA <u>prohibits</u> employee disability-related inquiries or medical examinations unless they are job-related and consistent with business necessity. Generally, a disability-related inquiry or medical examination of an employee is job-related and consistent with business necessity when an employer has a reasonable belief, based on objective evidence, that:

> An employee's ability to perform essential job functions will be impaired by a medical condition; or
>
> An employee will pose a direct threat due to a medical condition.**[(17) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#17)](https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#17)**

This reasonable belief "must be based on objective evidence obtained, or reasonably available to the employer, prior to making a disability-related inquiry or requiring a medical examination."**[(18) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#18)](https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#18)**

All information about applicants or employees obtained through disability-related inquiries or medical examinations must be kept **confidential**.**[(19) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#19)](https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#19)** Information regarding the medical condition or history of an employee must be collected and maintained on separate forms and in separate medical files and be treated as a confidential medical record.

## B. DIRECT THREAT

A **"direct threat"** is "a significant risk of substantial harm to the health or safety of the individual or others that cannot be eliminated or reduced by reasonable accommodation."**[(20) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#20)](https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#20)** If an individual with a disability poses a direct threat despite reasonable accommodation, he or she is not protected by the nondiscrimination provisions of the ADA.

Assessments of whether an employee poses a direct threat in the workplace must be based on objective, factual information, "not on subjective perceptions . . . [or] irrational fears" about a specific disability or disabilities.[21] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#21). The EEOC's regulations identify four factors to consider when determining whether an employee poses a direct threat: (1) the duration of the risk; (2) the nature and severity of the potential harm; (3) the likelihood that potential harm will occur; and (4) the imminence of the potential harm.[22] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#22)

## DIRECT THREAT AND PANDEMIC INFLUENZA, COVID-19, AND OTHER PUBLIC HEALTH EMERGENCIES

**Direct threat** is an important ADA concept during an influenza or coronavirus pandemic.

Whether pandemic influenza or coronavirus rises to the level of a direct threat depends on the severity of the illness. If the CDC or state or local public health authorities determine that the illness is like seasonal influenza or the 2009 spring/summer H1N1 influenza, it would not pose a direct threat or justify disability-related inquiries and medical examinations. By contrast, if the CDC or state or local health authorities determine that pandemic influenza or coronavirus is significantly more severe, it could pose a direct threat. The assessment by the CDC or public health authorities would provide the objective evidence needed for a disability-related inquiry or medical examination.

During a pandemic, employers should rely on the latest CDC and state or local public health assessments. While the EEOC recognizes that public health recommendations may change during a crisis and differ between states, employers are expected to make their best efforts to obtain public health advice that is contemporaneous and appropriate for their location, and to make reasonable assessments of conditions in their workplace based on this information.

*Based on guidance of the CDC and public health authorities as of March 2020, the COVID-19 pandemic meets the direct threat standard. The CDC and other public health authorities have acknowledged that COVID-19 is highly contagious and potentially fatal. Due to the community spread of COVID-19 in the United States, these authorities have issued precautions to slow the spread, such as urging significant restrictions on public gatherings. In addition, numerous state and local authorities have issued closure orders for businesses, entertainment and sport venues, and schools in order to avoid bringing people together in close quarters due to the risk of contagion or instituted masking requirements in public places. These facts manifestly support a finding that a significant risk of substantial harm would be posed by having someone with COVID-19, or symptoms of it, present in the workplace at the current time. At such time as the CDC and state/local public health authorities revise their assessment of the spread and severity of COVID-19, that could affect whether a direct threat still exists.

## C. REASONABLE ACCOMMODATION

A **"reasonable accommodation"** is a change in the work environment that allows an individual with a disability to have an equal opportunity to apply for a job, perform a job's essential functions, or enjoy equal benefits and privileges of employment.**[23] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#23)**

An accommodation poses an **"undue hardship"** if it results in significant difficulty or expense for the employer, taking into account the nature and cost of the accommodation, the resources available to the employer, and the operation of the employer's business.**[24] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#24)** If a particular accommodation would result in an undue hardship, an employer is not required to provide it but still must consider other accommodations that do not pose an undue hardship.**[25] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#25)**

Generally, the ADA requires employers to provide reasonable accommodations for known limitations of applicants and employees with disabilities. **(26) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#26)**

# III. ADA-COMPLIANT EMPLOYER PRACTICES FOR PANDEMIC PREPAREDNESS

The following Questions and Answers are designed to help employers plan how to manage their workforce in an ADA-compliant manner before and during a pandemic.

## A. BEFORE A PANDEMIC

HHS advises employers to begin their pandemic planning by identifying a "pandemic coordinator and/or team with defined roles and responsibilities for preparedness and response planning."**(27) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#27)**. This team should include staff with expertise in all equal employment opportunity laws.**(28) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#28)**. Employees with disabilities should be included in planning discussions, and employer communications concerning pandemic preparedness should be accessible to employees with disabilities.

When employers begin their pandemic planning, a common ADA-related question is whether they may survey the workforce to identify employees who may be more susceptible to complications from pandemic influenza or coronavirus than most people.

**1. Before an influenza or coronavirus pandemic occurs, may an ADA-covered employer ask an employee to disclose if he or she has a compromised immune system or chronic health condition that the CDC says could make him or her more susceptible to complications of influenza or coronavirus?**

No. An inquiry asking an employee to disclose a compromised immune system or a chronic health condition is disability-related because the response is likely to disclose the existence of a disability. **(29) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#29).** The ADA does not permit such an inquiry in the absence of objective evidence that pandemic symptoms will cause a direct threat. Such evidence is completely absent before a pandemic occurs.

**2. Are there ADA-compliant ways for employers to identify which employees are more likely to be unavailable for work in the event of a pandemic?**

Yes. Employers may make inquiries that are not disability-related. An inquiry is not disability-related if it is designed to identify potential non-medical reasons for absence during a pandemic (e.g., curtailed public transportation) on an equal footing with medical reasons (e.g., chronic illnesses that increase the risk of complications). The inquiry should be structured so that the employee gives one answer of "yes" or "no" to the whole question without specifying the factor(s) that apply to him. The answer need not be given anonymously.

Below is a sample ADA-compliant survey that can be given to employees to anticipate absenteeism.

**ADA-COMPLIANT PRE-PANDEMIC EMPLOYEE SURVEY**

Directions: Answer "yes" to the whole question *without specifying the factor that applies to you*. Simply check "yes" or "no" at the **bottom of the page**.

**In the event of an influenza or coronavirus pandemic, would you be unable to come to work because of any one of the following reasons:**

- If schools or day-care centers were closed, you would need to care for a child;

- If other services were unavailable, you would need to care for other dependents;

- If public transport were sporadic or unavailable, you would be unable to travel to work; and/or;

- If you or a member of your household fall into one of the categories identified by the CDC as being at high risk for serious complications from the pandemic influenza virus, you would be advised by public health authorities not to come to work (e.g., pregnant women; persons with compromised immune systems due to cancer, HIV, history of organ transplant or other medical conditions; persons less than 65 years of age with underlying chronic conditions; or persons over 65).

**Answer: YES_____ , NO_____**


### 3. May an employer require *new entering employees* to have a post-offer medical examination to determine their general health status?

Yes, if all entering employees in the same job category are required to undergo the medical examination[30] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#30) and if the information obtained regarding the medical condition or history of the applicant is collected and maintained on separate forms and in separate medical files and is treated as a confidential medical record.

**Example A**: An employer in the international shipping industry implements its pandemic plan when the WHO and the CDC confirm that a pandemic may be imminent because a new influenza or coronavirus is infecting people in multiple regions, but not yet in North America. Much of the employer's international business is in the affected regions. The employer announces that, effective immediately, its post-offer medical examinations for all entering international pilots and flight crew will include procedures to identify medical conditions that the CDC associates with an increased risk of

complications from the pandemic influenza or coronavirus. Because the employer gives these medical examinations post-offer to all entering employees in the same job categories, the examinations are ADA-compliant.

4. **May an employer rescind a job offer made to an applicant based on the results of a post-offer medical examination if it reveals that the applicant has a medical condition that puts her at increased risk of complications from the pandemic influenza or coronavirus?**

No, unless the applicant would pose a direct threat within the meaning of the ADA. A finding of "direct threat" must be based on reasonable medical judgment that relies on the most current medical knowledge and/or the best available evidence such as objective information from the CDC or state or local health authorities. The finding must be based on an individualized assessment of the individual's present ability to safely perform the essential functions of the job, after considering, among other things, the imminence of the risk; the severity of the harm; and the availability of reasonable accommodations to reduce the risk. Before concluding that an individual poses a direct threat, the employer must determine whether a reasonable accommodation could reduce the risk below the direct threat level.

**Example B**: The same international shipping employer offers a financial position at its U.S. headquarters to Steve. This position does not involve regular contact with flight crew or travel to the affected WHO region. Steve's post-offer medical examination (which is the same examination given to all U.S. headquarters employees) reveals that Steve has a compromised immune system due to recent cancer treatments. Given the fact that the position does not involve regular contact with flight crew or travel, and that the virus has not spread to North America, Steve would not face a significant risk of contracting the virus at work and does not pose a "direct threat" to himself or others in this position. Under the ADA, it would be discriminatory to rescind Steve's job offer based on the possibility of an influenza or coronavirus pandemic.

## B. DURING AN INFLUENZA OR CORONAVIRUS PANDEMIC

The following questions and answers discuss employer actions when the WHO and the CDC report an influenza or coronavirus pandemic.

### 5. May an ADA-covered employer send employees home if they display influenza-like symptoms during a pandemic?

Yes. The CDC states that employees who become ill with symptoms of influenza-like illness at work during a pandemic should leave the workplace. Advising such workers to go home is not a disability-related action if the illness is akin to seasonal influenza or the 2009 spring/summer H1N1 virus. Additionally, the action would be permitted under the ADA if the illness were serious enough to pose a direct threat. **\*Applying this principle to current CDC guidance on COVID-19, this means an employer can send home an employee with COVID-19 or symptoms associated with it.**

### 6. During a pandemic, how much information may an ADA-covered employer request from employees who report feeling ill at work or who call in sick?

ADA-covered employers may ask such employees if they are experiencing influenza-like symptoms, such as fever or chills <u>and</u> a cough or sore throat. Employers must maintain all information about employee illness as a confidential medical record in compliance with the ADA.

If pandemic influenza is like seasonal influenza or spring/summer 2009 H1N1, these inquiries are not disability-related. If pandemic influenza becomes severe, the inquiries, even if disability-related, are justified by a reasonable belief based on objective evidence that the severe form of pandemic influenza poses a direct threat.

**\*Applying this principle to current CDC guidance on COVID-19, employers may ask employees who report feeling ill at work, or who call in sick, questions about their symptoms to determine if they have or may have COVID-19. Currently these symptoms**

include, for example, fever, chills, cough, shortness of breath, or sore throat.

**7. During a pandemic, may an ADA-covered employer take its employees' temperatures to determine whether they have a fever?**

Generally, measuring an employee's body temperature is a medical examination. If pandemic influenza symptoms become more severe than the seasonal flu or the H1N1 virus in the spring/summer of 2009, or if pandemic influenza becomes widespread in the community as assessed by state or local health authorities or the CDC, then employers may measure employees' body temperature.

However, employers should be aware that some people with influenza - including the 2009 H1N1 virus* - **or with COVID-19** do not have a fever.

**\*Because the CDC and state/local health authorities have acknowledged community spread of COVID-19 and issued attendant precautions as of March 2020, employers may measure employees' body temperature. As with all medical information, the fact that an employee had a fever or other symptoms would be subject to ADA confidentiality requirements.**

**8. When an employee returns from travel during a pandemic, must an employer wait until the employee develops influenza symptoms to ask questions about exposure to pandemic influenza during the trip?**

No. These would not be disability-related inquiries. If the CDC or state or local public health officials recommend that people who visit specified locations remain at home for several days until it is clear they do not have pandemic influenza symptoms, an employer may ask whether employees are returning from these locations, even if the travel was personal.**(31) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#31)**

**\*Similarly, with respect to the current COVID-19 pandemic, employers may follow the advice of the CDC and state/local public health authorities regarding information needed to permit an employee's return to the workplace after visiting a specified location, whether for business or personal reasons.**

**9. During a pandemic, may an ADA-covered employer ask employees *who do not have influenza or coronavirus symptoms* to disclose whether they have a medical condition that the CDC says could make them especially vulnerable to influenza or coronavirus complications?**

No. If pandemic influenza or coronavirus is like seasonal influenza or the H1N1 virus in the spring/summer of 2009, making disability-related inquiries or requiring medical examinations of employees *without* symptoms is prohibited by the ADA.[32] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#32). However, under these conditions, employers should allow employees who experience flu-like symptoms to stay at home, which will benefit all employees including those who may be at increased risk of developing complications.[33] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#33)

If an employee voluntarily discloses (without a disability-related inquiry) that he has a specific medical condition or disability that puts him or her at increased risk of influenza or coronavirus complications, the employer must keep this information confidential. The employer may ask him to describe the type of assistance he thinks will be needed (e.g. telework or leave for a medical appointment). Employers should not assume that all disabilities increase the risk of influenza or coronavirus complications. Many disabilities do not increase this risk *(e.g.* vision or mobility disabilities).

If an influenza or coronavirus pandemic becomes more severe or serious according to the assessment of local, state or federal public health officials, ADA-covered employers may have sufficient objective information from public health advisories to reasonably conclude that employees will face a direct threat if they contract pandemic influenza

or coronavirus.(34) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#34). Only in this circumstance may ADA-covered employers make disability-related inquiries or require medical examinations of asymptomatic employees to identify those at higher risk of influenza or coronavirus complications.

## 10. May an employer encourage employees to telework (i.e., work from an alternative location such as home) as an infection-control strategy during a pandemic?

Yes. Telework is an effective infection-control strategy that is also familiar to ADA-covered employers as a reasonable accommodation. (35) (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#35)

In addition, employees with disabilities that put them at high risk for complications of pandemic influenza or coronavirus may request telework as a reasonable accommodation to reduce their chances of infection during a pandemic.

## 11. During a pandemic, may an employer require its employees to adopt infection-control practices, such as regular hand washing, at the workplace?

Yes. Requiring infection control practices, such as regular hand washing, coughing and sneezing etiquette, and proper tissue usage and disposal, does not implicate the ADA.

## 12. During a pandemic, may an employer require its employees to wear personal protective equipment (e.g., face masks, gloves, or gowns) designed to reduce the transmission of pandemic infection?

Yes. An employer may require employees to wear personal protective equipment during a pandemic. However, where an employee with a disability needs a related reasonable accommodation under the ADA (e.g., non-latex gloves, or gowns designed for individuals who use

wheelchairs), the employer should provide these, absent undue hardship.

### 13. May an employer covered by the ADA and Title VII of the Civil Rights Act of 1964 compel all of its employees to take the influenza or COVID-19 vaccine regardless of their medical conditions or their religious beliefs during a pandemic?

No. An employee may be entitled to an exemption from a mandatory vaccination requirement based on an ADA disability that prevents him from taking the vaccine. This would be a reasonable accommodation barring undue hardship (significant difficulty or expense). Similarly, under Title VII of the Civil Rights Act of 1964, once an employer receives notice that an employee's sincerely held religious belief, practice, or observance prevents him from taking the vaccine, the employer must provide a reasonable accommodation unless it would pose an undue hardship as defined by Title VII ("more than de minimis cost" to the operation of the employer's business, which is a lower standard than under the ADA).**[36] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#36)**

Generally, ADA-covered employers should consider simply encouraging employees to get the influenza vaccine rather than requiring them to take it.

See Section K., "Vaccinations," in "**What You Should Know About COVID-19 and the ADA, the Rehabilitation Act, and Other EEO Laws (https://www.eeoc.gov/wysk/what-you-should-know-about-covid-19-and-ada-rehabilitation-act-and-other-eeo-laws#K)** ."

### 14. During a pandemic, must an employer continue to provide reasonable accommodations for employees with known disabilities that are unrelated to the pandemic, barring undue hardship?

Yes. An employer's ADA responsibilities to individuals with disabilities continue during an influenza or coronavirus pandemic. Only when an employer can demonstrate that a person with a disability poses a

direct threat, even after reasonable accommodation, can it lawfully exclude him from employment or employment-related activities.

If an employee with a disability needs the same reasonable accommodation at a telework site that he had at the workplace, the employer should provide that accommodation, absent undue hardship. In the event of undue hardship, the employer and employee should cooperate to identify an alternative reasonable accommodation.

**Example C**: An accountant with low vision has a screen-reader on her office computer as a reasonable accommodation. In preparation for telework during a pandemic or other emergency event, the employer issues notebook computers to all accountants. In accordance with the ADA, the employer provides the accountant with a notebook computer that has a screen-reader installed.

All employees with disabilities whose responsibilities include management during a pandemic must receive reasonable accommodations necessitated by pandemic conditions, unless undue hardship is established.

**Example D**: A manager in a marketing firm has a hearing disability. A sign language interpreter facilitates her communication with other employees at the office during meetings and trainings. Before the pandemic, the employer decided to provide video phone equipment and video relay software for her at home to use for emergency business consultations. (Video relay services allow deaf and hearing impaired individuals to communicate by telephone through a sign language interpreter by placing a video relay call.[37] (https://www.eeoc.gov/fact-sheet/pandemic-preparedness-workplace-and-americans-disabilities-act#37).) During a pandemic, this manager also is part of the employer's emergency response team. When she works from home during the pandemic, she uses the video relay services to participate in daily management and staff conference calls necessary to keep the firm operational.

**\*The rapid spread of COVID-19 has disrupted normal work routines and may have resulted in unexpected or increased requests for**

reasonable accommodation.  Although employers and employees should address these requests as soon as possible, the extraordinary circumstances of the COVID-19 pandemic may result in delay in discussing requests and in providing accommodation where warranted.  Employers and employees are encouraged to use interim solutions to enable employees to keep working as much as possible.

### 15. During a pandemic, may an employer ask an employee why he or she has been absent from work if the employer suspects it is for a medical reason?

Yes. Asking why an individual did not report to work is not a disability-related inquiry. An employer is always entitled to know why an employee has not reported for work.

**Example E**: During an influenza pandemic, an employer directs a supervisor to contact an employee who has not reported to work for five business days without explanation. The supervisor asks this employee why he is absent and when he will return to work. The supervisor's inquiry is not a disability-related inquiry under the ADA.

## *HIRING DURING THE COVID-19 PANDEMIC

### *16. If an employer is hiring, may it screen applicants for symptoms of COVID-19?

**\*Yes. An employer may screen job applicants for symptoms of COVID-19 after making a conditional job offer, as long as it does so for all entering employees in the same type of job. This ADA rule allowing post-offer (but not pre-offer) medical inquiries and exams applies to all applicants, whether or not the applicant has a disability.**

### *17. May an employer take an applicant's temperature as part of a post-offer, pre-employment medical exam?

**\*Yes.  Any medical exams are permitted after an employer has made a conditional offer of employment.  However, employers should be aware that some people with COVID-19 do not have a fever.**

**\*18. May an employer delay the start date of an applicant who has COVID-19 or symptoms associated with it?**

**\*Yes.  According to current CDC guidance, an individual who has COVID-19 or symptoms associated with it should not be in the workplace.**

**\*CDC has issued guidance applicable to all workplaces generally, but also has issued more specific guidance for particular types of workplaces (e.g. health care employees). Guidance from public health authorities is likely to change as the COVID-19 pandemic evolves.  Therefore, employers should continue to follow the most current information on maintaining workplace safety. To repeat: the ADA does not interfere with employers following recommendations of the CDC or public health authorities, and employers should feel free to do so.**

**\*19. May an employer withdraw a job offer when it needs the applicant to start immediately, but the individual has COVID-19 or symptoms of it?**

\*Based on current CDC guidance, this individual cannot safely enter the workplace, and therefore the employer may withdraw the job offer if the employee is unable to work or would need to work in a location where the employee's presence could endanger others through exposure to COVID-19.

## C. AFTER A PANDEMIC

**20. May an ADA-covered employer require employees who have been away from the workplace during a pandemic to provide a doctor's note certifying fitness to return to work?**

Yes. Such inquiries are permitted under the ADA either because they would not be disability-related or, if the influenza or coronavirus pandemic were truly severe, they would be justified under the ADA standards for disability-related inquiries of employees.

As a practical matter, however, doctors and other health care professionals may be too busy during and immediately after a pandemic outbreak to provide fitness-for-duty documentation. Therefore, new approaches may be necessary, such as reliance on local clinics to provide a form, a stamp, or an e-mail to certify that an individual does not have the pandemic virus.

## IV. EEOC AND RELATED RESOURCES

Employers are encouraged to consult the following EEOC publications for further information about the **Americans with Disabilities Act (https://www.eeoc.gov/disability-discrimination)**, as well as other agency materials regarding COVID-19.

- **Disability-Related Inquiries and Medical Examinations:**
  - *Disability-Related Inquiries & Medical Examinations of Employees Under the ADA* (2000) at **https://www.eeoc.gov/policy/docs/guidance-inquiries.html (https://www.eeoc.gov/policy/docs/guidance-inquiries.html)**;
  - *Obtaining and Using Employee Medical Information as Part of Emergency Evacuation Procedures* (2001) at **https://www.eeoc.gov/facts/evacuation.html (https://www.eeoc.gov/fact-sheet/fact-sheet-obtaining-and-using-employee-medical-information-part-emergency-evacuation)**;
  - Enforcement Guidance: *Preemployment Disability-Related Questions & Medical Examinations* (1995) at **https://www.eeoc.gov/policy/docs/preemp.html (https://www.eeoc.gov/policy/docs/preemp.html)**.
- **Reasonable Accommodation and Undue Hardship**: Enforcement Guidance: *Reasonable Accommodation and Undue Hardship under the*

*ADA* (as revised 2002)
at **https://www.eeoc.gov/policy/docs/accommodation.html (https://www.eeoc.gov/policy/docs/accommodation.html)** .

- o **Telework as a Reasonable Accommodation**: *Work at Home/Telework as a Reasonable Accommodation* (2003)
  at **https://www.eeoc.gov/facts/telework.html (https://www.eeoc.gov/fact-sheet/work-hometelework-reasonable-accommodation)** .

- o **Centers for Disease Prevention and Control:  www.cdc.gov (http://www.cdc.gov)**

  - ▪ **CDC Guidance for Employers and Workplaces on COVID-19: https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html (https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html)**

- o **U.S. Department of Labor**

  - ▪ **Occupational Safety and Health Administration https://www.osha.gov/ (https://www.osha.gov/)**

    **"Preparing Workplaces for COVID-19," https://www.osha.gov/Publications/OSHA3990.pdf (https://www.osha.gov/Publications/OSHA3990.pdf)**

  - ▪ **Wage and Hour Division**

    **"COVID-19 or Other Public Health Emergencies and the Family and Medical Leave Act" https://www.dol.gov/agencies/whd/fmla/pandemic (https://www.dol.gov/agencies/whd/fmla/pandemic)**

---

**Endnotes**

1. 42 U.S.C. §§ 12111–12117, 12201–12213. EEOC is revising its ADA regulations to comply with the ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553, which was effective on January 1, 2009. 74 Fed.Reg. 48,431 (Sept. 23, 2009). While the Amendments expand ADA coverage, they do not change the ADA requirements

concerning disability-related inquiries and medical examinations; the requirement of reasonable accommodation barring undue hardship; or the analysis of direct threat.

2. An "epidemic" is an outbreak of disease that occurs suddenly in numbers significantly greater than normal, but which spreads only within communities, states, or a limited number of countries. **http://www.flu.gov/glossary/#E (http://www.flu.gov/glossary/#E)**. Such an outbreak usually occurs when a pathogen mutates, allowing it to evade the human immune system. **http://www.flu.gov/individualfamily/about/index.html (http://www.flu.gov/individualfamily/about/index.html)**.

3. U.S. Dep't of Health & Human Servs., Pandemics and Pandemic Scares of the 20th Century, **https://www.cdc.gov/flu/pandemic-resources/basics/past-pandemics.html (https://www.cdc.gov/flu/pandemic-resources/basics/past-pandemics.html)** (last visited Sept. 22, 2009). The most severe influenza pandemic in the last century was the Spanish Flu Pandemic of 1918-1919, which killed 675,000 people in the United States and 50 million people worldwide at the end of World War I. The Spanish Flu targeted young, healthy adults and was often fatal within a few days. This virus caused the immune system to attack the respiratory system, which explains why young adults with vigorous immune systems were especially vulnerable. David M. Morens & Jeffery K. Taubenberger, *1918 Influenza: The Mother of all Pandemics*, 12 Emerging Infections Diseases 15 (2006), **https://wwwnc.cdc.gov/eid/article/12/1/05-0979_article (https://wwwnc.cdc.gov/eid/article/12/1/05-0979_article)**.

4. *World facing global A(H1N1) flu pandemic, announces UN health agency*, UN News Service, June 11, 2009, **http://www.un.org/apps/news/story.asp? NewsID=31106&Cr=h1n1&Cr1 (http://www.un.org/apps/news/story.asp? NewsID=31106&Cr=h1n1&Cr1)** (also noting that H1N1 tends to infect people under 25 years old, with approximately two percent of cases resulting in severe or life-threatening symptoms).

5. The WHO defines the following specific pandemic phases worldwide:

- **Phase 1**: No new influenza virus subtypes have been detected in humans. An influenza virus subtype that has caused human infection may be present in animals. If present in animals, the risk of human disease is considered to be low.

- **Phase 2**. No new influenza virus subtypes have been detected in humans. However, a circulating animal influenza virus subtype poses a substantial risk of human disease.

- **Phase 3**. Human infection with a new subtype, but no human-to-human spread, or at most rare instances of spread to a close contact.

- **Phase 4**. Small cluster(s) with limited human-to-human transmission but spread is highly localized, suggesting that the virus is not well adapted to humans.

- **Phase 5**. Larger cluster(s) but human-to-human spread of the virus still localized, suggesting that the virus is becoming increasingly better adapted to humans, but may not yet be fully transmissible (substantial pandemic risk).

- **Phase 6**. Pandemic phase: increased and sustained transmission in general population.

6. *See* Ctrs. for Disease Control & Prevention, Guidance for Businesses and Employers to Plan and Respond to the 2009-2010 Influenza Season (2009), **http://www.pandemicflu.gov/professional/business/guidance.pdf (http://www.pandemicflu.gov/professional/business/guidance.pdf)** ; Ctrs. for Disease Control & Prevention, Resources for Businesses and Employers – COVID-19, **https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html (https://www.cdc.gov/coronavirus/2019-ncov/community/organizations/businesses-employers.html)** .

7. 42 U.S.C. § 12112(d)(4)(A); *Conroy v. New York State Dep't of Corr. Servs.*, 333 F.3d 88, 94-95 (2d Cir. 2003); *Fredenburg v. Contra Costa County Dep't of Health Servs.*, 172 F. 3d 1176, 1182 (9th Cir. 1999); *Roe v. Cheyenne Mountain Conference Resort, Inc.*, 124 F.3d 1221, 1229 (10th Cir. 1997); *see also* Equal Employment Opportunity Comm'n, Enforcement Guidance: Preemployment Disability-Related Questions and Medical Examinations § B.1 (1995), **https://www.eeoc.gov/policy/docs/preemp.html (https://www.eeoc.gov/policy/docs/preemp.html)** .

8. 42 U.S.C. §§ 12111(3), (8); 29 C.F.R. §§ 1630.2(r), 1630.15(b)(2).

9. 42 U.S.C. § 12112(b)(5); *see also* § 12111(3); 29 C.F.R. § 1630.2(r).

10. These ADA standards apply to federal sector complaints of non-affirmative action employment discrimination arising under section 501 of the Rehabilitation Act of 1973. 29 U.S.C. § 791(g) (1994). It also applies to complaints of non-affirmative action employment discrimination arising under section 503 and employment discrimination under section 504 of the Rehabilitation Act. 29 U.S.C. §§ 793(d), 794(d) (1994).

11. 42 U.S.C. § 12112(d). Equal Employment Opportunity Comm'n, **Enforcement Guidance: Disability-Related Inquiries and Medical Examinations of Employees under the Americans with Disabilities Act (https://www.eeoc.gov/policy/docs/guidance-inquiries.html)** , § B of "General Principles" (2000), **https://www.eeoc.gov/policy/docs/guidance-inquiries.html#4 (https://www.eeoc.gov/policy/docs/guidance-inquiries.html#4)** [hereinafter Inquiries and Exams].

12. Inquiries and Exams, *supra* note 11, at § B.1 of "General Principles." *See also Conroy*, 333 F.3d at 95-96 (citing ADA and relevant EEOC guidance and holding that an employer's request for a "general diagnosis" from employees returning from sick leave absence is a disability-related inquiry regulated by the ADA because it "tend[ed] to reveal a disability").

13. *See* Am. Cancer Soc'y, Should Cancer Patients Get a Flu Shot? (Oct. 17, 2008), **https://www.cdc.gov/cancer/flu/basic-info.htm (https://www.cdc.gov/cancer/flu/basic-info.htm)** (noting that "[i]t is common for people during cancer treatment to have weakened immune systems"); *see also* Ctrs. for Disease Control & Prevention, Basic AIDS/HIV Information (Sept. 3, 2008), **http://www.cdc.gov/hiv/topics/basic/ (https://www.cdc.gov/hiv/basics/whatishiv.html)** (reporting that "HIV . . . attacks the immune system . . .[and] [h]aving AIDS means that the virus has weakened the immune system").

14. Inquiries and Exams, *supra* note 11, at § B.2 of "General Principles."

15. 42 U.S.C. § 12112(d)(2)(A).

16. 42 U.S.C. § 12112(d)(3)(A); *see also* 29 C.F.R. § 1630.14(b).

17. Inquiries and Exams, *supra* note 11, at § A.5 of "Job-Related and Consistent with Business Necessity;" *see also Conroy*, 333 F.3d at 97.

18. *See* Inquiries and Exams, *supra* note 11, at § A.5 of "Job-Related and Consistent with Business Necessity."

19. Medical information on employees or applicants is confidential with the following exceptions: (1)supervisor[s] and managers may be told about necessary restrictions on work duties and about necessary accommodations; (2) first aid and safety personnel may be told if the disability might require emergency treatment; (3) government officials may access the information when investigating compliance with the ADA; (4) employers may give information to state workers' compensation offices, state second injury funds, or workers' compensation insurance carriers in accordance with state workers' compensation laws; and (5) employers may use the information for insurance purposes. 29 C.F.R. §§ 1630.14(b)(1)(i)–(iii), (c)(1)(i)–(iii); 29 C.F.R. pt. 1630 app. § 1630.14(b).

20. 29 C.F.R. § 1630.2(r).

21. *Id.*; 29 C.F.R. pt. 1630 app. § 1630.2(r).

22. *Id.*

23. 29 C.F.R. pt. 1630 app. § 1630.2(o); *see also U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 416 (2002) (citing the Appendix).

24. 42 U.S.C. § 12111(10); *see also* 29 C.F.R. § 1630.2(p) (including factors to consider when determining undue hardship); 29 C.F.R. pt. 1630 app. § 1630.2(p) (providing a more detailed analysis and examples of where a requested reasonable accommodation would pose an undue hardship).

25. 42 U.S.C. § 12112(b)(5)(A); *see also* Equal Employment Opportunity Comm'n, Revised Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans With Disabilities Act ( 2002), **https://www.eeoc.gov/policy/docs/accommodation.html#undue (https://www.eeoc.gov/policy/docs/accommodation.html#undue)** [hereinafter Reasonable Accommodation Guidance].

26. 42 U.S.C. § 12112(b)(5)(A).

27. *See* U.S. Dep't of Health and Human Servs., Business Pandemic Influenza Planning Checklist: Item 1.1, **http://www.pandemicflu.gov/professional/business/businesschecklist.htm**

l(http://www.pandemicflu.gov/professional/business/businesschecklist.html)
(last visited Sept. 22, 2009).

28. *See* Job Accommodation Network,Considering the Needs of Employees with
Disabilities During a Pandemic Flu Outbreak
(2009), https://askjan.org/blogs/jan/2020/03/the-ada-and-managing-
reasonable-accommodation-requests-from-employees-with-disabilities-in-
(https://askjan.org/blogs/jan/2020/03/the-ada-and-managing-reasonable-
accommodation-requests-from-employees-with-disabilities-in-response-to-
covid-19.cfm) (the Job Accommodation Network is a service of the U.S Department
of Labor's Office of Disability Employment Policy).

29. Inquiries and Exams, *supra* note 11, at § B.1, "General Principles."

30. 42 U.S.C. § 12112(d)(3).

31. *See infra* Q & A 16 for a discussion of when an employer may require a medical
release as a condition of returning to work.

32. Asking employees if they are immuno-compromised or have a chronic condition
is a disability-related inquiry subject to the ADA's restrictions. When pandemic
influenza symptoms only resemble those of seasonal influenza, they do not provide
an objective basis for a "reasonable belief" that employees will face a direct threat if
they become ill. Therefore, they do not justify disability-related inquiries or medical
examinations.

33. *See also* Ctrs. for Disease Control, *supra* note 5, at 7. ADA-covered employers may
receive requests for reasonable accommodation from individuals with disabilities
that place them at risk of influenza or coronavirus complications.

34. *Id.* at 10–11.

35. Telework (i.e., working from an alternative location) is an example of "social
distancing," which public health authorities may require in the event of a pandemic.
"Social distancing" reduces physical contact between people to minimize disease
transmission by, for example, avoiding hand-shakes and keeping a distance from
others in public places. Other social distancing practices that may be implemented
during a pandemic include: "closing schools; canceling public gatherings; planning
for liberal work leave policies; . . . voluntary isolation of [pandemic infection] cases;
and voluntary quarantine of household contacts." Ctrs. for Disease Control &

Prevention, Pandemic Influenza Mitigation, **https://www.cdc.gov/flu/pandemic-resources/planning-preparedness/community-mitigation.html (https://www.cdc.gov/flu/pandemic-resources/planning-preparedness/community-mitigation.html)** (last visited Sept. 22, 2009). Employees with disabilities may request telework as a reasonable accommodation, even if the employer does not have a policy allowing it. *See* Equal Employment Opportunity Comm'n, Work at Home/Telework as a Reasonable Accommodation (Oct 27, 2005), **https://www.eeoc.gov/facts/telework.html (https://www.eeoc.gov/fact-sheet/work-hometelework-reasonable-accommodation)** .

36. Equal Employment Opportunity Comm'n, EEOC Compliance Manual Section 12: Religious Discrimination 56-65 (2008), **https://www.eeoc.gov/policy/docs/religion.pdf (https://www.eeoc.gov/sites/default/files/migrated_files/laws/guidance/religion.pdf)** .

37. For general information about video relay service, see Fed. Commc'ns Comm'n, Video Relay Services (Oct. 21, 2008), **https://www.fcc.gov/consumers/guides/video-relay-services (https://www.fcc.gov/consumers/guides/video-relay-services)** .