# EXHIBIT 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

AARON ABADI,                                          :

                      Plaintiff,                 :     Case No. 1:23-cv-04033-LJL

         - against -                                 :

AMERICAN AIRLINES GROUP INC., et al,                  :

                 Defendants.                 :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## UNPUBLISHED AUTHORITIES
## IN SUPPORT OF THE JOINT MOTION TO DISMISS BY DEFENDANTS

**CONCESIONARIA VUELA COMPAÑÍA DE AVIACIÓN, S.A.P.I. DE C.V.
ROYAL AIR MAROC
AEROVÍAS DE MÉXICO S.A. DE C.V.
TRANSPORTES AÉREOS PORTUGUESES, S.A.
SPIRIT AIRLINES, INC.
AVIANCA S.A.
SINGAPORE AIRLINES
LATAM AIRLINES GROUP S.A.
IBERIA LÍNEAS AÉREAS DE ESPAÑA, S.A. OPERADORA, SOCIEDAD
UNIPERSONAL
LOT POLISH AIRLINES, SA
BRITISH AIRWAYS P.L.C.,
AND
MATTHEW ROBERTS**

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 3 of 103

Abadi v. Target Corporation, Not Reported in Fed. Rptr. (2023)

2023 WL 4045373
Only the Westlaw citation is currently available.
United States Court of Appeals, Third Circuit.

Aaron ABADI, Appellant

v.

TARGET CORPORATION, and Numerous
Unnamed Employees of Target Corporation

No. 23-1050
|
Submitted Pursuant to Third
Circuit LAR 34.1(a) June 14, 2023
|
(Opinion filed: June 16, 2023)

On Appeal from the United States District Court for the
Eastern District of Pennsylvania (D.C. Civil Action No. 2:22-
cv-02854), District Judge: Honorable Chad F. Kenney

**Attorneys and Law Firms**

Aaron Abadi, New York, NY, Pro Se.

John W. Egan, Esq., Jacob F.M. Oslick, Esq., Seyfarth
Shaw, New York, NY, Michael E. Steinberg, Esq., Seyfarth
Shaw, Boston, MA, for Target Corporation, And Numerous
Unnamed Employees of Target Coporation

Before: JORDAN, CHUNG, and NYGAARD, Circuit Judges

OPINION [*]

PER CURIAM

 **\*1** Aaron Abadi appeals pro se from the District Court's
order dismissing his civil rights action. For the reasons set
forth below, we will affirm in part and vacate in part the
District Court's judgment.

**I.**

In 2022, Abadi initiated this action in the District Court
against Target Corporation and unnamed Target employees.
Abadi alleged that, in January 2021, he entered a Target
store in Philadelphia and was asked to put on a face mask.
According to Abadi, he is unable to wear masks due to a
sensory processing disorder. [1] Abadi alleged that his disorder
excused him from COVID-19-related mask mandates in
place at the time, and that he explained this to Target
employees. Nonetheless, according to Abadi, he was told
to put on a mask or to leave the store. Abadi contended
that, in refusing to allow him to shop without a mask, the
defendants discriminated against him based on his disability
in violation of Title III of the Americans with Disabilities
Act ("ADA"), the Rehabilitation Act, and the Pennsylvania
Human Relations Act ("PHRA"), conspired to deprive him
of his civil rights in violation of 42 U.S.C. § 1985,
and neglected to prevent the violation of his civil rights in
violation of 42 U.S.C. § 1986.

The District Court screened the complaint pursuant to 28
U.S.C. § 1915(e)(2) and dismissed Abadi's §§ 1985 and
1986 claims. The defendants later filed a motion to dismiss the
remaining claims under Federal Rule of Civil Procedure 12(b)
(1) and (6). On January 9, 2023, the District Court granted
the motion upon concluding that Abadi lacked standing to
pursue injunctive relief under Title III of the ADA and the
Rehabilitation Act, and that Abadi failed to state a claim
under the Rehabilitation Act and the PHRA. Abadi timely
appealed and challenges the District Court's dismissal of his
§§ 1985 and 1986 claims at the screening stage, as well
as the decision to grant the defendants' motion to dismiss the
remaining claims.

**II.**

We have jurisdiction pursuant to 28 U.S.C. § 1291 and
exercise plenary review of dismissals for lack of standing and
for failure to state a claim. See Newark Cab Ass'n v. City of
Newark, 901 F.3d 146, 151 (3d Cir. 2018); N. Jersey Brain
& Spine Ctr. v. Aetna, 801 F.3d 369, 371 (3d Cir. 2015). To
survive a motion to dismiss for failure to state a claim, "a
complaint must contain sufficient factual matter, accepted as
true, to state a claim to relief that is plausible on its face."
Santiago v. Warminster Twp., 629 F.3d 121, 128 (3d Cir.
2010) (citation and quotation marks omitted).

**III.**

We agree with the District Court's decision to dismiss Abadi's claims under 42 U.S.C. §§ 1985 and 1986. As the District Court noted, the intra-corporate conspiracy doctrine provides that "an entity cannot conspire with one who acts as its agent." Gen. Refractories Co. v. Fireman's Fund Ins. Co., 337 F.3d 297, 313 (3d Cir. 2003); see also Robison v. Canterbury Village, Inc., 848 F.2d 424, 431 (3d Cir. 1988) (applying doctrine to § 1985(3) claim). While, as Abadi argues on appeal, "a section 1985(3) conspiracy between a corporation and one of its officers may be maintained if the officer is acting in a personal, as opposed to official, capacity, or if independent third parties are alleged to have joined the conspiracy," Robison, 848 F.2d at 431, Abadi did not make any allegations in his complaint that Target's unnamed employees were acting in their personal capacities in demanding that he wear a mask or leave the store. Thus, the District Court properly dismissed this claim. While Abadi has since argued that Target did *not* approve of its employees' conduct during the incident in question, this contention is inconsistent with the allegations in the complaint and nonetheless does not create a plausible inference that the unnamed employees were acting for their "sole personal benefit" in enforcing a mask requirement. See Heffernan v. Hunter, 189 F.3d 405, 412 (3d Cir. 1999). And because a § 1986 claim cannot be maintained unless a plaintiff has established a cause of action under § 1985, the District Court correctly dismissed the § 1986 claim as well. See Robison, 848 F.2d at 431 n.10.

**\*2** The District Court also properly dismissed Abadi's ADA claim for lack of standing. Title III of the ADA, which prohibits discrimination on the basis of disability in public accommodations, see 42 U.S.C. § 12182, only provides for injunctive relief, see 42 U.S.C. § 12188(a); Bowers v. Nat'l Collegiate Athletic Ass'n, 346 F.3d 402, 433 (3d Cir. 2003) ("Title III defendants cannot be liable for money damages."). We have held that a Title III plaintiff "lacks standing to seek injunctive relief unless he alleges facts giving rise to an inference that he will suffer future discrimination by the defendant." Pryor v. Nat'l Collegiate Athletic Ass'n, 288 F.3d 548, 561 (3d Cir. 2002) (quotation marks omitted). As the District Court noted, Abadi failed to allege facts raising such an inference here. On the contrary, Abadi's allegations pertained to a one-time incident occurring in January 2021, and he acknowledged that Target's in-store mask policy has

been lifted and that he has shopped without incident in the months since. Although Abadi has argued that the mask requirement may be reinstated and he may be again prevented from shopping in Target without a mask, his contentions are too speculative to establish Article III standing. See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992) (reasoning that injury required to establish standing must be "actual or imminent, not conjectural or hypothetical" (quotation marks omitted)); Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc., 528 U.S. 167, 191 (2000) ("[I]f a plaintiff lacks standing at the time the action commences, the fact that the dispute is capable of repetition yet evading review will not entitle the complainant to a federal judicial forum."). We accordingly agree with the District Court that Abadi lacks standing to pursue injunctive relief under Title III.

As for Abadi's claim under the Rehabilitation Act, Abadi failed to demonstrate that Target, a private business, constitutes a "program or activity" covered by the Act. See 29 U.S.C. § 794(b). [2] Abadi has argued, both before the District Court and on appeal, that Target is subject to the Rehabilitation Act because its in-store pharmacies receive Medicare and Medicaid funding. However, accepted as true, this allegation does not establish that federal "assistance is extended to [Target] ... *as a whole.*" § 794(b)(3)(A)(i) (emphasis added); see also S. Rep. No. 100-64 at 17 (1987) ("Federal financial assistance extended to a corporation or other entity 'as a whole' refers to situations where the corporation receives general assistance that is not designated for a particular purpose."). And Abadi has not made any allegations that Target is "principally engaged in the business of providing education, health care, housing, social services, or parks and recreation." § 794(b)(3)(A)(ii). The District Court therefore properly dismissed this claim.

We will, however, vacate the District Court's dismissal of Abadi's PHRA claim. [3] Like Target (Br. at 33–34), we understand Abadi to claim that Target failed to accommodate his alleged disability by permitting him to shop without a mask. [4] The District Court concluded that the facts alleged in Abadi's complaint did "not articulate that [Abadi] was denied access to Target *because of* his disability, but, rather, that he was denied access due to a public health emergency and legitimate safety concerns which informed Target's generally applicable mask policy." Dkt. #29 at 14. This analysis focused only on whether Target's refusal to allow Abadi to shop was *motivated by* his alleged disability.

**Abadi v. Target Corporation, Not Reported in Fed. Rptr. (2023)**

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 5 of 103

**\*3** However, that is not a necessary component of a failure-to-accommodate claim; for such a claim, Abadi must instead plead facts raising a plausible inference that (1) he is disabled; (2) Target is a "public accommodation"; and (3) Target "unlawfully discriminated against him on the basis of his disability by (a) failing to make a reasonable modification that was (b) necessary to accommodate his disability." Matheis v. CSL Plasma, Inc., 936 F.3d 171, 175 (3d Cir. 2019) (describing elements of claim under Title III of the ADA); see also Kelly v. Drexel Univ., 94 F.3d 102, 105 (3d Cir. 1996) (providing that the PHRA is analyzed under the same standards as its federal counterparts); 16 Pa. Code § 44.21. [5] Thus, the District Court failed to analyze Abadi's claim under the correct standard. See generally Taylor v. Phoenixville Sch. Dist., 184 F.3d 296, 306 (3d Cir. 1999) (explaining

that disability discrimination "encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities"); Brooks v. Colorado Dep't of Corr., 12 F.4th 1160, 1167 (10th Cir. 2021) ("A claim for failure to make a reasonable accommodation does not require a showing of discriminatory motive."). [6]

We will accordingly vacate the District Court's dismissal of Abadi's PHRA claim and remand for further proceedings consistent with this opinion. We will otherwise affirm the District Court's judgment.

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 4045373

---

### Footnotes

\*  This disposition is not an opinion of the full Court and pursuant to I.O.P. 5.7 does not constitute binding precedent.

1  Abadi provided a doctor's note describing his alleged disability as an exhibit to his complaint.

2  For the same reasons stated above with respect to Abadi's Title III claim, Abadi also lacks standing to pursue injunctive relief under the Rehabilitation Act. Unlike Title III, however, the Rehabilitation Act also provides for money damages. See A.W. v. Jersey City Pub. Schs., 486 F.3d 791, 804 (3d Cir. 2007) (describing remedies available under Section 504 of the Rehabilitation Act).

3  The District Court dismissed the unnamed defendants from the action to preserve diversity jurisdiction over Abadi's state-law claim, see 28 U.S.C. § 1332, as Abadi did not properly allege state citizenship of those defendants. Abadi does not contest this issue on appeal, so it has been forfeited. M.S. ex rel. Hall v. Susquehanna Twp. Sch. Dist., 969 F.3d 120, 124 n.2 (3d Cir. 2020).

4  Although Abadi's contention that his disorder "limits almost all major life activities" because he "cannot function" when something touches his face, see Dkt. #2 at 5, was somewhat conclusory, we have held that a plaintiff "is not required, at this early pleading stage, to go into particulars about the life activity affected by [his] alleged disability or detail the nature of [his] substantial limitations." Fowler v. UPMC Shadyside, 578 F.3d 203, 213 (3d Cir. 2009).

5  Unlike Title III of the ADA, the PHRA allows for money damages. See Berardelli v. Allied Servs. Inst. of Rehab. Med., 900 F.3d 104, 126 (3d Cir. 2018).

6  Target does not directly defend the District Court's decision; instead, Target argues that we may affirm on any ground supported by the record and urges us to affirm the District Court's decision dismissing the PHRA

claim based on the "direct threat" exception, which "allows discrimination if a disability 'poses a direct threat to the health or safety of others.' " See 🚩Doe v. Cnty. of Centre, PA, 242 F.3d 437, 447 (3d Cir. 2001) (quoting 28 C.F.R. Part 35, App. A at 483); see also 16 Pa. Code § 44.21 (noting that requirement to make reasonable accommodations for individuals with disabilities should not be construed to impose "a demonstrable threat of harm to the health and safety of others"). However, Target did not raise this issue before the District Court, and the District Court did not consider it in dismissing Abadi's claim. We decline to reach this argument in the first instance and express no view on the merits of this or any other defense Target may raise.

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 7 of 103

Andreadakis v. Center for Disease Control & Prevention, Not Reported in Fed. Supp....

KeyCite Blue Flag – Appeal Notification

Appeal Filed by KLEANTHIS ANDREADAKIS v. CENTERS FOR DISEASE CONTROL AND PREVENTION, 4th Cir., September 12, 2022

2022 WL 2674194
Only the Westlaw citation is currently available.
United States District Court, E.D. Virginia,
Richmond Division.

Kleanthis ANDREADAKIS, Plaintiff,
v.
CENTER FOR DISEASE CONTROL
& PREVENTION et al., Defendants.

Civil No. 3:22cv52 (DJN)
|
Signed 07/11/2022

**Attorneys and Law Firms**

Kleanthis N. Andreadakis, Clarksville, TN, Pro Se.

Jonathan Tyler Lucier, US Attorney Office, Richmond, VA, Andrew Francis Freidah, Pro Hac Vice, Civil Division, Federal Programs Branch, Washington, DC, Michael Joseph Gerardi, Pro Hac Vice, Latham & Watkins LLP, Washington, DC, Stephen Michael Pezzi, Pro Hac Vice, Department of Justice, Washington, DC, for Defendants.

**MEMORANDUM OPINION**

David J. Novak, United States District Judge

 *1  Plaintiff Kleanthis Andreadakis filed the instant Complaint (ECF No. 1) challenging the implementation and enforcement of two government-issued COVID-19 safety measures regulating the airline industry. This matter comes before the Court on two motions to dismiss filed by multiple defendants. Defendants American Airlines, Inc., JetBlue Airways Corp., Southwest Airlines Co. and United Airlines, Inc. (collectively, the "Airline Defendants") have filed a Motion to Dismiss the Complaint (ECF No. 78), moving pursuant to Federal Rule of Civil Procedure 12(b)(6) to dismiss all twenty-four counts against them for failure to state a claim. Similarly, Defendant STAT-MD has filed a Motion to Dismiss Plaintiff's Complaint Pursuant to Federal Rules 12(b)(2) and 12(b)(6) (ECF No. 80), moving to dismiss the

two counts against it for lack of personal jurisdiction and failure to state a claim. For the reasons stated herein, the Court will GRANT the Motions and dismiss all claims against the Airline Defendants and STAT-MD. Additionally, for the reasons stated herein, the Court will DISMISS AS MOOT all claims against Defendants Centers for Disease Control and Prevention ("CDC") and the Department of Health and Human Services ("HHS") (collectively, the "Federal Defendants").

**I. BACKGROUND**

**A. The Challenged Orders**

Plaintiff challenges two government orders relating to the safety of air travel. On January 13, 2021, the CDC issued an order, which it then amended in December 2021 (the "Testing Order"), generally requiring international air travelers to provide proof of a negative COVID-19 test before departure to the United States. *Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery from COVID-19 for All Airline or Other Aircraft Passengers Arriving into the United States from Any Foreign Country*, 86 Fed. Reg. 69,256, 69,258 (Dec. 7, 2021.) Effective June 12, 2022, the CDC rescinded the Testing Order, citing the improvement of other tools used to fight COVID-19. 87 Fed. Reg. 36129 (June 15, 2022).

On February 3, 2021, the CDC issued the Mask Order. CDC, *Order Under Section 361 of the Public Health Service Act, Requirement for Persons to Wear Masks While on Conveyances and at Transportation Hubs*, 86 Fed. Reg. 8025, 8026 (Feb. 3, 2021). The Mask Order required persons to "wear masks over the mouth and nose when traveling on any conveyance ... into or within the United States" and "at transportation hubs." *Id.* at 8026. The Mask Order exempted "child[ren] under the age of 2" and anyone "with a disability who cannot wear a mask, or cannot safely wear a mask," among others. *Id.* at 8027. It further exempted "[p]rivate conveyances operated solely for personal, non-commercial use." *Id* at 8028. It did not apply "[w]hile eating, drinking, or taking medication, for brief periods." *Id* at 8027. The CDC last extended the Mask Order to remain in place until May 3, 2022, but thereafter stopped enforcing the Mask Order effective April 18, 2022 due to the court order discussed below. [1] Likewise, the Transportation Security Administration has ceased enforcing its mask-related security directives.

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 8 of 103

Andreadakis v. Center for Disease Control & Prevention, Not Reported in Fed. Supp....

**\*2**  On April 18, 2022, United States District Judge Kathryn K. Mizelle of the Middle District of Florida issued an order (the "Vacatur Order") declaring the Mask Order unlawful, vacating it and remanding it to the CDC. *Health Freedom Defense Fund, Inc. v. Biden, et al.*, No. 8:21cv1693 (M.D. Fla.), ECF No. 53. The Government has appealed that ruling. No. 8:21cv1693 (M.D. Fla.), ECF No. 55. The briefing in the appeal has not yet completed, and the Eleventh Circuit has not yet scheduled oral argument. *Health Freedom Defense Fund, Inc. v. Biden, et al.*, No. 22-11287 (11th Cir.).

### B. Plaintiff's Lawsuit

Plaintiff belongs to a group known as Americans Against Mask Mandates ("AAMM"), which Lucas Wall chairs. AAMM works collectively on lawsuits filed by its members to challenge the Mask Order. On January 28, 2022, Plaintiff, proceeding *pro se*, filed the instant Complaint against the CDC, HHS, American Airlines, JetBlue Airways, Southwest Airlines, United Airlines and STAT-MD. (Compl. (ECF No. 1).) Plaintiff seeks to "permanently enjoin enforcement of the Federal Transportation Mask Mandate and International Traveler Testing Requirement put into place by orders of the [CDC] — under the purported authority of its parent agency, [DHS]." (Compl. at 1-2.) Plaintiff also seeks to "end the unlawful discrimination against the disabled such as [himself] who can't safely wear a mask" by the four Airline Defendants. (Compl. at 2.) He also sues STAT-MD as the "medical vendor that evaluates mask-exemption demands for airlines including Southwest." (Compl. at 2.) Plaintiff brings forty-four counts in his Complaint. These include twelve violations of the Administrative Procedures Act ("APA") related to the creation and implementation of the challenged orders; six constitutional violations based on the restriction of the freedom to travel and the delegation of legislative power; thirteen violations of the Rehabilitation Act and Air Carrier Access Act for various COVID-related flight restrictions placed on air travelers; two counts of civil rights violations; and, various state law claims. Plaintiff brings the tenth case filed by AAMM members in federal courts.

### C. Procedural History

On January 28, 2022, Plaintiff filed his Complaint. (ECF No. 1.) On February 4, 2022, he filed a Motion for Preliminary Injunction (ECF No. 21) against the Federal Defendants, and, on February 7, 2022, he filed a Motion for Preliminary Injunction (ECF No. 10) against United Airlines. He filed a motion for expedited briefing on both, which the Court denied. (ECF Nos. 11, 22, 27.) In requesting preliminary

injunctions, Plaintiff asked the Court to enter an order enjoining Defendants from enforcing the FTMM. Defendants opposed the request for a preliminary injunction. (ECF Nos. 49-50.)

On February 7, 2022, the Airline Defendants filed a Motion to Transfer Litigation to the Middle District of Florida. (ECF No. 12.) Similarly, on February 17, 2022, the Federal Defendants filed a Motion to Transfer to the Middle District of Florida. (ECF No. 44.) In both transfer motions, Defendants argued that Plaintiff's lawsuit constitutes a substantially similar and in many respects identical lawsuit to Wall's litigation pending before Judge Byron in the Middle District of Florida. They argued that Plaintiff filed this action due to AAMM's dissatisfaction with the litigation pending before Judge Byron in Florida. Plaintiff opposed the transfer motions. (ECF No. 53.)

**\*3**  On April 6, 2022, the Airline Defendants filed their Motion to Dismiss. In support, they largely argue that the Air Carrier Access Act of 1986 ("ACAA"), ⚑ 49 U.S.C. § 41705, and the Airline Deregulation Act ("Deregulation Act"), ⚑ 49 U.S.C. § 41713(b), preempts Plaintiff's claims and provides the sole remedy for an airline passenger bringing disability discrimination and state law claims against the airlines. (Airline Defs.' Mem. of Law in Supp. of Mot. to Dismiss Compl. ("Airline Defs.' Mem.") (ECF No. 79) at 8, 17-22.) Similarly, the Airline Defendants argue that Plaintiff lacks a private right of action to allege violations of the ACAA. (Airline Defs.' Mem. at 10.) Further, the Airline Defendants aver that Plaintiff's claims under the Rehabilitation Act fail, because they are not subject to that Act. (Airline Defs.' Mem. at 13-15.) Additionally, the Airline Defendants argue that Plaintiff's claim for civil rights under ⚑ 42 U.S.C. § 1985(3) fails, because that section does not apply to disability discrimination complaints. (Airline Defs.' Mem. at 6-7.) Finally, the Airline Defendants argue that the Court lacks personal jurisdiction over them, because Plaintiff has not alleged that he purchased a ticket to fly from any of the Airline Defendants in Virginia. The Airline Defendants included a *Roseboro* notice with their Motion, advising Plaintiff that he needed to respond within twenty-one days or risk dismissal of his complaint. (ECF No. 78-2.)

On April 8, 2022, Defendant STAT-MD filed its Motion to Dismiss. It primarily argues that the Court lacks personal jurisdiction over Plaintiff's claims against it. (Br. in Supp. of Mot. to Dismiss. ("STAT-MD Mem.") (ECF No. 81)

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 9 of 103

Andreadakis v. Center for Disease Control & Prevention, Not Reported in Fed. Supp....

at 5.) Additionally, it argues that Plaintiff's claims for medical malpractice fail, because Plaintiff has not alleged the provision of health care or a physician-patient relationship. (STAT-MD Mem. at 6.) Additionally, that claim fails, because Plaintiff did not obtain a certificate of merit before filing suit, as required by Virginia's Medical Malpractice Act. (STAT-MD Mem. at 9.) Finally, STAT-MD argues that the civil conspiracy claims fail to properly allege the existence of a conspiracy, warranting dismissal. (STAT-MD Mem. at 10.) STAT-MD also included a *Roseboro* notice with its Motion, warning Plaintiff that a failure to respond to the motion within twenty-one days could result in the dismissal of his action. (STAT-MD Mem. at 1.)

On April 18, 2022, Plaintiff filed a Motion to Stay Briefing on Defendants' Motions to Dismiss (ECF No. 82), asking the Court to stay his deadline to respond to the motions to dismiss until after resolution of the transfer motions and preliminary injunction motions. On April 22, 2022, the Court denied his stay motion as moot, because it had resolved the transfer motions and preliminary injunction motion. (ECF No. 88.) Plaintiff, however, still failed to respond to the motions to dismiss. Accordingly, on June 14, 2022, the Court ordered Plaintiff to respond to the Motions by June 17, or it would consider the Motions unopposed. (ECF No. 93.) Plaintiff did not respond to the Motions or otherwise ask for an extension by June 17. Instead, on June 21, 2022, he filed a request for an extension of twenty-one (21) days to respond to the Motions, claiming that he had not responded because the Court had not ruled on his Motion to Stay. (ECF No. 94.) The Court denied his request for an extension, because it had ruled on the Motion to Stay, and had previously warned the parties that briefing on any motions would follow the standard briefing schedule provided for in the Local Rules. (ECF No. 98.) Plaintiff has still not filed an opposition to the Motions to Dismiss, and the Court considers the Defendants' bases for dismissal uncontroverted. *See Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004) (noting that when a plaintiff does not respond in opposition to a motion to dismiss, a district court is "entitled to, as authorized [by the Local Rules], to rule on the [defendants'] motion and dismiss [the plaintiff's] suit on the uncontroverted bases asserted therein").

On April 22, 2022, the Court denied the preliminary injunction motion and the transfer motions. (ECF No. 88.) Additionally, the Court ordered the parties to brief the impact of the Vacatur Order on Plaintiff's claims, and whether it rendered any of them moot. Plaintiff responded that it did not

moot any of his claims, and that he would continue to press forward with all of his claims. (ECF No. 89.)

## II. STANDARD OF REVIEW

**\*4** "Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdiction challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every stage following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016) (citation omitted). If a federal court reviews "only the parties' motion papers, affidavits attached to the motion, supporting legal memoranda, and the allegations in the complaint," then a plaintiff need only make a *prima facie* showing of personal jurisdiction to survive a motion to dismiss under Rule 12(b)(2). *Id* at 268 (citations omitted). "[T]he court must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction," *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989), though the Court need not consider only Plaintiff's proof of personal jurisdiction to decide which inferences it will make, *Mylan Labs., Inc. v. Akzo, N. V.*, 2 F.3d 56, 62 (4th Cir. 1993). "[W]here the defendant has provided evidence which denies facts essential for jurisdiction, the plaintiff must, under threat of dismissal, present sufficient evidence to create a factual dispute on each jurisdictional element which has been denied by the defendant and on which the defendant has presented evidence." *Indus. Carbon Corp. v. Equity Auto & Equip. Leasing Corp.*, 737 F. Supp. 925, 926 (W.D. Va. 1990) (citation omitted).

Similarly, a motion to dismiss pursuant to Rule 12(b)(6) tests the sufficiency of a complaint or counterclaim; it does not serve as the means by which a court will resolve contests surrounding the facts, determine the merits of a claim or address potential defenses. *Republican Party of NC. v. Martin*, 980 F.2d 943, 952 (4th Cir. 1992). In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff. *Mylan Labs., Inc. v. Matkari*, 7 F.3d 1130, 1134 (4th Cir. 1993). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.

Under the Federal Rules of Civil Procedure, a complaint or counterclaim must state facts sufficient to " 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests[.]' " *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). As the Supreme Court opined in *Twombly*, a complaint or counterclaim must state "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action," though the law does not require "detailed factual allegations." *Id* (citations omitted). Ultimately, the "[f]actual allegations must be enough to raise a right to relief above the speculative level," rendering the right "plausible on its face" rather than merely "conceivable." *Id.* at 555, 570. Thus, a complaint or counterclaim must assert facts that are more than "merely consistent with" the other pity's liability. *Id* at 557. And the facts alleged must be sufficient to "state all the elements of [any] claim[s]." *Bass v. E.I. Dupont de Nemours & Co.*, 324 F.3d 761, 765 (4th Cir. 2003) (citing *Dickson v. Microsoft Corp.*, 309 F.3d 193, 213 (4th Cir. 2002) and *Iodice v. United States*, 289 F.3d 270, 281 (4th Cir. 2002)).

### III. ANALYSIS

The Court will first address Defendant STAT-MD's Motion to Dismiss, finding that it lacks personal jurisdiction over STAT-MD for Plaintiff's claims. Next, the Court will address the Airline Defendants' Motion to Dismiss, finding that none of Plaintiff's claims against them can survive the Airline Defendants' challenge. Finally, although the Federal Defendants have not moved for dismissal, the Court will address why the claims against the Federal Defendants are moot.

#### A. The Court Lacks Personal Jurisdiction Over Plaintiff's Claims Against STAT-MD.

Defendant STAT-MD argues that the Court lacks personal jurisdiction over it for Plaintiff's claims. (STAT-MD Mem. at 4-6.) The Court agrees.

"Under Rule 12(b)(2), a defendant must affirmatively raise a personal jurisdictional challenge, but the plaintiff bears the burden of demonstrating personal jurisdiction at every state

following such a challenge." *Grayson v. Anderson*, 816 F.3d 262, 267 (4th Cir. 2016). Determinations of personal jurisdiction require a two-step inquiry. First, a court must find that the long-arm statute of the forum state authorizes the exercise of jurisdiction over a nonresident defendant. *Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). Then, the court must find that the exercise of personal jurisdiction over the defendant comports with the Due Process Clause of the Fourteenth Amendment. *Id.*

**\*5** Because Virginia's long-arm statute extends personal jurisdiction to the outer bounds of the Fourteenth Amendment Due Process Clause, "the two-prong test collapses into a single inquiry when Virginia is the forum state." *Tire Eng'g & Distribution, LLC v. Shandong Linglong Rubber Co.*, 682 F.3d 292, 301 (4th Cir. 2012). The Due Process Clause of the Fourteenth Amendment requires that a defendant "have certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.' " *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945).

Within those parameters, a court may find that it has either general or specific personal jurisdiction over a defendant. *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414-15 (1984). General personal jurisdiction exists over defendants with "continuous and systematic contacts with the forum state, such that a defendant may be sued in that state for any reason, regardless of where the relevant conduct occurred." *CFA Inst. v. Inst. of Chartered Fin. Analysts of India*, 551 F.3d 285, 292 n.15 (4th Cir. 2009). When the "continuous corporate operation within a state [is] thought so substantial and of such a nature as to justify suit against it on causes of action arising entirely distinct from those activities," a court can assert general jurisdiction over a corporate defendant. *Nichols v. G.D. Searle & Co.*, 991 F.2d 1195, 1199 (4th Cir. 1993) (quoting *Int'l Shoe Co.* 326 U.S. at 318)). Otherwise, a court may exercise specific personal jurisdiction only if a defendant's minimum contacts with the forum state form the basis for the claims in question. *Mitrano v. Hawes*, 377 F.3d 402, 406 (4th Cir. 2004).

The Court cannot exercise general jurisdiction over STAT-MD. Corporate defendants fall under the general jurisdiction

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 11 of 103

Andreadakis v. Center for Disease Control & Prevention, Not Reported in Fed. Supp....

of courts in their place of incorporation and principal place of business. *Ford Motor Company v. Montana Eighth Judicial District Court*, 141 S. Ct. 1017, 1024 (2021). Here, Plaintiff alleges that "STAT-MD is a non-profit organization backed by the resources of the university of Pittsburgh Medical Center. Its headquarters is at 200 Lothrop St. #F1301, Pittsburgh, PA 15213." (Compl. at 6.) Thus, STAT-MD is not subject to general jurisdiction in Virginia, requiring Plaintiff to establish the Court's specific jurisdiction to survive STAT-MD's personal jurisdiction challenge.

With respect to specific personal jurisdiction, the Fourth Circuit has established a three-part test, requiring trial courts to consider: "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the State; (2) whether the plaintiffs' claims arise out of those activities directed at the State; and (3) whether the exercise of personal jurisdiction would be constitutionally reasonable." *Consulting Eng'rs Corp. v. Geometric Ltd*, 561 F.3d 273, 278 (4th Cir. 2009) (internal quotations and citations omitted). Alternatively, because personal jurisdiction constitutes an individual right, a party may waive that right and submit to the personal jurisdiction of a court by appearance or by providing express or implied consent in "[a] variety of legal arrangements." *Ins. Corp. of Ireland, Ltd v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 703-04 (1982).

Under the first prong of the test for specific jurisdiction, the Fourth Circuit has enumerated several nonexclusive factors to consider whether a defendant has purposefully availed itself of the forum state, including:

**\*6**  • whether the defendant maintains offices or agents in the forum state,

• whether the defendant owns property in the forum state,

• whether the defendant reached into the forum state to solicit or initiate business,

• whether the defendant deliberately engaged in significant or long-term business activities in the forum state,

• whether the parties contractually agreed that the law of the forum state would govern disputes,

• whether the defendant made in-person contact with the resident of the forum in the forum state regarding the business relationship,

• the nature, quality and extent of the parties' communications about the business being transacted, [and]

• whether the performance of contractual duties was to occur within the forum.

*Consulting Eng'rs Corp.*, 561 F.3d at 278 (cleaned up). "If, and only if ... the plaintiff has satisfied this first prong of the test for specific jurisdiction need [the Court] move on to a consideration of prongs two and three." *Id*

"The second prong of the test for specific jurisdiction ... requires that the defendant's contacts with the forum state form the basis of the suit." *Id* at 278-79 (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985); *Helicopteros Nacionales de Columbia, S.A.*, 466 U.S. at 414). Finally, the third prong "permits a court to consider additional factors to ensure the appropriateness of the forum once it has determined that a defendant has purposefully availed itself of the privilege of doing business there." *Id.* at 279. Specifically, a court may evaluate "(1) the burden on the defendant of litigating in the forum; (2) the interest of the forum state in adjudicating the dispute; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the shared interest of the states in obtaining efficient resolution of disputes; and (5) the interests of the states in furthering substantive social policies." *Id* (citing *Burger King Corp.*, 471 U.S. at 477). With this standard in mind, the Court now turns to whether it can exercise personal jurisdiction over STAT-MD.

Plaintiff's scant allegations against STAT-MD do not satisfy the first prong of the test. Plaintiff alleges that STAT-MD reviews and denies mask-exemption demands for its airline clients "without ever speaking to the passenger or his/her doctor." (Compl. ¶¶ 671, 884.) Plaintiff makes no further allegations against STAT-MD. Plaintiff does not allege that any of this occurs in Virginia, nor that STAT-MD even knows whether the exemption request comes from a passenger in Virginia. Indeed, Plaintiff's allegations of wrongdoing stem from the claim that STAT-MD only interacted with the airlines (located outside of Virginia), rather than Plaintiff or his doctors, perhaps located in Virginia. Accordingly, Plaintiff has not alleged that STAT-MD purposefully availed itself of the privilege of conducting business in Virginia. The dearth of allegations connecting STAT-MD's activities to Virginia

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 12 of 103

Andreadakis v. Center for Disease Control & Prevention, Not Reported in Fed. Supp....

also render Plaintiff unable to satisfy the second or third prong of the test for personal jurisdiction. Thus, the Court lacks personal jurisdiction over STAT-MD, and the Court will dismiss the claims that Plaintiff brings against it. [2]

### B. The Court Will Dismiss the Claims Against the Airline Defendants.

**\*7** The Court now turns to the Airline Defendants' Motion to Dismiss. The Court will first address whether the civil conspiracy claims can survive before turning to Plaintiff's claims under the ACAA and the Rehabilitation Act. Finally, the Court will turn to Plaintiff's claims under various state laws and international laws. For the reasons stated below, all of the claims against the Airline Defendants fail.

### i. Plaintiff's Civil Conspiracy Claims Fail.

In Counts 19 and 20, Plaintiff alleges that the Airline Defendants and STAT-MD conspired to deprive disabled Americans of their civil rights by banning "anyone medically unable to wear a face mask from using the nation's air-transportation system." (Compl. ¶¶ 669-81.) Plaintiff brings this claim under 42 U.S.C. § 1985(3). The Airline Defendants move to dismiss these claims, first asserting that § 1985(3) does not apply to disability discrimination. (Airline Defs.' Mem. at 6-7.) Rather, they claim that § 1985 claims apply only to race-related discrimination conspiracies. (Airline Defs. Mem. at 6-7.)

42 U.S.C. § 1985 states in relevant part:

> If two or more persons in any State or Territory conspire ... for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; ... [and] in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived

> of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

42 U.S.C. § 1985(3); Harrison v. KVAT Food Mgmt., Inc., 766 F.2d 155, 156 (4th Cir. 1985).

The statute dates to 1871, when Congress passed the Ku Klux Klan Act to combat racial violence that the Klan and others waged against African Americans in the Reconstruction-Era South. D'Amato v. Wisconsin Gas Co., 760 F.2d 1474, 1487 (7th Cir. 1985). Section 2 of the Ku Klux Klan Act became § 1985. Id. As a threshold matter, "[i]n order to recover under Section 1985(3), a plaintiff must establish that 'some racial, or otherwise class-based, invidiously discriminatory animus behind the conspirators' action' exists." D'Amato, 760 F.2d at 1485 (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)). The Fourth Circuit has not yet addressed whether § 1985(3) applies to claims for disability discrimination.

The Supreme Court in Griffin v. Breckenridge explained that a plaintiff must demonstrate some class-based discriminatory animus motivating the conspirators' actions. 403 U.S. at 102. In Griffin, white citizens assaulted Black petitioners who travelled on a highway, and the petitioners alleged that the defendants conspired to do so with racial motivations. Id. at 88. The Court held that § 1985(3) extends to private conspiracies, but some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' actions must exist. Id. at 102. The Court concluded that petitioners did state a cause of action, because it fully alleged that the defendants conspired to commit the assault for racially charged reasons. Id. at 103.

In United Brotherhood of Carpenters v. Scott, the Supreme Court held that § 1985(3) could not reach conspiracies motivated by bias towards others on account of their economic views, status or activities, and thus it could

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 13 of 103

Andreadakis v. Center for Disease Control & Prevention, Not Reported in Fed. Supp....

not reach an alleged conspiracy against nonunion workers. 463 U.S. 825, 837-38 (1983). In that case, a construction company and two employees sued union members for allegedly conspiring to deprive the plaintiffs of equal protection by attacking a construction site, assaulting workers and destroying property. *Id.* at 825. The Court reaffirmed that there must be some racial, or otherwise class-based, invidiously discriminatory animus behind the conspirators' actions. *Id.* at 835. The Court further reasoned that the predominant purpose of the statute was to combat animus against Blacks and their supporters in the Reconstruction-era South. *Id.* at 836. The Court withheld judgment on whether § 1985(3) reached any farther than that central concern. *Id.* at 837.

**\*8** In *Harrison v. KVAT Food Mgmt., Inc.*, the Fourth Circuit expressed reluctance to extend the protections of § 1985(3) beyond those classes expressly provided by the Supreme Court. 766 F.2d 155, 161 (4th Cir. 1985). In *Harrison*, a discharged employee alleged that his former employers had conspired to prevent him from running for office as a Republican, but the court ultimately ruled that the protection of § 1985(3) did not extend to claims citing discriminatory animus against a class formed around purely political views. *Id.* at 161. The court reasoned that, based on the Supreme Court's decision in *Scott*, the 1871 Civil Rights Act and § 1985(3) originally intended to protect African Americans and the struggle for civil rights in the post-Civil War South. *See* *Harrison,* 766 F.2d at 160, 161 ("We are concerned here with a statute enacted to fulfill a particular purpose and designed to meet particular conditions."). *Harrison* further stressed the importance of the decision in *Scott* to withhold judgment on whether § 1985(3) extended further than that central original purpose. *Id.* at 162.

In *Buschi v. Kirven*, the Fourth Circuit held, in relevant part, that employees who called themselves "whistleblowers" could not qualify as a class entitled to protection under § 1985(3), because they did not possess characteristics comparable to race, national origin or sex, nor were they in "unprotected circumstances." 775 F.2d 1240, 1258 (4th Cir. 1985). The court reasoned that, to meet the requirement of class-based discriminatory animus, the class must possess the " 'discrete, insular and immutable characteristics comparable

to those characterizing classes such as race, national origin, and sex." ' *Id.* at 1257 (quoting *Bellamy v. Mason's Stores, Inc.,* 368 F. Supp. 1025, 1028 (E.D. Va. 1973)).

However, these decisions occurred before the passage of the Americans with Disabilities Act ("ADA") in 1990. In enacting the ADA, Congress found that:

> Individuals with disabilities are a discrete and insular minority who have been faced with restrictions and limitations, subjected to a history of purposeful unequal treatment, and relegated to a position of political powerlessness in our society, based on characteristics that are beyond the control of such individuals and resulting from stereotypic assumptions not truly indicative of the individual ability of such individuals to participate in, and contribute to, society.

42 U.S.C. § 12101(a)(7). Thus, Congress elevated the status of disabled individuals in passing the ADA. Thus, although the Fourth Circuit has not applied a § 1985(3) claim to disabled individuals, and construes protected classes narrowly, it has not foreclosed that application since the passage of the ADA. Other courts have determined that the passage of the ADA renders individuals with a disability protected under § 1985(3). *See, e.g., Lake v. Arnold*, 112 F.3d 686, 687-88 (3d Cir. 1997) (pointing to the ADA as evidence that § 1985(3) protects those with a mental disability). Ultimately, the Court need not definitively determine whether § 1985(3) applies to individuals with disabilities. Assuming, arguendo, that § 1985(3) applies to individuals with a disability, Plaintiff's claim still fails for the reasons stated below.

### ii. Plaintiff Fails to State a Claim Under 1985(3).

The Airline Defendants further argue that Plaintiff fails to state a claim under § 1985(3). The Court agrees.

To prevail on a claim under ⚑ § 1985(3), a plaintiff must prove:

(1) a conspiracy of two or more persons;

(2) who are motivated by a specific class-based, invidiously discriminatory animus to

(3) deprive the plaintiff of the equal enjoyment of rights secured by the law to all,

(4) and which results in injury to the plaintiff as

(5) a consequence of an overt act committed by the defendants in connection with the conspiracy.

⚑ *Simmons v. Poe*, 47 F.3d 1370, 1376 (4th Cir. 1995). Additionally, "the law is well settled that to prove a ⚑ section 1985 'conspiracy,' a claimant must show an agreement or a 'meeting of the minds' by defendants to violate the claimant's constitutional rights." *Id.*

**\*9** Claims under§ 1985(3) rarely prevail. *Davis v. Hudgins*, 896 F. Supp. 561, 571 (E.D. Va. 1995) ("Because of the high threshold that a Plaintiff must meet to establish a prima facie case under ⚑ section 1985, courts often grant motions of dismissal.") (citing ⚑ *Simmons*, 47 F.3d at 1377 ("This Court, under that standard, has rarely, if ever, found that a plaintiff has set forth sufficient facts to establish a ⚑ section 1985 conspiracy, such that the claim can withstand a summary judgment motion.")). Plaintiffs must allege the purported conspiracy with more than mere conclusions. ⚑ *Simmons*, 47 F.3d at 1377 ("Indeed, we have specifically rejected ⚑ section 1985 claims whenever the purported conspiracy is alleged in a merely conclusory manner, in the absence of concrete supporting facts.").

Here, Plaintiff has not alleged a conspiracy with the required concrete facts. Instead, he merely makes conclusory allegations regarding a conspiracy. Specifically, he alleges that the "Airline Defendants conspired to deprive disabled Americans, a protected class, of our civil rights by adopting policies in Summer 2020 that banned any person medically unable to wear a face mask from using the nation's air-transportation system." (Compl. ¶ 671.) He does not provide any details on how they conspired. Further, he alleges that

he "expect[s] to prove through discovery that the Airline Defendants conspired — with each other, with other air carriers, within their own companies, and with STAT-MD — to ban disabled flyers because of a discriminatory motive." (Compl. ¶ 680.) In doing so, he merely parrots the requirements of a prima facie claim under ⚑ § 1985(3). He further alleges that the Airline Defendants "are motivated by a class-based, invidiously discriminatory animus resulting in an unfounded, ridiculous fear that healthy, uninfected disabled travelers who can't wear a face mask are somehow a grave danger." (Compl. ¶ 681.) Again, he offers no concrete facts to support these allegations. These allegations simply will not suffice to state a claim under ⚑ § 1985(3). Accordingly, the Court will dismiss Counts 19 and 20.

### iii. Plaintiff Lacks a Private Right of Action Under the ACAA.

In Counts Twenty-Two through Thirty-Three, Plaintiff brings claims under the Air Carrier Access Act ("ACAA"), ⚑ 49 U.S.C. § 41705, alleging that the Airline Defendants discriminated against him on the basis of his disability. (Compl. ¶¶ 699-768.) The Airline Defendants move to dismiss these claims on the basis that no private cause of action exists under the ACAA. (Airline Defs.' Mem. at 10-11.) The Court agrees.

The ACAA provides that an air carrier:

> [m]ay not discriminate against an otherwise qualified individual on the following grounds: (1) the individual has a physical or mental impairment that substantially limits one or more major life activities; (2) the individual has a record of such an impairment; (3) the individual is regarded as having such an impairment.

⚑ 49 U.S.C.§ 41705(a).

However, the ACAA does not expressly bestow the right to sue to enforce this right. "[P]rivate rights of action to enforce federal law must be created by Congress." ⚑ *Alexander v.*

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 15 of 103

Andreadakis v. Center for Disease Control & Prevention, Not Reported in Fed. Supp....

*Sandoval*, 532 U.S. 275, 286 (2001). When Congress does not create an explicit private right of action, courts may interpret the structure and language of the statute to determine if Congress nevertheless intended to imply a right of action. *Id.*

Although the Fourth Circuit has not directly addressed this question, other circuits have determined that the ACAA does not create a private right of action. *See* ⚑*Love v. Delta Air Lines*, 310 F.3d 1347, 1354 (11th Cir. 2022) ("Moreover, taken together, the text of the ACAA ... and the surrounding statutory and regulatory structure create an elaborate and comprehensive enforcement scheme that belies any congressional intent to create a private remedy."); *Lopez v. JetBlue Airways*, 662 F.3d 593, 597 (2d Cir. 2011) (concluding that "the text and structure of the ACAA manifests no congressional intent to create a private right of action in a federal district court"); *Boswell v. Skywest Airlines, Inc.*, 61 F.3d 1263, 1270 (10th Cir. 2004) ("Congress' creation of a specific means of enforcing the statute indicates that it did not intend to allow an additional remedy — a private right of action — that it did not expressly mention at all."); *Segalman v. Southwest Airlines Co.*, 895 F.3d 1219, 1229 (9th Cir. 2018) ("In sum, the ACAA's legislative history is insufficient to overcome the strong suggestion that the statute's remedial scheme forecloses an implied private cause of action.").

**\*10** The Court finds the reasoning of these circuit courts persuasive. The ACAA does not provide a private right of action for Plaintiff to sue the Airline Defendants in this Court. Accordingly, the Court will dismiss his claims under the ACAA.

### iv. Plaintiff's Claims Under the Rehabilitation Act Fail.

Plaintiff also brings claims under the Rehabilitation Act in Counts Twenty-One, Twenty-Two and Twenty-Four through Thirty-Three. The Airline Defendants move to dismiss these claims, arguing that the Rehabilitation Act does not apply to them. (Airline Defs.' Mem. at 13.)

The Rehabilitation Act prohibits discrimination against disabled individuals with respect to any program or activity that receives federal financial assistance. ⚑29 U.S.C. § 794(a). Courts have defined the term "federal financial assistance" with respect to the Rehabilitation Act "to mean the federal government's provision of a subsidy to an entity."

*Shotz v. American Airlines, Inc.*, 420 F.3d 1332, 1335 (11th Cir. 2005). The Supreme Court has held that the Rehabilitation Act generally does not apply to commercial airlines, because airlines did not receive federal financial assistance within the meaning of the statute. ⚑*U.S. Dep't of Trans. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 599 (1986). However, courts must still determine whether a particular defendant is subject to the statute. "Generally, to determine the applicability of the Rehabilitation Act, a court must determine whether the government intended to give the defendant a subsidy, as opposed to compensation." *Tavares v. United Airlines*, 2015 WL 5026197, at \*7 (E.D. Va. Aug. 24, 2015).

Plaintiff alleges that the Rehabilitation Act applies to Defendant Airlines, because they "have accepted financial assistance during the COVID-19 pandemic, subjecting them to the Rehabilitation Act." (Compl. ¶ 689.) Defendants contend that they only received government funds pursuant to the Payroll Support Program established under the Coronavirus Aid, Relief and Economic Security Act ("CARES Act"). (Airline Defs.' Mem. at 13.) They could use this money "exclusively for the continuation of Wages, Salaries, and Benefits" to airline employees. (Airline Defs.' Mem. at 13.) Because the government restricted the way in which they could use the funds, rather than giving them discretion, the funds do not constitute federal financial assistance within the meaning of the Rehabilitation Act. (Airline Defs.' Mem. at 13.)

In *Schotz*, the Eleventh Circuit found that the Rehabilitation Act did not apply to airlines even though the government had provided them funds via the Stabilization Act in response to the September 11 attacks. 420 F.3d at 1337. The Eleventh Circuit determined that the Stabilization Act responded to the economic crises that the airline industry faced as a result of the terrorist attacks, thus compensating airlines for their losses rather than generally subsidizing them. *Id.* at 1336. The court found that Congress could not have intended to undermine the ACAA and the accompanying regulatory scheme when it responded to the economic crises. *Id.* at 1337.

The Court finds that this reasoning applies here. Plaintiff has not demonstrated that Congress intended the CARES Act to undermine the ACAA. Nor has he rebutted the argument that the CARES Act responded to the economic crises created by COVID-19, compensating the airlines for their losses rather than providing a general subsidy. Thus, on the record before it, the Court does not find that the CARES Act

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 16 of 103

Andreadakis v. Center for Disease Control & Prevention, Not Reported in Fed. Supp....

provided an exception to the Supreme Court's general rule that the Rehabilitation Act does not apply to the airlines. Accordingly, the Court will dismiss Plaintiff's claims under the Rehabilitation Act.

### v. Plaintiff's Claim Under the
### Virginia Human Rights Act Fails.

**\*11**  In Count Thirty-Four, Plaintiff brings a claim under the Virginia Human Rights Act ("VHRA") against the Airline Defendants for the alleged disability discrimination. (Compl. ¶¶ 775-88.) The Airline Defendants move to dismiss this count, arguing that several federal laws preempt it. (Airline Defs.' Mem. at 16-18.)

The Airline Deregulation Act provides that:

> [A] state, political subdivision of a State, or political authority of at least 2 states may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

🚩 49 U.S.C. § 41713(b)(1).

In *Morales v. Trans World Airlines*, the Supreme Court broadly interpreted the scope of the pre-emption provision. 🚩 504 U.S. 374 (1992). The Court held that the "relat[ed] to" phrase "express[es] a broad pre-emptive purpose," such that the statute preempts claims that have a "connection with, or reference to" an airline's prices, routes or services. 🚩 *Id* at 378, 383. The statute preempts even general statutes when particularly applied to airlines. 🚩 *Id* at 386. Thus, it preempted the application of general state consumer protection statutes to airline fare advertising. *Id.*

Here, Plaintiff seeks to apply a general statute — the VHRA — to the airlines. Specifically, he seeks to enforce his claims under the ACAA by way of the VHRA. (Compl. ¶ 778.) Essentially, he alleges that the airlines discriminated against him by refusing to let him board the plane without a mask,

despite his disability preventing him from safely wearing a mask. However, the Fourth Circuit has determined that the Deregulation Act preempts claims related to boarding practices. *See* 🚩 *Smith v. Comair, Inc.*, 134 F.3d 254, 259 (4th Cir. 1998) ("Smith's tort claims are based in part upon Comair's refusal of permission to board. Undoubtedly, boarding procedures are a service rendered by an airline. Therefore, to the extent Smith's claims are based upon Comair's boarding practices, they clearly relate to an airline service and are preempted under the [Deregulation Act].") (cleaned up). Moreover, to the extent that Plaintiff could argue that his claim stems from the airlines' refusal to grant him an exemption to the Mask Mandate when selling him a ticket, this likewise would fall under the services provided by an airline. Accordingly, Plaintiff's claim under the VHRA — Count Thirty-Four — is preempted, and the Court will dismiss it.

### vi. Plaintiff's Breach of Contract Claim Fails.

In Count 35, Plaintiff brings a breach of contract claim against the Airline Defendants, alleging that the Airline Defendants breached the contract of carriage when forcing Plaintiff to wear a mask when the parties did not agree to it in the contract. (Compl. ¶¶ 789-804.) Additionally, Plaintiff claims that United's contract terms requiring face coverings lack legal enforceability. (Compl. ¶ 796.) Defendant argues that the Court must dismiss this Count, arguing that the Deregulation Act preempts the breach of contract claim. (Airline Defs.' Mem. at 18-19.)

The Supreme Court has recognized a narrow exception to the Deregulation Act's preemption for some breach of contract claims. In *American Airlines, Inc. v. Wolens*, the Court carved out an exception for certain contract claims against airlines for actions that seek to enforce the parties' "own, self-imposed undertakings," such as agreements with respect to a frequent flyer program. 🚩 513 U.S. 219, 228 (1995). However, the Court limited this exception to breach of contract actions confined to the terms of the contract, "with no enlargement or enhancement based on state laws or policies external to the agreement." 🚩 *Id.* at 233. "Thus, when a contract claim cannot be adjudicated without resort to outside sources of law, the claim is still preempted by the [Deregulation Act]." 🚩 *Smith*, 134 F.3d at 257. The Fourth Circuit has held that preemption applies when a contract claim "can

Case 1:23-cv-04033-LJL   Document 180-1   Filed 11/20/23   Page 17 of 103

*Andreadakis v. Center for Disease Control & Prevention*, Not Reported in Fed. Supp....

only be adjudicated by reference to law and policies external to the parties' bargain," or "directly implicates the airline's discretion and/or duty under federal law." *Id.* at 258.

**\*12** Here, Plaintiff's breach of contract claim arises out of the Airline Defendants requiring him to wear a mask on the flight or obtain a medical exemption. Put differently, Plaintiff sues the Airlines for enforcing the Mask Mandate — federal law. Thus, Plaintiff's breach of contract claim "directly implicates the airlines' discretion and/or duty under federal law," *id*, and, therefore, the Deregulation Act preempts it. The Court will dismiss Count Thirty-Five.

### vii. Plaintiff's Other State Law Claims Fail.

In Counts Thirty-Six through Forty, Plaintiff alleges various other state law claims, including reckless endangerment, practicing medicine without a license, invasion of privacy, deceptive and misleading trade practices and fraudulent misrepresentation. (Compl. ¶¶ 805-51.) The Airline Defendants move to dismiss these claims as preempted by the Deregulation Act or as failing to state a claim. (Airline Defs.' Mem. at 19-22.)[3]

As discussed above, the Deregulation Act preempts state laws "related to a price, route, or service of an air carrier." 49 U.S.C. § 41713. The Fourth Circuit has recognized that "[s]uits stemming from outrageous conduct on the part of an airline toward a passenger will not be preempted under the [Deregulation Act] if the conduct too tenuously relates or is unnecessary to an airline's services." *Smith*, 134 F.3d at 259. The court gave the example that an airline holding a passenger without a safety or security justification would not give rise to preemption of that passenger's false imprisonment claim.

Here, all of Plaintiff's allegations arise from his claims that the Airline Defendants improperly required him to adhere to the Mask Mandate or submit proof of a required medical exemption. However, all of these relate to the Airlines' services. Additionally, the allegations in no way rise to the level of "outrageous conduct" that would allow them to escape preemption. Instead, the allegations show the Airline Defendants complying with law as set forth in the Mask Mandate. Accordingly, the Court will dismiss Counts Thirty-Six through Forty as preempted.

### viii. Plaintiff's Claim for Infringement of Right to Travel Fails.

In Count Forty-One, Plaintiff alleges that the Airline Defendants infringed on his constitutional right to travel. (Compl. ¶ 852-68.) The Airline Defendants move to dismiss this count, arguing that Plaintiff does not enjoy a constitutional right to travel by airplane. (Airline Defs.' Mem. at 22.) The Court agrees.

Individuals enjoy a constitutional right to travel. *Saenz v. Roe*, 526 U.S. 489, 498 (1999) ("[T]he constitutional right to travel from one State to another is firmly embedded in our jurisprudence."). However, courts have recognized that individuals do not enjoy a constitutional right to travel by the method of their choice. *See, e.g., Town of Southold v. Town of East Hampton*, 477 F.3d 38, 54 (2d Cir. 2007) ("[T]ravelers do not have a constitutional right to the most convenient form of travel[, and] minor restrictions on travel simply do not amount to the denial of a fundamental right."); *Gilmore v. Gonzales*, 435 F.3d 1125, 1137 (9th Cir. 2006) (noting that the plaintiff "does not possess the fundamental right to travel by airplane even though it is the most convenient mode of travel for him"); *Cramer v. Skinner*, 931 F.2d 1020, 1031 (5th Cir. 1991) ("Minor restrictions on travel simply do not amount to the denial of a fundamental right that can be upheld only if the Government has a compelling justification.").

**\*13** The Airline Defendants have not denied Plaintiff his fundamental right to travel. He may still travel by means other than aircraft. Further, he may travel by aircraft without a mask by obtaining an exemption. Or, he may travel by airplane with a mask. Thus, the Mask Mandate amounts to nothing more than a minor restriction on his travel, such that he cannot bring a claim for the denial of a constitutional right. Accordingly, the Court will dismiss Count Forty-One.

### ix. Plaintiff's International Covenants Claims Fail.

In Counts Forty-Two and Forty-Three, Plaintiff brings claims for violations of international law. (Compl. ¶¶ 869-82.) Specifically, Plaintiffs claims that the Airline Defendants have violated the International Covenant on Civil & Political Rights ("ICCPR") in Count Forty-Two and the Convention on Civil Aviation in Count Forty-Three. The Airline Defendants

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 18 of 103

Andreadakis v. Center for Disease Control & Prevention, Not Reported in Fed. Supp....

move to dismiss these claims, arguing that Plaintiff lacks a cause of action to enforce these covenants. (Airline Defs.' Mem. at 23.) The Court agrees.

Generally, treaties do not carry the force of law that affords an individual a private right of action to enforce its terms. *Medellin v. Texas*, 552 U.S. 491, 505 (2008) ("In sum, while treaties may comprise international commitments, they are not domestic law unless Congress has either enacted implementing statutes or the treaty itself conveys an intention that it be 'self-executing' and is ratified on these terms."). More specifically, the Supreme Court has recognized that the ICCPR binds the United States as a matter of common law, but "the United States ratified the [ICCPR] on the express understanding that it was not self-executing and so did not itself create obligations enforceable in the federal courts." *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004).

Plaintiff has not identified any reason why these two treaties confer a private cause of action that would allow him to prosecute these claims. Accordingly, the Court will dismiss Counts Forty-Two and Forty-Three. In sum, the Court will grant the Airline Defendants' Motion to Dismiss and will dismiss counts Nineteen through Forty-Three. [4]

### C. Plaintiff's Claims Against the Federal Defendants Are Moot.

Plaintiff brings Counts One through Eighteen against the CDC and HHS, asking the Court to set aside the Mask Mandate and Testing Order and enjoin those agencies from enforcing the mandates. However, the Court lacks subject matter jurisdiction over those claims, because the orders do not remain in effect. Thus, Plaintiff cannot claim a continuing injury that the Court can redress, rendering his claims moot.

The Court has an independent duty to satisfy itself of its own subject matter jurisdiction even where the defendant does not directly challenge it. *Andrus v. Charleston Stone Products Co., Inc.*, 436 U.S. 604, 608 n.6 (1978); *see United States v. Urutyan*, 564 F.3d 679, 684 (4th Cir. 2009) ("Nevertheless, we are obliged to satisfy ourselves of subject-matter jurisdiction, even where the parties concede it."). Indeed, "questions of subject matter jurisdiction must be decided first, because they concern the court's very power to hear the case." *Owens-Illinois v. Meade*, 186 F.3d 435, 442 n.4 (4th Cir. 1999). Following the vacatur of the Mask Order,

the Court ordered Plaintiff to brief the effect of the Vacatur Order on his claims, including which ones he intended to continue to litigate, and which ones had become moot. (ECF No. 87 at 14-15.) Plaintiff responded that he intended to press forward with all of his claims and that the Vacatur Order had not mooted any of them. (ECF No. 89.) The Court disagrees.

**\*14** Article III of the Constitution limits the Court's jurisdiction to cases and controversies. U.S. Const. art. III, § 2, cl. 1; *Eden, LLC v. Justice*, 36 F.4th 166, 169 (4th Cir. 2022). The mootness doctrine finds its root in the case-or-controversy limitation on federal judicial power, preventing a federal court from issuing advisory opinions on legal questions without a live controversy before it. *Eden*, 36 F.4th at 169. Thus, a "pending lawsuit is rendered moot when the issues presented are no longer live or the parties lack a legally cognizable interest in the outcome." *Lighthouse Fellowship Church v. Northam*, 20 F.4th 157, 162 (4th Cir. 2021). Courts "may only decide cases that matter in the real world" at the time that they decide them. *Eden*, 36 F.4th at 170. Decisions have no "practical effect in the real world" when a plaintiff has already received the relief sought in the lawsuit. *Id.* To that end, if "one of the elements essential to standing, like injury-in-fact, no longer obtains," then "a case is moot." *American Federation of Government Employees v. Office of Special Counsel*, 1 F.4th 180, 187 (4th Cir. 2021). In the context of challenging a government order no longer in effect, deciding the legality of the order would amount to issuing "an opinion advising what the law would be upon a hypothetical state of facts, in which the challenged orders had never been rescinded — which [courts] of course lack jurisdiction to provide." *Id.* (cleaned up).

Here, Plaintiff asks the Court to set aside two orders that the government no longer enforces and that no longer have any legal effect. TSA's Security Directives and Emergency Amendments, the enforcement mechanism of the Mask Order, expired on May 3, 2022. It has not been renewed. Additionally, on April 18, 2022, a federal district court vacated the Mask Order. *Health Freedom Defense Fund*, 2022 WL 1134138. Accordingly, effective April 18, 2022, the CDC considers the Mask Mandate "no longer in effect" and, as a result, "CDC will not enforce the Order." [5]

Likewise, effective June 12, 2022, the CDC rescinded the Testing Order. 87 Fed. Reg. 36129 (June 15, 2022). In rescinding the Testing Order, the CDC cited the "widespread uptake of effective COVID-19 vaccines," immunity bestowed

Case 1:23-cv-04033-LJL Document 180-1 Filed 11/20/23 Page 19 of 103

Andreadakis v. Center for Disease Control & Prevention, Not Reported in Fed. Supp....

by infection and vaccines and the availability of effective therapeutics. 87 Fed. Reg. at 36130. The CDC determined that these tools available to travelers could replace the testing requirement. *Id* Indeed, the CDC noted that the public did not have these tools available to it in January 2021 when it concluded that the Testing Order constituted a reasonable and necessary measure to help mitigate the spread of COVID-19. *Id.* at 362130-31.

Therefore, because neither order remains in effect, Plaintiff's claims to set aside the Orders do not present a live controversy. Plaintiff claims that the Orders injure him by forcing him to wear a mask while flying or risk a ban from using public airspace. (ECF No. 21 at 26.) Without continued enforcement of the complained-of Orders, neither of these harms can materialize. Thus, Plaintiff can no longer claim an injury-in-fact. Likewise, his claim to standing lacks redressability, as the Court cannot redress Plaintiff's claimed injury. Neither Order remains subject to enforcement, so the Court enjoining their enforcement and setting them aside would provide no additional relief to Plaintiff. As such, his claims against the Federal Defendants are moot. Absent an exception to the mootness doctrine, discussed below, the Court must dismiss his claims.

In arguing that the government will reinstate the Orders (ECF No. 89), Plaintiff appears to invoke the "voluntary cessation" exception to the mootness doctrine. "Pursuant to the voluntary cessation exception, a civil action does not become moot when a defendant voluntarily ceases its allegedly improper behavior, if there is a reasonable chance that the behavior will resume." *Lighthouse Fellowship Church*, 20 F.4th at 162. The exception seeks to eliminate the litigation tactic of "evad[ing] judicial review by temporarily altering questionable behavior." *Eden, LLC*, 36 F.4th at 170. As in the case here, "in circumstances where a challenged governmental regulation or legislation has expired, the inapplicability of the voluntary cessation exception has been established in several significant situations where mootness has been found." *Lighthouse Fellowship Church*, 20 F.4th at 163 (first citing *Trump v. Hawaii*, 138 S. Ct. 377 (2017) (Mem.); then citing 🔖 *Kremens v. Bartley*, 431 U.S. 119 (1977); and then citing 🔖 *Burke v. Barnes*, 479 U.S. 361 (1987).).

**\*15** Here, the Court finds that the voluntary cessation exception does not apply. First, the Court questions whether the exception could even apply to the Mask Order, as

Defendants did not *voluntarily* rescind the order. Rather, a federal district court vacated the order and then the gove^ment allowed it to expire. However, even if the exception could apply in this situation, the Court does not find it reasonable to expect that enforcement will recur. The return of enforcement of the Mask Order would require the Eleventh Circuit to vacate the district court's opinion in *Health Freedom Defense Fund*. Then, the TSA would need to renew the enforcement order, which expired on May 3, 2022. Especially in light of the changed circumstances that the CDC cited when lifting the Testing Order, the Court finds this too speculative to invoke the voluntary cessation doctrine.

Additionally, the cessation of enforcement can in no way be attributed to an effort by the government to moot this litigation. The lack of an evasive litigation tactic resembles the defendant's actions in 🔖 *American Federation of Government Employees v. Office of Special Counsel*, 1 F.4th 180 (4th Cir. 2021), where the plaintiffs challenged an advisory opinion of the Office of Special Counsel ("OSC") that related to the 2020 election. After the district court ruled, but before the Fourth Circuit ruled, the OSC withdrew its opinion, because the 2020 election was over. *Id.* at 284. The Fourth Circuit rejected the application of the "voluntary cessation" doctrine, because "there [was] no whiff of any of the opportunism, on the part of the defendant, that typically supports invocations of mootness exceptions where voluntary cessation of the challenged conduct is at issue." 🔖 *Id* at 188. The OSC had not withdrawn its opinion "with the aim of avoiding judgment in court" and, therefore, the court dismissed the appeal as moot. 🔖 *Id* at 188. Likewise, here, Defendants did not rescind or stop enforcing the Orders with the aim of avoiding judgment in this Court, and the Court sees no traces of opportunism in their decisions.

Finding Plaintiff's claims moot comports with how other courts have treated challenges to expired COVID-19 restrictions. For example, in *Lighthouse Fellowship Church*, the Fourth Circuit held that the plaintiff's challenges to Virginia's COVID-19 related restrictions were moot, because the restrictions had ended between the time the district court had ruled and when the Fourth Circuit issued its ruling. 20 F.4th at 161, 166 (4th Cir. 2021.) In finding it unreasonable that Governor Northam would reinstate the expired restrictions, the court relied in large part that "the current circumstances [were] materially different from those present at the outset of the pandemic." *Id.* at 164. The court cited greater knowledge of COVID-19 and how "vaccines

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 20 of 103

Andreadakis v. Center for Disease Control & Prevention, Not Reported in Fed. Supp....

and other measures to combat the virus have led to a significant change in the relevant circumstances." *Id.* Thus, the court found it "entirely speculative to assert that Governor Northam" would reinstate the restrictions. *Id.* Thus, the "voluntary cessation" exception to mootness did not apply, and the court dismissed the claims as moot.

Likewise, in *Eden, LLC*, the Fourth Circuit held that plaintiff's challenges to West Virginia's terminated COVID-19 safety measures became moot on appeal. 36 F.4th at 172. The court cited cases from numerous other circuits also finding challenges to terminated COVID-19 related restrictions moot. *Id.* at 171. Yet again, the court cited the change in circumstances, including "vaccines and other measures to combat the virus," to find the "likelihood of recurrence still more remote." *Id.* Accordingly, the court dismissed the plaintiff's claims as moot. *Id.*

Here, the Court finds the reasoning in these recent Fourth Circuit cases compelling. Circumstances have changed, as cited by the CDC in rescinding the Testing Order, including the availability of vaccines and other safety measures employed to combat the virus. Thus, the Court finds it unreasonable to expect that enforcement of these terminated Orders will recur. Therefore, the Court will dismiss Plaintiff's claims against the Federal Defendants as moot.

## IV. CONCLUSION

**\*16** For the reasons stated above, the Court will DISMISS WITHOUT PREJUDICE Counts One through Eighteen for lack of subject matter jurisdiction, because the Court finds these claims moot. Additionally, the Court will GRANT the Airline Defendants' Motion to Dismiss (ECF No. 78), and DISMISS WITH PREJUDICE Plaintiff's claims against the Airlines in Counts Nineteen through Forty-Three for failure to state a claim upon which relief can be granted. Finally, the Court will also GRANT Defendant STAT-MD's Motion to Dismiss (ECF No. 80) and DISMISS WITHOUT PREJUDICE Counts Nineteen and Forty-Four for lack of personal jurisdiction.

An appropriate Order shall issue.

## All Citations

Not Reported in Fed. Supp., 2022 WL 2674194

## Footnotes

1    Federal Transit Administration, *Federal Mask Requirement for Transit*, https://www.transit.dot.gov/TransitMaskUp (last visited July 5, 2022).

2    Because the personal jurisdiction question presents a threshold inquiry that the Court must first resolve, the Court need not address the arguments raised by STAT-MD in support of its Rule 12(b)(6) motion. However, the Court finds that these arguments have merit. The Court notes that it would also dismiss Plaintiff's claims against STAT-MD for failure to state a claim for the reasons that it dismisses them against the Airline Defendants and for the reasons set forth in STAT-MD's Memorandum, especially in light of Plaintiff's failure to rebut the arguments.

3    Defendants correctly point out that no civil cause of action exists for reckless endangerment (Count Thirty-Six). Even if such a cause of action did exist, it would be preempted for the reasons stated herein. Likewise, even if Plaintiff had alleged facts in Count Thirty-Seven to show that the Airline Defendants practiced medicine without a license (he has not), then such a claim would be preempted.

4    The Airline Defendants argue that the Court lacks personal jurisdiction over Plaintiff's claims against them, because he has not alleged that he bought a ticket to use their services. (Airline Defs.' Mem. at 24.) However, Plaintiff has alleged that he attempted to fly or was denied the ability to fly on each of the airlines. (Compl. ¶¶ 8,

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 21 of 103

Andreadakis v. Center for Disease Control & Prevention, Not Reported in Fed. Supp....

10, 18, 23-24.) At this stage, construing these allegations in Plaintiff's favor, the Court finds these allegations sufficient to confer personal jurisdiction.

5      https://www.cdc.gov/coronavirus/2019-ncov/travelers/travel-during-covid 19.html

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2009 WL 3260499
Only the Westlaw citation is currently available.
United States District Court,
E.D. New York.

Mohamed BARY, Plaintiff,
v.
DELTA AIRLINES, INC., Defendant.

Civil Action No. CV–02–5202(DGT).
|
Oct. 9, 2009.

West KeySummary

1    **Civil Rights**    Public Conveyances

Passenger stated a prima facie claim against airline under § 1981 when he alleged that he was discriminated against on the basis of ethnicity when airline refused to permit him to carry on his merchandise bag. Passenger testified that other white passengers were permitted to carry their bags onto the plane in order to give rise to an inference of race-based discrimination. Further, airline failed to articulate a legitimate, non-discriminatory reason for not allowing passenger to carry on his bag. 42 U.S.C.A. § 1981.

**Attorneys and Law Firms**

Sanjay Chaubey, New York, NY, for Plaintiff.

Michael J. Crowley, Gallagher Gosseen Faller & Crowley, Garden City, NY, for Defendant.

*MEMORANDUM AND ORDER*

TRAGER, District Judge.

**\*1** Mohamed Bary ("plaintiff") brings this action against Delta Airlines, Inc. ("defendant" or "Delta"), alleging that the air carrier discriminated against him, in violation of 42 U.S.C. § 1981 ("Section 1981"), Title VI of the Civil Rights Act of 1964, 42 U.S.C. § 2000d ("Title VI") and the New York Civil Rights Law ("NYCRL"), when it prevented him from carrying his bag onto a Delta flight. Plaintiff also seeks relief, under state law theories of negligence and bailment, for the jewelry he alleges was missing from the bag when he went to collect it after Delta forced him to check the bag. Defendant has moved for summary judgment on all of plaintiff's claims. For the reasons set forth below, defendant's motion is granted in part and denied in part.

**Background**

**(1)**

Plaintiff is a former resident of Sri Lanka who identifies himself as a Muslim Arab. Dep. of Mohamed Bary ("Bary Dep.") at 113. While living in Sri Lanka, plaintiff was in the jewelry business and transported jewelry into the United States on numerous occasions. *Id.* at 13–15. He moved to the United States in September 2000 in order to improve this business. *Id.* at 10–11. Here, he incorporated Bary Gems, Inc., of which he is the current owner and sole proprietor. Def.'s Statement Pursuant to Local Rule 56.1 ("Def.'s 56.1") ¶ 4; Bary Dep. at 20–21.

On November 8, 2001, plaintiff was a ticketed passenger on a Delta flight from LaGuardia Airport ("LaGuardia") to Denver, with a stop in Cleveland. Def.'s 56.1 ¶ 1. He purchased the tickets for his original flight through the Priceline.com website. [1] Bary Dep. at 78. The purpose of the trip was to attend an international gem and jewelry trade show where plaintiff hoped to sell some of his jewelry. *Id.* at 24, 89–90; Def.'s 56.1 ¶ 3. Plaintiff generally traveled to 25 or 30 similar trade shows each year. Bary Dep. at 24–25.

For his trip to Denver, plaintiff had packed two bags, one containing clothes, which he planned on checking in, and the other containing gems and jewels, which he expected to carry onto the plane (hereinafter, the "merchandise bag"). *Id.* at 75. He placed a lock on the merchandise bag to ensure that its contents would be secure. *Id.* at 76. The gems and jewels contained in the merchandise bag were comprised mostly of items that plaintiff had obtained from several different vendors on a consignment basis. *Id.* at 25–27, 62–66. In other words, much of the gems and jewels in the merchandise bag were not actually owned by plaintiff, but were loaned to him

by vendors who expected that the jewelry would either be returned to them or that plaintiff would sell the jewelry and then pay them a certain price. *Id.* at 27.

Having arrived early for his originally scheduled flight, plaintiff approached the Delta ticket counter to inquire about taking an earlier flight. *Id.* at 81. He was greeted at the counter by Vera Hall, a Delta customer service agent. Bary Dep. at 81–82; Dep. of Vera Hall ("Hall Dep.") at 6. Plaintiff presented his ticket to Hall, who then looked up his record on her computer. Bary Dep. at 81. Hall informed plaintiff that he was on a "random checklist," which required that his bags be hand-searched. *Id.* at 82–83, 104. She asked that plaintiff accompany her to a search area, which was located to the right of the ticket counter. *Id.* at 83, 93. Plaintiff followed Hall without protest. *Id.* at 83–84.

 **\*2** At the search area, plaintiff informed Hall that the merchandise bag contained jewelry and that although he did not mind having it searched, he wanted to carry the bag on the plane with him. *Id.* at 84–85. Hall then returned to her station at the ticket counter. *Id.* at 85. A security officer proceeded to look through plaintiff's merchandise bag, inspecting each item individually. *Id.* at 85, 87. Hall later returned with a baggage tag. *Id.* at 88. The security officer continued searching through the merchandise bag with Hall present. *Id.* at 89. Plaintiff, therefore, claims that Hall saw what was inside the merchandise bag. *Id.* at 89, 91. Plaintiff also explained to the security officer that he was on his way to a gem and jewelry trade show. *Id.* at 89–90. Once the security officer finished looking through the merchandise bag, plaintiff, once again, secured it with a lock. *Id.* at 92. Hall then placed a tag on the merchandise bag. *Id.* at 90. The security officer completed the search by briefly looking through plaintiff's clothing bag. *Id.*

After both bags had been searched, Hall told plaintiff that he would not be permitted to carry the merchandise bag on board. [2] *Id.* at 90. Plaintiff was, therefore, forced to check both of his bags, despite having made it clear to Hall that he wanted to carry the merchandise bag on the plane with him. *Id.* at 90, 127. In return, Hall presented plaintiff with two baggage tag receipts. [3] *Id.* at 125–27. When plaintiff asked Hall why other passengers were permitted to carry their bags onto the plane, Hall explained that Delta had discretion to decide who could carry baggage onto the plane. *Id.* at 90–91, 94. Plaintiff alleges that he was the only passenger who was not permitted to bring his bags on board. *Id.* at 113–14, 123–

24. He further asserts that his merchandise bag met Delta's carry on size requirement. *Id.* at 107.

The merchandise bag was the same bag in which plaintiff generally carried his jewelry when he traveled to trade shows. *Id.* at 70, 77. According to plaintiff, he had never before been prevented from carrying his merchandise bag on board prior flights with any airline. *Id.* at 77.

### (2)

Delta's version of the events is different in certain critical aspects. Hall admits that she was aware that plaintiff only wanted to check in one piece of luggage. Hall Dep. at 37–38, 40. Accordingly, she generated only one baggage tag. *Id.* at 38. That tag, however, indicated that plaintiff was designated as a "selectee." *Id.* at 38. Hall's understanding was that anyone designated as a "selectee" had to have his bags hand-searched and could not carry bags onto the plane. *Id.* at 38. Hall did not offer any explanation as to the basis of this belief. She, therefore, generated a second tag, and explained to plaintiff why he would be unable to bring his merchandise bag on board. *Id.*

 **\*3** According to Hall, plaintiff informed her that the reason he did not want to check in the merchandise bag was because it contained jewelry. *Id.* at 40–41. He also told Hall that, because of the bag's contents, he did not want it opened in front of a large group of people. *Id.* at 24. Hall then left the counter to inform her supervisor, James Wlodarczyk, that a passenger was refusing to have his bag searched. *Id.* at 41. Hall claims to have no knowledge of what transpired after Wlodarczyk took control of the situation. *Id.* at 26.

According to Wlodarczyk, once it became clear that plaintiff was a jeweler, he agreed to perform a more private search, as per Delta's established procedure for dealing with individuals who were transporting valuables. Wlodarczyk Dep. at 15, 30–31. The hand-search was, therefore, performed in a completely enclosed area behind a drawn curtain. *Id.* at 17, 43. The only individuals that Wlodarczyk claims were present at the search were himself, plaintiff, a security supervisor and the individual who actually conducted the search. *Id.* at 17. Additionally, Wlodarczyk testified that the merchandise bag was the only bag searched. *Id.* at 23, 31–32. According to Wlodarczyk, once the search was completed and it was determined that the bag did not contain any hazardous material, plaintiff was not prevented from carrying

the merchandise bag onto the plane. *Id.* at 21, 29. Wlodarczyk specifically recalls watching plaintiff make his way to the gate with the merchandise bag in his hand. *Id.* at 21, 31.

### (3)

Plaintiff boarded his flight and was transported to Denver with no further delays. Bary Dep. at 110. He arrived in Denver at approximately 4:00 pm. *Id.* at 133. After landing, plaintiff collected his two checked bags from baggage claim, but did not open the merchandise bag at that time. *Id.* at 128–29. The merchandise bag was still locked and it appeared not to have been opened since being hand-searched at LaGuardia. *Id.* at 129. Plaintiff then ran into M.S. Shafi, a dealer who was also attending the trade show. *Id.* at 131. Shafi, who had rented a car, drove plaintiff and himself to the Merchandise Mart, where the trade show was set to take place. *Id.* at 130–33. Plaintiff then prepared his display, but still did not open the merchandise bag. *Id.* at 133, 136. Plaintiff and Shafi then drove to the hotel where they were both staying. *Id.* at 136.

It was only the following morning, November 9, 2001, when plaintiff was placing the actual sale items on display, that he discovered that two pouches containing jewels and a box holding rings were missing from the merchandise bag. *Id.* at 132. While still in Denver, plaintiff called Delta's toll-free number to determine the procedure for reporting the missing items. *Id.* at 141–42. He was instructed to prepare a written claim, which he submitted to Delta on November 20, 2001. *Id.* at 142–43. Plaintiff attached, to his written claim, a three-page list of items that he believed were missing, and estimated their value at $373,186.81. *Id.* at 143.

**\*4** Plaintiff remained in Denver for the duration of the three-day trade show and then flew back to New York. *Id.* at 163. He reported the lost items to the Denver airport police while departing from Denver International Airport. *Id.* at 165. He also appears to have reported the stolen items to the police at LaGuardia. *See id.* at 162–63. Additionally, plaintiff wrote two letters to Delta concerning the loss of the jewels—one on November 18, 2001 and another on December 3, 2001. *Id.* at 117–20. Plaintiff did not accuse Delta of discrimination in either letter. *Id.* at 117–19.

### (4)

Delta submitted an affidavit from its in-house counsel affirming that Delta's domestic tariff ("Delta's tariff") was "published" pursuant to its business practice. Aff. of David A. Seiler ("Seiler Aff.") ¶ 3. According to the affidavit, the version of Delta's tariff that was in effect on November 8, 2001 listed jewelry among the "items considered unacceptable for transportation in checked baggage with/ without carrier's knowledge." Exhibit to Seiler Aff. ("Delta's Domestic Tariff"). Furthermore, Section J(1)(A) of Delta's tariff limited its liability for the loss of "baggage or other property" to $2,500:

> [L]iability, if any, for the loss ... of a fare-paying passenger's baggage or other property (whether checked or otherwise delivered in to the custody of [Delta] ), shall be limited to an amount equal to the value of the property, plus consequential damages, if any, and shall not exceed the maximum limitation of USD 2500.00 for all liability for each fare-paying passenger (unless the passenger elects to pay for higher liability as provided for in paragraph 3) below). The passenger shall not be automatically entitled to USD 2500.00 but must prove the value of losses or damages.

*Id.; see also* Def.'s 56.1 ¶ 9.

Additionally, Section J(2)(F) of Delta's tariff excluded liability for jewelry unless excess insurance was purchased:

> [Delta] is not responsible for *jewelry,* cash, camera equipment, or other similar valuable items contained in checked or unchecked baggage, unless excess valuation has been purchased. These items should be carried by the passenger.

Delta's Domestic Tariff (emphasis added).

Section J(3) of Delta's tariff permitted a passenger to declare a higher value for checked-in luggage by paying a fee:

> A passenger may, when checking in for a flight and presenting property for transportation, pay an additional charge ... and declare a value higher than ... [certain specified] maximum amounts ... in which event [Delta's] liability shall not exceed such higher declared value.

*Id.*

At his deposition, plaintiff claimed that on November 8, 2001 he was not aware that Delta's tariff excluded liability for jewelry or that he had the option of purchasing excess insurance. Bary Dep. at 73, 108. In his December 3, 2001 letter to Delta, however, plaintiff wrote: "I know that the ticket contract covering my travel excludes responsibility for jewelry and gemstones not declared." *Id.* at 120. At his deposition, plaintiff explained that he only learned about the exclusion of liability for lost jewelry when he consulted with an attorney after the November 8, 2001 flight. *Id.*

**(5)**

**\*5** Plaintiff filed the complaint in the present action on September 26, 2002. On July 10, 2003, plaintiff filed an amended complaint striking out certain unrelated allegations.[4] The amended complaint alleges that defendant: (1) violated 🔖 Section 1981, Title VI and the NYCRL by intentionally discriminating against plaintiff on the basis of race when it refused to allow him to carry on his merchandise bag and (2) was liable, under theories of negligence and bailment, for mishandling plaintiff's merchandise bag, causing certain items to be lost or stolen.

Defendant moves for summary judgment, arguing that: (1) plaintiff's 🔖 Section 1981 and Title VI claims fail because plaintiff provides no evidence of defendant's intent to discriminate on the basis of race; (2) plaintiff's Title VI claim fails because the infusion of federal financing into the airline industry after the September 11, 2001 terrorist attacks does not constitute "Federal financial assistance"; (3) plaintiff's

NYCRL claim fails because an aircraft is not a place of public accommodation under the statute; (4) plaintiff's tort claims are preempted by the Airline Deregulation Act ("ADA") and, thus, Delta's tariff, which limits liability for lost personal items to $2,500, is the sole determinant of the parties' rights and responsibilities under the contract of carriage; and (5) even if Delta is liable for the loss of plaintiff's jewelry and the limitation of liability is found to be unenforceable, plaintiff's damages should be limited to $13,847.76, which is the total amount that he paid the actual owners of the allegedly stolen jewels and gems.

**Discussion**

**(1)**

**Summary Judgment Standard**

Summary judgment should be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). In deciding a summary judgment motion, a court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." 🔖 *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In making this determination, the court must "resolve all ambiguities, and credit all factual inferences that could rationally be drawn in favor of the party opposing summary judgment." 🔖 *Fitzgerald v. Henderson,* 251 F.3d 345, 360 (2d Cir.2001) (citing *Anderson,* 447 U.S. at 249). A non-moving party's "conclusory statements, conjecture, or speculation" are not sufficient to defeat a motion for summary judgment. 🔖 *Kulak v. City of New York,* 88 F.3d 63, 71 (2d Cir.1996). Instead, the non-moving party must present specific facts sufficient to establish that there is a genuine factual issue for trial." 🔖 *Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

**(2)**

**Federal Financial Assistance Under Title VI**

**\*6** Defendant argues that because Delta is not a recipient of federal financial assistance, a prerequisite to liability under 42 U.S.C. § 2000d, it is entitled to summary judgment on plaintiff's Title VI claim. Title VI prohibits discrimination "under any program or activity receiving Federal financial assistance." [5] 42 U.S.C. § 2000d. The Supreme Court has found that Title VI "condition[s] an offer of federal funding on a promise by the recipient not to discriminate, in what amounts essentially to a contract between the Government and the recipient of [federal] funds." *Gebser v. Lago Vista Indep. Sch. Dist.,* 524 U.S. 274, 289, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998); *Soberal–Perez v. Heckler,* 717 F.2d 36, 41 (2nd Cir.1983) (noting the "emphasis [placed] upon the contractual nature of the receipt of federal moneys [under Title VI] in exchange for a promise not to discriminate ...."). Defendant acknowledges that it received funding from the federal government pursuant to the Air Transportation Safety and System Stabilization Act of 2001, Publ. L. No. 107–42, 115 Stat. 230 (2001) (codified as amended 49 U.S.C. § 401010) (the "Stabilization Act"). It argues, however, that the receipt of these funds does not subject it to liability under Title VI because such compensation does not qualify as "Federal financial assistance" under 42 U.S.C. § 2000d. [6] There is no Second Circuit case law on this issue.

In support of its argument, defendant cites to an Eleventh Circuit decision, *Shotz v. Am. Airlines, Inc.,* 420 F.3d 1332 (11th Cir.2005). *Shotz* involved an action brought pursuant to the Rehabilitation Act alleging disability discrimination. *Id.* at 1334. Like Title VI, the receipt of "Federal financial assistance" is a pre-requisite to liability under the Rehabilitation Act. *See* 29 U.S.C. § 794(a) ("No otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ...."). The plaintiffs in *Shotz,* like plaintiff here, argued that the air carrier defendants were subject to the Rehabilitation Act because the aid that they received from Congress pursuant to the Stabilization Act qualified as "Federal financial assistance."

The Eleventh Circuit disagreed, holding that, in passing the Stabilization Act, the express language of the statute makes clear that Congress intended to provide compensation to the airline industry and not to subsidize it (i.e., provide it with financial assistance). *Id.* at 1136 ("Plainly, the express language found in the Stabilization Act unambiguously shows Congress intended for the funds and financial benefits at issue to compensate, not subsidize, airline carriers."). Specifically, "the Stabilization Act begins by stating 'the President shall take the following actions to *compensate* air carriers for losses incurred by the air carriers as a result of the terrorist attacks on the United States that occurred on September 11, 2001.' " *Id.* (quoting the Stabilization Act) (alteration in original). The court reasoned further that "it seems illogical to infer that, in passing the Stabilization Act in response to the enormous economic crisis the airline industry faced as a result of the September 11 terrorist acts, Congress also intended to expose airline carriers to additional economic risk by allowing private lawsuits for damages to be brought under the Rehabilitation Act." *Id.* at 1136.

**\*7** The Eleventh Circuit's reasoning in *Shotz* applies equally to an action under Title VI. It is undisputed that an entity is subject to liability under either the Rehabilitation Act or Title VI only if it receives federal financial assistance. Courts have indicated that the definition of federal financial assistance is the same under both Title VI and the Rehabilitation Act. *See* *Jacobson v. Delta Airlines, Inc.,* 742 F.2d 1202, 1209 (9th Cir.1984) ("The legislative history of the Rehabilitation Act ... indicates that those terms [including 'Federal financial assistance'] were to be given the same meaning as the same terms in ... 42 U.S.C. § 2000d–1 (1982) ( Title VI) ...."); *see also Cook v. Budget Rent–A–Car Corp.,* 502 F.Supp. 494, 500 (S.D.N.Y.1980) ("Not only does Section 601 contain language very similar to that of Section 504 (including the crucial phrase 'Federal financial assistance'), but the 'legislative history' of Section 504, such as it is, makes it clear that Section 504 was patterned after, and intended to have a scope as broad as, Section 601."). Although the phrase "Federal financial assistance" is not defined in the Rehabilitation Act, courts have found that "an entity receives financial assistance when it receives a subsidy," *Nolley v. County of Erie,* 776 F.Supp. 715, 742 (W.D.N.Y.1991) (quoting *DeVargas v. Mason & Hanger–Silas Mason Co.,* 911 F.2d 1377, 1382 (10th Cir.1990)), as opposed to compensation. As demonstrated by the Eleventh Circuit in *Shotz,* the express language of the Stabilization Act evidences Congress' intent to compensate airline carriers for losses sustained as a result of the September 11 attacks and not to provide airlines with a subsidy. Plaintiff's opposition fails

to even address this argument. There is also no indication that Delta received any federal funding outside of the compensation it received pursuant to the Stabilization Act. Accordingly, plaintiff's Title VI claim must be dismissed. [7]

**(3)**

**New York Civil Rights Law**

Plaintiff also alleges that defendant is liable under the NYCRL for discriminating against him in a public accommodation. [8] Defendant argues that plaintiff's NYCRL claim should be dismissed because an aircraft is not a place of public accommodation. [9] Section 40 of the NYCRL protects individuals from discrimination "on account of race, creed, color or national origin," requiring that all persons "be entitled to the full and equal accommodations ... of any places of public accommodations." N.Y. Civ. Rights Law § 40. Section 40 defines "place of public accommodation" as including "all public conveyances, operated on land or water ...." The fact that NYCRL § 40 does not include public conveyances operated in the air indicates that airplanes are not deemed to be places of public accommodation under the statute. Furthermore, under a similar statute, 🚩New York Executive Law ("Executive Law") § 296, [10] the definition of "a place of public accommodation" specifically includes public conveyances operated in the air. *See* N.Y. Exec. Law § 292 (defining the term "place of public accommodation" as including "all public conveyances operated on land or water or in the air"); *see also South African Airways v. New York State Division of Human Rights,* 64 Misc.2d 707, 709, 315 N.Y.S.2d 651, 652 (Sup.Ct. N.Y. County 1970) (noting that 🚩Executive Law 296 "mak[es] it unlawful to discriminate 'directly or indirectly' against a person because of his race, in a 'place of public accommodation,' which obviously includes airplanes"). There is nothing to indicate that a place of public accommodation under the NYCRL includes an aircraft, and plaintiff fails to assert any argument to the contrary. Plaintiff's NYCRL claim is therefore dismissed. [11]

**(4)**

🚩**Section 1981**

**\*8** Plaintiff claims that defendant discriminated against him on the basis of ethnicity, [12] in violation of 🚩42 U.S.C. § 1981 when Delta refused to permit him to carry on his merchandise bag. Defendant argues, however, that plaintiff's 🚩Section 1981 claim should be dismissed because he is unable to show intentional discrimination. 🚩Section 1981 provides, in pertinent part, that "[a]ll persons within ... the United States shall have the same right ... to make and enforce contracts ... as is enjoyed by white citizens." 🚩42 U.S.C. § 1981. The right to make and enforce contracts "includes the making, performance, modification, and termination of contracts, and the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship." 🚩42 U.S.C. § 1981(b). To establish a claim under 🚩Section 1981, "plaintiff must allege facts in support of the following elements: (1) the plaintiff is a member of a racial minority; (2) an intent to discriminate on the basis of race by the defendant; and (3) the discrimination concerned one or more of the activities enumerated in the statute (i.e., make and enforce contracts, sue and be sued, give evidence, etc.)." *Mian v. Donaldson, Lufkin & Jenrette Sec. Corp. .,* 7 F.3d 1085, 1087 (2d Cir.1993) (per curiam). The parties do not dispute that plaintiff is a member of a racial minority and that the alleged discrimination concerned one of the enumerated activities in 🚩Section 1981. The only element at issue is whether plaintiff can demonstrate intentional discrimination on the part of defendant.

A plaintiff can prove intentional discrimination through either direct or circumstantial evidence. "Essential to an action under 🚩Section 1981 are allegations that the defendants' acts were purposefully discriminatory and racially motivated." 🚩*Albert v. Carovano,* 851 F.2d 561, 571 (2d Cir.1988) (en banc) (internal citations omitted). There is no direct evidence that defendant's decision not to allow plaintiff to carry on his merchandise bag was racially motivated. Plaintiff, therefore, relies on circumstantial evidence, namely that other passengers, who were white, were permitted to carry bags on the plane. The Second Circuit has recognized that because proving purposeful discrimination is often difficult, "plaintiffs in discrimination suits often must rely on the

cumulative weight of circumstantial evidence." *Norton v. Sam's Club,* 145 F.3d 114, 119 (2d Cir.1998).

The framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), is the procedure most often utilized where the evidence of discrimination is circumstantial. *See Fullard v. City of New York,* 274 F.Supp.2d 347, 354 (S.D.N.Y.2003). Although the *McDonnell Douglas* burden shifting framework was originally introduced for the purpose of analyzing employment discrimination claims under Title VII, it has been similarly employed by plaintiffs alleging intentional discrimination under Section 1981. *See Patterson v. County of Oneida,* 375 F.3d 206, 225 (2d Cir.2004); *see also Gant v. Wallingford Bd. of Educ.,* 195 F.3d 134, 146 (2d Cir.1999); *Harris v. Allstate Ins. Co.,* 83 F.Supp.2d 423, 431 (S.D.N.Y.2000) ("The adjudication of a discrimination claim pursuant to § 1981 follows the three-step procedure set forth in *McDonnell Douglas."* ).

**\*9** Under the *McDonnel Douglas* three-step procedure, the plaintiff bears the initial burden of proving, by a preponderance of the evidence, a prima facie case of discrimination. *Holcomb v. Iona Coll.,* 521 F.3d 130, 138 (2d Cir.2008). The plaintiff's burden of establishing a prima facie case is "minimal." *McPherson v. New York City Dep't of Educ.,* 457 F.3d 211, 215 (2d Cir.2006). Nevertheless, the plaintiff must still identify "circumstances giving rise to an inference of discrimination on the basis" of race. *McLee v. Chrysler Corp.,* 109 F.3d 130, 134 (2d Cir.1997). "An 'inference of discrimination arises when [an] individual of one race [is] treated less favorably than those of another race who are similarly situated.' " *Drayton v. Toys 'R' U.S., Inc.,* 645 F.Supp.2d 149, 2009 WL 2170233, at \*6 (S.D.N.Y. July 17, 2009) (citation omitted) (alteration in original).

If the plaintiff succeeds in establishing a prima facie case of discrimination, "the burden shifts to the defendant to articulate 'some legitimate, non-discriminatory reason' for its action." *Holcomb,* 521 F.3d at 138 (quoting *McDonnell Douglas,* 411 U.S. at 802). Once the defendant is able to provide such a reason, the plaintiff can no longer rely on the presumption that was raised by the prima facie case. *Id.* Instead, the burden shifts back to the plaintiff to demonstrate that the reasons offered by the defendant are pre-textual

and that defendant's action was actually motivated by race. *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) ("[S]hould the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination."). "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." *Holcomb,* 521 F.3d at 138. Therefore, even if a plaintiff is able to show pre-text, "[t]he court must examine the entire record to determine if plaintiffs meet their ultimate burden of persuading the fact-finder ... that defendants intentionally discriminated against them on the basis of their race." *Lizardo v. Denny's, Inc.,* 270 F.3d 94, 103 (2d Cir.2001).

At the prima facie stage, where, as noted, plaintiff's burden is *de minimus,* plaintiff's testimony that other white passengers were permitted to carry their bags onto the plane is sufficient to give rise to an inference of race-based discrimination. Defendant argues that "plaintiff's vague and casual observations that other passengers had brought carry on luggage on the [sic] board the aircraft fails to provide any evidence of national origin discrimination." Def.'s Mem. of Law for Summ J. ("Def.s' Mem.") at 11. It is well established, however, that "[a] plaintiff may support an inference of race discrimination by demonstrating that similarly situated [individuals] of a different race were treated more favorably." *Norville v. Staten Island Univ. Hosp.,* 196 F.3d 89, 95 (2d Cir.1999). Although those individuals with whom plaintiff compares himself "need not be identical, ... there should be a reasonably close resemblance of facts and circumstances." *Lizardo,* 270 F.3d at 101 (citing *Graham v. Long Island R.R.,* 230 F.3d 34, 40 (2d Cir.2000)). Delta never contends that plaintiff was not similarly situated to the other passengers on the plane. Moreover, there is evidence in the record that other passengers on plaintiff's flight were similarly situated. Specifically, plaintiff testified that the other white passengers on the plane were carrying bags that were similar in size to his merchandise bag and that his bag met Delta's carry on size requirement. Based on the minimal showing required at this stage, with all evidence being viewed in the light most favorable to plaintiff, plaintiff has brought forth sufficient circumstantial evidence of racial discrimination to defeat summary judgment. *See, e.g., Trigueros v. Southwest Airlines,* No. O5–CV–2256, 2007 WL 2502151, at

**\*4** (S.D.Cal. Aug.30, 2007) (finding that plaintiffs made out a prima facie case of discrimination by testifying that they were taken off the airplane and admonished when they refused to move a stowed carry-on bag when a similarly situated Caucasian woman was not removed from the plane after she refused to move her bag).

**\*10** In response to plaintiff's prima facie case, defendant fails to articulate a legitimate, non-discriminatory reason for not allowing plaintiff to carry on the merchandise bag.[13] The Second Circuit has found that "[a]ny legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case." *Fisher v. Vassar Coll.,* 114 F.3d 1332, 1335–36 (2d Cir.1997), *abrogated on other grounds by Reeves v. Sanderson Plumbing Prods., Inc.,* 530 U.S. 133, 146, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). Thus, all defendant had to do was bring forth some legitimate, non-discriminatory explanation for its conduct. The only explanation provided by defendant for why it might have required plaintiff to check in his merchandise bag was "that Delta has the discretion to restrict or limit a passenger's carry-on luggage." Def.'s Mem. at 10. Delta may very well have such discretion, but defendant offered no legitimate, non-discriminatory explanation for why it exercised that discretion to restrict plaintiff's carry on privilege while not preventing other passengers from carrying on their bags. Ultimately, defendant is unable to offer a non-discriminatory reason for its conduct because defendant denies that it ever prevented plaintiff from carrying his merchandise bag on board. As such, a material issue of fact exists, namely whether the alleged discriminatory act ever took place. Assuming that plaintiff was indeed forced to check his merchandise bag, plaintiff has established a prima facie case and defendant has failed to meet its burden at the second stage of the *McDonnel Douglas* analysis. Defendant is thus not entitled to summary judgment on plaintiff's Section 1981 claim.[14] *See, e.g., Feacher v. Intercontinental Hotels Group,* 563 F.Supp.2d 389, 403 (N.D.N.Y.2008) (denying summary judgment where defendants failed to provide a legitimate explanation for refusing to serve African American plaintiffs and instead attacked plaintiff's prima facie case by challenging whether the two Caucasian couples that plaintiffs saw entering the restaurant were actually served upon entering); *see also Litrel v. County of Suffolk,* 02–CV–2410, 2005 WL 2413671, at \*7 (E.D.N.Y. Sept.28, 2005) (finding material facts were at issue where defendants failed to show a legitimate,

nondiscriminatory explanation of their action after the burden shifted to them).

## (5)

### Preemption Under The Airline Deregulation Act

Defendant argues that plaintiff's state law tort claims are preempted by the Airline Deregulation Act (the "ADA").[15] Prior to 1978, airplane passengers were permitted to bring common law or statutory claims against airlines pursuant to the Federal Aviation Act (the "FAA"). *Rombom v. United Air Lines, Inc.,* 867 F.Supp. 214, 218 (S.D.N.Y.1994). At that time, the Civil Aeronautics Board (the "CAB") was given the power to regulate the interstate airline industry. *Am. Airlines v. Wolens,* 513 U.S. 219, 222, 115 S.Ct. 817, 130 L.Ed.2d 715 (1995). In an effort to loosen the economic regulation of the domestic airline industry, Congress amended the FAA in 1978 by enacting the Airline Deregulation Act ("ADA"). *Air Transp. Ass'n of Am., Inc. v. Cuomo,* 520 F.3d 218, 222 (2d Cir.2008) (per curiam). To further its goals, the ADA placed "exclusive legislative and regulatory authority in the aviation context in the hands of the federal government." *Weiss v. El Al Isr. Airlines, Ltd.,* 433 F.Supp.2d 361, 369 (S.D.N.Y.2006), *aff'd,* 309 Fed. App'x 483 (2d Cir. Feb.13, 2009), *cert. denied,* —— U.S. ——, 129 S.Ct. 2797, 174 L.Ed.2d 292 (June 15, 2009). "To ensure that the States would not undo federal deregulation with regulation of their own," the ADA included an express preemption provision. *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 378, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); *see also Peterson v. Cont'l Airlines, Inc.,* 970 F.Supp. 246, 249 (S.D.N.Y.1997).

**\*11** The ADA's preemption provision provides that "a State ... may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation ...." 49 U.S.C. § 41713(b)(1). The Supreme Court has interpreted this broadly, finding that the statute meant to preempt any state action "having a connection with, or reference to, airline rates, routes, or services." *Morales,* 504 U.S. at 384. On the other hand, state actions that are "too tenuous, remote, or peripheral a manner to have pre-emptive

effect," are not subject to preemption. *Id.* at 390 (internal quotation mark omitted).

In determining whether a state law claim concerning an alleged airline service is preempted by the ADA, numerous district courts in this circuit have adopted the three-part test established in *Rombom v. United Air Lines, Inc.,* 867 F.Supp. 214 (S.D.N.Y.1994) (Sotomayor, J.). *See Farash v. Continental Airlines, Inc.,* 574 F.Supp.2d 356, 363 (S.D.N.Y.2008) ("To assess whether a tort claim should be preempted, courts in the Southern District have generally applied the three-part test articulated in *Rombom.*" ), *aff'd,* 2009 WL 1940653 (2d Cir. Jul 02, 2009). Under the *Rombom* test, a court must first determine whether "the activity at issue in the claim is an airline service." *Id.* at 221. If the activity is an airline "service" then the court must decide whether the plaintiff's claim affects the airline service "directly or tenuously, remotely or peripherally." *Id.* at 222. If the "specific state tort claim has only an incidental effect on a service, there is no preemption and the state tort action should continue." *Id.* Third, the court looks to see whether "the underlying tortuous conduct was reasonably necessary to the provision of the service." *Id.* "If the tortuous act did not occur during the service ... or did not further the provision of the service in a reasonable manner, then the state tort claim should continue." *Id.* This final prong of the Rombom test "has been applied only to exempt from preemption actions that are 'outrageous or unreasonable,' " *Weiss,* 471 F.Supp.2d at 361 (quoting *Rombom,* 867 F.Supp. at 223).

An analysis under the three-part *Rombom* test reveals that plaintiff's state law tort claims are preempted by the ADA. At "[t]he first prong of the *Rombom* test ... the determination of service rests heavily on the extent to which the activity in question is ordinary and relates directly to air travel." *Id.* at 361. The activity at issue here, the handling of plaintiff's checked-in merchandise bag, is clearly "ordinary and relates directly to air travel," as it is usual for passengers to bring luggage with them when traveling and it is a customary practice for airlines to check that luggage. Furthermore, although not addressing the specific issue of whether baggage handling is an airline service subject to preemption, the Second Circuit has noted that "[a] majority of the circuits to have construed 'service' have held that the term refers to the provision or anticipated provision of labor from the airline to its passengers and encompasses matters such as boarding procedures, *baggage handling,* and food and drink-matters incidental to and distinct from the actual transportation of

passengers." *Cuomo,* 520 F.3d at 223 (holding "that requiring airlines to provide food, water, electricity, and restrooms to passengers during lengthy ground delays does relate to the service of an air carrier and therefore falls within the express terms of the ADA's preemption provision.") (emphasis added); *see, e.g., Hodges v. Delta Airlines, Inc.,* 44 F.3d 334, 336 (5th Cir.1995) (en banc) (defining "service" broadly as contractual features of air transportation, including "ticketing, boarding procedures, provision of food and drink, and baggage handling, in addition to the transportation itself"); *Koutsouradis v. Delta Air Lines, Inc.,* 427 F.3d 1339, 1343 (11th Cir.2005) (acknowledging that the Eleventh Circuit "has adopted the Fifth Circuit's definition of 'service' for ADA preemption purposes to include boarding procedures and baggage handling.") (citing *Branche v. Airtran Airways, Inc.,* 342 F.3d 1248, 1257 (11th Cir.2003)). [16]

**\*12** With regard to the second prong of the *Rombom* test, plaintiff's claims, which allege the negligent handling of his checked luggage, directly, as opposed to remotely or tenuously, affect the airline's baggage handling service. *See Malik v. Cont'l Airlines Inc.,* 305 Fed. App'x 165, 169 (5th Cir.2008) ("[W]e fail to see how permitting airline passengers to bring state tort claims based on lost luggage (however it came to be lost) can be characterized as 'remotely' connected to baggage handling services. Such claims strike at the very heart of a 'service' that Congress intended to protect from state regulation."). Finally, the loss of plaintiff's personal items allegedly transpired while Delta was providing the baggage handling service and plaintiff has presented no evidence demonstrating that the service was unreasonably performed. Plaintiff speculates that the jewelry in his merchandise bag might have been stolen by defendant's employees. Other than these conclusory allegations, however, there is nothing to indicate that Delta's conduct in handling his merchandise bag was either "outrageous or unreasonable." Plaintiff's state law tort claims are thus preempted by the ADA.

Plaintiff's claim for the loss of his jewelry should be determined under federal common law. In analogous cases concerning liability of air carriers for lost or damaged shipments, the Second Circuit has explicitly held that federal common law controls. *Nippon Fire & Marine Ins. Co. v. Skyway Freight Sys., Inc.,* 235 F.3d 53, 59 (2d Cir.2000) (finding "that federal common law continues to control the

issue of liability of air carriers for lost or damaged shipments even after deregulation."). Courts in other circuits have similarly held that federal common law provides a remedy for claims based on lost or damaged shipments or checked baggage. *See, e.g.,* 🔖*Read–Rite Corp. v. Burlington Air Express, Ltd.,* 186 F.3d 1190, 1195 (9th Cir.1999)* ("[F]ederal common law applies to loss of or damage to goods by interstate common carriers by air."); *see also* 🔖*Sam L. Majors Jewelers v. ABX, Inc.,* 117 F.3d 922, 925–29 (5th Cir.1997)* (holding that a negligence action brought against an air carrier for loss of goods arose under federal common law); 🔖*Malik,* 305 Fed. App'x at 170 ("We have recognized that the federal common law provides airline passenger's with a cause of action for lost luggage"). Plaintiff's complaint alleges only state law theories of liability. Plaintiff is, therefore, given thirty-five days, from the date of this memorandum and order, to amend his complaint to allege the specific theory or theories under which he intends to pursue the federal common law claim or claims for the loss of his jewelry.

### (6)

### Enforceability of Delta's Baggage Liability Limitation

According to Delta, even if it is found liable under federal common law for having lost plaintiff's jewelry, its liability should be limited to $2,500 as provided in Section J(1)(A) of its "published" domestic tariff. [17] Prior to airline de-regulation, "every air carrier" was required to file tariffs with the CAB showing, among other things, "all classifications, rules, regulations, practices, and services in connection with ... air transportation." 49 U.S.C. § 1373(a) (1982); *see also* 🔖*Jacobson v. Delta Airlines, Inc.,* 742 F.2d 1202, 1206 n. 2 (9th Cir.2001)* (quoting 49 U.S.C. § 1373(a) (1976)). At that time, "tariffs filed with the [CAB] constitute[d] the contract of carriage between airlines and their passengers and, if valid, conclusively and exclusively govern[ed] the rights and liabilities between the parties." *Mao v. Eastern Air Lines Inc.,* 310 F.Supp. 844, 846 (S.D.N.Y.1970)); *see also* 🔖*Lichten v. Eastern Airlines, Inc.,* 189 F.2d 939, 940 (2d Cir.1951)* (stating that "[t]o the extent ... [the tariff] rules are valid, they became a part of the contract under which the appellant and her baggage were carried."). "[L]imitations of liability in tariffs required to be filed by air carriers with the CAB [we]re binding on passengers and shippers whether or not the limitations [we]re embodied in the transportation documents." *Mao,* 310 F.Supp. at 846; *see also* 🔖*Vogelsang v. Delta Air Lines, Inc.,* 302 F.2d 709, 712 (2d Cir.1962)* (finding, in an action involving lost jewelry, that limitations of liability contained in tariffs filed with the CAB were binding on shippers and passengers). Thus, an air carrier could achieve limited liability by simply filing a valid tariff containing such a provision. [18]

**\*13** Beginning on January 1, 1983, however, domestic air carriers were no longer required to file tariffs with the CAB. [19] *See* 49 U .S.C. 1551(a)(2)(A) (1982) (abolishing the tariff filing requirement); 🔖*Wolens,* 513 U.S. at 230 (recognizing the "January 1, 1983, termination of domestic tariffs"). Thus, there is no longer a presumption that passengers have constructive notice of the provisions in a domestic air carrier's tariff. 47 Fed.Reg. 52129 (1982) (noting that pursuant to the ADA, after January 1, 1983, "[c]arriers will no longer be required or permitted to file domestic tariffs for any purpose ... and those on file as of that date shall have no force or effect."). Today, in order to bind passengers to domestic tariff provisions, an air carrier must provide the requisite notice in some other manner. *See Neal v. Republic Airlines, Inc.,* 605 F.Supp. 1145, 1148 (N.D.Ill.1985) (noting that although elimination of the tariff-filing requirement meant that "air carriers could no longer presume a shipper's notice of CAB-approved tariffs, it did not bar the carriers themselves from providing shippers with the requisite notice of declared value rates"). Whether Delta can enforce its baggage limitation of liability thus rests on whether plaintiff was given adequate notice of the provision either on or with his ticket. [20] *Wells v. Am. Airlines,* No. 88 Civ. 5729, 1991 WL 79396, at \*4 (S.D.N.Y. May 9, 1991) ("[L]imitations of liability are valid and binding on passengers as part of the contract of carriage where ... the passenger receives notice thereof either on or with the passenger's ticket.").

In similar actions brought against airlines for lost luggage, several courts have applied the "reasonable communicativeness" test in determining whether a passenger was provided with adequate notice of a baggage limitation of liability. *See, e.g., Gluckman v. Am. Airlines, Inc.,* 844 F.Supp. 151, 161 (S.D.N.Y.1994) (applying the reasonable communicativeness test in an action against an air carrier for failing to safely transport a passenger's pet dog); 🔖*Casas v. Am. Airlines, Inc.,* 304 F.3d 517, 524 (5th Cir.2002)* (stating, in an action involving lost baggage containing a

video camera worth $1,000, that "cases apply a two-step analysis in determining whether liability-limiting provisions are adequately plain and conspicuous to give reasonable notice of their meaning."); *Harger v. Spirit Airlines, Inc.,* No. 01 C 8606, 2003 WL 21218968, at \*5 (N.D.Ill. May 22, 2003) (applying the reasonable communicativeness test to a claim by plaintiff that the airline lost a jewelry bag that the airline had forced her to check in and noting that even if the released valuation doctrine applied that test would also have been met); *Huang v. Int'l Total Services,* No. 94–75368, 1997 WL 33377508, at \*3–6 (E.D.Mich. Apr.17, 1997) (applying the "reasonable notice" test where passenger alleged that one of his jewelry cases was stolen while going through the security checkpoint).

\*14  The Second Circuit explicitly adopted the reasonable communicativeness test in an action involving the enforceability of a provision limiting a cruise passenger's time to sue. *Ward v. Cross Sound Ferry,* 273 F.3d 520, 524 (2d Cir.2001). The general purpose of the reasonable communicativeness standard is to determine "whether the carrier did all it reasonably could to inform the passenger that the terms and conditions incorporated in the ticket were important matters of contract affecting his or her rights." *Gluckman,* 844 F.Supp. at 161. The court first reviews the physical characteristics of the ticket itself, including "features such as size of type, conspicuousness and clarity of notice on the face of the ticket, and the ease with which a passenger can read the provision in question." *Deiro v. Am. Airlines, Inc.,* 816 F.2d 1360, 1364 (9th Cir.1987) (quoting *Shankles v. Costa Armatori, S.P.A.,* 722 F.2d 861, 863–64 (1st Cir.1983)). The court then examines the circumstances surrounding the plaintiff's purchase and retention of the ticket. *Id.* (citing *Shankles,* 722 F.2d at 865). Because it is likely "that a passenger will not read the fine print upon purchase ... the surrounding circumstances ... 'may be of equal importance as the prominence of warnings and clarity of conditions in deciding whether a provision should be held to bind a particular passenger' " *Ward,* 273 F.3d at 523 (quoting *Shankles,* 722 F.2d at 865). "The surrounding circumstances to be considered include the passenger's familiarity with the ticket, the time and incentive under the circumstances to study the provisions of the ticket, and any other notice that the passenger received outside of the ticket." *Deiro,* 816 F.2d at 1364 (citing *Shankles,* 722 F.2d at 866). Also taken into consideration is whether

the plaintiff is an experienced commercial air traveler. *See Deiro,* 816 F.2d at 1365.

In lieu of the reasonable communicativeness test, other courts, in factually similar cases, have applied the "released valuation doctrine." *See, e.g., Shapiro v. United Airlines,* CV–88– 0950, U.S. Dist. LEXIS, at \*7–8 (E.D.N.Y. Aug. 30, 1989) (applying the release valuation doctrine where the plaintiff sought damages for the delay of his checked baggage); *Feature Enterprises, Inc. v. Cont'l Airlines,* 745 F.Supp. 198, 200 (S.D.N.Y.1990) (applying the released valuation doctrine in an action by a jewelry manufacturer against an airline for the loss of a jewelry case that had been checked in). The Second Circuit applied the released valuation doctrine in an action involving lost cargo. [21] *See Nippon Fire & Marine Ins. Co. v. Skyway Freight Sys., Inc.,* 235 F.3d 53, 59–60 (2d Cir.2000). Under the released valuation doctrine, provisions that limit a carrier's liability for lost or damaged cargo are enforceable as long as they "(1) are set forth in a 'reasonably communicative' form, so as to result in a 'fair, open, just and reasonable agreement' between shipper and shipper; and (2) offer the shipper a possibility of higher recovery by paying the carrier a higher rate." [22] *Id.*

\*15  The only evidence submitted by Delta in favor of binding plaintiff to its baggage limitation of liability was an affidavit from Delta's in-house counsel. Attached to that affidavit were selected portions of Delta's domestic tariff, including the provision limiting defendant's liability for lost or damaged baggage to $2,500. The affidavit did not indicate whether plaintiff's airplane ticket or boarding pass explicitly incorporated the terms of Delta's tariff or even referred to the tariff, whether the ticket or boarding pass themselves contained notice of Delta's baggage liability limitation or whether plaintiff received any other documents along with his ticket or boarding pass that may have contained the requisite notice of Delta's baggage liability limitation. The affidavit simply affirmed that Delta's tariff was "published" pursuant to Delta's business practice. [23] The affidavit and defendant's arguments misleadingly imply that Delta published its domestic tariff with an agency of the federal government and that such publication was sufficient to place passengers on constructive notice of the tariff's provisions. As demonstrated above, however, this is no longer the case with regard to domestic tariffs. It is hard to believe that counsel for Delta Airlines was unaware of the requirement to provide passengers with notice of its baggage

liability limitation. Indeed, in a second affidavit, submitted following further inquiry from this court, Delta appears to acknowledge its failure to address the existence of "the issue of Delta's notification to the plaintiff of the incorporated terms of the contract of carriage and limits of liability in place on November 8, 2001." [24] Supplemental Aff. Regarding Tariff ("Supp.Aff.") ¶ 1. Delta also acknowledged that it was aware of the requirement that "all air carriers are to include 'on or with each ticket' a notice of baggage liability limitations." Supp. Aff. ¶ 2. Still, Delta did not produce either plaintiff's airplane ticket, his boarding pass or any other document that may have contained the requisite notice. Such conduct is inexcusable and imposed an unnecessary burden on this court to conduct needless independent research.

It was only at the request of this court that Delta, for the first time, produced an example of a ticket jacket that it claims plaintiff should have received along with his boarding pass. No doubt, this information was available to Delta and Delta was aware of its importance at the time it filed its motion on October 24, 2008. [25] Defendant's failure to have submitted this evidence at that time is unacceptable. Nonetheless, a brief review of the ticket jacket is warranted. The front cover of the ticket jacket does not indicate that the document embodies "important matters of contract affecting [the passenger's] rights." *Gluckman,* 844 F.Supp. at 161. Although the inside of the ticket jacket notifies passengers of Delta's baggage limitation liability, the notice is contained on the bottom half of the second to last page of the document in small font:

**\*16** DOMESTIC—NOTICE OF BAGGAGE LIABILITY LIMITATIONS

Travel wholly within the 50 United States, Puerto Rico and the U .S. Virgin Islands

- Liability is limited to $2,500 per ticketed passenger unless a higher value (for checked baggage) is declared in advance and additional charges are paid

- Excess valuation may not be declared on certain types of articles

- No liability for electronic equipment, photographic equipment, jewelry, cash, computer equipment or other similar valuable items

Additionally, it is only on the last page of the ticket jacket, in a shaded box, that the document mentions anything concerning the incorporation of Delta's tariff:

NOTICE OF INCORPORATED TERMS

Air transportation is subject to the individual contract terms (including rules, regulations, tariffs and conditions) of transporting air carriers, which are herein incorporated by reference and made part of the contract of carriage. Incorporated terms may include, but are not restricted to:

1. Limits on liability for personal injury or death;

2. Limits on liability for baggage, including fragile or perishable goods and availability of excess valuation coverage ....

Upon request, plaintiff also submitted additional evidence, including the electronic tickets ("e-tickets") that he had printed directly from the Priceline.com website and a copy of his boarding pass. Conspicuously, plaintiff only retained three of the e-tickets' five pages. The first three pages contain no information concerning Delta's baggage limitation of liability. [26] Neither party submitted any evidence regarding the contents of the missing two pages and plaintiff's boarding pass does not refer to Delta's baggage liability limitation.

The surrounding circumstances, by themselves, do not indicate whether plaintiff received adequate notice of the baggage liability limitation. For example, there is no evidence that signs, advertising the baggage liability limitation, were posted at the airport or adjacent to Delta's ticket counter. Although plaintiff was an experienced commercial air traveler, having transported his jewelry on numerous flights, he appears to have had no incentive to familiarize himself with Delta's baggage liability limitation because he intended to carry the merchandise bag on board with him. It is also unclear whether he was familiar with the fact that airlines generally limit their liability in this manner because he claims to have always carried his merchandise bag on board with him. Even assuming that Hall gave plaintiff a copy of the ticket jacket, plaintiff would have only had a few moments to review its contents before being forced to check his bag. Additionally, neither Hall nor any other Delta employee informed plaintiff of the liability limitation or that he had the option of purchasing excess insurance. Indeed, plaintiff testified that he only became aware of the liability limitation

and the option of purchasing excess valuation after having consulted with an attorney.

**\*17**  At this time, however, it is not necessary to determine whether plaintiff received adequate notice of the liability limitation because an issue of fact exists regarding whether Delta materially breached its tariff by preventing him from carrying his merchandise bag onto the plane. If such a breach occurred Delta would not be permitted to enforce its baggage liability provision. *See* 🚩 *Coughlin v. Trans World Airlines, Inc.,* 847 F.2d 1432, 1433 (9th Cir.1988) (per curiam). *Coughlin* involved a suit brought by a passenger against an airline for losing a checked package containing the cremated remains of her husband. *Id.* The Ninth Circuit held that by refusing to allow the plaintiff to carry the package on board, even though it was well-within the size restriction for carry on luggage, the airline had breached an express provision in its tariff that valuables "should be carried personally by the passenger." *Id.* Under the express terms of the contract, the plaintiff should have been allowed to carry the cremated remains on board since they were clearly valuable and there was nothing to suggest that the carriage of human ashes was prohibited. *Id.* Because the airline materially breached its agreement, the tariff's limitation of liability provision was deemed unenforceable. *Id.* at 1434 ("It is axiomatic that a material breach of an agreement warrants rescission.... TWA cannot now attempt to enforce a provision of the contract it has violated. TWA's refusal to allow [the plaintiff] to protect her valuables by carrying them personally effectively denied her the benefit of her bargain with respect to the tariff agreement.").

The alleged facts in the present action are strikingly similar to *Coughlin.* Section J(2)(F) of Delta's domestic tariff provided that "[Delta] is not responsible for jewelry ..." and directed that jewelry "should be carried by the passenger." Thus, like the tariff provision in *Coughlin,* Delta's domestic tariff contained "a separate, liability-limitation-related contractual promise, namely a promise that the passenger might personally monitor the safety of the valuables by carrying them in the cabin." 🚩 *Hill Constr. Corp. v. Am. Airlines, Inc.,* 996 F.2d 1315, 1319 (1st Cir.1993) (Breyer, C.J.) (discussing the contract provision at issue in *Coughlin* ). Similar to the plaintiff in *Coughlin,* plaintiff here alleges that Delta's ticketing agent forced him to check his merchandise bag even though it contained valuable jewelry and despite the fact that it was within Delta's carry on size restriction.[27] Although Delta claims that it never forced plaintiff to check

his merchandise bag, the evidence is to be viewed in the light most favorable to plaintiff. An issue of fact, therefore, remains as to whether Delta materially breached its own tariff. Accordingly, the enforceability of Delta's baggage liability limitation cannot be determined on summary judgment. *See, e.g., Harger,* 2003 WL 21218968, at \*8 (denying summary judgment on plaintiff's breach of contract of carriage claim where there was an issue of fact concerning whether the airline refused to permit the plaintiff to check in her baggage because it did not meet the carry on size requirement and finding that "[i]f ... [the plaintiff's] bag met the specific size requirements under the contract of carriage but Spirit refused to allow [the plaintiff] to carry it on, then Spirit materially breached its contract of carriage and it cannot enforce the liability limitation against [the plaintiff].").

### (7)

### Limiting Plaintiff's Damages

**\*18**  Alternatively, Delta argues that even if its liability is not limited to $2,500, plaintiff's damages should be limited to $13,847.76 because this is the only amount of money that plaintiff expended as a result of the loss of the jewelry. In support of its argument defendant submitted copies of four checks made out by Bary Gems, Inc. totaling $2,748.88 and eleven checking deposit slips totaling $11,098.88. Defendant claims that this is the only evidence of the payments that plaintiff made to his vendors to reimburse them for the lost merchandise. Plaintiff does not contest this assertion. The $13,847.76 figure, although representative of plaintiff's current out-of-pocket costs, is not indicative of the amount that plaintiff is still responsible for re-paying. Indeed, plaintiff testified that he only gave his vendors as much money as he could afford, and that the $13,847.76 represents less than 5% of what he still owes them. Bary Dep. at 153, 157. Although plaintiff's vendors have yet to bring suit against him, plaintiff has made it fairly clear that his vendors still expect to be paid for the lost jewelry. Thus, the checks and checking deposit slips that defendant introduced do not conclusively demonstrate that plaintiff's damages should be limited to $13,847.76.[28]

### Conclusion

Defendant's motion for summary judgment is granted with regard to plaintiff's state law tort claims, which are preempted by the ADA, and plaintiff's Title VI and NYCRL claims. Defendant's motion for summary judgment is denied with regard to plaintiff's ⚑ Section 1981 claim and the enforceability of defendant's baggage liability limitation. Plaintiff may pursue any claim he may have for the loss of his jewelry under federal common law. Plaintiff is given thirty-five (35) days from the date of this memorandum and order to amend his complaint to specify the theory or theories that he intends to pursue under federal common law.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 3260499

## Footnotes

1    As discussed *infra,* at his request, plaintiff ended up taking an earlier flight. Specifically, he was transported on Delta Flight 405 from LaGuardia to Cleveland, after which he connected to Delta Flight 1497 from Cleveland to Denver.

2    Hall did not explain to plaintiff why he could not carry his bag onto the plane.

3    It is not entirely clear at what point plaintiff received his boarding pass. At his deposition, he testified that Hall gave him his "ticket" only "after this incident." Bary Dep. at 81. The term "after this incident" could refer either to the time period immediately after plaintiff's bags were searched or after Hall informed plaintiff that he could not carry his merchandise bag on board the plane.

4    On November 23, 2005, this matter was administratively closed due to a voluntary petition for relief filed by Delta with the Bankruptcy Court for the Southern District of New York. An April 24, 2008 memorandum and order granted plaintiff's request to re-open this case finding that plaintiff's claims against Delta were not discharged.

5    Specifically, Title VI provides: "No person in the United States shall, on the ground of race, color, or national origin, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." ⚑ 42 U.S.C. § 2000d. Like a claim brought under ⚑ Section 1981, in order to establish a claim under Title VI, a plaintiff must demonstrate: (1) that the defendant discriminated against her on the basis of race; (2) that the discrimination was intentional; and (3) that the discrimination was a "substantial" or "motivating factor" for the defendant's actions. ⚑ *Tolbert v. Queens Coll.,* 242 F.3d 58, 69 (2d Cir.2001).

6    In his complaint, plaintiff alleges that "Defendant is the recipient of federal financial assistance," but never specifies the exact source or purpose of that funding. Pl.'s Am. Compl. ¶ 32.

7    Even if the compensation that Delta received pursuant to the Stabilization Act was deemed to be a subsidy, plaintiff does not have standing to bring suit under Title VI. "In order to establish standing to sue under [Title VI] plaintiffs must be the intended beneficiaries of the federal spending program." *Scelsa v. City Univ. of New York,* 806 F.Supp. 1126, 1140 (S.D.N.Y.1992); *see also Coalition of Bedford–Stuyvesant Block Ass'n, Inc. v. Cuomo,* 651 F.Supp. 1202, 1208 n. 2 (E.D.N.Y.1987) (finding that Title VI "does grant private parties the right to sue, but only if they are either the intended beneficiaries of the federal program or the discrimination that the

plaintiffs are suffering will negatively impact upon those intended beneficiaries"). There is nothing to indicate that plaintiff was an intended beneficiary of the money that Delta received pursuant to the Stabilization Act.

Furthermore, "[l]iability under Title VI ... cannot be imputed to institutions based on the actions of their employees." ⚑ *Goonewardena v. New York,* 475 F.Supp.2d 310, 328 (S.D.N.Y.2007). Here, plaintiff seeks to hold Delta responsible for an alleged discriminatory act perpetrated by one of its employees. Plaintiff produced no evidence demonstrating that Delta itself acted with the requisite intent by, for example, instituting discriminatory policies or practices. *See id.* (dismissing plaintiff's Title VI claim against defendant educational institution where plaintiff sought to hold the defendant liable for the acts of its employees rather than alleging that the defendant's policies or general practices were discriminatory, which would have demonstrated that the institution itself acted with the requisite intent to discriminate).

8    "[T]he standards governing claims asserted pursuant to ⚑ 42 U.S.C. § 1981 are identical to those for claims asserted pursuant to the ... New York Civil Rights Law." ⚑ *Drayton v. Toys 'R' Us Inc.,* 645 F.Supp.2d 149, 2009 WL 2170233, at *10 (S.D.N.Y. July 17, 2009) (quoting ⚑ *Joseph v. New York Yankees P'ship,* No. 00 Civ. 2275, 2000 WL 1559019, at *6 (S.D.N.Y. Oct. 13, 2000)).

9    Defendant's argument focuses on the fact that an aircraft is not a place of public accommodation under ⚑ 42 U.S.C. § 2000a. Pursuant to ⚑ 42 U.S.C. § 2000a: "All persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation, as defined in this section, without discrimination or segregation on the ground of race, color, religion, or national origin." ⚑ 42 U.S.C. § 2000a(a). The definition of the phrase "a place of public accommodation" under ⚑ Section 2000a, however, is not the same as the definition of the term under the NYCRL. For example, although the federal statute does not include any modes of transportation under its definition of the phrase, *see* 42 § U.S.C.2000a(b), the NYCRL does, *see* N.Y. Civ. Rights Law § 40. Thus, the fact that an aircraft may not be considered a place of public accommodation under ⚑ Section 2000a does not necessitate a similar finding under the NYCRL.

10    🚩 Executive Law § 296(2)(a) provides: "It shall be an unlawful discriminatory practice for any person, being the owner, lessee, proprietor, manager, superintendent, agent or employee of any place of public accommodation ... because of the race, creed, color, national origin ... directly or indirectly, to refuse, withhold from or deny to such person any of the accommodations, advantages, facilities or privileges thereof ...."

11    Alternatively, although never argued by defendant, dismissal of plaintiff's NYCRL claim is also warranted because plaintiff failed to comply with the statute's notice requirement. NYCRL Section 41 "establishes a private cause of action to recover a statutory penalty against those who violate" Section 40 or who aid or incite such a violation. *Jews for Jesus, Inc. v. Jewish Community Relations Council of New York, Inc.,* 79 N.Y.2d 227, 234, 590 N.E.2d 228, 232, 581 N.Y.S.2d 643, 647 (1992). Section 41 requires that "[a]t or before the commencement of any action under this section, notice thereof shall be served upon the attorney general." N.Y. Civ. Rights Law § 41. It is well established that "[t]he failure to comply with the notice provisions of New York Civil Rights Law Article 4 is fatal to a private action under that Article." ⚑ *Feacher v. Intercontinental Hotels Group,* 563 F.Supp.2d 389, 407 (N.D.N.Y.2008). Because there is no indication in the record that plaintiff complied with this pre-requisite, his claim under the statute must be dismissed.

12    For the purposes of 🚩 Section 1981, the term "race" includes an individual's ethnicity. 🚩 *Albert v. Carovano,*
*851 F.2d 561, 572 (2d Cir.1988)* (citing 🚩 *Saint Francis Coll. v. Al–Khazraji,* 481 U.S. 604, 107 S.Ct. 2022,
*95 L.Ed.2d 582 (1987)*).

13    Defendant does bring forth two non-discriminatory reasons for other actions. However, these explanations
cannot rebut plaintiff's prima facie case because they focus on conduct that is wholly separate from the acts
that plaintiff alleges were discriminatory. First, defendant explains that the reason Hall told plaintiff that he
was required to check in his bag was that "it was her understanding at that time that a selectee could not
bring carry-on luggage on board the aircraft." Def.'s Reply Mem. of Law in Support of Summ J. Mot. ("Def.'s
Reply") at 8. This only establishes a legitimate, non-discriminatory explanation for why Hall believed that
plaintiff could not carry on his luggage. Defendant, however, denies that plaintiff was ever required to check in
his bag. Defendant also provides a reason for subjecting plaintiff to a hand-search of his bag, arguing that the
search was required because plaintiff was designated as a "selectee" under the federal security framework
that was put in place for all air carriers. Plaintiff, however, never alleges that the security screening, which
required his bags to be hand-searched, was racially motivated.

14    Defendant also argues that plaintiff's discrimination claim should be dismissed because there is no evidence
that plaintiff suffered any damages as a result of the alleged discrimination. It is well established, however,
that a plaintiff need not have suffered an actual loss as a result of the discrimination in order to bring an action
under 🚩 Section 1981. 🚩 *Tolbert v. Queens Coll.,* 242 F.3d 58, 74 (2d Cir.2001) (reinstating a jury's award of
punitive damages and awarding the plaintiff nominal damages in an action alleging violations of Title VI and
🚩 Section 1981, finding that "[e]ven if the plaintiff fails to persuade the jury that the proven violation caused
him an injury that is compensable, the defendant who committed the violation is not entitled to judgment as
a matter of law.").

15    Much of plaintiff's opposition is spent arguing that the ADA does not preempt plaintiff's discrimination claims.
*See, e.g.,* Pl.'s Mem. of Law in Opp'n to Def.'s Mot. for Summ. J. at 13 ("Despite defendants [sic] tortured
efforts to characterize its racial discrimination against Mr. Bary as somehow related to an airline service,
protecting such conduct is not what Congress envisioned when deregulating the airline industry."). Defendant,
however, concedes this point, acknowledging that it never argued that the ADA preempts plaintiff's civil rights
claims. *See* Def.'s Reply at 1 ("The plaintiff's opposition memorandum strenuously argues that claims against
air carriers pursuant to 🚩 42 U .S.C. § 1981 are not expressly preempted. However, that general point is not
in dispute."). Delta's preemption argument is aimed only at plaintiff's state law tort claims, which have nothing
to do with discrimination. Accordingly, the preemption discussion focuses only on plaintiff's tort claims.

16    The Ninth Circuit, on the other hand, has explicitly held that baggage handling is not included in the definition
of "service." 🚩 *Charas v. Trans World Airlines, Inc.,* 160 F.3d 1259, 1265–66 (9th Cir.1998) (en banc) (holding
that "service" refers to "such things as the frequency and scheduling of transportation" and "the selection of
markets," but not "the safe handling and storage of luggage").

17    Although Section J(2)(F) of Delta's domestic tariff excluded liability for jewelry unless excess insurance was
purchased, Delta never argues that it is completely free from liability for the loss of plaintiff's jewelry.

18    The CAB had "primary jurisdiction" over the validity of tariffs, which meant that "a shipper complaining that a
carrier's rate, rule, or practice is unreasonable or discriminatory must exhaust the administrative jurisdiction
over the subject matter before seeking a judicial determination of the question." 🚩 *First Pennsylvania Bank,*
*N.A. v. Eastern Airlines, Inc.,* 731 F.2d 1113, 1120 (3d Cir.1984).

19      Airlines, however, are still required to file tariffs with the Department of Transportation ("DOT") for foreign air transportation. 14 C.F.R. § 221.2 (stating that "every air carrier and every foreign air carrier shall file with the Department, and provide and keep open to public inspection, tariffs showing all fares, and charges for foreign air transportation ....").

20      In 2001, the rules promulgated by the DOT, the agency that inherited the remaining responsibilities of the CAB, explicitly permitted air carriers to limit their liability for the carriage of baggage to $2,500. *See* 14 C.F.R. § 254.4 (2001) ("[A]n air carrier shall not limit its liability for provable direct or consequential damages resulting from the disappearance of, damage to, or delay in delivery of a passenger's personal property, including baggage, in its custody to an amount less than $2500 for each passenger."). The regulations also mandated that an airline provide conspicuous written notice either on or with the passenger's ticket regarding the airline's baggage liability limitation or that federal law requires that any limitation be at least $2,500. 14 C.F.R. § 254.5 (2001) ("[A]n air carrier shall provide to passengers, by conspicuous written material included on or with its ticket, either: (a) Notice of any monetary limitation on its baggage liability to passengers; or (b) The following notice: 'Federal rules require any limit on an airline's baggage liability to be at least $2500 per passenger.' "). The regulations permit the DOT to "review the minimum limit of liability prescribed ... every two years." 14 C.F.R. § 254.6. Today, the limit is $3,300. *See* 14 C.F.R. § 254.4.

21      In *Gluckman,* the court indicated that the released valuation doctrine only applies to claims relating to freight or cargo and not to airline baggage claims pursued by passengers. *Gluckman,* 844 F.Supp. at 161 n. 5. As indicated *infra,* it is not necessary to decide which test applies here.

22      What is deemed reasonable notice under the reasonable communicativeness test is likely to also constitute reasonable notice under the released valuation doctrine. *Deiro,* 816 F.2d at 1365 n. 4. It is thus not necessary to differentiate between the two standards with regard to the notice requirement.

23      The affidavit gave no explanation as to what "published" meant.

24      Delta's supplemental affidavit does not explain why Delta failed to reveal this information on its own.

25      There is no indication from Hall's deposition whether a ticket jacket was actually provided to plaintiff along with his boarding pass.

26      The last page ends with: "You are permitted the same baggage allowance as other economy class passengers. Since carry-on and checked baggage ...."

27      Delta does not contest that plaintiff's merchandise bag met the airline's carry on size requirement. Additionally, at her deposition, Hall acknowledged that plaintiff informed her that his bag contained jewelry. Hall Dep. at 40–41.

28      Some of the jewelry that plaintiff allegedly lost consisted of items that were owned by plaintiff himself and that he valued at $1,140.80. Bary Dep. at 64–65.

---

End of Document                                          © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3443362
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Sreekrishna M. CHERUVU, Plaintiff-Appellant,

v.

HEALTHNOW NEW YORK, INC., d.b.a. BlueCross
BlueShield of Western New York, Independent Health
Association, Inc., Individual Practice Association
of Western New York, Inc., Excellus Health Plan,
Inc., d.b.a. Univera Healthcare, Susan Schultz,

a.k.a. Susan Nason, Defendants-Appellees. *

No. 22-1993
|
May 15, 2023

Appeal from a judgment of the United States District Court
for the Western District of New York (Lawrence J. Vilardo,
*Judge*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

For Plaintiff-Appellant: Gerald T. Walsh, Zdarsky, Sawicki &
Agostinelli LLP, Buffalo, NY.

For Defendants-Appellees HealthNow New York, Inc., d.b.a.
BlueCross BlueShield of Western New York, and Susan
Schultz, a.k.a. Susan Nason: Michael P. McClaren (Meghan
M. Hayes, on the brief), Webster Szanyi LLP, Buffalo, NY.

For Defendants-Appellees Independent Health Association,
Inc. and Individual Practice Association of Western New
York, Inc.: Mark A. Molloy, Nixon Peabody LLP, Buffalo,
NY.

For Defendant-Appellee Excellus Health Plan, Inc., d.b.a.
Univera Healthcare: Joshua I. Feinstein (Ryan J. Lucinski, on
the brief), Hodgson Russ LLP, Buffalo, NY.

PRESENT: AMALYA L. KEARSE, DENNIS JACOBS,
RICHARD J. SULLIVAN, Circuit Judges.

**Opinion**

**\*1** Plaintiff Sreekrishna Cheruvu, a former physician,
appeals from the district court's dismissal of his claims

under 42 U.S.C. §§ 1981, 1982, 1983, 1985,
and 1988 against Defendants HealthNow New York, Inc.,
doing business as BlueCross BlueShield of Western New
York ("BlueCross"), Independent Health Association, Inc.
("IHA"), Individual Practice Association of Western New
York, Inc. ("IPA"), Excellus Health Plan, Inc., d.b.a. Univera
Healthcare ("Univera"), and Susan Schultz, a.k.a. Susan
Nason ("Schultz"). [1] We assume the parties' familiarity with
the underlying facts, procedural history, and issues on appeal.

In 2020, Cheruvu brought suit alleging primarily that
Defendants acted in concert with state and federal law-
enforcement agencies to maliciously prosecute him for
engaging in fraudulent billing practices, in violation of
section 1983. [2] Cheruvu also asserted that Defendants
discriminated and conspired to discriminate against him on
the basis of his race, in violation of sections 1981, 1982,
and 1985, and sought attorney's fees, pursuant to 42
U.S.C. § 1988. In granting Defendants' motions to dismiss
the complaint, the district court concluded that Cheruvu failed
to plausibly allege that (1) Defendants "act[ed] under color
of state law" to support a claim under section 1983,
*Cheruvu v. HealthNow N.Y. Inc.*, No. 20-cv-808 (LJV), 2022
WL 3346918, at \*4 (W.D.N.Y. Aug. 12, 2022) (internal
quotation marks omitted), and (2) Defendants possessed any
"discriminatory intent," as is required to establish liability
under sections 1981, 1982, and 1985, *id.* at \*6. [3]
"We review *de novo* a district court's dismissal of a complaint
pursuant to Rule 12(b)(6)" of the Federal Rules of Civil
Procedure, "accepting all factual allegations in the complaint
as true[ ] and drawing all reasonable inferences in the
plaintiff's favor." *Dolan v. Connolly*, 794 F.3d 290, 293 (2d
Cir. 2015) (internal quotation marks omitted).

**\*2** The district court correctly concluded that Cheruvu
failed to state a claim under section 1983. "Because the
United States Constitution regulates only the [g]overnment,
not private parties," *Fabrikant v. French*, 691 F.3d 193,
206 (2d Cir. 2012) (internal quotation marks omitted), a
plaintiff asserting a section 1983 claim for constitutional
violations must plausibly allege "that he was injured by either
a state actor or a private party acting under color of state
law," *Ciambriello v. County of Nassau*, 292 F.3d 307, 323
(2d Cir. 2002). We have held that a private party "acts under

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 40 of 103

Cheruvu v. HealthNow New York, Inc., Not Reported in Fed. Rptr. (2023)

color of state law when [it] 'is a willful participant in joint activity with the [s]tate or its agents.' " *Id.* at 324 (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 152 (1970)). To plead that a private party was "a willful participant in joint activity with the [s]tate," Cheruvu must plausibly allege that the private party and the state "share some common goal to violate the plaintiff's rights. *Betts v. Shearman*, 751 F.3d 78, 85 (2d Cir. 2014) (internal quotation marks omitted). On the other hand, "[a] merely conclusory allegation that a private entity acted in concert with a state actor does not suffice to state a [ section] 1983 claim against the private entity." *Ciambriello*, 292 F.3d at 324.

Here, Cheruvu's complaint asserts that Defendants acted under color of state law by furnishing allegedly "false information" to law-enforcement agencies and by providing purportedly "misleading testimony and fabricated evidence." App'x at 24, 34. But the law is clear that the "provision of ... information to [law-enforcement agencies] does not by itself make [a private party] a joint participant in state action under [s]ection 1983," *Ginsberg v. Healey Car & Truck Leasing, Inc.*, 189 F.3d 268, 272 (2d Cir. 1999), and that "all witnesses – [law-enforcement] officers as well as lay witnesses – are absolutely immune from civil liability [under section 1983] based on their testimony in judicial proceedings," *Briscoe v. LaHue*, 460 U.S. 325, 328 (1983). Aside from these broad assertions, and evidence that certain of the Defendants were very pleased with Cheruvu's prosecution, Cheruvu alleges no facts to suggest that Defendants and the law-enforcement agencies that were involved in his investigation "share[d] some common goal to violate [his] rights." *Betts*, 751 F.3d at 85. Thus, because the complaint contains nothing more than "conclusory allegation[s] that [Defendants] acted in concert with a state actor," we affirm the district court's dismissal of Cheruvu's section 1983 claims against Defendants. [4] *Ciambriello*, 292 F.3d at 324.

The district court also correctly dismissed Cheruvu's racial-discrimination claims under sections 1981, 1982, and 1985, all of which require Cheruvu to plausibly allege that Defendants had the "intent to discriminate against him on the basis of his race." *Sherman v. Town of Chester*, 752 F.3d 554, 567 (2d Cir. 2014) ( sections 1981 and 1982); *see also* *Reynolds v. Barrett*, 685 F.3d 193, 201–02 (2d Cir. 2012) ("[ Section] 1985 ... require[s] 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.' " (quoting *Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971))). As the district court pointed out, "Cheruvu offer[ed] little more than his own say[-]so that [D]efendants targeted him because of his race." *Cheruvu*, 2022 WL 3346918, at *6. Indeed, the entirety of the complaint's allegations of discriminatory intent consists of the following: (1) "[Cheruvu] is [an] Asian Indian American," and (2) "[D]efendants had an intent to discriminate against [him] on the basis of race." App'x at 35. These "naked assertions of racial discrimination," *Gant v. Wallingford Bd. of Educ.*, 69 F.3d 669, 672 (2d Cir. 1995) (internal quotation marks omitted), are simply inadequate to "giv[e] rise to a plausible inference of racially discriminatory intent," *Henry v. County of Nassau*, 6 F.4th 324, 335–36 (2d Cir. 2021) ("In order to survive a motion to dismiss, the plaintiff must specifically allege the events claimed to constitute intentional discrimination as well as circumstances giving rise to a plausible inference of racially discriminatory intent." (internal quotation marks omitted)). On this record, we cannot conclude that the district court erred by dismissing Cheruvu's section 1981, 1982, and 1985 claims.

**\*3** We have considered all of Cheruvu's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

### All Citations

Not Reported in Fed. Rptr., 2023 WL 3443362

---

## Footnotes

\*      The Clerk of Court is respectfully directed to amend the official case caption as set forth above.

1    The district court also declined to exercise supplemental jurisdiction over Cheruvu's state-law claims and remanded those claims to state court. On appeal, Cheruvu does not challenge that portion of the district court's decision.

2    Between July 2014 and January 2015, Cheruvu was thrice indicted by federal and state grand juries for his allegedly fraudulent billing practices. The government also brought a civil-forfeiture action against Cheruvu in federal court in May 2014. While his federal criminal trial was ongoing, Cheruvu pleaded guilty to one count of healthcare theft or embezzlement, in violation of 18 U.S.C. § 669(a). Cheruvu also entered a similar guilty plea in the state criminal case. After Cheruvu moved to withdraw his guilty pleas alleging actual innocence, all federal criminal charges and civil-forfeiture proceedings against Cheruvu were dismissed pursuant to a settlement agreement between Cheruvu and the United States Attorney for the Western District of New York. As part of the settlement agreement, the $99,378.17 seized from Cheruvu was forfeited to the government, which arranged to "disburse such funds" among BlueCross, IHA, and Univera. App'x at 54–55. In November 2019, the New York state court also dismissed all of the state criminal charges against Cheruvu.

3    Because the district court concluded that Cheruvu was not "a prevailing party" for purposes of section 1981, 1982, 1983, and 1985, it also rejected Cheruvu's request for attorney's fees under section 1988. *Cheruvu*, 2022 WL 3346918, at *6 n.12; *see also* 42 U.S.C. § 1988(b) ("In any action or proceeding to enforce a provision of sections 1981, ... 1982, 1983, [or] 1985 ..., the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs...."); *Chabad Lubavitch of Litchfield Cty., Inc. v. Litchfield Historic Dist. Comm'n*, 934 F.3d 238, 243 (2d Cir. 2019) ("To qualify as a prevailing party [under section 1988], ... [a] plaintiff must obtain an enforceable judgment against the defendant from whom fees are sought." (internal quotation marks omitted)).

4    On appeal, Cheruvu argues that the Supreme Court's recent decision in *Thompson v. Clark*, 142 S. Ct. 1332 (2022), "undermined the rationale" for the district court's dismissal of his "[s]ection 1983 malicious[-]prosecution claim[s]." Cheruvu Br. at 33. But Cheruvu's reliance on *Thompson* is misplaced. While the district court dismissed Cheruvu's section 1983 claims because the complaint had failed to allege that Defendants "act[ed] under color of state law," *Cheruvu*, 2022 WL 3346918, at *4 (internal quotation marks omitted), *Thompson* concerned "the favorable[-]termination requirement of the Fourth Amendment," which is an entirely different element for a malicious-prosecution claim, 142 S. Ct. at 1336, and one on which the district court did not rely.

---

**End of Document**                                                                © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2019 WL 3564578
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Jennifer COLLINS, Plaintiff,
v.
GIVING BACK FUND and NEXUS Global, Defendants.

No. 18 Civ. 8812 (CM)
|
Signed 08/06/2019

**Attorneys and Law Firms**

Joshua Alan Douglass, Solo Practitioner, Hempstead, NY, for Plaintiff.

Monica Susan Asher, McDermott, Will & Emery, LLP, New York, NY, for Defendants.

**MEMORANDUM DECISION AND ORDER GRANTING DEFENDANTS' MOTION TO DISMISS AND DENYING COLLINS' MOTION TO SUBSTITUTE DEFENDANT**

McMahon, C.J.:

**\*1** This is Plaintiff Jennifer Collins' ("Collins") second attempt to bring an action for disability discrimination and intentional infliction of emotional distress against the Giving Back Fund ("GBF"), a not-for-profit organization, and a networking program allegedly funded by GBF called NEXUS Global ("NEXUS"). An earlier case alleging the same facts was voluntarily discontinued as to these two Defendants and dismissed as against a third party against whom Plaintiff recently brought suit in the New York State Supreme Court.

Presently before the Court is a motion to dismiss filed by both Defendants (Dkt. No. 16), as well as Collins' motion to substitute Jonah Wittkamper, the President of NEXUS, for NEXUS as a party defendant (Dkt. No. 19).

This case can only be understood in conjunction with the first action filed by Collins—*Collins v. Lindstrom*, No. 18 Civ. 6696 [1] (the "First Action"). In that case, Collins alleged that Lindstrom—a philanthropist and socialite with whom she had a brief affair—had unfairly caused GBF and NEXUS—an exclusive, social entrepreneurship "summit" and networking

platform—to revoke an invitation to a function sponsored by NEXUS that NEXUS had extended to Collins. Collins alleged that the revocation of her invitation constituted disability discrimination in violation of the Rehabilitation Act, 🚩29 U.S.C. § 794, because she suffers from bipolar disorder and post-traumatic stress disorder. Collins also asserted claims against Lindstrom for slander, and against all three defendants for intentional infliction of emotional distress.

Collins voluntarily discontinued her claims against GBF and NEXUS while those three parties tried to reach a settlement. The stipulation of discontinuance inexplicably, but quite explicitly, provided that Collins would bring an entirely new action against GBF and NEXUS if those settlement negotiations failed—which they did. This lawsuit (the "Second Action") was filed when those negotiations broke down.

Meanwhile, Lindstrom—as against whom the claims asserted in the First Action were not discontinued—moved for dismissal of the purely state law claims asserted against him. Because the federal claim on which jurisdiction had been predicated had been voluntarily discontinued, and there was no diversity between Lindstrom and Collins, that motion was granted, without prejudice to Collins' commencing her suit against Lindstrom in the New York State Supreme Court—which she has done.

Procedurally, this case might seem very confusing. One thing, however, is crystal clear: Plaintiff fails to state any claim against either GBF or NEXUS, and no amendment would permit her to cure her pleading deficiencies. Their motions to dismiss are, therefore, granted.

Moreover, since Collins asserts no claim that would lie against anyone associated with NEXUS (such as its president), her motion to substitute Wittkamper as a party defendant is denied as futile.

**I. Materials Considered**

**\*2** The record before the Court is, to be frank, a mess. Everyone is represented by counsel, but none of the lawyers seems to know the rules for litigating a motion to dismiss under Fed. R. Civ. P. 12(b)(6).

When a party moves to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), a district court's analysis is confined to "the allegations

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 43 of 103

Collins v. Giving Back Fund, Not Reported in Fed. Supp. (2019)

contained within the four corners of the complaint." 🔖 *Carlin v. Davidson Fink LLP*, 852 F.3d 207, 212 (2d Cir. 2017) (internal quotation marks and citation omitted). Beyond the text of the complaint, the Court may consider only documents that are appended as exhibits to the complaint, that are incorporated by reference in the text of the complaint, or that are otherwise "integral" to the allegations contained therein. *DiFolco v. MSNBC Cable LLC*, 622 F.3d 104, 111 (2d Cir. 2010).

Here, Collins filed a Complaint. (Dkt. No. 6.) [2] There were no exhibits appended to that pleading.

At the same time she originally tried to file her Complaint (*see* Dkt. No. 2), Plaintiff filed her sworn affidavit, together with twenty-one exhibits (Dkt. No. 3). There are references to this affidavit and to at least some of these exhibits in the text of the Complaint. It is, therefore, appropriate to consider this contemporaneously-filed document on a motion to dismiss. Defendants certainly considered them part of the pleading; when they filed a motion to dismiss (Dkt. No. 16), they addressed the contents of the affidavit and its exhibits. The Court will consider them in deciding the motion to dismiss; under the rule of *DiFolco*, they were prepared and filed contemporaneously with the Complaint and were referenced therein.

Collins responded to the motion to dismiss on December 13, by filing a motion to substitute a party (Dkt. No. 19). Defendants filed their reply on December 21. (Dkt. No. 20.) Those documents will be considered on the motion to dismiss.

On December 26, 2018, Collins filed a second affidavit—containing additional factual matter and exhibits that were not appended to her original affidavit—with the Clerk of Court. This affidavit and its exhibits will not be considered on the motion to dismiss; it was prepared long after the Complaint was drafted and filed, and it is not referenced in the pleading sought to be dismissed. It is, therefore, stricken from the record on this motion.

Unfortunately, the Court was not fully familiar with the state of the record when, on January 3, 2019, Defendants—having learned of the filing of this second affidavit—sought permission to file a sur-reply in order to respond to its new allegations (rather than ask the Court to strike the affidavit, which is what they should have done). I granted that application. (Dkt. No. 25.) I should not have done so, because the affidavit is not properly part of the record on this motion.

So while I did give Defendants permission to file the sur-reply, I will not consider it, and I strike that from the record on the motion to dismiss—with apologies to Defendants, who should not have had to prepare any such documents.

I suggest that, in the future, if these lawyers intend to litigate in federal court, they learn the rules and abide by them.

**\*3** The statement of facts that follows is drawn entirely from the "four corners of the pleading" as I have deemed it to be—Dkt. Nos 3 and 6—and nothing else.

## II. Statement of Facts

### A. The Parties and Lindstrom

Collins is an entrepreneur. In her email signature she describes herself as an: "Entertainer. Yogi. Writer. Artist. Mental Health Professional. CEO of GTI Enterprises." (Pl. Aff. Exs. H, I.)

In 2017, Collins was engaged as a fundraising consultant for ARC-38, a non-profit located in Duchess County, New York. (Pl. Aff. ¶ 6.)

Defendant NEXUS is a networking group allegedly run by Defendant GBF, a 501(c)(3) non-profit organization incorporated in Massachusetts and headquartered in Los Angeles. (Compl. ¶ 13.) GBF "encourages and facilitates charitable giving by professional athletes, celebrities, high net-worth individuals, existing nonprofit organizations, corporations, and others who truly desire to give back." (*Id.* ¶ 33.) GBF created the NEXUS project to "bridge communities of wealth and social entrepreneurship." (*Id.*) NEXUS' mission is to "connect, inspire, and activate exceptional social innovators and the next generation of influential families around the world." (*Id.*) To facilitate this mission, NEXUS organizes a variety of "summits"—networking events for members, admitted applicants, and featured speakers. (*Id.* ¶ 32.)

Christopher Rockefeller Lindstrom ("Lindstrom"), who is really the central character in this case, is, among other things, "a fifth-generation Rockefeller"—the family synonymous with industrial fortune and philanthropic contributions. (*Id.* ¶ 19.) Lindstrom is a philanthropist and an investor, who invests in organizations that promote economic sustainability. (Compl. ¶¶ 19–27.) He co-founded CycleEffect, a venture capital firm that invests in companies focused on the "regenerative economy." (*Id.* ¶¶ 22–25.) And, insofar as is relevant here, he is a member of NEXUS. (*See id.* ¶ 26.)

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 44 of 103

Collins v. Giving Back Fund, Not Reported in Fed. Supp. (2019)

### B. Collins' Interactions with Lindstrom

Collins met Lindstrom in the spring of 2017, in her capacity as a fundraising consultant for ARC-38. (Compl. ¶ 39.) Their initial interactions were purely professional. Lindstrom loaned ARC-38 $184,000 at that time to prevent foreclosure on its property. (*Id.* ¶ 40.) ARC-38 designated Collins to "refinanc[e] ... and/or renegotiat [e] the terms of the loan." (*Id.* ¶ 41.) [3]

At some point early in their acquaintance, Collins and Lindstrom had dinner. (Pl. Aff. ¶ 13.) Over dinner, Lindstrom mentioned to Collins that he was member of a networking group called NEXUS. (*Id.* ¶ 14.) Collins became fixated on attending the group's annual conference. (*Id.* ¶ 19.) Her application to attend that conference, which was initially accepted and subsequently rejected, is the crux of the present lawsuit.

After Lindstrom informed Collins about NEXUS, she did some research and discovered that it was holding a summit very soon. (Pl. Aff. ¶ 19.) Collins texted Lindstrom to ask if he could secure "a spot" for her at the upcoming event. (Pl. Aff. Ex. C.) Lindstrom responded he could not, but said: "I can endorse you for the US [*sic*] Summit in February." (*Id.*) The USA Summit is an annual NEXUS summit held in Washington, D.C. (Compl. ¶ 71.)

**\*4** Collins viewed this exchange as some sort of binding commitment by Lindstrom to get her invited to the USA Summit; she attaches the text message to her Complaint as "documentation." (*Id.* ¶ 87; Pl. Aff. ¶ 57, Ex. C.)

### C. Collins' Personal Relationship with Lindstrom

At some point the relationship between Collins and Lindstrom became more personal.

Collins arranged to meet Lindstrom for coffee to discuss the terms of the loan to ARC-38. (Pl. Aff. ¶ 10–11.) During this meeting, Collins discovered that Lindstrom was interested in "broader land-stewardship initiatives, cryptocurrency, and health and wellness programs." (*Id.* ¶ 11.) Collins asked to see Lindstrom again to discuss these subjects. (*Id.*)

Lindstrom invited Collins to spend the day at his farmhouse in Hudson, New York "to discuss business affairs." (*Id.* ¶ 12.) During that meeting, Lindstrom viewed nude pictures of Collins on her phone and offered to paint her portrait from

those photos. (*Id.* ¶ 17–18.) Collins agreed to the portrait; she would later follow up inquire about the status of this "commission[ ]." (*Id.* Ex. E.)

Lindstrom and Collins then entered into a consensual sexual relationship. (*Id.* ¶ 26.) Lindstrom invited Collins back to his Hudson farmhouse a second time. (*Id.* ¶ 27.) The two also traveled to New Hampshire to go hiking. (*Id.*)

During the hike trip, Lindstrom told Collins that he was in love with another woman, and that he viewed Collins as his "friend." (*Id.* ¶ 28.) Collins was "devastated" by the news. (*Id.* 129.)

### D. Collins' Mental Health Issues

After Lindstrom told Collins that he viewed her only as a friend, Collins "felt" that her "bipolar disorder ... was triggered." (*Id.* ¶ 30.) Initially, she did not seek medical attention. (*Id.* ¶ 31.) Instead, she sought to obtain an explanation from Lindstrom. (Pl. Aff. ¶¶ 32–35, Ex. E.)

In October 2017, Collins asked to meet Lindstrom to "express [her] emotions and difficulties as a result of the events in New Hampshire." (*Id.* ¶ 32.) Lindstrom agreed to a meeting, but apparently the two spent the time discussing "mutual business interests." (*Id.* ¶ 34.)

After a few weeks of reflection, she e-mailed Lindstrom on November 15, 2017. (*Id.* Ex. E) In that note, she discussed her "disappoint[ment]" in the "pain of [Lindstrom's] false courtship," and told Lindstrom that his lack of follow-through on certain unspecified promises "triggered" her "to the point of being unable to sleep." (*Id.*) Those broken "promises" included Lindstrom's failure to paint a nude portrait of Collins and his failure to introduce Collins to his "network," which supposedly would have helped Collins complete the refinancing of ARC-38's loan. (*Id.*) Collins also asked how she could "move forward with an endorsement for NEXUS," as she still wanted to attend the upcoming conference. (*Id.*)

Lindstrom did not respond to Collins's email. (Compl. ¶ 69.)

### E. Hospitalization

On November 18, 2017, Collins sought care at the Maimonides Hospital in Brooklyn, New York, for "psychiatric purposes." (*Id.* ¶ 70.) She remained at the center for ten days. (Pl. Aff. Ex. F.)

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 45 of 103

Collins v. Giving Back Fund, Not Reported in Fed. Supp. (2019)

According to Collins, she had "episodes ... directly related to feeling used and silenced by" Lindstrom. (*Id.* ¶ 37.) Doctors at the hospital gave Collins a sedative. (*Id.*)

**F. NEXUS Reaches Out**

**\*5**  On December 7, just a week after her release, Collins received an email from NEXUS. (*Id.* Ex. G.) The email contained information about upcoming NEXUS events. (*Id.*) Collins construed the email as an "Invitation," albeit not a "personalized" one, since it included a link to the organization's monthly newsletter. (*Id.*)

Collins forwarded the message from NEXUS to Lindstrom. (Pl. Aff. ¶ 40.) In her email, Collins informed Lindstrom that she intended to apply to the USA Summit. (*Id.*) She also asked that he join her at a separate NEXUS event "to spend time together in a smaller group setting." (*Id.*)

Lindstrom did not respond. (*See* Compl. ¶ 78.)

The next day, Collins forwarded Lindstrom her completed application for the USA Summit by email. (Pl. Aff. Ex. H.) She advised Lindstrom that she had "used his name" on her application, and made a suggestion: "anything [Lindstrom] could do to ensure an invitation [to the Summit] would be greatly appreciated." (*Id.*)

Lindstrom did not respond. (*See* Compl. ¶ 78.)

Three days later, on December 11, Collins emailed Lindstrom again. She asked to meet with him to discuss "any ... all ... or just a few of the things we have in common." (Pl. Aff. Ex. I.)

Lindstrom did not respond.

That evening, Collins emailed Lindstrom for the second time. She expressed frustration that Lindstrom had not responded to her efforts to see, speak, or "brainstorm" with her. (Pl. Aff. Ex. J.)

Finally, Lindstrom responded. (*Id.* ¶ 46.)

He sent Collins an email stating he was "not going to work with her when [she] act[ed] like this." (*Id.* Ex. K.) In his note, Lindstrom called Collins "overbearing," "manic," and expressed his discomfort that Collins was "trying to insert [herself] into [his] networks and projects without ... [his] approval." (*Id.*)

Collins responded by text message, informing him that her "mania" was "triggered" by Lindstrom's failure to keep promises. (*Id.*) Collins also accused Lindstrom of "taking advantage of his power to engage with [her] sexually," even though, in her affidavit, Collins describes her sexual relationship as "consensual." (*Id.*; Pl. Aff. ¶ 26.)

Lindstrom did not respond. Instead, he "blocked" Collins from sending messages to his phone. (*See* Pl. Aff. Ex. N.)

**G. USA Summit**

On December 21, Collins attended the NEXUS event she had learned about in the email. (*Id.* Ex. G.) Collins alleges that she met NEXUS members at this event "who [were] happy to endorse me for [the] summit," although she never identifies them. (*Id.* Ex. N.)

A few days later, on December 24, the NEXUS team sent Collins an email stating that she had been accepted to the USA Summit. (*Id.* Ex. L.)

On December 26, Collins forwarded this note to Lindstrom "to keep [him] in the loop." [4] (*Id.* Ex. M.)

Lindstrom responded by email on January 5, 2018, telling Collins that he viewed her repeated efforts to communicate with him as "harassment." (*Id.* Ex. N.) He told Collins that he intended to block her emails, as he had already done with her phone calls and text messages. (*Id.*) Lindstrom also told Collins that he planned to tell the NEXUS organization that Collins was "not a fit for the NEXUS community," and that she had used him as a reference without his "full consent." (*Id.*)

**\*6**  Collins sent an email back to Lindstrom, promising that her "connection [with Lindstrom] would never be the same." (*Id.*) "[T]he more you try to silence me, the harder I am going to fight back." (*Id.*)

**H. NEXUS Revokes Collins' Acceptance**

Lindstrom contacted NEXUS the following day. While acknowledging that NEXUS could invite anyone it liked to the USA Summit, he said that Collins had listed his (Lindstrom's) name as a reference without his consent and had been harassing him for months. Lindstrom stated that he did not recommend that Collins become a member of the NEXUS community. (*Id.*)

Collins v. Giving Back Fund, Not Reported in Fed. Supp. (2019)

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 46 of 103

On January 15, NEXUS rescinded Collins' acceptance to the USA Summit. (Pl. Aff. Ex. O.)

Collins responded with three emails to NEXUS over the next two days. (*Id.* Exs. O–P.) Among other things, she speculated that NEXUS rescinded her acceptance because (*i*) Lindstrom sought to silence Collins about their "personal relationship," which Lindstrom exploited to "engage with [Collins] sexually;" (*ii*) unnamed "powerful men" wanted to silence "female leaders;" (*iii*) NEXUS wanted to avoid a "situation of blatant personal vendetta and silencing." (*Id.*)

On January 18, NEXUS sent two emails to Collins in response. (*Id.* Ex. Q.) In its first email, NEXUS relayed that it had shared Collins' messages about Lindstrom with its "Values Council," which is "an independent body of NEXUS members who review and evaluate 'red flags' raised about or members on a monthly basis in relation to upholding the NEXUS Values and community code of conduct." [5] (*Id.*) In its second email, NEXUS advised Collins that no decision about her complaints about Lindstrom would be made prior the USA Summit, but that the Council would inform Collins if she were ever to be considered for future events. (*Id.*)

Later that day, Collins responded via email, expressing pleasure "with initial steps" that NEXUS had taken. (*Id.* Ex. S.) However, she asked that NEXUS take further action "to ensure [her] voice as a person with bipolar disorder and complex PTSD is adequately heard." (*Id.*) Collins directed that such a "space" was "absolutely necessary" based on the "#metoo and Times Up" movements. (*Id.*)

NEXUS apparently did not respond.

Collins then commenced litigation by filing the First Action.

### III. Procedural History

#### A. The First Action

About six months after Collins' acceptance to the USA Summit was revoked, she commenced the First Action. (*See* 18-cv-6696 Dkt. No. 1.) She asserted the following causes of action: (*i*) defamation against Christopher Rockefeller Lindstrom, (*ii*) intentional infliction of emotional distress against Lindstrom, NEXUS, and GBF, and (*iii*) a violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, against NEXUS and GBF. (*Id.* ¶¶ 90–111.)

Just over a week later, on August 10, 2018, GBF, NEXUS and Collins filed a stipulation of voluntary dismissal. (18-cv-6696 Dkt. No. 12.) The stipulation provided that Collins would file a new action against GBF and NEXUS if the parties failed to execute a settlement. (*Id.*) The Court so-ordered this stipulation of partial discontinuance on September 21, 2018. (18-cv-6696 Dkt. No. 25.)

**\*7** This left Lindstrom as the only party defendant in the First Action. He immediately filed a motion to dismiss, and sought sanctions against Collins. (18-cv-6696 Dkt. Nos. 13, 28.)

On November 26, 2018, this Court granted Lindstrom's motion to dismiss but denied his motion for sanctions. (18-cv-6696 Dkt. No. 39.)

On March 4, 2019, Collins filed a lawsuit against Lindstrom in state court, where it remains pending. *Collins v. Lindstrom*, No. 500275/2019 (Sup. Ct., Kings Cty.).

#### B. The Second Action (This Case)

Collins failed to consummate a settlement with NEXUS and GBF. Therefore, on September 26, 2018, she filed a new Complaint—the present lawsuit—against those two entities. She did not list Lindstrom in the caption of her new lawsuit and did not obtain or serve him with a summons in this action. (Dkt. Nos. 11–12.) In fact, at the same time she filed this lawsuit, she was actively litigating against Lindstrom in the First Action.

Nonetheless, aside from the caption, the Complaint in this action is a carbon copy of the one filed in the First Action. Not only does it assert all of the factual allegations against Lindstrom, it includes all of the claims against Lindstrom that were being litigated, and that were eventually dismissed, in the First Action—claims that Plaintiff presumably asserted against Lindstrom in the action she filed in the New York State Supreme Court earlier this year.

Between the parties' agreeing that a second action would be filed and counsel's negligent failure to edit the claims against Lindstrom out of the instant complaint, they have managed to generate considerable confusion. I conclude, however, that Plaintiff did not intend to sue Lindstrom in this lawsuit.

In the Second Circuit, when claims are asserted in the body of a pleading but that party is not named in the caption, the "intent of the pleader" determines whether that person should

be treated as a party defendant: "The caption, pleadings, service of process and other indications of the intent of the pleader, are evidence upon which a district court will decide, in cases of doubt, whether an entity has properly been made a party to a lawsuit." *Nationwide Mut. Ins. Co. v. Kaufman*, 896 F. Supp. 104, 109 (E.D.N.Y. 1995) (citing *Jones v. Griffith*, 870 F.2d 1363, 1365 (7th Cir. 1989)).

In this case, it is clear that Plaintiff did not intend to name Lindstrom as a party defendant in the Second Action. We know this because (1) she stipulated to bring a separate lawsuit against NEXUS and GBF, which she has in fact done; (2) she continued to litigate her claims against him in the First Action; and, (3) when that case was dismissed without prejudice, she sued Lindstrom in the New York State Supreme Court.

Therefore, the claims against Lindstrom are stricken from the Complaint as irrelevant surplusage. They will not be considered further.

### C. Present Motions

On December 10, 2018, Defendants GBF and NEXUS filed a motion to dismiss. (Dkt. No. 16.) They argue that the Complaint (*i*) fails to state a claim upon which relief can be granted; and (*ii*) does not plead facts from which the Court can infer that NEXUS is a legal entity with the capacity to be sued.

In response to the second issue, Collins moved on December 13, 2018, seeking to substitute Jonah Wittkamper, the President of NEXUS, as Defendant in place of NEXUS. (Dkt. No. 19.) Jonah Wittkamper is the President of NEXUS. Collins alleged that, under N.Y. Gen. Ass'ns Law § 13, he could be held accountable for any alleged disability discrimination and intentional infliction of emotional distress perpetrated by NEXUS. (Dkt. No, 19 at 2.)

### IV. Standard of Review

**\*8** When a party moves to dismiss for failure to state a claim upon which relief can be granted under Fed. R. Civ. P. 12(b)(6), the Court must "accept all allegations in the complaint as true and draw all inferences in the non-moving party's favor." *LaFaro v. N. Y. Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009) (internal quotation marks omitted). The claims will survive the motion to dismiss as long as they contain "sufficient factual matter, accepted as true, to state a claim

to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted). Collins must do more, however, than merely attach "labels and conclusions" to bald factual assertions. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007).

"The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. A plaintiff must plead facts that "allow the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Pension Ben. Guar. Corp. ex rel. St. Vincent Catholic Med. Ctrs. Ret. Plan v. Morgan Stanley Inv. Mgmt. Inc.*, 712 F.3d 705, 717–18 (2d Cir. 2013).

A complaint fails to state a claim "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct." *Iqbal*, 556 U.S. at 679. "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679; *Ruston v. Town Bd. for Town of Skaneateles*, 610 F. 3d 55, 58–59 (2d Cir. 2010). The Court accepts as true all well-pleaded factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements for a cause of action." *Iqbal*, 556 U.S. at 678.

## V. Discussion

### A. Defendants' Motion to Dismiss is Granted

#### 1. The Claims Against NEXUS Are Dismissed Because NEXUS Cannot Be Sued

NEXUS moves to dismiss the claims asserted against it because it is not a legal person and so cannot be sued. The motion is GRANTED.

NEXUS is not alleged to be either a corporation or a partnership, or any sort of entity with independent legal status. It is some sort of private networking group that is a "project" of GBF. *Cf. Hamad v. Ctr. for Study of Popular Culture*, No. A-06-CA-285-SS, 2007 WL 9701889, at *1 n.1 (W.D. Tex. Jan. 17, 2007), *aff'd sub nom. Hamad v. Ctr. for Jewish Cmty.*

Collins v. Giving Back Fund, Not Reported in Fed. Supp. (2019)

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 48 of 103

*Studies*, 265 F. App'x 414 (5th Cir. 2008) ("Although Plaintiff continues to name Campus Watch as a defendant in his filings, this organization is not a legal entity but a project of the nonprofit organization Middle East Forum.") The most that can be said is that NEXUS is an "association" of persons with common interests.

Pursuant to Section 13 of New York's General Associations Law, entitled "Action or proceeding against unincorporated association," "An action or special proceeding may be maintained, against the president or treasurer of such an association ... upon any cause of action, for or upon which the plaintiff may maintain such an action or special proceeding, against all the associates, by reason of their interest or ownership in ... or their liability therefor, either jointly or severally." For purposes of Section 13, "Any partnership, or other company of persons, which has a president or treasurer, is deemed an association within the meaning of this section."

It would appear, then, that as long as NEXUS has a president, its president can be named as the defendant on any claim for which the entire association would be liable. And indeed, Plaintiff has moved for leave to substitute NEXUS' President, Jonah Wittkamper, the President of NEXUS, as the party Defendant on her claims against NEXUS.

**\*9** However, even if I were to substitute Wittkamper as the named Defendant on the claims against NEXUS, the complaint would have to be dismissed—because Plaintiff fails to state any claim against the association on which she can recover.

### B. Plaintiff's Claim under the Rehabilitation Act Is Dismissed With Prejudice

Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, prohibits discrimination against qualified individual with disabilities by certain programs receiving government funding.

To state a claim for a violation of the Rehabilitation Act, Collins must plead: (1) that a program receives federal funding; (2) that she is "disabled" within the meaning of the Act; (3) that she is otherwise qualified for a program; and (4) that she was excluded from that program solely because of her disability. *Putkowski v. Warwick Valley Cent. Sch. Dist.*, 363 F. Supp. 2d 649, 654 (S.D.N.Y. 2005).

However, the Rehabilitation Act claim must be dismissed, because Collins fails to plead (1) that she was denied access to a program that receives federal funding, and (*ii*) that she is a "qualified individual" under Section 504 of the Act.

The Court agrees with both arguments.

### 1. Collins Fails to Allege that She Was Excluded From a Program that Receives Federal Funding

Collins does not specifically allege that she was excluded from a program that receives federal funding. Nor does she allege facts from which it could be inferred that NEXUS— the program from which she was excluded—receives federal funding.

However, she pleads that NEXUS is a "project" of GBF, and that GBF received a federal grant in the amount of $492,357, from the Regional Innovation Strategies Program from the United States Economic Development Administration, for some unspecified purpose. (Compl. ¶¶ 33–35.) The question is, is that sufficient to plead that Plaintiff was excluded from a federally funded program for purposes of the Rehabilitation Act?

It is not.

There are four separate types of entities whose operations can be considered "programs or activities" under the Act:

> For the purposes of this section, the term "program or activity" means all of the operations of–
>
> (1)
>
> (A) a department, agency, special purpose district, or other instrumentality of a State or of a local government; or
>
> (B) the entity of such State or local government that distributes such assistance and each such department or agency (and each other State or local government entity) to which the assistance is extended, in the case of assistance to a State or local government;
>
> (2)
>
> (A) a college, university, or other postsecondary institution, or a public system of higher education; or

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 49 of 103

Collins v. Giving Back Fund, Not Reported in Fed. Supp. (2019)

(B) a local educational agency (as defined in section 7801 of Title 20), system of career and technical education, or other school system;

(3)

(A) an entire corporation, partnership, or other private organization, or an entire sole proprietorship--

(i) if assistance is extended to such corporation, partnership, private organization, or sole proprietorship as a whole; or

(ii) which is principally engaged in the business of providing education, health care, housing, social services, or parks and recreation; or

(B) the entire plant or other comparable, geographically separate facility to which Federal financial assistance is extended, in the case of any other corporation, partnership, private organization, or sole proprietorship; or

**\*10**  (4) any other entity which is established by two or more of the entities described in paragraph (1), (2), or (3); any part of which is extended Federal financial assistance.

⚑ 29 U.S.C. § 794(b).

Obviously, the only category that might conceivably apply to NEXUS or its alleged sponsor, GBF, is paragraph (3). Neither Defendant is a governmental entity or an educational institution, and nothing in the Complaint suggests that either Defendant was established by two or more entities subject to Section 504 of the Rehabilitation Act. GBF is a private organization that serves as a platform for private philanthropy. Viewing the allegations of the Complaint most favorably to Collins, GBF sponsors various projects, of which NEXUS is one.

The Complaint does not specifically allege that GBF received federal funding for NEXUS. However, that is not necessarily fatal to the Complaint. All of the operations of a private entity like GBF—the "entire" private organization, including all its programs—will be subject to Section 504 as long as GBF meets one of two disjunctive conditions under the statute:

(i) it receives Federal financial assistance "as a whole;" or

(ii) it is "principally engaged" in one of the enumerated businesses—education, health care, housing, social services, or parks and recreation.

*See id.* § 794(b)(3)(A)(i)–(ii).

Collins' Complaint fails to plead that GBF qualifies under either condition. I will discuss them in reverse order.

First, Collins has not plausibly pleaded that either GBF or NEXUS is "*principally* engaged in the business of providing education, health care, housing, social services, or parks and recreation." *Id.* § 794(b)(3) (emphasis added). "Principally engaged" has been interpreted to mean "the primary activities of a business, excluding only incidental activities." ⚑ *Doe v. Salvation Army in U.S.*, 685 F.3d 564, 571 (6th Cir. 2012). The modifier "principally" is significant, not merely because the statute's plain text requires as much, but because legislative history clearly shows that Congress intended the Rehabilitation Act to apply only to organizations that act as government surrogates by providing what are traditionally conceived of as "public services." As the Seventh Circuit explained in ⚑ *Runnion ex rel. Runnion v. Girl Scouts of Greater Chi and N.W. Ind.*, 786 F.3d 510 (7th Cir. 2015):

When read in context [ ], the passages from the legislative history [ ] explain why the provision was limited to covering organizations providing the enumerated services. *See* S. Rep. No. 100–64, at 4, 1988 U.S.C.C.A.N. 3 at 6 ("if the corporation provides *a public service*, such as social services, education, or housing, the entire corporation is covered"); *id.* at 18 (explaining that the bill under consideration would cover "private entities ... that provide services that *are traditionally regarded as within the public sector*, i.e., those enumerated in part (3)(A)(ii) of the definition of 'program or activity' "); *id.* at 20 ("Even private corporations are covered in their entirety ... *if they perform governmental functions*, i.e., are 'principally engaged in the business of providing education, housing, social services, and parks and recreation.' ").

**\*11**  *Id.* at 525 (emphasis added).

Both the language of the statute and the legislative history indicate that the Rehabilitation Act does not reach organizations like GBF or NEXUS. The Complaint alleges that GBF "sets up donor-advised accounts for celebrity performers and athletes" (Compl. ¶ 13) and "encourages

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 50 of 103

Collins v. Giving Back Fund, Not Reported in Fed. Supp. (2019)

and facilitates charitable giving by professional athletes, celebrities, and high net-worth individuals" (Compl. ¶ 33). It also alleges that NEXUS "connects, inspires, and activates exceptional social innovators and the next generation of influential families around the world." (Compl. ¶ 31.) None of this suggests that GBF or NEXUS is engaged at all—let alone "principally"—in providing the sort of "social services" that are traditionally provided by the public sector (education, health care, housing, or parks and recreation). NEXUS is an exclusive networking group for the rich and famous—the antithesis of a social services provider. As the Seventh Circuit has explained, private membership organizations that do not perform government functions do not qualify for clause (ii)'s "categorical exemption" to the rule that private entities are not comprehended in the scope of the Act. 786 F.3d at 526.

Nor does the complaint allege that either GBF or NEXUS receives federal funding "as a whole." For purposes of clause (i), the phrase "as a whole" means that federal assistance is extended to the organization otherwise than for some specific purpose—put differently, that the recipient of federal funds received those funds as general assistance. S. Rep, No 100-64, at 17 (1987), *as reprinted in* 1988 U.S.C.C.A.N. 3, 19. The report is quite specific that "federal financial assistance that is earmarked for one or more facilities of a private corporation or other private entity when it is extended is not assistance to the entity 'as a whole.' " *Id.* Additionally, "Federal aid which is limited in purpose ... is not considered aid to the corporation as a whole[.]" *Id.*

It has been repeatedly held that federal funding to a private entity not primarily engaged in education, health care, housing or parks and recreation, when that funding is earmarked for a particular project or site within the entity's operations, is not "as a whole" federal funding for purposes of the Rehabilitation Act. Instead, Section 504 is "program specific" as to such enterprises. *Boswell v. SkyWest Airlines, Inc.*, 217 F. Supp. 2d 1212, 1216 (D. Utah 2002), *aff'd*, 361 F.3d 1263 (10th Cir. 2004). "Though Congress chose to broaden the definition of 'program or activity' as it relates to 'all of the operations' of certain public entities, it did not do the same for private ones." *Dana v. Baker Hughes, Inc.*, No. 14-cv-01861,2015 WL 5576880, at *10 (M.D. Pa. Sept. 21, 2015); *see also Blair v. Bank of America, N.A.*, No. 10-CV-946-SI, 2012 WL 860411, at *5 (D. Or. Mar. 13, 2012), *aff'd*, 573 F. App'x 665 (9th Cir. 2014); *Squire v. United Airlines*, 973 F. Supp. 2d 1004 (D. Colo. 1997); *Phillips v.*

*Goldsteins' Rosenbwergs' Raphael-Sachs, Inc.*, No. CIV. A. 12-3833, 2013 WL 6506160, at *5 (E.D. Pa. Dec. 10, 2013).

**\*12** The Complaint in this case alleges that GBF, the sponsor of NEXUS, received a single $492,357.00 federal grant. (Compl. ¶ 35.) The Complaint does not allege that this constitutes funding "as a whole;" neither does it allege that this funding had anything to do with NEXUS. Therefore, the Complaint fails to allege that plaintiff was excluded from a "program or activity receiving Federal financial assistance," as required to state a claim for a violation of Section 504 of the Rehabilitation Act. 29 U.S.C. § 794(a).

Ordinarily I would dismiss with leave to replead. However, a public record of every federal grant is accessible on a federal agency's website. The court can take judicial notice of adjudicative facts contained on government websites, because that information "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." *Schwartz v. U.S. Drug Enforcement Admin.*, No. 16-750-CV, 2017 WL 2451976, at *1 (2d Cir. June 6, 2017) (summary order), citing Fed. R. Evid. 201. Therefore, it is possible for the Court to assess whether granting leave to amend would be futile in this instance.

Amendment would indeed be futile. The grant pleaded in the Complaint was awarded for the benefit of a GBF-sponsored project called the City Innovate Foundation (CIF), and is specifically directed to CIF's San Francisco regional program. *See* 2017 Awardees, Giving Back Fund, Inc., https://www.eda.gov/oie/ris/i6/2017/awardees/ giving-back-fund.htm. Such a grant does not qualify as funding to GBF "as a whole," and so does not sweep in any of its other projects—including specifically NEXUS. To the extent that the grant renders GBF's operations subject to the Rehabilitation Act, it is "project specific" to CIF.

### 2. Collins Does Not Plausibly Allege that She Is a Qualified Individual Within the Meaning of the Rehabilitation Act

Obviously, there is no need to go further; the fact that Plaintiff fails to link the event from which she was excluded to any qualified "program or activity" dooms her Rehabilitation Act claim without more. But there is a second reason why the Complaint must be dismissed: Plaintiff does not plead facts that enable the Court to plausibly infer that she qualifies as an "individual with a disability," as that term is used in the Act.

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 51 of 103

Collins v. Giving Back Fund, Not Reported in Fed. Supp. (2019)

To qualify as an individual with a disability within the meaning of Section 504, Collins must plead that (*i*) she suffers from a physical or mental impairment; (*ii*) that the impairment affects a "major life activity;" and (*iii*) that the impairment "substantially limits" the major life activity. *See Bragdon v. Abbot*, 524 U.S. 624, 630–31 (1998) (discussing definition of "disability" under the Americans with Disabilities Act ("ADA")) (citing 42 U.S.C. § 12102(2)); *see also B.C. v. Mount Vernon Sch. Dist.*, 837 F.3d 152, 159 (2d Cir. 2016) (noting that "Section 504 expressly incorporates ... the ADA's definition").

There is no dispute that Collins has satisfied the first element. Collins pleads that she suffers from a mental impairment. Both bipolar and post-traumatic stress disorders are listed as examples of "impairments" that have the potential to "substantially limit" a major life activity in the relevant Equal Employment Opportunity Commission regulations. *See* 29 C.F.R. § 1630.2(j)(3)(iii) ("It should be easily concluded that ...bipolar disorder, post-traumatic stress disorder ... substantially limit brain function [and] may substantially limit additional major life activities."). Numerous courts have similarly concluded that these disorders constitute "disabilities" within the meaning of the Rehabilitation Act. *See, e.g.*, *Whalley v. Reliance Grp. Holdings, Inc.*, No. 97-cv-4018, 2001 WL 55726, at *4 (S.D.N.Y. Jan. 22, 2001) (bipolar disorder recognized as "mental impairment"); *Andino v. Fischer*, 698 F. Supp. 2d 362, 370 (S.D.N.Y. 2010) (post-traumatic stress disorder recognized as "disability").

**\*13** However, Collins does not plead facts from which the Court can infer that these disorders "substantially affected" her ability to perform any "major life activities." 29 U.S.C. § 794; *see also* *Whalley*, 2001 WL 55726, at *5.

Major life activities include "functions such as caring for one's self, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Bragdon*, 524 U.S. at 638–39 (citing 45 C.F.R. § 84.3(j)(2)(ii); 28 C.F.R. § 41.31(b)(2)). The term " '[s]ubstantially limits' is not meant to be a demanding standard," *see* 29 C.F.R. § 1630.2(j)(3)(i), but, "It is well-established that an impairment does not significantly restrict a major life activity if it results

only in mild limitations." *Whalley*, 2001 WL 55726, at *4 (citing *Reeves v. Johnson Controls World Servs., Inc.*, 140 F.3d 144, 151 (2d Cir. 1998)). Courts require a plaintiff to do more than simply allude to her impairments in her pleading; she must plead *how* those impairments significantly impacted her major life activities, or she will not survive a motion to dismiss. *See Schwartz v. New York State Ins. Fund*, No. 17 CIV. 8973 (LGS), 2018 WL 3442962, at *5 (S.D.N.Y. My 17, 2018); *Graham v. Macy's Inc.*, No. 14 Civ. 3192, 2015 WL 1413643, at *3 (S.D.N.Y. Mar. 23, 2015).

Here, Collins has not pleaded how her bipolar and post-traumatic stress disorders affect her in any major life activity. The Complaint is devoid of any allegations tending to show that these conditions had a significant impact on her ability to ability to care for herself, perform manual tasks, walk, see, hear, learn, speak or breathe.

Nor does the Complaint plead facts tending to show that her condition substantially impaired her ability to work. Collins affirmatively pleads that she is the CEO of GTI Enterprises and the founder and executive director of a non-profit organization. (Compl. ¶ 29; Pl. Aff. Ex. H.) She was tasked with duties like renegotiating loans, and she actively sought out networking opportunities. Rather than explaining how her bipolar disorder and PTSD have negatively affected her ability to work, Collins' complaint actually extols her professional accomplishments.

Collins alleges that she spent ten days hospitalized in a psychiatric ward. (Pl. Aff. Ex. F.) But short hospitalizations, even when coupled with continued treatment, do not automatically establish that a plaintiff suffers from a substantially limiting condition.

The Second Circuit's decision in *Colwell v. Suffolk County Police Department*, 158 F.3d 635 (2d Cir. 1998) (superseded by statute on other grounds), is instructive. There, a police officer was hospitalized for one month to treat a physical impairment and was out of work for a total of seven months.

*Id.* at 640. The court concluded that this was not sufficient to qualify as a "substantial impact" on the officer's "major life activity," because "the non-particularized and unspecific residual limitations described on his police work [was] of too short a duration and too vague an extent to be 'substantially limiting.' " *Id.* at 646.

Collins v. Giving Back Fund, Not Reported in Fed. Supp. (2019)

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 52 of 103

If Colwell's temporary disability was not enough to qualify him as an "individual with a disability" for Rehabilitation Act purposes, Collins' far briefer hospitalization can hardly qualify. According to her own pleading, within days after her discharge, Collins was submitting an application to attend the NEXUS Summit and, in fact, attended another NEXUS event. Those well-pleaded facts do not smack of a substantial limitation on Collins' ability to work. *Cf. Ragusa v. Malverne Union Free Sch. Dist.*, 381 F. App'x 85, 88 (2d Cir. 2010) (summary order) (finding no evidence of a substantial limitation where "The record contains no medical evidence other than a doctor's note clearing Ragusa to return to work following her surgery").

**\*14** Even so, in other circumstances, I might grant Collins leave to amend to try to assert facts from which a substantial limitation could be inferred. However, because of her failure to plead that she was excluded from a qualified "program or activity," that, too, would be futile.

### C. Collins' Intentional Infliction of Emotional Distress Claim Is Dismissed

The Rehabilitation Act claim is the only federal claim in the case. However, it appears that the court may have original diversity jurisdiction (not just supplemental jurisdiction) over the claim of intentional infliction of emotional distress, since Collins is a New York resident and GBF is a citizen of Massachusetts.

That claim, too, must be dismissed with prejudice.

Intentional infliction of emotional distress ("IIED") is a highly disfavored cause of action under New York law, one that is almost never successful. In order to prevail, a plaintiff must demonstrate conduct "so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized society." *Stuto v. Fleishman*, 164 F.3d 820, 827 (2d Cir. 1999) (quoting *Howell v. N.Y. Post Co.*, 81 N.Y.2d 115, 122, 596 N.Y.S.2d 350, 612 N.E.2d 699 (1993)). The standard is virtually impossible to meet.

Collins does not even come close.

"Acts which merely constitute harassment, disrespectful or disparate treatment, a hostile environment, humiliating criticism, intimidation, insults or other indignities fail to sustain a claim of [IIED] because the conduct alleged is not sufficiently outrageous." *Lydeatte v. Bronx Overall Econ. Dev. Corp.*, No. 00-cv-5433, 2001 WL 180055, at \*2 (S.D.N.Y. Feb. 22, 2001). Being disinvited from a networking event may be disrespectful or harassing, but it falls well short of being outrageous. This claim is dismissed with prejudice.

### D. The Cross Motion to Substitute Wittkamper for NEXUS is Denied as Moot

Obviously, the dismissal with prejudice of all claims pleaded in the Complaint moots Collins' effort to substitute Wittkamper as a Defendant in place of NEXUS.

### Conclusion

The only plausible inference that can be drawn from the allegations of the pleading and the affidavit attached thereto and its exhibits is that Collins was dropped from the NEXUS Summit because Lindstrom told NEXUS officials that she represented a risk. Collins cannot make a federal case out of her rejection.

The motion to dismiss is granted. All claims asserted against NEXUS and GBF are dismissed with prejudice and with costs to Defendants. As the claims against Lindstrom were already dismissed, and so have been stricken from the pleading at issue, there is nothing left of this case.

Dismissal is with prejudice and with costs to the Defendants.

The Clerk of Court is directed to remove the motions at Dkts. Nos. 16 and 19 from the court's list of open motions, and to close the case.

This "written opinion" constitutes the decision and order of the Court.

### All Citations

Not Reported in Fed. Supp., 2019 WL 3564578

Collins v. Giving Back Fund, Not Reported in Fed. Supp. (2019)

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 53 of 103

## Footnotes

1   References to "18-cv-6696 Dkt. No. ___" refer to documents filed in *Collins v. Lindstrom*, No. 18 Civ. 6696 (S.D.N.Y.). References to "Dkt. No. ___" refer to documents filed in the above-captioned case.

2   Originally filed as Dkt. No. 2, but rejected for counsel's filing error.

3   Collins was never successful able to refinance ARC-38's loan. The Complaint does not explain why the refinancing project failed, although Collins mentions her "shame ... [in] not being able to successfully lead" the initiative. (Pl. Aff. Ex. E.)

4   Collins informed Lindstrom she "received a scholarship" to the event. (Compl. ¶ 80; Pl. Aff. Ex. M.) However, Collins' own exhibits reflect that while she requested a full scholarship from NEXUS, that request was never acknowledged nor granted. (Pl. Aff. Ex. L.)

5   The NEXUS Community Code of Conduct includes the directive that NEXUS does not "tolerate harassment." (Pl. Aff. Ex. R.)

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2001 WL 604039

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.

Edwin Y. FONDO, M.D., Plaintiff,

v.

DELTA AIRLINES, INC. and
AIR FRANCE, INC, Defendants.

No. 00 CIV. 2445(JSM).

|

May 31, 2001.

**Attorneys and Law Firms**

Edwin Fondo, New York, for plaintiff.

Brian Sexton, Quirk & Bakalor, P.C., John MacCrate, III, Bingham, Englar, Jones & Houston, New York, for defendants.

OPINION and ORDER

MARTIN, District J.

**\*1** Edwin Fondo, M.D. ("Plaintiff"), who appears *pro se,* brings this action against Defendants Delta Airlines, Inc. ("Delta") and Air France, Inc. ("Air France") based on their failure to transport him to Brazzaville, Africa, and for various tortious acts. Air France removed the case from state court pursuant to 28 U.S.C. § 1441(d). Delta moves to dismiss the complaint for failure to state a claim and for summary judgment, and Air France moves for summary judgment. For the reasons stated below, Defendants' motions are granted.

I. BACKGROUND

On or about July 16, 1999, Plaintiff telephoned Delta and requested a reservation for a round-trip, first-class ticket from New York City to Brazzaville, Republic of Congo. Plaintiff's purpose in traveling to Brazzaville was to attend a Pan–African music festival that had hired him as a publicity consultant. (Sexton Aff. Ex. F. at 14–16, 22.) The festival was to take place from August 1 to August 8, 1999. Therefore, Plaintiff informed the Delta agent that he needed to arrive before August 1.

On July 28, 1999, Plaintiff paid $4,859.22 to a Delta agent and was issued what he believed to be a round-trip ticket to Brazzaville, connecting through Paris. In fact, the African destination printed on the ticket was Douala, Cameroon, not Brazzaville. (Sexton Aff. Ex. D.) Plaintiff observed that Brazzaville did not appear on his itinerary, and when he brought this to the attention of the agent, he claims that she told him that the plane would stop in Douala to pick up passengers and that he would not need a voucher to reboard. (Sexton Aff. Ex. F at 58–66.) Plaintiff alleges that the Delta agent inspected his Brazzaville visa and health certificate, and never requested Cameroonian papers. (Sexton Aff. Ex. F at 64.)

On July 30, 1999, Plaintiff departed from New York and arrived in Paris, where he was booked on Air France Flight 846 bound for Douala. Plaintiff claims that he continued to believe that he was headed for Brazzaville. Upon landing in Cameroon, Plaintiff was informed that the Brazzaville airport had been closed for two weeks. Because Plaintiff did not have a Cameroonian visa, Air France booked him on a return flight to Paris. Plaintiff alleges that Air France treated him poorly during his brief stop in Douala by detaining and searching him, and that an Air France agent accused him of stealing the flight.

Upon arriving in Paris, a Delta agent advised Plaintiff that no flights to Brazzaville were scheduled for the foreseeable future and that he should return to New York. Delta refused to refund Plaintiff's money. On August 1, 1999, Plaintiff flew back to New York. Later that day, a Delta agent telephoned Plaintiff and told him to rush to the airport for a 7:00 p.m. flight to Brazzaville on Air Afrique. Once at the airport, Plaintiff was informed that the flight was over-booked, and Plaintiff was rescheduled for a 9:00 p.m. flight later that evening. That flight was cancelled, and Plaintiff once again returned home.

**\*2** On August 2, 1999, Plaintiff again requested a refund, which Delta refused. Delta instead offered to fly Plaintiff to Brazzaville for an additional $606.03 as a change-of-destination fee. Plaintiff paid the additional money and was issued a ticket to Brazzaville with connections through Paris and Douala. (Sexton Aff. Ex. E.) On August 4, 1999, Plaintiff departed from Paris on Delta Flight 8267, which was operated by Air France as Flight 007. (MacCrate Aff. Ex. 6 .) Although Plaintiff was booked on Cameroon Airlines Flight 81 out of Paris, that flight was apparently cancelled.

Plaintiff waited in Paris until August 7, 1999, when he was booked on another Air France flight bound for Brazzaville, connecting through Douala. Once again, the airplane landed in Douala and did not proceed to Brazzaville. Plaintiff waited in Douala for two days. On August 9, 1999, Plaintiff boarded Cameroon Airlines Flight 804 bound for Brazzaville. Upon arrival, Plaintiff discovered that he had lost his clients and his business contract. Plaintiff departed Brazzaville on August 13, 1999, and arrived home in New York the next day.

Plaintiff thereafter brought this action, claiming that Defendants willfully and deliberately breached his contract of carriage by failing to fly him to Brazzaville by August 1, 1999. Further, Plaintiff alleges that Air France intentionally humiliated him when its agent accused him of stealing his first flight to Cameroon. As a result of this series of cancelled flights and his exposure to airport noise and humidity, Plaintiff alleges that he suffered from numerous physical ailments, including headaches, insomnia, elevated blood pressure, tinnitis, and an unsteady gait. Plaintiff seeks compensatory damages for his lost business contract, the cost of his tickets, and his out-of-pocket money, and he also seeks punitive damages.

## II. DISCUSSION

### A. Delta

The Airline Deregulation Act of 1978 (the "ADA") preempts state laws that purport to regulate the prices, routes, or services of air carriers. *See* 49 U.S.C. § 41713(b)(1). Courts are empowered, however, to enforce the terms of a contract between an air carrier and a passenger. *See* *American Airlines, Inc. v. Wolens,* 513 U.S. 219, 228–29, 232–33, 115 S.Ct. 817, 824, 826 (1995). This is because private contractual agreements and common law remedies for their breach do not implicate state policies enacted for the purpose of regulating airlines. *See id.* at 229 & n. 5; 115 S.Ct. at 824 & n. 5. Plaintiff's claims for compensatory damages for Delta's alleged breach of contract are therefore not preempted under the ADA . [1]

In adjudicating contract disputes between an air carrier and its passenger, the *Wolens* Court held that courts are confined to enforcement of the terms of the "parties' bargain, with no enlargement or enhancement based on state laws or policies

external to the agreement." *Id.* at 232–33; 115 S.Ct. at 826. Here, Plaintiff's breach of contract claim against Delta centers on the first ticket, issued July 28, 1999, and Delta's failure to transport Plaintiff to Brazzaville by August 1, 1999. [2] Plaintiff cannot dispute that Delta complied with the terms of the ticket as it was printed and accepted by him. The ticket provided for a round trip to Douala, Cameroon, and that is exactly where Plaintiff was flown. As such, Plaintiff's sole basis for recovery arises from the existence of an oral assurance by Delta's agent, extrinsic to the written contract, that misled him into thinking that his ticket would take him to a destination other than the one printed on the ticket. [3]

**\*3** Plaintiff cannot succeed on his breach of contract claim against Delta. An airline ticket, as supplemented by the carrier's tariff, embodies the contract of carriage between the airline and its passenger. *See* 14 C.F.R. § 253.4. Plaintiff admits that he accepted the ticket with full knowledge that on its face it provided for a trip to Cameroon, not to Brazzaville. [4] In New York, "clear, complete writings should generally be enforced according to their terms." *W.W.W. Assocs., Inc. v. Giancontieri,* 566 N.E.2d 639, 640 (N.Y.1990). Evidence extrinsic to the agreement, which is offered for the purpose of varying the agreement's terms, is generally inadmissible where the agreement is complete and contains no ambiguity. *See id.* at 642. Because the ticket as accepted by Plaintiff objectively manifests the parties' intent that he be flown to Cameroon, Plaintiff cannot offer parol evidence to vary its terms. *Cf. Clemente v. Philippine Airlines,* 614 F.Supp. 1196, 1199 (S . D.N.Y.1985) (oral assurance by airline's agent could not vary express terms of contract of carriage). *See generally* *Klos v. Polskie Linie Lotnicze,* 133 F.3d 164, 168 (2d Cir.1997).

Nor can Plaintiff succeed on a fraud theory. Under New York law, the prima facie elements of a fraud claim consist of a material false representation, scienter, reliance, and injury. *See* *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc.,* 98 F.3d 13, 19 (2d Cir.1996). Plaintiff's complaint contains no facts that would substantiate a fraud claim; he states only that he was issued "travel documents" for a round trip to Brazzaville. Not only has Plaintiff failed to plead a claim for fraud, but he has failed to plead one with particularity. *See* Fed.R.Civ.P. 9(b).

In his deposition, Plaintiff recounts the incident in which Delta's agent assured him that his ticket was for a direct

Fondo v. Delta Airlines, Inc., Not Reported in F.Supp.2d (2001)

flight to Brazzaville. (Sexton Aff. Ex. F at 56–68.) Even assuming that Plaintiff has alleged facts that would indicate that the agent acted with fraudulent intent, which would be an extraordinarily generous reading of his account, he cannot use a fraud theory for the purpose of rewriting specific terms of his agreement. [5] *See* Cougar Audio, Inc. v. Reich, No. 99 Civ. 4498, 2000 WL 420546, at *6 & n. 4 (S.D.N.Y.2000); Meinrath v. Singer Co., 482 F.Supp. 457, 460–61 (S.D.N.Y.1979), *aff'd,* 697 F.2d 293 (2d Cir.1982).

Finally, although Plaintiff styles his action as one for breach of contract, he also alleges various actions by Delta that could amount to a tort. For example, Plaintiff accuses Delta of intentionally humiliating him in their various interactions concerning his ticket purchases and his attempts to obtain a refund. Even assuming that these claims are not preempted, [6] Delta's actions in no way rise to the level of outrageousness required under New York law to state a claim for intentional infliction of emotional distress. *See Norman,* 2000 U.S. Dist. LEXIS 14618, at *14–15; Guerrero v. American Airlines, Inc., No. 97 Civ.1948, 1998 WL 196199, at *3 (S.D.N.Y. Apr. 22, 1998). Moreover, there is no evidence that Delta deliberately or maliciously interfered with Plaintiff's travel plans, nor has Plaintiff substantiated any other claim against Delta. [7]

**\*4** Accordingly, Plaintiff's claims against Delta are dismissed.

### B. Air France

Plaintiff's breach of contract claim against Air France focuses on only two of his flights on that airline, both of which were arranged through Delta. On July 31, 1999, Plaintiff flew from Paris to Douala on Flight 846 as provided for in his first ticket, and on August 4, 1999, Plaintiff flew from JFK to Paris on Flight 007 as provided for in his second ticket. Thus, Air France performed the specific terms of those contracts of carriage. Plaintiff's breach of contact claims against Air France are dismissed.

Plaintiff also alleges tortious behavior on the part of Air France, primarily in relation to the incident in Douala in which he was "deported" and forced to reboard a flight for Paris and in which an Air France agent allegedly accused him of stealing or "hijacking" the flight. Even assuming that Plaintiff has stated a claim for intentional infliction of

emotional distress or false imprisonment, the Court lacks subject matter jurisdiction over this claim under the Foreign Sovereign Immunities Act (the "FSIA"), 28 U.S.C. § 1602 *et seq.*

The FSIA is the exclusive source of subject matter jurisdiction over claims against foreign states and their agencies or instrumentalities in United States courts. *See* Republic of Argentina v. Weltover, Inc., 504 U.S. 607, 610–11, 112 S.Ct. 2160, 2164 (1992). Air France, as an instrumentality of a foreign state, *see* 28 U.S.C. § 1603(b)(2), is "presumptively immune from suit in federal court unless the plaintiff meets its burden going forward of demonstrating that the claim asserted against that foreign entity falls within one of the statutory exceptions to immunity." Seisay v. Compagnie Nationale Air France, No. 95 Civ. 7660, 1997 WL 431084, at *4 (S.D.N.Y. July 30, 1997). The only relevant exception here is for claims "based upon a commercial activity carried on in the United States by the foreign state." 28 U.S.C. § 1605(a)(2).

Courts have held that in order to qualify for this exception, a plaintiff's claim must have some identifiable nexus with the commercial activity performed in the United States. *See* Saudi Arabia v. Nelson, 507 U.S. 349, 357–58, 113 S.Ct. 1471, 1477–78 (1993); Santos v. Compagnie Nationale Air France, 934 F.2d 890, 892–93 (7th Cir.1991). For example, where a passenger purchases an airline ticket in the United States and is injured when the plane crashes, jurisdiction exists because the foreign airline undertook a duty to safely transport the passenger. *See Santos,* 934 F.2d at 893–94. On the other hand, the *Nelson* Court found that even though the commercial activity at issue there, the defendant's recruitment of the plaintiff and the execution of an employment contract, "led to the conduct that eventually injured the Nelsons" in Saudi Arabia, it did not form the basis of their false imprisonment and personal injury claims. Id. at 358, 113 S.Ct. at 1478.

**\*5** Here, the only nexus between Plaintiff's tort claims and Air France's commercial activity in the United States is that Plaintiff purchased his tickets here. In a similar case, Judge Keenan found that Air France was immune from a passenger's claim that she was falsely imprisoned in a Paris airport even though he bought his ticket in New York. *See* Seisay, 1997 WL 431084 at *5–6. Judge Keenan found that the plaintiff's purchase of a ticket in New York was irrelevant to proving his cause of action for false imprisonment in Paris. *See also Moses v. Air Afrique,* No. 99 Civ. 541, 2000

WL 306853, at *3 (E.D.N.Y. Mar. 21, 2000); *Nazarian v. Compagnie Nationale Air France,* 989 F.Supp. 504, 508–09 (S.D.N.Y.1998).

Plaintiff does not allege that Air France owed him a duty of care that was violated when he was questioned in close confinement and then sent back to Paris. Rather, he describes actions that could conceivably amount to false imprisonment or intentional infliction of emotional distress, or even perhaps defamation. Although Plaintiff's purchase of his airline ticket in New York might be a relevant fact in assessing those claims, that act does not in and of itself form an element of those causes of action. Accordingly, Plaintiff's tort claims are dismissed for lack of subject matter jurisdiction.

### III. CONCLUSION

For the foregoing reasons, Defendants' motions to dismiss this action are granted.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2001 WL 604039

## Footnotes

1    In contrast to the claims for compensatory damages, Plaintiff's attempt to recover punitive damages against Delta exceeds the terms of his contract of carriage and is preempted under the ADA. *See, e .g., Travel All Over the World, Inc. v. Kingdom of Saudi Arabia,* 73 F.3d 1423, 1432 n. 8 (7th Cir.1996); *Norman v. Trans World Airlines, Inc.,* 98 Civ. 7419, 2000 U.S. Dist. LEXIS 14618, at *19 (S.D.N.Y.2000).

2    As to the second ticket, Plaintiff did arrive in Brazzaville as provided for in his ticket, although he apparently arrived three days later than planned because his connecting flight from Paris on Cameroon Airlines was cancelled.

3    After *Wolens,* courts have indicated that a contract claim is preempted if reference is required to sources of law outside of the agreement that operate to alter its terms or the parties' obligations. *See, e.g., Smith v. Comair, Inc.,* 134 F.3d 254, 257 (4th Cir.1998); *Travel All Over the World,* 73 F.3d at 1432; *Breitling U.S.A. Inc. v. Federal Express Corp.,* 45 F.Supp.2d 179, 184–86 (D.Conn.1999). Thus, a claim based on an ambiguity contained within the contract was found not to be preempted, *see Richmond Capital Corp. v. Federal Express Corp. No.,* 29 F.Supp.2d 737, 740 (M.D.La.1998), while a plaintiff's attempt to invoke the equitable doctrine of waiver to void an express condition of the contract was held preempted, *see Breitling,* 45 F.Supp.2d at 186–87. An overly expansive reading of *Wolens* might lead to the conclusion that reference to an external agreement that modifies the terms of a written contract is an impermissible reference to a source of law outside of the contract. However, ascertaining whether an oral agreement modified the terms of a written contract of carriage is part and parcel of identifying the parties' intent and allows enforcement of the agreement according to those terms. In this respect, this case differs from cases holding that importation of equitable doctrines and defenses external to the contract amounts to impermissible state regulation. *See, e.g., Williams v. Federal Express Corp.,* No. CV 99–06252, 1999 WL 1276558, at *5 (C.D.Ca. Oct. 6, 1999); *Breitling,* 45 F.Supp.2d at 186–87.

4    Plaintiff also admits that he is an experienced world-traveler.

5     Plaintiff also may not recover under a theory that Delta was negligent in carrying out an agreement to take him to Brazzaville. New York law does not provide a cause of action for negligent performance of a contract. See *City of New York v. 611 West 152nd St., Inc.,* 710 N.Y.S.2d 36, 38 (App.Div.2000).

6     There is wide disagreement over whether and when tort claims are subject to preemption under the ADA. *Cf.* *Taj Mahal Travel, Inc. v. Delta Airlines Inc.,* 164 F.3d 186, 192–94 (3d Cir.1998) (proper inquiry is whether state law amounts to "public utility-style regulation"), *with* *Travel All Over the World,* 73 F.3d at 1434–35 (adopting distinction between airline "services" and "operations"); *see also* *Rombom v. United Air Lines, Inc.,* 867 F.Supp. 214 (S.D.N.Y.1994) (setting forth three-part test). Because Plaintiff's tort claims fail under state law in any event, the thorny question of preemption need not be addressed.

7     In his complaint, Plaintiff vaguely alludes to an incident in which Delta security guards forcibly removed him from JFK airport after he requested a refund of his ticket price. In Plaintiff's deposition, it becomes clear that Plaintiff was asked to leave the terminal because it was closing. Although Plaintiff was keeping vigil in order to speak to a supervisor, he voluntarily left after the guards made an attempt to move Plaintiff's luggage outside of the terminal doors. (Sexton Aff. Ex. F. at 167–71.) This incident does not provide a basis for an assault or battery claim. Plaintiff also alleges in his complaint that he suffered from several physical ailments as a result of his travels, but he does not connect these claims to any cause of action.

---

**End of Document**                                        © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:23-cv-04033-LJL   Document 180-1   Filed 11/20/23   Page 59 of 103

Harrell v. New York State Department of Corrections and..., Not Reported in Fed....

2019 WL 3817190
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Diane HARRELL, Individually and as Administratrix of
the Estate of Samuel D. Harrell, III, Deceased, Plaintiff,

v.

NEW YORK STATE DEPARTMENT OF
CORRECTIONS AND COMMUNITY
SUPERVISION ("DOCCS"), et al., Defendants.

No. 15-CV-7065 (RA)
|
Signed 08/14/2019

**Attorneys and Law Firms**

Keith Michael Szczepanski, Luna Droubi, Jonathan C.
Moore, Beldock Levine & Hoffman LLP, New York, NY, for
Plaintiff.

Maria Barous Hartofilis, Yan Fu, New York State Office of the
Attorney General, New York, NY, Stacey Lynn Moar, Lippes
Mathias Wexler Friedman LLP, Buffalo, NY, for Defendants
Joseph Guarino, Corrections Officer Thomas A. Dickenson,
Corrections Officer Bryan W. Eull, Corrections Officer Justin
M. Sorensen, Corrections Officer John L. Yaeger, Corrections
Officer Justin T. Charpentier.

Stacey Lynn Moar, Lippes Mathias Wexler Friedman LLP,
Buffalo, NY, for Defendant John and Jane Doe, ## 1, 2, 3, etc.

Stacey Lynn Moar, Lippes Mathias Wexler Friedman LLP,
Buffalo, NY, Yan Fu, New York State Office of the Attorney
General, New York, NY, for Defendant Frederick Belanger.

Stacey Lynn Moar, Lippes Mathias Wexler Friedman LLP,
Buffalo, NY, Yan Fu, New York State Office of the Attorney
General, New York, NY, for Defendants OMH Empoyee
Jason Laufman, OMH Employee Maria D. Zaprowski,
Lieutenant Alan Washer, Margaret Berry, Marianne Sarvis,
OMH Employee Maura Endrizzi, Seleste Leigh Wallace,
John U. Carreras, Terry W. Shultis, Shawna L. Healy,
Shirley R. Roberts, Corrections Officer Benjamin V. Mathew,
Corrections Officer Chris Sherman, Corrections Officer John
L. Rolle, Corrections Officer Mario Morel, Corrections
Officer Paul F. Harrington, Corrections Officer Robert D.
Michels, Corrections Officer Rutger Rivera, Corrections
Officer Tim J. Salerno.

Dennis C. Vacco, Pro Hac Vice, B. Kevin Burke, Jr., Stacey
Lynn Moar, Lippes Mathias Wexler Friedman LLP, Buffalo,
NY, for Defendant Agents and Officials of NYSCOPBA ##
1, 2, 3, etc.

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

**\*1** Plaintiff Diane Harrell, proceeding individually and as
administratrix of the estate of her late husband Samuel D.
Harrell, III ("Harrell"), brings this action for his wrongful
death while incarcerated at Fishkill Correctional Facility.
The Defendants consist of various New York State agencies
and their employees (collectively the "State Defendants")
and the New York State Correctional Officers & Benevolent
Association, Inc., a union representing correction officers in
New York State, and its agents and employees (collectively
the "NYSCOPBA Defendants"). Before the Court is the
NYSCOPBA Defendants' motion to dismiss the complaint,
pursuant to Federal Rule of Civil Procedure 12(b)(6). For the
reasons stated below, the motion is granted.

BACKGROUND [1]

The factual background of this case is set forth in detail in
the Court's opinion resolving the State Defendants' motion to
dismiss, and the Court assumes the parties' familiarity with
it. Here, the Court briefly recounts only those facts that are
necessary to resolve the instant motion.

On April 21, 2015, Harrell suffered a mental health episode
at Fishkill Correctional Facility and announced that he was
leaving the facility. Numerous Fishkill correction officers (the
"Fishkill Officers") [2] allegedly responded by tackling him to
the ground and beating him, resulting in his death. To cover
up their actions, Plaintiff claims, the Fishkill Officers falsely
reported to the hospital where Harrell was taken that he had
overdosed, intimidated witnesses with threats of violence,
and retaliated against witnesses, both physically and through
the use of solitary confinement. The officers allegedly called
witnesses who spoke out about the incident "Nigger lovers"
and "Rats." Am. Compl. ¶ 115. The Orange County Medical
Examiner determined that Harrell's death was a homicide
caused by a physical altercation with correction officers.

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 60 of 103

Harrell v. New York State Department of Corrections and..., Not Reported in Fed....

Following Harrell's death, the Amended Complaint alleges, NYSCOPBA agents "conferred with the Fishkill Officers and received incriminating admissions of criminal behavior," and then "suppressed [that information] and adopted and orchestrated an affirmative strategy of obstruction and falsification." *Id.* ¶ 110. This purported strategy of obstruction involved at least two specific acts. First, a union spokesperson informed the *Poughkeepsie Journal* that Harrell had assaulted correction officers and that "several officers were needed to restrain Harrell after the assault." *Id.* ¶ 108. Second, NYSCOPBA purportedly distributed a flier claiming that Harrell died from an overdose. *Id.* ¶ 109, Ex. 1. The flier reads in pertinent part: "Just 6 short days after getting out of the SHU, [con]vict Harrell was able to get resupplied and start drugging again. On April 21, 2015, at approximately 8:30pm, this [con]vict was so stoned that he assaulted numerous officers, sending two of them to the outside hospital and a half dozen or so to the RMU. The [con]vict ended up deceased." *Id.*, Ex. 1. In addition, an unspecified group of defendants allegedly "[s]ubmit[ed] false reports, statements, and testimony" and "[lied] to authorities concerning the events." *Id.* ¶ 136.

**\*2** The NYSCOPBA Defendants deny having had "any meetings with DOCCS officials or other State agencies regarding a response to the incident involving Harrell." Powers Aff. ¶ 27. They also attest that they "did not create, produce, or disseminate the flier attached to the Complaint," nor did they "assist in its creation or sanction it in any manner." *Id.* ¶ 21.

## LEGAL STANDARD

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." 🚩 *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) (citation omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* In considering a motion to dismiss, "the court is to accept as true all facts alleged in the complaint ... [and] draw all reasonable inferences in favor of the plaintiff." 🚩 *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir. 2007).

## DISCUSSION

### I. § 1983 Conspiracy Claim

The NYSCOPBA Defendants first move to dismiss Plaintiff's § 1983 conspiracy claim against the State Defendants. Unlike the twofold conspiracy claim against the State Defendants, related to allegations of beating and a subsequent cover-up, the conspiracy claim against the NYSCOPBA Defendants is limited to the alleged cover-up. *See* Opp. at 9. To state a § 1983 conspiracy claim, a plaintiff must allege facts showing: "(1) an agreement between two or more State actors or between a State actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." 🚩 *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999). "Private persons, jointly engaged with state officials in the prohibited action, are acting 'under color' of law for purposes of [§ 1983]" 🚩 *Adickes v. Kress & Co.,* 398 U.S. 144, 152 (1970). Thus, where a private actor conspires with a state actor to deprive an individual of his constitutional rights, the private actor can be held liable under § 1983. *See* 🚩 *Ciambriello,* 292 F.3d at 324.

### A. Agreement

Plaintiff has not plausibly alleged that the NYSCOPBA Defendants entered a conspiratorial agreement with the State Defendants. The Amended Complaint alleges that the NYSCOPBA Defendants "conferred" with the Fishkill Officers and received admissions of criminal behavior, without providing a time or location where this agreement took place or identifying a single participant in the meeting. AC ¶ 110. [3] Nor are there any allegations in the Amended Complaint as to precisely what the alleged conspirators agreed to do. The only allegation that is linked to a meeting of the minds states that "defendants engaged in ... meeting and discussing information concerning the state of the investigation and present a united front in the face of any questioning." *Id.* ¶ 136(d). This allegation lacks the factual specificity required for the Court to reasonably infer an agreement between the NYSCOPBA Defendants and the State Defendants to cover up the cause of Harrell's death. *See Bermudez v. City of New York,* No. 11-CV-50, 2013 WL 593791, at \*8 (S.D.N.Y. Feb. 14, 2013) (dismissing the plaintiff's allegations as "conclusory," where the complaint alleged that the defendants "conferred and agreed not to

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 61 of 103

Harrell v. New York State Department of Corrections and..., Not Reported in Fed....

pursue" certain evidence, "agreed not to disclose certain information," and "actively conspired to suppress the actual events").

**\*3** Plaintiff argues that a meeting of the minds is "readily apparent" from the fact that both the NYSCOPBA and State Defendants "immediately began espousing" the same story after their April 21, 2015 meeting. Opp. at 10. Yet even if the Amended Complaint had alleged such a specific meeting, parallel activity—especially of the vague sort suggested here—is insufficient to prove a conspiracy. *See Schiller v. Duthie*, No. 15-CV-4933, 2017 WL 3726993, at \*18 (S.D.N.Y. Aug. 28, 2017) ("Even detailed allegations of parallel conduct do not suffice [to plead a § 1983 conspiracy] without some factual basis for inferring the existence of an agreement."). Plaintiff has not plausibly alleged a conspiratorial agreement between the NYSCOPBA Defendants and the Fishkill Officers, nor between NYSCOPBA and any other defendants.

### 1. Actual Unconstitutional Injury

In any event, the Amended Complaint does not allege an "actual deprivation of constitutional rights" resulting from the supposed cover-up. *Romer v. Morgenthau*, 119 F. Supp. 2d 346, 363 (S.D.N.Y. 2000). First, the specific injury at issue here cannot stem from action taken against Harrell once he died based on the well-established rule that post-mortem cover-ups are not actionable conspiracies, as a deceased person does not have constitutional rights. In *Ford v. Moore*, 237 F. 3d 156 (2d Cir. 2001), for example, the Court of Appeals held that any claim of a deceased individual against defendant police officers who allegedly conspired to cover-up unconstitutional conduct against him had "extinguished" upon his death. *Id.* at 165. The Court explained that "the civil rights of a person cannot be violated once that person has died," and noted that the plaintiff—the administratrix of the decedent's estate—had not alleged any claims in her capacity as administratrix. *Id.* (quoting *Silkwood v. Kerr–McGee Corp.*, 637 F.2d 743, 749 (10th Cir. 1980))

In this case, the Amended Complaint alleges that the NYSCOPBA Defendants conspired to deprive Harrell of his constitutional rights by covering up his death, based on conduct that took place once he had died—issuing statements and a flier regarding the cause of his death. Although an alleged conspiracy to violate a decedent's rights beginning prior to the decedent's death may be actionable,

*see Estate of Morris ex rel. Morris v. Dapolito*, 297 F. Supp. 2d 680, 691 (S.D.N.Y. 2004), the Amended Complaint makes clear that the NYSCOPBA Defendants' involvement in any possible conspiracy to cover-up Harrell's death did not begin until *after* Harrell had died. Moreover, Plaintiff does not make any allegations based on her capacity as administratrix of decedent's estate. *See Ford*, 237 F.3d at 165. Rather, she claims that the conspiracy to cover-up Harrell's death "deprived Harrell of rights, privileges, and immunities secured by the Constitution and laws of the United States." AC ¶ 131.

Even if Plaintiff had properly alleged that Defendants' conspiracy to cover-up Harrell's death deprived her of a property right to be "fully compensated through a lawsuit," *Barrett v. United States*, 689 F.2d 324, 332 (2d Cir. 1982), an "access-to-courts" claim of this sort would fail nonetheless. Access-to-court claims exist "to provide some effective vindication for a separate and distinct right to seek judicial relief for some wrong[,]" *Christopher v. Harbury*, 536 U.S. 403, 414–15 (2002), such as the wrongful death of a relative. There are two variants of such claims. In a "forward-looking" access-to-courts claim, a plaintiff alleges that "official action is presently denying an opportunity to litigate." *Id.* at 413. The object of a "forward-looking" claim "is to place the plaintiff in a position to pursue a separate claim for relief once the frustrating condition has been removed." *Id.* In a "backward-looking" claim—the viability of which is uncertain in this Circuit, *see Sousa v. Marquez*, 702 F.3d 124, 128 (2d Cir. 2012)—a plaintiff looks back "to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable." *Id.* Here, an access-to-courts claim of either type fails. Plaintiff does not seek the removal of a "frustrating condition." *Id.* Nor has Plaintiff alleged that the cover-up conspiracy prevented her from litigating his underlying claims. Indeed, she brings those very claims in this action. *See Tavares v. New York City Health & Hosps. Corp.*, No. 13-CV-3148, 2015 WL 158863, at \*8 (S.D.N.Y. Jan. 13, 2015). Thus, even assuming the NYSCOPBA Defendants conspired with State Defendants to cover up the cause of Harrell's death, it would not create a reasonable inference that the cover-up denied Plaintiff access to the courts.

**\*4** In sum, the Amended Complaint does not include sufficient factual allegations to make a conspiratorial agreement between the NYSCOPBA Defendants and the State Defendants plausible, nor does it include allegations

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 62 of 103

Harrell v. New York State Department of Corrections and..., Not Reported in Fed....

of a constitutional injury caused by a cover-up conspiracy involving NYSCOPBA. For those reasons, Plaintiff's § 1983 conspiracy claim as to the NYSCOPBA Defendants is dismissed.

### B. § 1985 and § 1986 Claims

In the Third, Fourth, and Fifth Causes of Action, Plaintiff alleges that the NYSCOPBA Defendants conspired with certain State Defendants to impede the due course of justice in violation of 42 U.S.C. § 1985(2), conspired to interfere with Harrell's civil rights in violation of 42 U.S.C. § 1985(3), and neglected to prevent interference with Harrell's civil rights in violation of 42 U.S.C. § 1986, respectively. These claims are dismissed as well.

The statutes underlying these three causes of action all require the showing of a conspiracy motivated by discriminatory animus. The second clause of § 1985(2)—the only clause relevant here—provides a cause of action where "two or more persons conspire for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to any citizen the equal protection of the laws." 42 U.S.C. § 1985(2). Similarly, § 1985(3) requires a plaintiff to show "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." Cine SK8, Inc. v. Town of Henrietta, 507 F.3d 778, 791 (2d Cir. 2007) (citation omitted). Finally, Section 1986 "provides a cause of action against anyone who having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so." Thomas v. Roach, 165 F.3d 137, 147

(2d Cir. 1999) (citation omitted). In other words, "a § 1986 claim must be predicated upon a valid § 1985 claim." Id. Thus, "[Sections] 1985 and 1986 require 'some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.' " Reynolds v. Barrett, 685 F.3d 193, 201–02 (2d Cir. 2012) (quoting Griffin v. Breckenridge, 403 U.S. 88, 102 (1971)).

The Court need not assess the viability of Plaintiff's underlying conspiracy claims, as she has not plausibly alleged that the NYSCOPBA Defendants' actions were motivated by "class-based, invidious discriminatory animus." Id. at 201–02. Plaintiff makes no factual allegations that the NYSCOPBA Defendants themselves conspired to cover up Harrell's beating due to racial animus against him, or that they made any racially derogatory comments at any time. Instead, although Plaintiff asserts that the union "kn[ew] about the 'Beat Up Squad,' including their racially motivated abusive actions," id. ¶ 147, and "conspired to cover up these racially motivated abuses," id. ¶ 148, she alleges no facts to support these conclusory allegations. As Plaintiff has failed to plausibly allege discriminatory animus as required by § 1985 and § 1986, the Court need not address the other elements of these claims. For this reason, the § 1985 and § 1986 claims are dismissed.

### CONCLUSION

**\*5** For the foregoing reasons, NYSCOPBA's motion to dismiss is granted. The Clerk of Court is respectfully directed to remove NYSCOPBA from the caption of this case. The Clerk of Court is further directed to terminate the motion pending at docket number 204.

SO ORDERED.

**All Citations**

Not Reported in Fed. Supp., 2019 WL 3817190

### Footnotes

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 63 of 103

Harrell v. New York State Department of Corrections and..., Not Reported in Fed....

1    The following facts, taken from the Amended Complaint, are accepted as true for the purposes of this motion. *See* 🚩 *Johnson v. Rowley*, 569 F.3d 40, 44 (2d Cir. 2009).

2    The "Fishkill Officers" refer to Defendant Correction Officers Anderson, Beroni, Charpentier, DeFreese, Dickinson, Eull, Harrington, Mathew, Michels, Morel, O'Connor, Rivera, Rolle, Salerno, Sherman, Sorensen, Yager, and John and Jane Doe officers alleged to be involved in Mr. Harrell's death.

3    Plaintiff argues that she has provided a "time and place" in the Amended Complaint. Opp. at 14. The Court disagrees. The details she provides in her memorandum do not appear in the Amended Complaint. "[A] district court errs when it ... relies on factual allegations contained in legal briefs or memoranda" in deciding a motion to dismiss." 🚩 *Friedl v. City of New York*, 210 F.3d 79, 83 (2d Cir. 2000). Rule 12(b)(6) requires courts to either "exclude the additional material and decide the motion on the complaint alone or ... convert the motion to one for summary judgment under Fed. R. Civ. P. 56 and afford all parties the opportunity to present supporting material." 🚩 *Fonte v. Bd. of Managers of Cont'l Towers Condo.*, 848 F.2d 24, 25 (2d Cir. 1988). Neither party has asked the Court to convert this motion into one for summary judgment, and the Court will not consider these factual allegations raised for the first time in a brief in opposition to a motion to dismiss.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

Killoran v. Westhampton Beach School District, Not Reported in Fed. Rptr. (2023)

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 64 of 103

2023 WL 4503278
Only the Westlaw citation is currently available.
United States Court of Appeals, Second Circuit.

Christian KILLORAN, Plaintiff-Appellant,
Terrie Killoran, individually and on behalf
of their son, A.K., a minor, Plaintiff,
v.
WESTHAMPTON BEACH SCHOOL DISTRICT,
Michael Radday, individually and in his official
capacity as Superintendent, Suzanne M. Mensch,
Halsey C. Stevens, Stacy Rubio, Claire Bean,
James N. Hulme, Joyce Donnesson, George R.
Kast, Jr., Individually and Collectively as Board
of Education Members, Defendants-Appellees.

No. 22-204
|
July 13, 2023

Appeal from a judgment of the United States District Court
for the Eastern District of New York (Brown, *J.*).

**UPON DUE CONSIDERATION, IT IS HEREBY
ORDERED, ADJUDGED, AND DECREED** that the
judgment of the district court is **AFFIRMED**.

**Attorneys and Law Firms**

FOR PLAINTIFF-APPELLANT: Christian Killoran, pro se,
Killoran Law P.C., Westhampton Beach, NY.

FOR DEFENDANTS-APPELLEES: Scott J. Kreppein,
Devitt Spellman Barrett, LLP, Smithtown, NY, Anne C.
Leahey, Anne Leahey Law, LLC, Huntington, NY.

PRESENT: MYRNA PÉREZ, ALISON J. NATHAN,
MARIA ARAÚJO KAHN, Circuit Judges.

## SUMMARY ORDER

**\*1** This is one of three appeals related to a long-running
dispute between Plaintiff-Appellant Christian Killoran
("Plaintiff") and the Westhampton Beach School District
("Westhampton") over the education of Plaintiff's son, A.K.,
a young man who has Down syndrome. [1]

Plaintiff, on behalf of A.K., appeals from a judgment
entered on January 28, 2022 by the United States District
Court of the Eastern District of New York (Brown, *J.*),
awarding summary judgment in favor of Defendants-
Appellees, Westhampton and various Westhampton officials
and Board of Education members in their individual and
official capacities (collectively, "Defendants"), on Plaintiff's
claims under the Individuals with Disabilities Education Act
("IDEA"), 20 U.S.C. § 1400 *et seq.*, the Americans with
Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, and the
Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29
U.S.C. § 794 *et seq.*

In awarding summary judgment, the district court concluded
that Plaintiff failed to assert a prima facie claim under
the ADA or the Rehabilitation Act. It also upheld the
decision of a State Review Officer ("SRO") affirming the
findings of an Impartial Hearing Officer ("IHO") who
rejected Plaintiff's challenge to the Individualized Education
Plans ("IEPs") developed for A.K. for the 2016–2017 and
2017–2018 school years. The SRO primarily concluded
that A.K.'s two IEPs, which recommended out-of-district
placements, were reasonably calculated to provide A.K. a free
appropriate public education ("FAPE") in the least restrictive
environment ("LRE"). We assume the parties' familiarity
with the underlying facts, the procedural history, and the
issues on appeal, which we reference only as necessary to
explain our decision to affirm. [2]

## I. Standard of Review

**\*2** This Court reviews a district court's award of summary
judgment de novo. *See* McBride v. BIC Consumer Prods.
Mfg. Co., 583 F.3d 92, 96 (2d Cir. 2009). Summary judgment
is warranted only where, construing the evidence in the light
most favorable to the non-movant, and drawing all reasonable
inferences in that party's favor, "there is no genuine dispute as
to any material fact and the movant is entitled to judgment as
a matter of law." Fed. R. Civ. P. 56(a); *see also* McBride,
583 F.3d at 96. "A fact is 'material' ... if it 'might affect
the outcome of the suit under the governing law,' " and an
issue is " 'genuine' if 'the evidence is such that a reasonable
jury could return a verdict for the nonmoving party.' "
Holtz v. Rockefeller & Co., 258 F.3d 62, 69 (2d Cir. 2001)
(quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242,
248 (1986)).

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 65 of 103

Killoran v. Westhampton Beach School District, Not Reported in Fed. Rptr. (2023)

"In a district court proceeding under the IDEA, the parties and the court typically style the decision as a ruling on a motion for summary judgment, but 'the procedure is in substance an appeal from an administrative determination, not a summary judgment motion.' " *Bd. of Educ. of Yorktown Cent. Sch. Dist. v. C.S.*, 990 F.3d 152, 165 (2d Cir. 2021) (quoting *M.H. v. N.Y.C. Dep't of Educ.*, 685 F.3d 217, 226 (2d Cir. 2012)). The district court must conduct "an independent review of the administrative record and make a determination based on a 'preponderance of the evidence,' " but "the role of the federal courts in reviewing state educational decisions under the IDEA is 'circumscribed.' " *Gagliardo v. Arlington Cent. Sch. Dist.*, 489 F.3d 105, 112 (2d Cir. 2007) (quoting *Mrs. B. v. Milford Bd. of Educ.*, 103 F.3d 1114, 1120 (2d Cir. 1997); *Muller v. Comm. on Special Educ.*, 145 F.3d 95, 101 (2d Cir. 1998)). The review "is by no means an invitation to the courts to substitute their own notions of sound educational policy for those of the school authorities which they review." *Bd. of Educ. of Hendrick Hudson Cent. Sch. Dist., Westchester Cnty. v. Rowley*, 458 U.S. 176, 206 (1982). Courts " 'defer to the final decision of the state authorities,' even where 'the reviewing authority disagrees with the hearing officer,' " *A.C. ex rel. M.C. v. Bd. of Educ. of Chappaqua Cent. Sch. Dist.*, 553 F.3d 165, 171 (2d Cir. 2009) (quoting *Karl ex rel. Karl v. Bd. of Educ. of Geneseo Cent. Sch. Dist.*, 736 F.2d 873, 877 (1984)), and "[d]eference is particularly appropriate when ... the state hearing officers' review has been thorough and careful," *Walczak v. Fla. Union Free Sch. Dist.*, 142 F.3d 119, 129 (2d Cir. 1998).

## II. Discussion

### A. ADA and Rehabilitation Act Discrimination Claims

Plaintiff argues that Defendants discriminated against A.K. on account of his disability, in violation of the ADA and the Rehabilitation Act, by failing to enroll A.K. for the 2015–2016 school year and by failing to place him for the 2016-2017 school year. These arguments are unavailing because Plaintiff does not assert a prima facie claim under either statute.

Though there are "subtle differences" between the ADA and the Rehabilitation Act, we generally "treat claims under the two statutes identically," applying the same standards to both. *Henrietta D. v. Bloomberg*, 331 F.3d 261, 272 (2d Cir. 2003) (citation and internal quotation marks omitted). To make a claim under either statute, Plaintiff must show that (1) A.K. "is a qualified individual with a disability"; (2) Defendants are "subject to one of the Acts"; and (3) A.K. "was denied the opportunity to participate in or benefit from [Defendants'] services, programs, or activities, or was otherwise discriminated against by the [Defendants] because of his disability." *McElwee v. Cnty. of Orange*, 700 F.3d 635, 640 (2d Cir. 2012).

**\*3** "Under both statutes, a defendant discriminates when it fails to make a reasonable accommodation that would permit a qualified disabled individual to have access to and take a meaningful part in public services." *Id.* at 640 (citation and internal quotation marks omitted). "A plaintiff alleging that he was denied a reasonable accommodation bears the burdens of both production and persuasion as to the existence of some accommodation that would allow him to meet the essential eligibility requirements of the service, program, or activity at issue." *Id.* at 642.

As an initial matter, Plaintiff fails to adduce sufficient evidence that A.K. was discriminated against due to his disability. In support of his claims, Plaintiff primarily points to a previous IHO's decision concluding that Defendants failed to provide A.K. a FAPE for the 2015–2016 and 2016–2017 school years. Evidence of an IDEA violation, without more, however, is insufficient to demonstrate a violation under either Act. *See* *Wenger v. Canastota Cent. Sch. Dist.*, 979 F. Supp. 147, 152 (N.D.N.Y. 1997), *aff'd mem.*, 208 F.3d 204 (2d Cir. 2000) ("[S]omething more than a mere violation of the IDEA is necessary in order to show a violation of Section 504 in the context of educating children with disabilities ....").

Regardless, Plaintiff also does not, as he must, show that his proposed accommodation—A.K.'s placement in Westhampton Beach Middle School—was reasonable. Plaintiff concedes that implementing A.K.'s IEP, as he envisioned, was not possible in an existing program in Westhampton Beach Middle School. But he does not provide non-conclusory evidence that A.K.'s placement at Westhampton Beach Middle School in a newly developed program or in a mainstreamed classroom was possible, let alone reasonable. *See* *McBride*, 583 F.3d at 100 ("[T]he ADA imposes liability for, *inter alia*, discriminatory refusal

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 66 of 103

Killoran v. Westhampton Beach School District, Not Reported in Fed. Rptr. (2023)

to undertake a feasible accommodation, not mere refusal to explore possible accommodations where, in the end, no accommodation was possible."). This is not enough to defeat summary judgment. *See Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993) ("Genuine issues of fact are not created by conclusory allegations."); *cf. Jackan v. N.Y. State Dep't of Lab.*, 205 F.3d 562, 566 (2d Cir. 2000) ("The burden of persuasion on the existence of an effective accommodation is not satisfied by mere speculation." (internal quotation marks omitted)).

## B. IDEA Claims

On appeal, Plaintiff principally argues that A.K.'s IEPs violated the LRE requirement of the IDEA by failing to recommend in-district placements. Because the IDEA does not require a district to develop an in-district placement for one child and the out-of-district placements offered to A.K. satisfied the LRE requirement, Plaintiff's IDEA claims are unavailing.

"In determining whether an IEP complies with the IDEA, courts make a two-part inquiry that is, first, procedural, and second, substantive." *R.E. v. N.Y.C. Dep't of Educ.*, 694 F.3d 167, 189–90 (2d Cir. 2012). Here, Plaintiff does not allege any procedural violation. Accordingly, our analysis focuses on the second part of the inquiry. At the second step, "[c]ourts ... examine whether the IEP was substantively adequate, namely, whether it was reasonably calculated to enable the child to receive educational benefits." *Id.* at 190 (alterations, citations, and internal quotation marks omitted). "In determining the substantive adequacy of the IEP, we must ... consider whether the state complied with the IDEA's LRE requirement by educating the child, to the maximum extent appropriate, with children who are not disabled." *T.M. ex rel. A.M. v. Cornwall Cent. Sch. Dist.*, 752 F.3d 145, 160 (2d Cir. 2014).

**\*4** Plaintiff argues, entirely without supporting case law, that under the IDEA's LRE requirement, a district must analyze whether it could create a placement for a child in the district before recommending an out-of-district placement. We are unpersuaded. Though a school district "must consider an appropriate continuum of alternative placements" and "offer the disabled student the least restrictive placement from that continuum that is appropriate for his or her needs," it "need

not itself operate all of the different educational programs." *Id.* at 165. The school district "may instead include free public placements at educational programs operated by other entities, including other public agencies or private schools." *Id.* Here, the record reflects that in developing A.K.'s IEPs, the various Committees on Special Education ("CSEs") considered several placement options, including placement in Westhampton Beach Middle School, and concluded that placement in an out-of-district special class[3] was most appropriate for A.K.'s needs.

Plaintiff also argues that the placements proposed in the IEPs were not the LRE and thus violated the IDEA. We disagree. To determine whether a student's placement is the LRE, we apply the test articulated in *P. ex rel. Mr. And Mrs. P. v. Newington Bd. of Educ.*, which instructs us to consider (1) "whether education in the regular classroom, with the use of supplemental aids and services, can be achieved satisfactorily for a given child," and (2) "if not, then whether the school has mainstreamed the child to the maximum extent appropriate." 546 F.3d 111, 120 (2d Cir. 2008) (citation and internal quotation marks omitted). Here, Plaintiff contends that the LRE was Westhampton Beach Middle School. The record does not support this claim. As discussed above, Westhampton did not have a special class suited to A.K.'s needs, nor does the law require it to create one. Moreover, Plaintiff does not dispute that A.K. scored at or below the first percentile in reading comprehension, spelling, listening comprehension, and mathematics; in the low range in single-word reading and in the low average range in pseudo-word decoding; and below the first percentile in speech-language skills. In light of A.K.'s unique needs, we agree with the SRO's well-reasoned conclusion that educating A.K. in a regular classroom could not be satisfactorily achieved even with the use of supplemental aids and services. As to the second prong of the test, we again agree with the SRO's conclusion that the IEPs mainstreamed A.K. to the maximum extent possible. Both IEPs recommended that A.K. be placed in an out-of-district general education school so that he could attend nonacademic activities, like extracurricular activities, electives, and lunch, with his general education peers. Accordingly, we conclude that A.K.'s IEPs satisfied the IDEA's LRE requirement.

We have considered all of Plaintiff's remaining arguments and find them to be without merit. Accordingly, we **AFFIRM** the judgment of the district court.

Case 1:23-cv-04033-LJL    Document 180-1    Filed 11/20/23    Page 67 of 103

Killoran v. Westhampton Beach School District, Not Reported in Fed. Rptr. (2023)

**All Citations**

Not Reported in Fed. Rptr., 2023 WL 4503278

<br>

## Footnotes

1    *See Killoran v. Westhampton Beach UFSD*, 21-2647 (2d Cir.); *Killoran v. Westhampton Beach Sch. Dist.*, No. 22-1753 (2d Cir.).

2    At the outset, we resolve Defendants' motion to strike, which challenges our jurisdiction, Plaintiff's standing to represent his son, and the sufficiency of Plaintiff's briefs and appendix. The motion is **DENIED**. Defendants argue that the notice of appeal improperly designated an order rather than a judgment, but a notice of appeal must "designate the judgment—*or the appealable order*—from which the appeal is taken." Fed. R. App. P. 3(c)(1)(B) (emphasis added). Further, "[a]n appeal must not be dismissed ... for failure to properly designate the judgment if the notice of appeal was filed after entry of the judgment and designates an order that merged into that judgment." Fed. R. App. P. 3(c)(7). As to Plaintiff's standing to represent his son, Plaintiff is an attorney who was admitted pro hac vice in *Killoran v. Westhampton Beach UFSD*, 21-2647 (2d Cir.), and we perceive no issue with his standing in the instant case. While Defendants correctly identify extensive deficiencies with Plaintiff's briefing and appendix, we exercise our discretion at this late date to resolve this appeal and its companions on the merits. *See* *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 133 (2d Cir. 2004).

3    Under New York law, a "[s]pecial class means a class consisting of students with disabilities who have been grouped together because of similar individual needs for the purpose of being provided specially designed instruction ..." N.Y. Comp. Codes R. & Regs. tit. 8, § 200.1(uu).

---

**End of Document**                              © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    4

2023 WL 6977448
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Dr. Nader KREIT, Plaintiff,
v.
BYBLOS BANK S.A.L., Defendant.

22-cv-10751 (LJL)
|
Signed October 22, 2023

**Attorneys and Law Firms**

Andrew Zeitz, Law Office of Barry E. Janay, New York, NY, Barry E. Janay, The Law Office of Barry E. Janay, P.C., Florham Park, NJ, for Plaintiff.

Jeffrey David Rotenberg, Clark Smith Villazor LLP, New York, NY, Jennifer Delasco, Neal F. Kronley, DLA Piper LLP, New York, NY, Samantha L. Chaifetz, DLA Piper LLP, Washington, DC, for Defendant.

MEMORANDUM & ORDER

LEWIS J. LIMAN, United States District Judge:

 **\*1** Defendant Byblos Bank S.A.L. ("Defendant") moves, pursuant to Federal Rules of Civil Procedure 12(b)(2) and 12(b)(6), to dismiss the complaint against it for lack of jurisdiction and for failure to state a claim for relief. Dkt. No. 38. For the reasons that follow, the motion to dismiss for lack of jurisdiction is GRANTED.

**BACKGROUND**

The Court accepts the well-pleaded allegations of the complaint as true for purposes of the motion to dismiss. Dkt. No. 18. [1]

This is but one of a number of cases in this District stemming from the Lebanese financial crisis that began in 2019. *See, e.g.,* Elghossain v. Bank Audi S.A.L., 2023 WL 6390160 (S.D.N.Y. Sept. 29, 2023); Moussaoui v. Bank of Beirut & the Arab Countries, 2023 WL 5977239 (S.D.N.Y. Sept. 14, 2023).

Plaintiff Nader Kreit ("Plaintiff"), a dual citizen of the United States and Syria, is a dentist who resides in Texas and operates several dental clinics in Texas. Dkt. No. 18 ¶¶ 18–19. Defendant is a banking entity with its principal place of business in the country of Lebanon. *Id.* ¶ 12.

Plaintiff's relationship with Defendant began in 2012. In 2011, Plaintiff opened a wealth management account with Byblos Bank Syria funded through a wire transfer from Wells Fargo Bank N.A. ("Wells Fargo"). *Id.* ¶ 20. On December 28, 2012, Plaintiff transferred his Byblos Bank Syria account to Defendant and opened other wealth management accounts with Defendant to invest in multiple currencies, including the U.S. dollar, the euro, and the Lebanese pound. *Id.* ¶ 21. From 2012 to 2017, Plaintiff regularly transferred large sums of money from his U.S.-based Wells Fargo account to Defendant in Lebanon through international wire transfers. *Id.* ¶ 26. Between November 13, 2015 and July 5, 2018 alone, Plaintiff transferred $4,825,000.00 from Wells Fargo to Defendant. *Id.* ¶ 25.

As has been reported in other cases, *see, e.g.,* Daou v. BLC Bank, S.A.L., 42 F.4th 120 (2d Cir. 2022), in late 2019, Lebanese banks, including Defendant, experienced liquidity issues due to a political and financial crisis in Lebanon that began earlier that year. Dkt. No 18 ¶¶ 28, 42. As a result, Defendant and other Lebanese banks denied depositors access to their lawfully deposited funds and prohibited depositors from accessing their money at the banks. *Id.* ¶¶ 43, 46; *see also* Daou, 42 F.4th at 126 (explaining that when the Lebanese pound dropped precipitously in value in late 2019, "the Lebanese banking sector tried desperately to prevent a run on the banks, first by temporarily closing the country's banks, and then by making it nearly impossible to remove large quantities of USD from the country").

 **\*2** Prior to December 4, 2019, Plaintiff had free access to his account with Defendant through Society for Worldwide Interbank Financial Telecommunications ("SWIFT") transfers between Defendant and banks in the United States. Dkt. No. 18 ¶ 40. On multiple occasions between December 2019 and the commencement of this action, Plaintiff requested that Defendant transfer his funds to his U.S. bank account, but he was refused. *Id.* ¶ 31. On one instance, he requested that 2,115,000.00 euros be transferred to his United States bank account. *Id.* ¶ 32. Defendant refused to effectuate the transfer. *Id.* ¶ 33.

Ultimately, in August 2022, Defendant notified Plaintiff that it was closing his accounts. *Id.* ¶ 35. In September 2022, Defendant offered to send Plaintiff a check in the amount of his remaining balance stated in Lebanese currency. *Id.* ¶ 36; Dkt. No. 18-4. Plaintiff alleges that his deposits were converted from U.S. dollars into Lebanese pounds without his consent and that the Lebanese pound experienced hyperinflation, which resulted in a devaluation of the account balances. Dkt. No. 18 ¶¶ 44–45.

**PROCEDURAL HISTORY**

Plaintiff commenced this action on December 20, 2022. Dkt. No. 1. Days later, Plaintiff filed a motion for an *ex parte* writ of attachment and an order to show cause, asking the Court to attach $23,474,500 in correspondent bank accounts maintained by Defendant. [2] Dkt. Nos. 6, 9. After receiving briefing, Dkt. Nos. 21–25, 28, the Court heard oral argument on the application, and then denied the motion from the bench, Dkt. No. 32; March 9, 2023 Minute Entry. The Court ruled that it did not have personal jurisdiction over Defendant and thus Plaintiff failed to demonstrate the likelihood of success required for attachment. Dkt. No. 32 at 17–18; *see Silverman v. Miranda*, 116 F. Supp. 3d 289, 310 (S.D.N.Y. 2015). The sole basis for jurisdiction then asserted by Plaintiff was on a *quasi in rem* theory—that this Court had jurisdiction over Defendant based on its power over property within the state of New York. The Court determined that it could not exercise jurisdiction over the Defendant because the *quasi in rem* jurisdictional inquiry, "like the minimum contacts inquiry generally, focuses on the 'relationship among the defendant, the forum and the litigation,' " Dkt. No. 32 at 19 (quoting *Shaffer v. Heitner*, 433 U.S. 186, 204, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977)), and Plaintiff had failed to establish the requisite nexus between the forum and the litigation. Two independent reasons animated the Court's conclusion: (1) Plaintiff had not established that there was any relationship between his causes of action and Defendant's New York-based correspondent bank accounts; and (2) even assuming that money that Plaintiff sent to Defendant passed through New York-based correspondent accounts, he failed to allege a relationship between his claims and the accounts at issue. *Id.* at 20–21. The Court concluded that each of Plaintiff's claims revolved around activities that took place in Lebanon and that it was "entirely incidental to those claims that the funds that

ended up in Plaintiff's Lebanese bank account first traveled through a United States account." *Id.* at 21–22.

**\*3** On June 29, 2023, Defendant filed this motion, accompanied by a memorandum of law in support of the motion, and three declarations. Dkt. Nos. 38–42. Plaintiff filed a memorandum of law in opposition to the motion to dismiss and three declarations on August 18, 2023. Dkt. No. 49. [3] Defendant filed a reply memorandum of law in further support of its motion to dismiss on September 15, 2023, along with two additional declarations. Dkt. Nos. 53–55. On October 4, 2023, Defendant filed a letter with supplemental authority relevant to the motion. Dkt. No. 56.

**DISCUSSION**

Plaintiff asserts five substantive claims in his complaint: (1) breach of contract for Defendant's failure to honor his requests to withdraw or transfer his funds; (2) conversion for converting his U.S. dollar deposits into Lebanese pounds of substantially lesser value; (3) a violation of the New York Uniform Voidable Transactions Act for transferring his assets in the accounts to corporate insiders, high-level officials within Lebanon, and international banks; (4) a violation of the New York Uniform Fraudulent Conveyance Act for transferring Plaintiff's euro and U.S. dollar assets to third parties and corporate insiders, high-level officials within Lebanon, and international banks without receiving reasonable value in exchange; and (5) fraudulent conveyance in violation of New York Debtor and Creditor Law. Dkt. No. 18 at 10–14.

Defendant's motion to dismiss is predicated on both jurisdictional and substantive grounds. In support of its argument that the Court lacks jurisdiction, Defendant contends that it is not subject to *in personam* jurisdiction in New York under New York's long-arm statute, Dkt. No. 39 at 7–13, that the lawsuit must be dismissed based on a mandatory forum selection clause in Plaintiff's account opening agreement, and that *forum non conveniens* further supports dismissal, *id.* at 13–18. Substantively, Defendant contends that the complaint fails to state a claim for relief. *Id.* at 18–25.

The Court begins with the personal jurisdiction issue. *See, e.g.*, *NuMSP, LLC v. St. Etienne*, 462 F. Supp. 3d 330, 341 (S.D.N.Y. 2020). "A court facing challenges as to both its jurisdiction over a party and the sufficiency of any claims

raised must first address the jurisdictional question and must dismiss the action against any defendant over whom it lacks personal jurisdiction." *Romero v. 88 Acres Foods, Inc.*, 580 F. Supp. 3d 9, 14 (S.D.N.Y. 2022); *see* Fed. R. Civ. P. 12(b)(2).

"On a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 566 (2d Cir. 1996). "[T]he showing a plaintiff must make to defeat a defendant's claim that the court lacks personal jurisdiction over it 'varies depending on the procedural posture of the litigation.' " *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 84 (2d Cir. 2013) (per curiam) (quoting *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990)). Where, as here, jurisdictional discovery has not been conducted, the plaintiff need only make a *prima facie* showing by his pleadings and affidavits that jurisdiction is proper. *Id.* at 85; *see also Metro. Life Ins. Co.*, 84 F.3d at 567.

**\*4** This *prima facie* showing "must include an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Dorchester Fin. Sec.*, 722 F.2d at 85. While the Court "construe[s] the pleadings and affidavits in the light most favorable to plaintiffs," *id.*, the Court "will not draw argumentative inferences in the plaintiff's favor" and need not "accept as true a legal conclusion couched as a factual allegation," *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013).

"To determine whether the exercise of personal jurisdiction is proper in a diversity case, the Court must conduct a two-part inquiry: first, the Court looks at whether there is a basis for personal jurisdiction under the laws of the forum state, and second, the Court must examine whether the exercise of personal jurisdiction comports with constitutional due process." *Loughlin v. Goord*, 558 F. Supp. 3d 126, 139 (S.D.N.Y. 2021); *see Licci*, 732 F.3d at 168; *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*, 305 F.3d 120, 124 (2d Cir. 2002).

"In New York, there are two ways to establish personal jurisdiction over a defendant: (1) 'general jurisdiction' under N.Y. C.P.L.R. § 301; and (2) 'specific jurisdiction' under N.Y. C.P.L.R. § 302." *Chatwal Hotels & Resorts LLC v. Dollywood Co.*, 90 F. Supp. 3d 97, 103 (S.D.N.Y. 2015). Plaintiff does not assert that Defendant is subject to general personal jurisdiction under N.Y. C.P.L.R. § 301. Nor could he. Plaintiff alleges only that "Defendant is a Lebanese bank with its principal place of business in Lebanon," Dkt. No. 18 ¶ 12, rather than asserting that Defendant is "engaged in such a continuous and systematic course of doing business in New York to warrant a finding of its presence" here, *Landoil Res. Corp. v. Alexander Servs., Inc.*, 918 F.2d 1039, 1043 (2d Cir. 1990). Instead, Plaintiff seeks to establish the Court's specific personal jurisdiction over Defendant through New York's long-arm statute, N.Y. C.P.L.R. § 302(a), and in particular under N.Y. C.P.L.R. § 302(a)(1).[4] That statute provides, in relevant part, that "a court may exercise personal jurisdiction over any non-domiciliary, ... who in person or through an agent: transacts any business within the state or contracts anywhere to supply goods or services in the state," "[a]s to a cause of action arising" from the transaction of such business. N.Y. C.P.L.R. § 302(a)(1). To establish jurisdiction under N.Y. C.P.L.R. § 302(a)(1), "two requirements must be met: (1) The defendant must have transacted business within the state; and (2) the claim asserted must arise from that business activity." *Eades v. Kennedy, PC Law Offices*, 799 F.3d 161, 168 (2d Cir. 2015) (quoting *Licci*, 732 F.3d at 168).

**\*5** Plaintiff here alleges that Defendant "has purposefully availed itself to [sic] establish and maintain commercial banking relationship [sic] with US banks located in New York County, City and State of New York by maintaining correspondent bank accounts, known as 'Interbank' or 'Nostro' bank accounts located in this jurisdiction," and that Defendant "repeatedly and systematically" used those correspondent bank accounts "to purposefully avail itself to [sic] New York's dependable and transparent banking system," as well as "the US dollar as a stable and fungible currency." Dkt. No. 18 ¶¶ 50, 52. He alleges that Defendant holds out its correspondent banking relationships "to the world, as a means to further its commercial activities and to obtain market acceptance, as well as maintain direct and continuous contact with the New York State and US correspondent banks located in that State." *Id.* ¶ 51. Plaintiff identifies five United States banks with whom Defendant has a correspondent banking relationship. *Id.* ¶¶ 13–17. Appended to his memorandum opposing Defendant's motion to dismiss, Plaintiff also submitted the declaration

of an advisor on banking practices, operations, and systems. Dkt. No. 49-2. As relevant here, the advisor explains that: (1) foreign international banks, such as Defendant, maintain correspondent bank accounts to facilitate the receipt, payment, or other transfers of local currency denominations, *id.* ¶ 5; (2) correspondent banks process deposits, transfers, withdrawals, investments, and other financial services in United States currency for foreign institutions, *id.* ¶ 12; (3) Plaintiff's transfers from his Wells Fargo account likely would have traveled through one of Defendant's correspondent banks in New York before being sent onward to his specific account with Defendant, and, if his funds were transferred pursuant to his withdrawal instructions to an account in the United States, they would have been paid out of a correspondent account Defendant had in New York, *id.* ¶ 13; (4) "[b]anking practices dictate that USD transferred abroad comply with the correspondent banking agreement between the correspondent bank and the foreign bank," *id.* ¶ 16; and (5) the transfer of funds to Defendant from Wells Fargo through a correspondent account would be reflected by "an accounting entry in the [Demand Deposit Accounting System] ... which credited the [Defendant's] account for further payment into the client's account at the Byblos Bank branch specified," *id.* ¶ 16.[5]

Plaintiff's allegations are insufficient to establish the Court's personal jurisdiction over Defendant. The Second Circuit's decision in 🔖 *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, involved nearly identical facts to those alleged here and is controlling. The plaintiffs there, Joseph and Karen Daou, were dual citizens of the United States and Lebanon who alleged—like Plaintiff here alleges—that they were induced to deposit United States currency into Lebanese bank accounts with the promise that they would be able to withdraw that money in the United States, only to have the banks renege on that promise and to keep their funds trapped in Lebanon during the Lebanese financial crisis. 🔖 *Id.* at 125–26. In particular, the Daous alleged that the defendant banks failed to honor their repeated requests to execute wire transfers of millions of dollars from their accounts in Lebanon to accounts in the United States. 🔖 *Id.* at 126–27. Ultimately, the defendant banks gave the Daous checks denominated in United States dollars but which could be cashed only in Lebanon. 🔖 *Id.* at 127. The Daous brought common law claims for civil conspiracy, fraud, issuance of dishonored checks, conversion, breach of contract, promissory estoppel, and unjust enrichment, as well as statutory claims under the

Racketeer Influenced and Corrupt Organizations Act, 🔖 18 U.S.C. § 1962(c), and alleged damages in excess of $60 million. 🔖 *Id.* at 127.

The Daous alleged that the Lebanese banks that had enticed them to deposit United States dollars and that had refused to return the Daous' money by wire back to the United States were subject to personal jurisdiction under C.P.L.R. § 302(a)(1), based on their correspondent banking relationships in New York. The Daous' allegations were almost identical to those of Plaintiff here. They alleged that the banks "purposefully use[d] New York correspondent accounts on a regular basis to move USD deposits in and out of Lebanon." 🔖 *Id.* at 130. The Daous also alleged that the banks had used their New York correspondent accounts to handle the Daous' money in the past "and likely would have done so if, counterfactually, they had transferred the Daous' money to the United States as promised." 🔖 *Id.* at 131.

Relying on an unbroken line of decisions from New York's lower courts, the Second Circuit held that the Daous' allegations were insufficient to render personal jurisdiction over the Lebanese banks proper under C.P.L.R. § 302(a)(1). 🔖 *Id.* at 125. The court determined that the Daous' allegations that the defendant banks used New York correspondent accounts to regularly move U.S. dollar deposits in and out of Lebanon satisfied the first prong of the 302(a)(1) test— the banks had "transacted business" in New York. 🔖 *Id.* at 129–30. But the Daous' allegations failed the second prong —none of the Daous' legal claims arose from the Lebanese banks' transactions in New York. 🔖 *Id.* at 130. Both the Daous' allegation that the defendant banks had used the correspondent accounts to pay out wire transfers in the past, and their allegation that the banks would have used the correspondent accounts to pay out the requested wire transfers that were never effected, were, separately and together, insufficient to establish the requisite nexus. "To the extent that the Daous allege[d] that the [Lebanese banks] advertised the availability of their New York correspondent accounts to potential customers and used those accounts to transfer some of the millions of dollars in the Daous' accounts into Lebanon in the first instance, the connection between those past transactions and the claims [made by the Daous was] 'merely coincidental.' " 🔖 *Id.* at 132 (quoting 🔖 *Johnson v. Ward*, 4 N.Y.3d 516, 797 N.Y.S.2d 33, 829 N.E.2d 1201, 1203 (N.Y. 2005)). The Lebanese banks could just as easily

have "routed the Daous' USD deposits through correspondent accounts in Florida, London, or Switzerland, or through no correspondent account at all." *Id.* The harm resulting from the banks' refusals to effectuate wire transfers would have been the same. And the Daous' allegation "that the requested wire transfers likely would have been routed through the New York correspondent accounts if the [Lebanese banks] had not refused those requests," was, the Circuit found, "not only highly speculative, but supplie[d] no connection whatsoever, much less a substantial one, between the claims and any actual transaction that occurred in New York." *Id.* The court could find no authority that would predicate personal jurisdiction on "a hypothetical future transaction that never actually occurred." *Id.* The court concluded that all of the Daous' claims "turn[ed] on alleged measures taken by Lebanese banks in Lebanon to ensure that USD deposits remained in that country," and that the Daous had failed to allege that the Lebanese banks had "used an actual, specific transaction through a New York correspondent account in the course of bringing about the injuries on which the claims [were] predicated—namely, that the Daous' USD remained in Lebanon." *Id.* Accordingly, the Daous' claims against the Lebanese banks were properly dismissed.

**\*6** In the wake of *Daou*, the courts in this District have not hesitated to dismiss for lack of personal jurisdiction claims against Lebanese banks for their failure to return U.S. dollar deposits to the plaintiff's accounts in the United States where jurisdiction is predicated upon a foreign bank's use of correspondent accounts in New York. In *Elghossain v. Bank Audi S.A.L.*, 2023 WL 3005524 (S.D.N.Y. Feb. 23, 2023), *report and recommendation adopted by* 2023 WL 6390160, the court considered a claim by plaintiffs who claimed that the defendant Lebanese bank at which they established an account denominated in Lebanese pounds had refused to convert its contents to U.S. dollars, and wire the money to the plaintiffs' bank in North Carolina, leaving them with "nearly worthless" Lebanese pounds. *Id.* at \*1. The plaintiffs alleged that they were lured into sending U.S. dollars to the Lebanese bank through a wire that designated the bank's correspondent bank in New York by assurances of a high interest rate and that there would be no restrictions on their ability to withdraw their U.S. dollars and transfer them out of Lebanon. *Id.* at \*3–4. Judge Moses ruled that *Daou* was fatal to the plaintiffs' claims. Any advertising by the Lebanese bank that transfers would be effected through New York-based correspondent accounts constituted a "merely coincidental" connection to

the state. *Id.* at \*7 (quoting *Daou*, 42 F.4th at 132). Without an identification of a specific transaction undergirding the plaintiffs' legal claims that occurred in New York, the court found that it could not assert personal jurisdiction over the defendant bank. *Id.* at \*12 (citing *Daou*, 42 F.4th at 132). Judge Gardephe adopted Judge Moses' report and recommendation in its entirety over plaintiffs' objections. 2023 WL 6390160, at \*1. He concluded that "[a]dvertising New York correspondent accounts and using the New York correspondent accounts to wire money to Plaintiffs in North Carolina is insufficient to establish personal jurisdiction [in New York]." *Id.* at \*13.

And in *Moussaoui v. Bank of Beirut & the Arab Countries*, 2023 WL 5977239, the court dismissed for want of jurisdiction a complaint with near identical facts and allegations stemming from a Lebanese bank's refusal to wire funds sent to it from the United States through a New York correspondent bank account. *Id.* at \*1–2, 7. The court held, like *Daou* and *Elghossain*, that, where a plaintiff makes only "broad allegations regarding correspondent banking relationships and accounts maintained by the defendants in New York" that "do not arise out of any *specific* transaction or business activity conducted by the defendants in New York," the plaintiff had failed to make the requisite showing to warrant personal jurisdiction under N.Y. C.P.L.R. § 302(a) (1). *Id.* at \*6–7 (citing *Daou*, 42 F.4th at 130).

The New York State courts have reached the same results. *See, e.g.*, *Chaar v. Arab Bank P.L.C.* —— N.Y.S.3d ——, 2023 WL 6626845 (1st Dep't Oct. 12, 2023); *Khalife v. Audi Saradar Private Bank SAL*, 11 N.Y.S.2d 468 (1st Dep't 2015); *Trans Atlantic Imaging S.A.L. v. Banque MISR Liban S.A.L.*, 2021 WL 2435887 (N.Y. Sup. Ct. June 15, 2021); *Malaeb v. Bankmed S.A.L.*, 2021 WL 1925638 (N.Y. Sup. Ct. May 13, 2021).

Plaintiff's assertions here are essentially indistinguishable from those in *Daou*, *Moussaoui*, and *Elghossain*. Plaintiff has failed to show that his claims arose from any correspondent bank transactions. His claim that the Court has personal jurisdiction over Defendant rests on no more than "broad allegations regarding correspondent banking relationships and accounts maintained by the [D]efendant[ ] in New York," *Moussaoui*, 2023 WL 5977239, at \*7, and he does not allege that Defendant "used an actual, specific

transaction through a New York correspondent account in the course of bringing about the injuries on which the claims are predicated," 🔖 *Daou,* 42 F.4th at 132. Although it may be that the U.S. dollars that Plaintiff transferred to Lebanon were sent there by Defendant's correspondent bank account in New York, and are reflected by an accounting entry as between the correspondent bank and the Lebanese bank, the same was true in 🔖*Daou.* That fact is "merely coincidental." 🔖*Id.* Defendant's failure to transfer money that Plaintiff requested, its conversion of Plaintiff's money from U.S. dollars to Lebanese pounds without his consent, its transfers to others, which give rise to Plaintiff's substantive causes of action, all occurred in Lebanon. Without any indicia that Plaintiff's legal claims are based on transfers effectuated by Defendant's correspondent accounts, the Court cannot exercise personal jurisdiction over Defendant under New York C.P.L.R. § 302(a)(1).

For related reasons, Plaintiff's request for jurisdictional discovery is denied. Plaintiff has "not made a *prima facie* showing that the district court could properly exercise jurisdiction over" Defendant and has failed to establish a genuine issue of jurisdictional fact. 🔖*Daou,* 42 F.4th at 133 n.6; *see Reed Int'l, Inc. v. Afg. Int'l Bank,* —— F. Supp. 3d ——, 2023 WL 2138600, at *15 (S.D.N.Y. Feb. 21, 2023). And Plaintiff has further "failed to show how the information

[he] hoped to obtain ... would bear on the critical issue" for jurisdiction. 🔖*Gualandi v. Adams,* 385 F.3d 236, 245 (2d Cir. 2004); *see also* 🔖*Haber v. United States,* 823 F.3d 746, 753 (2d Cir. 2016). The Court declines to exercise its broad discretion to order discovery in these circumstances. *See, e.g., Select Harvest USA LLC v. Indian Overseas Bank,* 2023 WL 2664079, at *11 (S.D.N.Y. Mar. 28, 2023).

**\*7** In light of the Court's disposition of Defendant's personal jurisdiction challenge, the Court has no occasion to address the remainder of Defendant's arguments.

## CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss for lack of jurisdiction is GRANTED and the Plaintiff's complaint is DISMISSED without prejudice. The Clerk of Court is respectfully directed to close this case.

It is SO ORDERED.

**All Citations**

Slip Copy, 2023 WL 6977448

## Footnotes

1    On December 29, 2022, the plaintiff filed a motion for leave to refile his complaint with the exhibits that he had been unable to attach when he originally filed his complaint. Dkt. No. 14. The Court granted that motion. Dkt. No. 17. Plaintiff filed the complaint with its attachments on January 3, 2023. Dkt. No. 18. It is otherwise identical to the complaint filed on December 20, 2022. For convenience, the Court refers to the complaint filed at Dkt. No. 18.

2    "A correspondent bank account is a domestic bank account held by a foreign bank, similar to a personal checking account used for deposits, payments and transfers of funds. Correspondent accounts facilitate the flow of money worldwide, often for transactions that otherwise have no connection to New York." 🔖*Licci ex rel. Licci v. Lebanese Canadian Bank, S.A.L.,* 732 F.3d 161, 165 n.3 (2d Cir. 2013) (internal citations and quotation marks omitted).

3    On July 26, 2023, Plaintiff filed a letter motion for jurisdictional discovery. Dkt. No. 43. The Court denied that motion without prejudice to Plaintiff's request for jurisdictional discovery in connection with his opposition to the motion to dismiss. Dkt. No. 45.

4    In his complaint, Plaintiff also alleged that the Court had *quasi in rem* jurisdiction under C.P.L.R. Sections 314(3) and 🚩6201(1) as a result of its contemplated attachment of funds held by the Defendant in accounts in New York. Dkt. No. 18 ¶¶ 53–54. The Court, however, denied Plaintiff's motion for a writ of attachment and held that Plaintiff's allegations failed to establish *quasi in rem* jurisdiction. Dkt. No. 31. That decision is law of the case. *See Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009); 🚩*Romero v. Manhattan & Bronx Surface Transit Operating Auth.*, 2022 WL 624451, at *6–7 (S.D.N.Y. Mar. 2, 2022).

5    Plaintiff also has submitted (1) an unauthenticated set of alleged text messages which he claims contain Whatsapp messages intended to entitle him to deposit his money in Lebanon and to use his funds to engage in various real estate transactions, Dkt. No. 49 at 7 n.1, Dkt. No. 49-1, and (2) a declaration signed by him which largely reiterates the allegation of the complaint but adds: "I have exhausted every possible avenue to attempt to recoup my money and obtain redress and my last resort is through this Court in this action where I am seeking $19,000,000.00 of my money on deposit with Byblos Bank," Dkt. No. 49-3 ¶ 23.

---

**End of Document**                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2023 Thomson Reuters. No claim to original U.S. Government Works.                     7

2022 WL 335491
Only the Westlaw citation is currently available.
United States District Court, S.D. Florida.

Windy LUCIUS and James Watson, Plaintiffs,

v.

FORT TACO, LLC, Defendant.

CASE NO. 21-22397-CIV-WILLIAMS/MCALILEY
|
Signed 01/05/2022

**Attorneys and Law Firms**

Juan Courtney Cunningham, Miami, FL, for Plaintiffs.

Richard Francis Della Fera, Law Office of Richard F. Della Fera, PA, Fort Lauderdale, FL, for Defendant.

**REPORT AND RECOMMENDATION**

CHRIS MCALILEY, UNITED STATES MAGISTRATE JUDGE

**\*1** Defendant, Fort Taco, LLC, filed a Motion to Dismiss, which the Honorable Kathleen M. Williams referred to me for a report and recommendation. (ECF Nos. 10, 12). Plaintiffs, Windy Lucius, and James Watson filed a response. (ECF No. 11). Defendant filed a reply, and Plaintiffs filed two Notices of Supplemental Authority. (ECF Nos. 13, 14, 17). Having carefully reviewed the parties' memoranda, the pertinent portions of the record and the applicable law, for the reasons explained below, I recommend that the Court grant the Motion to Dismiss.

**I. BACKGROUND**

This is an action pursuant to the Rehabilitation Act of 1973, 29 U.S.C. § 794. Plaintiffs, who are blind, allege that they were denied access to, and the benefits of, Defendant's website because numerous portions of the website cannot be read by Screen Reader Software, which is designed to assist persons who are visually impaired. (ECF No. 1 at ¶¶ 2, 9). Plaintiffs claim that Defendant's website is an extension of its physical restaurant, and that it allows customers to make reservations, purchase gift cards, explore menu items and take advantage of specials. (*Id.*). Plaintiffs allege that they attempted to access Defendant's website,

but many features were inaccessible to them because those features do not interface with and are not readable by Screen Reader Software. (*Id.*). Plaintiffs acknowledge that Defendant's website contains an accessibility widget but allege that this tool does not function properly. (*Id.*). Plaintiffs assert that they continue to attempt to utilize Defendant's website because they wish to patronize Defendant's brick and mortar restaurant and would like to know in advance about new products, items available for purchase, and promotions. (*Id.* at ¶¶ 10, 13).

Plaintiffs bring one claim for violation of Section 504 of the Rehabilitation Act. They allege that Defendant is subject to the Rehabilitation Act because it received federal financial assistance in the form of loans under the Paycheck Protection Program ("PPP"). (*Id.* at ¶¶ 7, 1-1). On its PPP applications, Defendant reported that it intended to use the loan proceeds for payroll expenses. (ECF No. 1-1 at pp. 2, 6). Plaintiffs allege that Defendant's website is a "program or activity" within the meaning of the Act, and that Plaintiffs were denied access to the website solely because of their disability. (ECF No. 1 at ¶¶ 11(f)). Plaintiffs further allege that Defendant acted with deliberate indifference because it is aware of the inaccessible features of its website and failed to remedy them. (*Id.* at ¶ 12).

Defendant moves to dismiss the Complaint for failure to state a claim upon which relief can be granted and raises three arguments: (1) any alleged deficiencies in its website cannot constitute disability discrimination because Defendant operates a physical restaurant and thus, its website is not the sole means of accessing its goods and services, relying upon the Eleventh Circuit's recent decision in *Gil v. Winn Dixie, 993 F.3d 1266 (11th Cir. 2021)*; (2) the Rehabilitation Act is inapplicable because the PPP loans that Defendant received are not federal financial assistance within the meaning of the Rehabilitation Act; and (3) Plaintiffs have not alleged sufficient facts to show that Defendant acted with deliberate indifference. (ECF No. 10 at 3-9).

**\*2** Plaintiffs oppose the Motion to Dismiss and contend that (1) *Gil* is inapplicable because the decision is limited to whether a website is considered a place of public accommodation, which is not an issue here, and *Gil* does not bind this Court because the Eleventh Circuit has not issued a mandate and has before it a petition for rehearing;[1] (2) whether the PPP loans that Defendant received constitute federal financial assistance is a question of fact that cannot be decided on a motion to dismiss and (3) the deliberate

indifference inquiry cannot be decided on a motion to dismiss because it is a fact intensive inquiry that requires discovery. (ECF No. 11 at 6-12).

The Court must first address the threshold issue of the applicability of the Rehabilitation Act. As explained below, the Court concludes, as a matter of law, that Defendant's receipt of PPP loans does not constitute federal financial assistance within the meaning of the Rehabilitation Act.[2] Accordingly, the Complaint fails to state a claim upon which relief can be granted.

## II. ANALYSIS

### A. The Rehabilitation Act

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States ... shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under *any program or activity receiving Federal financial assistance* ...." 29 U.S.C. § 794(a) (emphasis added). The statute defines "program or activity" to include "an entire corporation, partnership, or other private organization, or an entire sole proprietorship if assistance is extended to such corporation, partnership, private organization, or sole proprietorship *as a whole* ...." *Id.* at § 794(b)(3)(A)(i) (emphasis added).

While Section 504 does not define the term "Federal financial assistance," the legislative history provides guidance. The Senate Report gives this explanation of "federal financial assistance" within the meaning of Section 504:

> Federal financial assistance extended to a corporation or other entity "as a whole" refers to situations where the corporation receives *general assistance that is not designated for a particular purpose.* Federal financial assistance to the Chrysler Company for the purpose of preventing the company from going bankrupt would be an example of assistance to a corporation "as a whole." Federal aid which is limited in purpose, e.g., Job Training Partnership Act (JPTA) [*sic*] funds, is not considered aid

> to the corporation as a whole, even if it is used at several facilities and the corporation has discretion to determine which of its facilities participates in the program. A grant to a religious organization to enable it to extend assistance to refugees would not be assistance to the religious organization as a whole if that is only one among a number of activities of the organization.

S. REP. 100-64 at *17 (1987) (emphasis supplied).

### B. The Paycheck Protection Program

The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act") created the Paycheck Protection Program ("PPP"), which authorizes the Small Business Administration ("SBA") to guarantee loans to small businesses affected by the COVID-19 pandemic. 15 U.S.C. § 636(a)(36)(B), (F). "The [CARES] Act is in large part aimed at helping businesses make payroll and pay operating expenses in order to keep people employed through the economic downturn." *In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1247 (11th Cir. 2020). The PPP is one of the programs "designed to accomplish that goal." *Id.* at 1247.

**\*3** The SBA administers PPP loans under section 7(a) of the Small Business Act, which is the SBA's primary program for providing financial assistance to small businesses.[3] 15 U.S.C. § 636(a)(36)(B). The PPP allows eligible small businesses to obtain guaranteed loans to cover certain expenses, and those loans may be forgiven if the recipient uses the proceeds in a specified manner.[4] Several provisions of the PPP are relevant here.

First, subparagraph 36(F) sets forth the following "[a]llowable uses of covered loans":

> During the covered period, an eligible recipient may, in addition to the allowable uses of a loan made under this subsection, use the proceeds of the covered loan for --
>
> (I) payroll costs;

(II) costs related to the continuation of group health care benefits during periods of paid sick, medical or family leave, and insurance premiums;

(III) employee salaries, commissions, or similar compensations;

(IV) payments of interest on any mortgage obligation ...;

(V) rent (including rent under a lease agreement);

(VI) utilities;

(VII) interest on any other debt obligations that were incurred before the covered period;

(VIII) covered operations expenditures, as defined in section 636m(a) of this title;

(IX) covered property damage costs, as defined in section 636m(a) of this title;

(X) covered supplier costs, as defined in section 636m(a) of this title; and

(XI) covered worker protection expenditures, as defined in section 636m(a) of this title.

*Id.* at § 636(a)(36)(F)(i).

Second, 15 U.S.C § 636m(b) limits the allowable uses for loan proceeds which are eligible for loan forgiveness.[5] An eligible borrower may receive loan forgiveness equal to the amount of PPP loan proceeds used for (i) payroll costs, (ii) mortgage interest, (iii) rent, (iv) utilities, (v) covered operations expenditures, (vi) covered property damage costs, (vii) covered supplier costs, and (viii) covered worker protection costs. *See* 15 U.S.C. § 636m(b). The statute further limits eligibility for loan forgiveness to eligible recipients who use "at least 60 percent of the covered loan amount for payroll costs" noting that they may use up to 40 percent of the covered loan amount for the remaining uses specified in section 636m(b). *Id.* at 636m(d)(8).

The CARES Act delegates authority to the SBA Administrator "to issue regulations to carry out" the PPP. *See* 15 U.S.C. § 9012. Pursuant to this authority, the SBA issued an interim final rule on April 15, 2020 (the "Interim Final Rule"), which further narrows the permissible uses of a PPP loan. *See* Business Loan Program Temporary Changes;

Paycheck Protection Program, 85 Fed. Reg. 20,811 (Apr. 15, 2020).

**\*4** Specifically, the Interim Final Rule instructs that proceeds of a PPP loan "are to be used for" (i) payroll costs, (ii) costs of group health insurance benefits, (iii) mortgage interest payments, (iv) rent, (v) utilities, (vi) interest payments on debt obligations incurred before February 15, 2021 and/or (vii) refinancing an SBA EIDL loan made between January 31, 2020 and April 3, 2020. *Id.* at 20,814. It also requires that "at least 75 percent of the PPP loan proceeds *shall* be used for payroll costs."[6] *Id.* (emphasis added). The SBA justified these more stringent limitations on a borrower's ability to use PPP loan proceeds this way:

> While the Act provides that PPP loan proceeds may be used for the purposes listed above and for other allowable uses described in section 7(a) of the Small Business Act (15 U.S.C. 636(a)), the Administrator believes that finite appropriations and the structure of the Act warrant a *requirement that borrowers use a substantial portion of the loan proceeds for payroll costs*, consistent with Congress' overarching goal of keeping workers paid and employed.

> \*\*\*\*\*

> This *limitation on the use of the loan funds* will help to ensure that the finite appropriations available for these loans are directed toward payroll protection, as each loan that is issued depletes the appropriation, regardless of whether portions of the loan are later forgiven.

*Id.* (emphasis added).

The Interim Final Rule thus make clear that the restrictions contained therein are not confined to only those borrowers who seek loan forgiveness but, rather, apply to all borrowers that receive PPP loans. The Interim Final Rule also makes clear that noncompliance will result in serious consequences. A borrower who uses PPP funds for "unauthorized purposes" will be "direct[ed] to repay those amounts" and a borrower who "knowingly use[s] the funds for unauthorized purposes ... will be subject to additional liability such as charges for fraud." *Id.*

Finally, subparagraph 36(G) requires that PPP loan applicants submit a good faith certification with their application. 15 U.S.C. § 636(a)(36)(G)(i). The statute provides that an "eligible recipient" applying for a PPP loan "shall make

a good faith certification" that, among other things, "the uncertainty of current economic conditions makes necessary the loan request to support the ongoing operations of the eligible recipient" and "the funds will be used to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments...." *Id.* at § 636(a) (36)(G)(i)(I), (II). The Interim Final Rule also requires the applicant to certify that "I understand that if the funds are knowingly used for unauthorized purposes, the Federal Government may hold me legally liable such as for charges of fraud." 85 Fed. Reg. at 20,814.

**C.** Section 504 is Inapplicable

Plaintiffs allege that Defendant is subject to Section 504 of the Rehabilitation Act because it received PPP loans. (ECF No. 1 at ¶ 7; ECF No. 1-1). As mentioned, Section 504 is applicable to private entities that receive federal financial assistance "as a whole." 29 U.S.C. § 794(b)(3)(A)(i). The legislative history of the Rehabilitation Act clarifies that federal financial assistance is extended to a private entity "as a whole" when the entity "receives general assistance that is not designated for a particular purpose." S. REP. 100-64 at *17. The Court concludes that the plain language of Title 15 U.S.C. § 636(a)(36) and the SBA's Interim Final Rule demonstrates that a PPP loan is not general assistance but, rather, is designated for a particular purpose.

**\*5** A PPP loan recipient's use of PPP funds, regardless of whether loan forgiveness is sought or received, is constrained by the statute and regulation. Recipients are not free to use PPP loan proceeds as they see fit to maintain their operations. Rather, the statute sets out a list of "allowable uses" and the PPP loan applicant must certify that the funds will be used for specified purposes, namely "to retain workers and maintain payroll or make mortgage payments, lease payments, and utility payments." 15 U.S.C. § 636(a)(36)(G). The Interim Final Rule reduces the list of allowable uses even further and mandates that PPP loan proceeds be used to pay particular costs. 85 Fed. Reg. at 20,814.

Significantly, the statute and regulation mandate that recipients use a specified percentage of PPP loan proceeds for payroll costs.[7] *Id.*; 15 U.S.C. § 636m(b). Moreover, PPP loan recipients are subject to harsh consequences for misuse of PPP funds, including repayment of the loan and, for knowingly misusing the funds, federal fraud charges. 85 Fed. Reg. at 20,814.

Plaintiffs argue that the PPP constitutes general assistance because Defendant "already certified that it was going to use the loan for ongoing operations, not a particular purpose." (ECF No. 11 at 11). Plaintiffs rely upon Defendant's certification that "[c]urrent economic uncertainty makes this loan request necessary to support the ongoing operations of the Applicant." (ECF No. 11 at 10). This certification does not support Plaintiffs' argument because it addresses why Defendant needs a PPP loan, not how it intends to use the loan proceeds. In fact, in its PPP applications, Defendant was clear that it intends to use all of the loan proceeds for payroll costs. (ECF No. 1-1 at 2, 6). Moreover, a different certification addresses use of PPP funds. Specifically, Defendant, like all borrowers who apply for a PPP loan, must also certify that it will use the funds for limited purposes (i.e., to retain workers, maintain payroll, or make mortgage, lease, and utility payments). 85 Fed. Reg. at 20,814. This certification, coupled with the statutory and regulatory limitations of PPP funds, reinforce the Court's conclusion that a PPP loan is designated for a particular purpose.

Plaintiffs also argue that they "should be allowed to conduct discovery to determine how the PPP funds were used and to review loan documents." (ECF No. 11 at 8). The Court disagrees. "[T]he inquiry of whether Defendants received 'federal financial assistance' within the meaning of the [statute at issue] focuses on the intent of Congress when enacting the [statute], and not on the acts of the recipient of the funds." *Shotz v. American Airlines, Inc.*, 323 F.Supp.2d 1315, 1319 (S.D. Fla. 2004) (citations omitted).

The Court has considered the decision of the Eleventh Circuit Court of Appeals in *Moore v. Sun Bank of North Florida, N.A.*, 923 F.2d 1423 (11th Cir. 1991). In *Moore*, the Eleventh Circuit, in a split decision, concluded that a national bank's participation in the SBA's guaranteed loan program constitutes receipt of federal financial assistance pursuant to Section 504. The *Moore* decision is distinguishable for several reasons. First, *Moore* preceded the creation of the PPP by many years, and it considered the SBA's guaranteed loan program more broadly. This distinction is important because, unlike traditional SBA loans which can be used for a variety of general business purposes, the PPP and implementing regulations significantly limit how the borrower can utilize PPP loan proceeds; they also dictate how the borrower must apportion loan proceeds among the allowable uses. *See* 15

U.S.C. § 636(a)(36)(F), (G); 85 Fed. Reg. at 20,814; 15 U.S.C. § 636m(b).

*6 Second, the *Moore* Court did not address the legislative history discussed above, nor did it examine whether the assistance was provided to the entity "as a whole." Instead, the Court examined whether contracts of insurance or guaranty are excluded from the definition of federal financial assistance (they are not), and whether the bank was a "mere beneficiary of federal funds" or a "recipient" (it was a recipient). *Id.* at 1425-32. Neither of those issues are relevant here. For these reasons, *Moore* does not cause this Court to conclude that Defendant's PPP loans bring it within the scope of the Rehabilitation Act.

I also recognize that another division of this Court recently denied a motion to dismiss a Section 504 claim where the plaintiff, as here, alleged that the defendant's receipt of PPP loans subjected it to the Rehabilitation Act. In *Fernandez v. Bruno Northfleet, Inc.*, the Honorable William P. Dimitrouleas found that allegations that the defendant "owns or operates a business that is the recipient of federal financial assistance" and "as a recipient of financial assistance, Defendant has subjected itself and all of its operations ... including its website, to the provisions of the Rehab Act" were "sufficient at the pleading stage." 🚩 No. 21-cv-80609, 2021 WL 4851378, at *4 (S.D. Fla. Oct. 18, 2021).

The *Fernandez* Court relied upon the *Moore* decision, without further analysis, along with a decision from a district court in Maryland, 🚩 *Husbands v. Financial Management Solutions, LLC*, No. GJH-20-3618, 2021 WL 4339436, at *8 (D. Md. Sept. 23, 2021). The defendant in *Husbands* raised a different argument: that the Rehabilitation Act was inapplicable because the Defendant received its PPP loans *after* the acts alleged in the amended complaint. *Id.* Without further analysis, that Court concluded that the allegations were sufficient to state a claim. *Id.*

Plaintiffs also rely upon a district court decision from the Eastern District of Louisiana, *Beverly R. v. Mt. Carmel*

*Academy of New Orleans, Inc.*, 528 F.Supp.3d 451 (E.D. La. 2021). That case too is distinguishable because the defendant argued it was no longer subject to the Rehabilitation Act because its PPP loan had been forgiven. *Id.* at 461. In sum, Plaintiffs do not cite any decisions which analyze whether PPP loans constitute "federal financial assistance" within the meaning of Section 504. [8]

## III. CONCLUSION

For the reasons set forth above, the Court concludes that a PPP loan is not financial assistance extended to a company "as a whole" because it is not general assistance but, rather, is designated for a particular purpose. As such, Defendant's receipt of PPP loans does not constitute federal financial assistance within the meaning of the Rehabilitation Act. Accordingly, the Court concludes, as a matter of law, that the Rehabilitation Act does not apply to Defendant. I therefore **RESPECTFULLY RECOMMEND** that the Court **GRANT** Defendant's Motion to Dismiss, (ECF No. 10), and dismiss the Complaint with prejudice.

## IV. OBJECTIONS

*7 **No later than fourteen days from the date of this Report and Recommendation** the parties may file any written objections to this Report and Recommendation with the Honorable Kathleen M. Williams, who is obligated to make a *de novo* review of only those factual findings and legal conclusions that are the subject of objections. Only those objected-to factual findings and legal conclusions may be reviewed on appeal. *See* 🚩 *Thomas v. Arn*, 474 U.S. 140 (1985), *Henley v.* Johnson, 885 F.2d 790, 794 (11th Cir. 1989), 🚩 28 U.S.C. § 636(b)(1), 11th Cir. R. 3-1 (2016).

RESPECTFULLY RECOMMENDED in chambers at Miami, Florida, this 5th day of January 2022.

## All Citations

Slip Copy, 2022 WL 335491

**Footnotes**

1    On December 28, 2021, after Plaintiffs filed their response memorandum, the Eleventh Circuit granted the petition for panel rehearing, dismissed the appeal as moot, and vacated its opinion. *Gil v. Winn-Dixie Stores, Inc.*, No. 17-13467, 2021 WL 6129128, at *1 (11th Cir. Dec. 28, 2021).

2    In light of this conclusion, the Court does not address Defendant's remaining arguments for dismissal.

3    Congress created the PPP by adding subparagraph (36) to the SBA's existing Section 7(a) loan program, which is codified in 15 U.S.C. § 636(a). *See* 15 U.S.C. § 636(a)(36).

4    To be clear, as summarized below, the statute and regulation establish criteria for receipt of a PPP loan and criteria for forgiveness of that loan.

5    The Complaint alleges that Defendant obtained PPP loans but does not indicate whether Defendant sought forgiveness of those loans. (ECF No. 1-1 at 1, 5). For the sake of completeness, the Court addresses the limitations applicable to forgiveness of PPP loans. Even if Defendant has not sought loan forgiveness, the other limitations applicable to an award and use of PPP loans discussed here demonstrate that receipt of a PPP loan does not constitute federal financial assistance to the company as a whole, as intended by the Rehabilitation Act.

6    Congress, in the Paycheck Protection Flexibility Act of 2020, later lowered the 75% threshold that the SBA had set by mandating that at least 60% of PPP loan proceeds be used for payroll costs. Pub. L. No. 116-142 (June 5, 2020).

7    This priority is reflected in the title of the aid program, the *Paycheck* Protection Program.

8    Without offering any analysis, Plaintiffs attach to their Response an excerpt from an SBA "FAQ" page for "Faith-Based Organizations" regarding PPP loans which states that "[r]eceipt of a loan through any SBA program constitutes Federal financial assistance and carries with it the application of certain nondiscrimination obligations." (ECF No. 11-1). While this conclusory sentence supports Plaintiffs' argument, it does not change the Court's analysis. First, Defendant is not a faith-based organization. Second, the FAQ generically uses the term "Federal financial assistance." As explained in this Report and Recommendation, the legislative history of Section 504, by contrast, explains the meaning of the term for purposes of the Rehabilitation Act. Third, the Court notes that an informal FAQ sheet from the SBA is not binding authority, and Plaintiffs have provided no authority for this Court to give it deference.

---

**End of Document**            © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2023 WL 3044614
Only the Westlaw citation is currently available.
United States District Court, C.D. California.

Uri MARCUS, Yvonne Marcus, Avrohom Gordon,
Devorah Gordon & Cindy Russo, Plaintiffs,

v.

CENTERS FOR DISEASE CONTROL &
PREVENTION, Department of Health & Human
Services, Transportation Security Administration,
Julie Carrigan, Alaska Airlines, Allegiant Air,
American Airlines, Delta Air Lines, Frontier
Airlines, Hawaiian Airlines, Southwest Airlines,
United Airlines, Yet-To-Be-Named Employees of
the 8 Airlines, Stat-MD, & Medaire, Defendant.

Case No. 2:22-cv-02383-SSS-ASx
|
Signed February 21, 2023

**Attorneys and Law Firms**

Yvonne Marcus, Uri Marcus, Ojai, CA, Pro Se.

Devorah Gordon, Avrohom Gordon, New Richmond, OH,
Pro Se.

Cindy Russo, Santa Clarita, CA, Pro Se.

Andrew Freidah, Stephen M. Pezzi, Michael J. Gerardi, Pro
Hac Vice, Johnny Hillary Walker, US Department of Justice,
Washington, DC, for Defendants.

**ORDER DENYING PLAINTIFFS' MOTION
FOR LEAVE TO FILE A SUR-REPLY [DKT.
168], GRANTING DEFENDANTS' MOTIONS
TO DISMISS [DKTS. 86, 92, 95, 97, 133], AND
DENYING AS MOOT AIRLINE DEFENDANTS'
MOTION FOR PROTECITVE ORDER FOR
STAY OF DISCOVERY [DKTS. 136, 145]**

SUNSHINE S. SYKES, United States District Judge

**\*1** Before the Court are motions to dismiss by Defendants
Centers for Disease Control and Prevention ("CDC"), the
United States Department of Health & Human Services
("HHS"), the Transportation Security Administration, Julie
Carrigan, Acting Division Director of TSA's National

Transportation Vetting Center, in her official capacity
(collectively, the "Federal Defendants"), [Dkt. 97], Alaska
Airlines, Inc., American Airlines, Inc., Delta Air Lines,
Inc., Hawaiian Airlines, Inc., Southwest Airlines Co., United
Airlines, Inc., Frontier Airlines, Inc., and Allegiant Air, LLC's
(collectively, the "Airline Defendants") [Dkt. 86], MedAire,
Inc. ("MedAire") [Dkt. 92], STAT-MD [Dkt. 95], and Julie
Carrigan, in her individual capacity [Dkt. 133], and the
Airline Defendants' motion to stay discovery pending the
Court's ruling on the above-mentioned motions to dismiss
[Dkts. 136], which MedAire and STAT-MD join [Dkts.
145, 156]. For the reasons below, the Court **GRANTS** all
Defendants' motions to dismiss and **DENIES AS MOOT**
Airline Defendants' motion to stay.

## I. BACKGROUND

Plaintiffs bring this lawsuit challenging the Federal
Defendants' enforcement of the Federal Transportation Mask
Mandate ("FTMM") [1] and the International Traveler Testing
Requirement ("ITTR"). [2] [Dkt. 1 ¶ 1]. Plaintiffs also
claim the Airline Defendants committed acts of unlawful
discrimination against them. Plaintiffs also allege claims
against STAT-MD and MedAire, two medical vendors who
evaluate mask-exemption demands for several of the Airline
Defendants.

### A. The COVID-19 Pandemic

In December 2019, the novel coronavirus, later named SARS-
CoV-2, was first detected in Wuhan, Hubei Province, in the
People's Republic of China. *See Declaring a Nat'l Emergency
Concerning the Novel Coronavirus Disease (COVID-19)
Outbreak*, 85 Fed. Reg. 15,337 (Mar. 13, 2020). The virus
causes a respiratory disease known as COVID-19, *id.*,
which is highly contagious and poses a risk of "severe"
respiratory illness, meaning that infected persons may require
hospitalization, intensive care, or the use of a ventilator.
CDC, *Requirement for Negative Pre-Departure COVID-19
Test Result or Documentation of Recovery From COVID-19
for all Airline or Other Aircraft Passengers Arriving Into
the United States From Any Foreign Country*, 86 Fed. Reg.
69,256, 69,259 (Dec. 7, 2021). Severe cases may be fatal. *Id.*
Additionally, asymptomatic persons can transmit the virus. 86
Fed. Reg. at 69,258.

**\*2** On January 31, 2020, the Secretary of HHS declared
a public health emergency. [3] On March 11, 2020, the
World Health Organization (WHO) classified COVID-19 as a

pandemic. 85 Fed. Reg. at 15,337. On March 13, 2020, then-President Trump declared the outbreak a national emergency. *Id.*

### B. The FTMM

On January 21, 2021, President Biden issued an Executive Order explaining that public-health experts "have concluded that mask-wearing, physical distancing, appropriate ventilation, and timely testing can mitigate the risk of travelers spreading COVID-19." *Exec. Order No. 13998, Promoting COVID-19 Safety in Domestic and Int'l Travel,* 86 Fed. Reg. 7205 (Jan. 26, 2021). The Executive Order also directed executive officials to require masks on various forms of transportation and while in transit hubs. *Id.* On January 27, 2021, the Department of Homeland Security issued a Determination of a National Emergency and directed the Transportation Security Administration ("TSA") to support "the [Centers for Disease Control and Prevention ("CDC")] in the enforcement of any orders or other requirements necessary to ... mitigate the spread of COVID-19 through the transportation system." [4]

On February 3, 2021, the CDC issued the FTMM, which, in general, requires persons to "wear masks over the mouth and nose when traveling on any conveyance (e.g., airplanes, trains, subways, buses, taxis, ride-shares, ferries, ships, trolleys, and cable cars) into or within the United States" and "at any transportation hub." 86 Fed. Reg. 8025, 8026 (Feb. 3, 2021). The TSA then issued directives, applicable to the Airline Defendants, to implement and support enforcement of the FTMM. [5] On February 5, 2021, the Department of Transportation ("DOT") issued a *Notice of Enforcement Policy: Accommodation By Carriers of Persons with Disabilities Who Are Unable to Wear or Safely Wear Masks While on Commercial Aircraft,* [Dkt. 1-1 at 14], which provides specific instructions on how airline may implement the FTMM in a manner that complies with DOT requirements. The airlines then began implementing the FTMM accordingly.

The CDC stopped enforcing the FTMM effective April 18, 2022, *see* Federal Transit Administration, *Federal Mask Requirement for Transit,* https://www.transit.dot.gov/ TransitMaskUp, in light of a court order in 🚩 *Health Freedom Def. Fund, Inc. v. Biden,* 599 F. Supp. 3d 1144 (M.D. Fla. 2022), *appeal docketed,* No. 22-11287 (11th Cir. Apr. 21, 2022), which declared the FTMM unlawful and is now on appeal before the Eleventh Circuit.

### C. The ITTR

On December 25, 2020, the CDC issued an order generally requiring air travelers seeking to depart the United Kingdom with a final destination in the United States to provide documentation of a negative COVID-19 test result to the airline before departure. *Requirement for Negative Pre-Departure COVID-19 Test Result for All Airline Passengers Arriving Into the United States from the United Kingdom (UK),* 85 Fed. Reg. 86,933 (Dec. 31, 2020). A few weeks later, the UK variant had been identified in North America, along with another highly transmissible variant from South Africa. *Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for All Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country,* 86 Fed. Reg. 6331, 6333–34 (Jan. 21, 2021).

**\*3** On January 13, 2021, "[b]ased on increased transmissibility and spread of these new variants of SARS-CoV-2, and to reduce introduction and spread of these and future SARS-CoV-2 variants into the United States," the CDC determined that "expanding current UK pre-departure testing requirements to all foreign countries and U.S.-bound passengers is warranted." *Id.* at 6334. On January 26, 2021, the CDC reissued the testing order with minor modifications, superseding the January 13 version. *Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for all Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country,* 86 Fed. Reg. 7387 (Jan. 28, 2021). The justification for these testing requirements was that "[i]ndividuals who travel may be at risk for exposure to SARS-CoV-2 before, during, and after travel[,]" which "could result in U.S.-bound travelers further spreading the virus to others during travel, upon arrival in the United States, and at their destinations." *Id.* at 7389.

The most recent iteration of the order, the ITTR, was issued on December 7, 2021, providing that passengers age 2 and older traveling to the United States from abroad generally must take a COVID-19 test one day before their flight and present a negative test result (or proof of recovery from COVID-19) to board. [Dkt. 97-3 at 2]. "[T]he emergent Omicron variant[,]" a more transmissible strain of SARS-CoV-2 that is now dominant within the United States, was "of critical significance" to the CDC's decision to continue the testing requirement for international travelers. [*Id.* at 4].

Effective June 12, 2022, CDC rescinded the international traveler testing order. *Rescinding Requirement for Negative Pre-Departure COVID-19 Test Result or Documentation of Recovery From COVID-19 for All Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country*, 87 FR 36129-01.

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a)(2) requires that a complaint set forth "a short and plain statement of the claim showing that the pleader is entitled to relief," in order to "give the defendant fair notice of what the ... claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). A defendant may move to dismiss a complaint under Rule 12 for any one of several specified grounds, including lack of subject matter jurisdiction, Fed. R. Civ. P. 12(b)(1), and failure to state a claim upon which relief may be granted, Fed. R. Civ. P. 12(b)(6).

### D. Dismissal Under Rule 12(b)(1)

Rule 12(b)(1) tests whether Plaintiff has met his burden to show that the Court possesses subject matter jurisdiction over the action such that it may adjudicate the claims pressed in the action. *See Kokkonen v. Guardian Life Ins. Co.*, 511 U.S. 375 (1994); *Ass'n of Am. Med. Colleges v. United States*, 217 F.3d 770, 778–79 (9th Cir. 2000). A request to dismiss for lack of Article III standing is properly raised as Rule 12(b)(1) challenge to a court's subject matter jurisdiction. *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). A party may seek a Rule 12(b)(1) dismissal based "either on the face of the pleadings or by presenting evidence." *Warren v. Fox Family Worldwide, Inc.*, 328 F.3d 1136, 1139 (9th Cir. 2003). When a party asserts a facial challenge to subject matter jurisdiction, the Court limits its inquiry to the allegations set forth in the complaint. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).

### E. Dismissal Under Rule 12(b)(2)

Where a defendant moves to dismiss a complaint under Rule 12(b)(2) for lack of personal jurisdiction, the plaintiff bears the burden of demonstrating that jurisdiction is appropriate. *Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 800 (9th Cir. 2004). There are two types of personal

jurisdiction, general and specific. "General jurisdiction over a corporation is appropriate only when the corporation's contacts with the forum state 'are so constant and pervasive as to render it essentially at home' in the state." *Martinez v. Aero Caribbean*, 764 F.3d 1062, 1066 (9th Cir. 2014) (citing *Daimler AG v. Bauman*, 571 U.S. 117, 122 (2014)). Specific jurisdiction over a defendant exists "when a case 'aris[es] out of or relate[s] to the defendant's contacts with the forum.' " *Id.* (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 n.8 (1984)). The Ninth Circuit has established a three-prong test to determine whether specific jurisdiction over a defendant exists:

**\*4** (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

(2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

(3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

*Schwarzenegger*, 374 F.3d at 802. The plaintiff has the burden of establishing the first two prongs of the test, if either of the first two prongs is not met, specific jurisdiction does not exist. *Id.* If the plaintiff establishes the first two prongs, the burden shifts to the defendant to "present a compelling case" that exercising jurisdiction would be unreasonable. *Id.*

### F. Dismissal Under Rule 12(b)(6)

Motions to dismiss under Federal Rule of Civil Procedure 12(b)(6) test the legal sufficiency of the claims asserted in a complaint. *Navarro v. Block*, 250 F.3d 729, 732 (9th Cir. 2001). Subject to Rule 12(b)(6), the Court reviews the complaint for facial plausibility. *See Ashcroft v. Iqbal*, 556 U.S. 662, 663 (2009). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007)). To state a plausible claim for relief, the complaint "must contain sufficient allegations of underlying facts" to support its legal conclusions. *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir.

2011). "Factual allegations must be enough to raise a right to relief above the speculative level ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact) ..." 🚩 *Twombly*, 550 U.S. at 555 (citations and footnote omitted).

In ruling on a Rule 12(b)(6) motion, "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party." 🚩 *Am. Family Ass'n v. City & County of San Francisco*, 277 F.3d 1114, 1120 (9th Cir. 2002). Although a complaint attacked by a Rule 12(b)(6) motion "does not need detailed factual allegations," a plaintiff must provide "more than labels and conclusions." 🚩 *Twombly*, 550 U.S. at 555. Accordingly, to survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face," which means that a plaintiff must plead sufficient factual content to "allow[ ] the Court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 🚩 *Iqbal*, 556 U.S. at 678 (internal quotation marks omitted).

### G. Pleading Fraud with Particularity Under Rule 9(b)

When an action alleges fraud, Rule 9(b) imposes additional pleading requirements. A plaintiff alleging fraud "must state with particularity the circumstances constituting fraud[.]" 🚩 Fed. R. Civ. P. 9(b). This requirement means that the plaintiff must identify the "time, place, and specific content of the false representations as well as the identities of the parties to the misrepresentations." 🚩 *Swartz v. KPMG LLP*, 476 F.3d 756, 764 (9th Cir. 2007) (citations omitted). "[A]llegations of fraud must be specific enough to give defendants notice of the particular misconduct which is alleged to constitute the fraud charged 'so that they can defend against the charge and not just deny that they have done anything wrong.' " 🚩 *Sanford v. MemberWorks, Inc.*, 625 F.3d 550, 558 (9th Cir. 2010) (citation omitted).

## III. DISCUSSION

### A. STAT-MD's Motion to Dismiss

**\*5** STAT-MD moves to dismiss based on a lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2).[6] STAT-MD's role as described in the 159-page complaint is relatively limited. The FTMM contains an exception for any

"person with a disability who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act." [Dkt. 1 ¶ 219]. In order to determine which passengers can and cannot safely wear a mask, certain airlines consulted with STAT-MD and/or MedAire to evaluate "mask-exemption demands." [*Id.* ¶ 7]. According to the Complaint, STAT-MD provides " 'Airline Consultation Services' including In-flight emergency consultation as well as fitness-to-fly ground screening." [*Id.* ¶ 37]. As part of its services, STAT-MD reviews mask-exemption demands submitted by airline clients "without ever talking to the passenger and/or his/her physician." [*Id.* ¶ 1084].

In February 2022, Plaintiffs Uri and Yvonna Marcus ("Marcus Plaintiffs") purchased tickets to fly on an aircraft operated by Delta Airlines. [*Id.* ¶ 90]. According to the Complaint, STAT-MD consulted with Delta Airlines to deny the Plaintiffs' request for a masking exemption. [*Id.*]. Based on STAT-MD's alleged conclusion that one or more of the Plaintiffs' alleged medical conditions did not prevent them from wearing a mask, Plaintiffs assert a claim for medical malpractice (Count 39) and a claim for conspiracy to interfere with civil rights (Count 20).

The Court lacks general personal jurisdiction over STAT-MD because the complaint is devoid of allegations demonstrating STAT-MD's "constant and pervasive" contacts with California, much less the requisite amount of contacts to render STAT-MD at home in California. *See* 🚩 *Martinez*, 764 F.3d at 1066. Moreover, Plaintiffs concede STAT-MD is not subject to general jurisdiction in California. [Dkt. 131 at 7].

The Court also lacks specific personal jurisdiction over STAT-MD. Under the Ninth Circuit's three-prong test, it is Plaintiffs' burden to establish the first two prongs, which are that (1) STAT-MD purposefully directed its activities, consummated some transaction with the forum or resident thereof, or performed some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws, and that (2) Plaintiffs' claims against STAT-MD arise out of or relates to STAT-MD's forum-related activities. *See* 🚩 *Schwarzenegger*, 374 F.3d at 802.

Plaintiffs' allegations regarding STAT-MD fail to establish prong one of the test. Plaintiffs argue that STAT-MD should be subject to specific personal jurisdiction because of its

contractual relationship with Airline Defendants who do business with passengers in California. However, as alleged in the Complaint, STAT-MD only "reviews mask-exemption demands submitted by its airline clients without ever talking to the passenger and/or his/her physician." [Dkt. 1 ¶ 884]. In *Andreadakis v. Ctr. for Disease Control & Prevention*, the court addressed similar allegations against STAT-MD and found plaintiffs' allegations insufficient to establish specific personal jurisdiction:

> Plaintiff alleges that STAT-MD reviews and denies mask-exemption demands for its airline clients "without ever speaking to the passenger or his/her doctor." (Compl. ¶¶ 671, 884.) Plaintiff makes no further allegations against STAT-MD. Plaintiff does not allege that any of this occurs in Virginia, nor that STAT-MD even knows whether the exemption request comes from a passenger in Virginia. Indeed, Plaintiff's allegations of wrongdoing stem from the claim that STAT-MD only interacted with the airlines (located outside of Virginia), rather than Plaintiff or his doctors, perhaps located in Virginia. Accordingly, Plaintiff has not alleged that STAT-MD purposefully availed itself of the privilege of conducting business in Virginia.

**\*6**  🏳 No. 3:22CV52, 2022 WL 2674194, at \*6 (E.D. Va. July 11, 2022). Likewise here, Plaintiffs do not allege that any of STAT-MD's action took place in California or that STAT-MD even knows whether the exemption request comes from a passenger in California. Plaintiffs' allegations do not constitute the type of purposeful direction toward California or purposeful availment of its laws required to establish the first prong of the Ninth Circuit's test for specific personal jurisdiction. The Court thus lacks personal jurisdiction over STAT-MD, and all claims against STAT-MD are **DISMISSED**.

### B. MedAire's Motion to Dismiss

MedAire also moves to dismiss based on a lack of personal jurisdiction. Like STAT-MD, MedAire's role in Plaintiffs' complaint is limited. According to the complaint, Marcus Plaintiffs "booked" roundtrip tickets on Defendant Hawaiian Airlines ("Hawaiian") on February 25, 2022 for round-trip tickets from Los Angeles (LAX) to Honolulu (HNL) on July 7 through July 14, 2022. [Dkt. 1 ¶ 102]. After booking, the Marcus Plaintiffs reached out to Hawaiian to request a mask exemption for their itinerary because they allegedly "are medically disabled and are unable to wear masks." [Dkt. 1 at 304]. Hawaiian informed the Marcus Plaintiffs that guests who are unable to wear a face covering due to a medical

condition or disability would need to complete a medical assessment via phone with MedLink (a service provided by MedAire) at the airport on the day of their flight in order to be granted an exemption. [Dkt. 1 ¶ 104; *id.* at 304]. The Marcus Plaintiffs responded that they wanted to obtain an exemption or provisional exemption prior to their arrival at LAX. [Dkt. 1 ¶ 304].

Plaintiffs allege that "mask exemptions were denied via Hawaiian's illegal 'Fit to Fly' process, which involved a full medical assessment with MedAire, who determined that mask exemptions could not be approved in advance" and that "Hawaiian would make no exceptions to its rule." [Dkt. 1 ¶ 105]. There is no allegation that the Marcus Plaintiffs presented to the gate on the day of travel or underwent any pre-flight telephone screen with MedAire, that MedAire entertained, let alone denied, a request for a mask exemption from the Marcus Plaintiffs, that the Marcus Plaintiffs ever interacted with anyone from MedAire, or that MedAire was ever contacted by Hawaiian in relation to the Marcus Plaintiffs' booking. [*See* Dkt. 1]. Finally, MedAire is not implicated by any other allegation in the Complaint. [*Id.*].

Plaintiffs concede MedAire is not subject to general personal jurisdiction in California. [Dkt. 130 at 28]. They instead contend the Court has specific personal jurisdiction over MedAire "based on those regular and daily actions arising out from the State of California where the Court is located, and out from the connection between those contacts and the lawsuit." [*Id.* at 29]. Plaintiffs further argue, in a conclusory fashion, that the Court has specific personal jurisdiction over MedAire "because of [MedAire's] contacts within the State." [*Id.*]. But similar to their deficient allegations regarding STAT-MD, Plaintiffs' allegations regarding MedAire do not constitute the type of purposeful direction toward California or purposeful availment of its laws required to establish the first prong of the Ninth Circuit's test for specific personal jurisdiction. The Court thus lacks personal jurisdiction over MedAire, and all claims against MedAire are **DISMISSED**. [7]

### C. Julie Carrigan's, in Her Individual Capacity, Motion to Dismiss

**\*7**  Defendant Carrigan, in her individual capacity, also argues this Court lacks personal jurisdiction over her. Plaintiffs do not argue this Court has general personal jurisdiction over her but instead argues that specific personal jurisdiction exists. However, the complaint is devoid of

allegations sufficient to establish this Court has specific personal jurisdiction over Defendant Carrigan.

Plaintiffs first argue that Defendant Carrigan has a wealth of contacts in California in the form of employees she supervises. However, that Defendant Carrigan supervises employees located in California is insufficient to establish the minimum contacts required for specific personal jurisdiction over her in her individual capacity. *See* 🚩 *Hill v. Pugh,* 75 F. App'x 715, 719 (10th Cir. 2003) ("It is not reasonable to suggest that federal prison officials may be hauled into court simply because they have regional and national supervisory responsibilities over facilities within a forum state."). Moreover, Plaintiffs' conclusory claim that Defendant Carrigan "individually benefitted from her contacts within the State of California" lacks support from factual allegations.

Plaintiffs also argue that the acts and events at the center of the claims against Defendant Carrigan occurred in California, namely that she sent a letter revoking Plaintiff Uri Marcus' PreCheck eligibility to a Post Office Box located in California and that Plaintiff Uri Marcus suffered injury in California as a result of the revocation. However, Plaintiffs' claim against Defendant Carrigan is not the act of sending a letter to Plaintiff Uri Marcus but that she decided to revoke his TSA PreCheck status, which occurred outside of California. Moreover, although Plaintiff Uri Marcus claims he was injured by Defendant Carrigan in California, Plaintiffs' complaint lacks factual allegations to support that claim. As Defendant Carrigan notes, Plaintiff Uri Marcus admits that he lives in Israel and has not flown at all (let alone through California) since December 9, 2020, nearly a year before the TSA PreCheck revocation in November 2021. [Dkt. 166 at 3 n.2 (citing Opp. at 11; Dkt. 1 ¶¶ 20, 115–16, 882–83)].

Plaintiffs also argue personal jurisdiction is proper because Defendant Carrigan was served with the complaint through her attorney in California. But this is incorrect. The Parties filed a joint stipulation that Defendant Carrigan would accept service of process through her attorney who is located in Washington, D.C., not California. [Dkt. 96 at 2–3].

Even considering the totality of Plaintiffs' arguments, Plaintiffs have not met their burden to establish that personal jurisdiction exists over Defendant Carrigan in her individual capacity in California. *See* 🚩 *Schwarzenegger,* 374 F.3d at

800. Therefore, all claims against Defendant Carrigan in her individual capacity are **DISMISSED**.

### D. Airline Defendants' Motion to Dismiss

#### 1. *Shotgun Pleading*

Airline Defendants argue that Plaintiffs' complaint should be dismissed because it constitutes a shotgun pleading. Shotgun pleadings violate Federal Rules of Civil Procedure 8(a) and 🚩 9(b) because they fail to provide defendants with a clear statement about what they allegedly did wrong, such as "in cases with multiple defendants where the plaintiff uses the omnibus term 'Defendants' throughout a complaint by grouping defendants together without identifying what the particular defendants specifically did wrong." 🚩 *Sollberger v. Wachovia Sec., LLC,* No. CV 09-0766, 2010 WL 2674456, at *4 (C.D. Cal. June 30, 2010).

**\*8** The complaint does not constitute a shotgun pleading because Plaintiffs have sufficiently identified what each Airline Defendant has allegedly done wrong. Although Airline Defendants point to certain allegations where Plaintiffs have alleged that "Airline Defendants" have violated the law [*see* Dkt. 86-1 at 15 (citing Dkt. 1 ¶¶ 893, 914, 931, 934, 1019, 1025, 1049, 1055, 1061)], Plaintiffs have provided Airline Defendant-specific allegations elsewhere in the complaint that identify the ways in which each Airline Defendant allegedly violated the law [*see, e.g.,* Dkt. 1 ¶¶ 495–589]. Because Plaintiffs' complaint does not constitute a shotgun pleading, the Court thus proceeds to evaluate whether Plaintiffs' allegations against the Airline Defendants are sufficient to state a claim.

#### 2. *Claims 20 and 21: Conspiracy to Interfere with Civil Rights and Neglecting to Prevent Interference with Civil Rights*

Plaintiffs have failed to sufficiently state claims for civil conspiracy (Claim 20) and neglecting to prevent a conspiracy (Claim 21). To state a claim of civil conspiracy under 🚩 42 U.S.C. § 1985(3), "a complaint must allege that the defendants did (1) 'conspire or go in disguise on the highway or on the premises of another' (2) 'for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal

privileges and immunities under the laws.' It must then assert that one or more of the conspirators (3) did, or caused to be done, 'any act in furtherance of the object of (the) conspiracy,' whereby another was (4a) 'injured in his person or property' or (4b) 'deprived of having and exercising any right or privilege of a citizen of the United States.' " 🚩*Griffin v. Breckenridge*, 403 U.S. 88, 102–03 (1971).

Plaintiffs' claim for conspiracy fails because Plaintiffs have only pled conclusory allegations that a conspiracy exists and that the conspiracy was for the purpose of depriving Plaintiffs equal protection of the laws or equal privileges and immunities under the laws. [*See, e.g.*, Dkt. 1 ¶ 904 ("We have presented facts above, and expect to further prove through discovery, that the Airline Defendants conspired – with each other, with other air carriers, within their own companies, and with STAT-MD and MedAire – to ban disabled flyers because of a discriminatory motive.")]. In Plaintiffs' opposition to the instant motion, they fail to identify any non-conclusory allegations in the complaint to support their claim. Thus, Plaintiffs' Claim 20 is **DISMISSED** in its entirety.

Similarly, because Plaintiffs have failed to plausibly plead the existence of a conspiracy, they have also necessarily failed to plead that the Airline Defendants' employees neglected to stop a conspiracy. Therefore, Plaintiffs' Claim 21 is also **DISMISSED**.

### 3. *Claims 22–30 under the Rehabilitation Act*

Airline Defendants move to dismiss Plaintiffs' Claims 22–30, brought under the Rehabilitation Act, 🚩29 U.S.C. § 794 ("RA"), arguing they are not subject to claims brought under the statute. The RA prohibits discrimination against disabled individuals with respect to any program or activity receiving Federal financial assistance. 🚩29 U.S.C. § 794(a). The Supreme Court has held that the RA generally does not apply to commercial airlines, which did not receive federal financial assistance within the meaning of the statute. 🚩*U.S. Dep't of Transp. v. Paralyzed Veterans of Am.*, 477 U.S. 597, 606 (1986); *see also Woods v. Sw. Airlines*, No. CV0906466, 2010 WL 11596478, at *3 (C.D. Cal. June 7, 2010) (finding Southwest Airlines received only compensation, which did not constitute federal financial assistance under the RA).

Plaintiffs allege "[t]he Airline Defendants have accepted federal financial assistance during the COVID-19 pandemic, subjecting them to the [RA]." [Dkt. 1 ¶ 914]. While Airline Defendants concede they received money from the U.S. Government pursuant to the Payroll Support Program established under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), they argue such funds do not constitute "federal financial assistance" under the RA.

**\*9** This exact issue was considered by the court in 🚩*Andreadakis*, 2022 WL 2674194, at *10, which held the airline defendants received CARES Act funding to compensate for their economic losses created by COVID-19 and not as a subsidy that constitutes federal financial assistance under the meaning of the RA. This Court agrees.

The Eleventh Circuit decided a similar question in *Shotz v. Am. Airlines, Inc.*, 420 F.3d 1332, 1337 (11th Cir. 2005) and held that funds airlines received from the federal government pursuant to the Stabilization Act constituted compensation for losses in response to the economic crisis caused by the September 11 terrorist attacks and did not constitute a subsidy or federal financial assistance subjecting the airline defendants to liability under the RA. *See also Lucius v. Fort Taco, LLC*, No. 21-22397-CIV, 2022 WL 335491, at *6 (S.D. Fla. Jan. 5, 2022) ("Defendant's receipt of PPP loans [under the CARES Act] does not constitute federal financial assistance within the meaning of the Rehabilitation Act.").

So too here. The Court finds the funds the Airline Defendants received from the government under the CARES Act were compensation in response to the economic crises created by COVID-19 and do not constitute a subsidy or federal financial assistance under the RA. Airline Defendants are thus not subject to the RA, and Plaintiffs' Claims 22–30 under the RA are **DISMISSED**.

### 4. *Claims 23–30 under the Air Carrier Access Act*

Airline Defendants move to dismiss Plaintiffs' Claims 23–30, brought under the Air Carrier Access Act, 🚩49 U.S.C. § 41705 ("ACAA"), arguing Plaintiffs lack a private right of action to pursue violations under the statute. In *Segalman v. Sw. Airlines Co.*, 895 F.3d 1219, 1222 (9th Cir. 2018), the Ninth Circuit joined the Second, Fifth, Tenth, and Eleventh Circuits in concluding that Congress did not intend to create a private cause of action under the ACAA and held that the

ACAA does not create an implied private cause of action. Although Plaintiffs request that the Court "judicially imply a private right of action from a federal statute," [Dkt. 129 at 22–23], the Court is not at liberty to rewrite statutes or create rights of action where none exist. Plaintiffs' Claims 23–30 under the ACAA are thus **DISMISSED**.

### 5. *Claim 31: California Unruh Act*

Airline Defendants argue Plaintiffs' Claim 31 under California's Unruh Act, Cal. Civ. Code § 51(b), is preempted by federal law. "Federal law impliedly preempts state law when the state law 'regulates conduct in a field that Congress intended the Government to occupy exclusively.' " *Azocar v. Delta Air Lines, Inc.*, 562 F. Supp. 3d 788, 792 (C.D. Cal. 2021) (citation omitted). "Courts should 'more readily' infer preemption 'in the field of aviation' than in other fields because aviation 'is an area of law where the federal interest is dominant.' " *Id.*

Airline Defendants argue Plaintiffs' discrimination claims under the Unruh Act are preempted by the ACAA, which exclusively governs allegations of discriminatory or unfair treatment of passengers claiming a disability. The Unruh Act prohibits discrimination by business establishments in California from discriminating against individuals with disabilities. Cal. Civ. Code § 51.1(a). However, "[t]he ACAA comprehensively addresses not only discrimination in the form of access to services and information, but also with respect to assisting disabled passengers in boarding, deplaning, and connecting to subsequent flights." *Lagomarsino v. Delta Airlines, Inc.*, No. CV193131, 2020 WL 1955314, at *3 (C.D. Cal. Feb. 7, 2020). The ACAA thus impliedly preempts Plaintiffs' Unruh Act claim. *See Azocar v. Delta Air Lines, Inc.*, 562 F. Supp. 3d 788, 794 (C.D. Cal. 2021) (dismissing plaintiff's Unruh Act claims as preempted by the ACAA); *Lagomarsino*, 2020 WL 1955314, at *3 (C.D. Cal. Feb. 7, 2020) (same). The Court thus **DISMISSES** Plaintiffs' Claim 31 under the Unruh Act.

### 6. *Claim 32: Breach of Contract*

**\*10**  Airline Defendants move to dismiss Plaintiffs' breach of contract claims as preempted by the Airline Deregulation Act ("ADA"). The ADA allows air carriers to "refuse to transport a passenger ... the carrier decides is, or might be, inimical

to safety." 49 U.S.C.A. § 44902(a)(2) (West). Additionally, the Airline Deregulation act contains a preemption clause that states as follows:

> Except as provided in this subsection, a State, political subdivision of a State, or political authority of at least 2 States may not enact or enforce a law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier that may provide air transportation under this subpart.

49 U.S.C.A. § 41713(b)(1) (West). The Supreme Court recognized an exception to the ADA for contract claims "alleging no violation of state-imposed obligations, but seeking recovery solely for the airline's breach of its own, self-imposed undertakings." *Am. Airlines, Inc. v. Wolens*, 513 U.S. 219, 220 (1995). The *Wolens* exception is confined to "breach-of-contract actions, to the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." *Id.* at 233.

Plaintiffs' breach of contract claim is preempted by the ADA. Plaintiffs claim Airline Defendants breached their respective contracts of carriage by "[f]orcing passengers ... to wear a mask." [Dkt. 1 ¶ 1011]. However, an airline's refusal to transport a passenger based on safety concerns and the implementation of federal executive orders regarding such concerns are preempted by the ADA. *See* 49 U.S.C.A. §§ 41713(b)(1), 44902(a)(2) (West). The *Wolens* exception does not apply because the decision to implement the FTMM —a federally-imposed obligation—"cannot be adjudicated without resort to outside sources of law." *Smith v. Comair, Inc.*, 134 F.3d 254, 257 (4th Cir. 1998) ("Because a court adjudicating Smith's contract claim could not confine itself to the terms of the parties' bargain, *Wolens* is not controlling."). Plaintiffs' breach of contract claim is thus preempted and **DISMISSED**.

### 7. *Claim 33: Recklessness*

Airline Defendants move to dismiss Plaintiffs' claim for recklessness because reckless endangerment is a criminal not civil cause of action, *see* 6 Am. Jur. 2d Assault and Battery § 20 ("The crime of reckless endangerment is committed when a defendant commits an act that places another in imminent danger of death or serious bodily injury"), and "California does not recognize a cause of action for the tort of reckless endangerment." *Steward v. United States*, No. CV032715, 2006 WL 8443403, at *10 (C.D. Cal. June 8, 2006), *aff'd*, 282 F. App'x 595 (9th Cir. 2008). Plaintiffs do not cite any authority to the contrary. Accordingly, the Court **DISMISSES** Plaintiffs' Claim 33 for recklessness.

### 8. *Claim 34: Practicing Medicine Without a License*

Plaintiffs' claim 34 alleges Airline Defendants requiring passengers to wear a mask constitutes practicing medicine without a license in violation of the Food Drug and Cosmetics Act ("FDCA"). There is no private right of action under the FDCA. *See Perez v. Nidek Co.*, 711 F.3d 1109, 1119 (9th Cir. 2013). Additionally, Plaintiffs' complaint lacks sufficient factual allegations to state a plausible claim of practicing medicine without a license. Moreover, to the extent Plaintiffs rely on the California constitution for their claims, state law claims regarding an airline's decision to refuse to transport passengers based on safety concerns and the FTMM are preempted by the ADA. *See* 49 U.S.C.A. §§ 41713(b)(1), 44902(a)(2) (West). Plaintiffs' claim for practicing medicine without a license is thus **DISMISSED**.

### 9. *Claim 35: Invasion of Privacy*

 **\*11** Plaintiffs bring Claim 35, invasion of privacy, under the California constitution. According to Plaintiffs, Airline Defendants illegally invaded Plaintiffs' privacy by asking for medical information to determine whether passengers were eligible for an exemption to the FTMM. Again, this is a state law claim regarding Airline Defendants' concerns of safety and their implementation of the FTMM. Thus, it is preempted by the ADA. *See* 49 U.S.C.A. §§ 41713(b)(1), 44902(a)(2) (West). Plaintiffs' Claim 35 is **DISMISSED.**

### 10. *Claim 36: Deceptive and Misleading Trade Practices*

Plaintiffs' bring Claim 36, deceptive and misleading trade practices, under the FDCA and Section 41712 of the ADA. However, there is no private right of action under either the FDCA, *Perez*, 711 F.3d at 1119, or Section 41712 of the ADA, *Greenstein v. Peters*, No. CV 08-6104, 2009 WL 654044, at *2 (C.D. Cal. Mar. 10, 2009) (citing *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 302 (1976)). Plaintiffs' Claim 36 is thus **DISMISSED**.

### 11. *Claim 37: Fraudulent Misrepresentation*

Plaintiffs' Claim 37 alleges Airline Defendants defrauded passengers by falsely representing that "federal law" requires airline passengers to wear face masks and by failing to advise passengers of the risk associated with wearing masks. However, Plaintiffs' claim regarding fraudulent misrepresentation are preempted by the ADA. *See Pica v. Delta Air Lines, Inc.*, No. CV 18-2876, 2018 WL 5861362, at *7 (C.D. Cal. Sept. 18, 2018) (collecting cases). Plaintiffs' Claim 37 is thus **DISMISSED**.

### 12. *Claim 38: Infringement on the Constitutional Right to Travel*

Plaintiffs' claim that Airline Defendants have deprived them of their constitutional right to travel by requiring them to wear face masks. While individuals enjoy a constitutional right to travel, *Saenz v. Roe*, 526 U.S. 489, 498 (1999), "[Plaintiffs] do[ ] not possess a fundamental right to travel by airplane even though it is the most convenient mode of travel for [them]," *Gilmore v. Gonzales*, 435 F.3d 1125, 1137 (9th Cir. 2006). Moreover, as the court in *Andreadakis* noted, Plaintiffs have not been deprived of their right to travel:

> The Airline Defendants have not denied Plaintiff his fundamental right to travel. He may still travel by means other than aircraft. Further, he may travel by aircraft without a mask by obtaining an exemption. Or, he may travel by airplane with a mask. Thus, the Mask Mandate amounts to nothing more than a minor restriction on his travel, such that he cannot bring a

claim for the denial of a constitutional right.

No. 3:22CV52, 2022 WL 2674194, at *13. So too here. Accordingly, Plaintiffs' Claim 38 is **DISMISSED**.

### E. Federal Defendants' Motion to Dismiss

#### 1. *Shotgun Pleading*

The Federal Defendants move to dismiss the entire complaint as a shotgun pleading. As discussed above with respect to the Airline Defendants' motion to dismiss, the complaint does not constitute a shotgun pleading. *See supra* Section III.D.1. Thus, the Court will not grant the Federal Defendants' motion on this basis and instead proceeds to evaluate the sufficiency of the individual alleged claims they challenge.

#### 2. *Claim 4: Congressional Review Act*

In Claim 4, Plaintiffs allege CDC and HHS violated the Congressional Review Act ("CRA") because they did not submit the FTMM to Congress prior to implementing it. [Dkt. 1¶ 791 (citing 5 U.S.C. § 801(a)(1)(A))]. However, "federal courts do not have jurisdiction over statutory claims that arise under the CRA." *Ctr. for Biological Diversity v. Bernhardt*, 946 F.3d 553, 563 (9th Cir. 2019). Plaintiffs' Claim 4 is thus **DISMISSED**.

#### 3. *Claim 6: 10th Amendment*

**\*12** Plaintiffs seek a declaration from the Court stating the FTMM is unconstitutional and the CDC and HHS violated the 10th Amendment of the United States Constitution by issuing the FTMM. The Tenth Amendment states that "[t]he powers not delegated to the United States by the Constitution, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. However, as Plaintiffs concede, the United States Constitution grants the federal government to regulate interstate commerce. U.S. Const. art. I. § 8, cl. 3; [Dkt. 1 ¶ 781].

Plaintiffs argue that "the 10th Amendment precludes CDC and HHS from applying any national mask mandate to intrastate transportation" and that "[m]ost modes of transportation affected by the FTMM ... never cross state lines." [Dkt. 1 ¶ 781]. However, the federal government's power to regulate interstate commerce "extends to those intrastate activities which in a substantial way interfere with or obstruct the exercise of the granted power." *Wickard v. Filburn*, 317 U.S. 111, 124 (1942) (citing *United States v. Wrightwood Dairy Co.*, 315 U.S. 110, 119 (1942)). Thus, Plaintiffs' allegations that the FTMM regulates some modes of intrastate transportation are insufficient to state a violation of the Tenth Amendment.

Plaintiffs also allege the FTMM violates the anti-commandeering doctrine. While "Congress may not simply 'commandee[r] the legislative processes of the States by directly compelling them to enact and enforce a federal regulatory program," "[t]he anticommandeering doctrine does not apply when Congress evenhandedly regulates an activity in which both States and private actors engage." *Murphy v. Nat'l Collegiate Athletic Ass'n*, 138 S. Ct. 1461,78 (2018) (citation omitted). Therefore, "[b]ecause the FTMM applies to public and private mass transportation systems, Plaintiff[s'] Tenth Amendment challenge falls flat." *Wall v. Centers for Disease Control & Prevention*, No. 6:21-CV-975, 2022 WL 1619516, at *2 (M.D. Fla. Apr. 29, 2022). Plaintiffs provide no argument in opposition regarding their anti-commandeering allegations. The Court thus **DISMISSES** Plaintiffs' Claim 6.

#### 4. *Claim 7: Violation of the Fifth Amendment*

Plaintiffs claim they have been denied due process in violation of the Fifth Amendment because they "have been denied mask exemptions by private corporations such as airlines with no opportunity to appeal their decision to a neutral federal decision-maker." [Dkt. 1 ¶ 786]. "To qualify as a constitutionally protected, due process liberty interest, the interest must be 'objectively, deeply rooted in history and tradition of the United States, and must be implicit in concept of ordered liberty, so that neither liberty nor justice would exist if it were sacrificed.' " *Wall v. Centers for Disease Control & Prevention*, No. 6:21-CV-975, 2022 WL 1619516, at *2 (M.D. Fla. Apr. 29, 2022) (quoting *Kerry v. Din*, 576 U.S. 86, 93 (2015) (plurality)). However, the right to travel

without a mask in the context of a global pandemic is not such an interest. *See id.* Thus, Claim 7 is **DISMISSED**.

### 5. *Claims 8 and 15: Violation of the Constitutional Right to Travel*

Plaintiffs' Claims 8 and 15 allege the FTMM and ITTR, respectively, violate Plaintiffs' constitutional right to travel. However, as discussed above with respect to the Airline Defendants' motion to dismiss Plaintiffs' Claim 38, *see supra* Section III.D.12, while individuals enjoy a constitutional right to travel, 🔖 *Saenz*, 526 U.S. at 498, (1999), "[Plaintiffs] do[ ] not possess a fundamental right to travel by airplane even though it is the most convenient mode of travel for [them]," 🔖⚠ *Gilmore*, 435 F.3d at 1137. Moreover, Plaintiffs' scant allegations regarding this purported constitutional violation are insufficient to state a claim that they have been deprived of their right to travel. Therefore, Plaintiffs' Claims 8 and 15 are **DISMISSED**.

### 6. *Claims 10 and 16: Violations of the FDCA*

**\*13**  Plaintiffs allege that the FTMM and ITTR violate the FDCA by allegedly forcing them to use medical devices that are unapproved by the FDA or under an Emergency Use Authorization ("EUA"). [Dkt. 1 ¶¶ 813–32, 862–70]. However, as discussed above with respect to the Airline Defendants' motion to dismiss Claim 34, there is no private right of action under the FDCA. *See supra* Section III.D.8 (citing 🔖 *Perez*, 711 F.3d at 1119). Plaintiffs' Claims 10 and 16 are thus **DISMISSED**.

### 7. *Claim 17: International Covenant on Civil & Political Rights*

Plaintiffs claim the CDC and HHS violated the International Covenant on Civil & Political Rights ("ICCPR") by issuing the International Traveler Testing Requirement ("ITTR"), which generally prohibits airline passengers onto any aircraft destined to the United States from a foreign country unless the passenger presents a negative COVID-19 test or documentation that the passenger has recovered from COVID-19 in the past 90 days. *Requirements for Negative Pre-Departure Covid-19 Test Result or Documentation of Recovery From Covid-19 for All Airline or Other Aircraft Passengers Arriving Into the United States From Any Foreign Country*, 86 FR 69256-03.

But the ICCPR is "not self-executing and so did not itself create obligations enforceable in the federal courts." 🔖 *Sosa v. Alvarez-Machain*, 542 U.S. 692, 735 (2004). Claim 17 is thus **DISMISSED**.

### 8. *Claim 18: PreCheck Revocation*

Plaintiffs claim TSA and Ms. Carrigan, the Acting Division Director of TSA's National Transportation Vetting Center, violated Plaintiff Uri Marcus' rights by revoking his TSA PreCheck status. Pursuant to 🔖 49 U.S.C. § 46110, TSA orders are appealable to only "the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides ...." The courts of appeals thus have "exclusive jurisdiction to affirm, amend, modify, or set aside any part of [a TSA order]." 🔖 *Id.* § 46110(c). Orders regarding the PreCheck program are made pursuant to TSA's authority under Part A of Title 49, and therefore fall under section 46110. *See* 49 U.S.C. § 44919 (governing administration of the PreCheck Program); *see also* 🔖⚠ *Gilmore*, 435 F.3d at 1132 ("Courts have given a broad construction to the term 'order' " in 🔖 Section 46110); *id.* ("finality is key" to the inquiry and "if the order provides a 'definitive' statement of the agency's position, has a 'direct and immediate' effect on the day-to-day business of the party asserting wrongdoing, and envisions 'immediate compliance with its terms,' the order has sufficient finality" to fall under 🔖 section 46110); [Dkt. 1 at 323 ("This letter constitutes TSA's final decision.")].

Plaintiffs cannot "escape the jurisdictional limitations of 🔖 § 46110 by claiming that [they] assert[ ]" a constitutional challenge to the TSA's order. *See Corbett v. United States*, 458 F. App'x 866, 871 (11th Cir. 2012). Thus, Plaintiffs characterization of TSA's revocation of Plaintiff Uri Marcus' PreCheck status as "blatant retaliation for his First Amendment-protected activities," [Dkt. 1 ¶ 882], does not grant the Court jurisdiction to review the TSA's order. Because the Court does not have subject matter jurisdiction over Plaintiffs' Claim 18, it is thus **DISMISSED**.

**F. Mootness**

The Court ordered the Parties to submit supplemental briefing regarding potential mootness of Plaintiffs' claims. After reviewing the Parties' submissions, the Court finds none of Plaintiffs' claims are moot at this time.

**G. Leave to Amend**

**\*14** Pursuant to Federal Rule of Civil Procedure 15, 15(a) (2), "[t]he court should freely give leave when justice so requires." Therefore, the Court **GRANTS** Plaintiffs leave to file an amended complaint. If Plaintiffs wish to file an amended complaint, they are **DIRECTED** to do so no later than **March 16, 2023**. Plaintiffs are further **DIRECTED** to file a "redlined" version of the amended complaint identifying all additions and deletions of material as an appendix to the amended complaint. An additional copy of the redlined complaint must be provided to Chambers by email at SSS_Chambers@cacd.uscourts.gov on the same day the amended complaint is filed electronically.

**H. Airline Defendants' Motion for Protective Order for Stay of Discovery**

Airline Defendants, joined by Stat-MD and MedAire, seek a stay of discovery, pending the Court's decision on their respective motions to dismiss. In light of the instant ruling deciding all motions to dismiss filed by all Defendants, the Court **DENIES AS MOOT** Airline Defendants' motion for protective order for stay of discovery.

**IV. CONCLUSION**

For the foregoing reasons, the Court **ORDERS** as follows:

1. The Court **DENIES** Plaintiffs' motion for leave to file a sur-reply [Dkt. 168];

2. The Court **GRANTS** STAT-MD's motion [Dkt. 95] and **DISMISSES WITHOUT PREJUDICE** all claims against STAT-MD;

3. The Court **GRANTS** MedAire's motion [Dkt. 92] and **DISMISSES WITHOUT PREJUDICE** all claims against MedAire;

4. The Court **GRANTS** Defendant Carrigan's motion [Dkt. 133] and **DISMISSES WITHOUT PREJUDICE** all claims against Defendant Carrigan in her individual capacity;

5. The Court **GRANTS** the Airline Defendants' motion [Dkt. 86] and **DISMISSES WITHOUT PREJUDICE** Claims 20–38;

6. The Court **GRANTS** the Federal Defendants' motion [Dkt. 97] and **DISMISSES WITHOUT PREJUDICE** Claims 4, 6–10, 15–18;

7. The Court **GRANTS** Plaintiffs leave to file an amended complaint no later than March 16, 2023; and

8. The Court **DENIES AS MOOT** Airline Defendants' motion for protective order for stay of discovery [Dkts. 136, 145].

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2023 WL 3044614

---

## Footnotes

1     According to Plaintiffs, the FTMM they seek to challenge consists of 1) Executive Order 13998, 86 Fed. Reg. 7,205 (Jan. 26, 2021); 2) Department of Homeland Security Determination 21-130 (Jan. 27, 2021); 3) CDC Order "Requirement for Persons to Wear Masks While on Conveyances & at Transportation Hubs," 86 Fed. Reg. 8,025 (Feb. 3, 2021); 4) Transportation Security Administration Health Directives 1542-21-01D, 1544-21-02D, and 1582/84-21-01D (March 19, 2022); and 5) TSA Emergency Amendment 1546-21-01D (March 19, 2022). [Dkt. 1 ¶ 2].

2     According to Plaintiffs, the ITTR they seek to challenge consists of the CDC Order "Requirements for Negative Pre-Departure COVID–19 Test Result or Documentation of Recovery from COVID–19 for All Airline or Other

Aircraft Passengers Arriving into the United States from Any Foreign Country." 86 Fed. Reg. 69,256 (Dec. 7, 2021).

3    HHS, *Determination that a Public Health Emergency Exists* (Jan. 31, 2020), https://www.phe.gov/emergency/ news/healthactions/phe/Pages/2019-nCoV.aspx.

4    U.S. Dep't. of Homeland Security, *Determination of a National Emergency Requiring Actions to Protect the Safety of Americans Using and Employed by the Transportation System* (Jan. 30, 2021), https://www.dhs.gov/ sites/default/files/publications/21_0130_as1_determination-national-emergency.pdf.

5    TSA Security Directives, 1542-21-01D, 1544-21-02D, and 1582/84-21-01D; and TSA Emergency Amendment 1546-21-01D.

6    "Where, as here, there is no applicable federal statute governing personal jurisdiction, the district court applies the law of the state in which the district court sits. Because California's long-arm jurisdictional statute is coextensive with federal due process requirements, the jurisdictional analyses under state law and federal due process are the same." ⚑ *Schwarzenegger*, 374 F.3d at 800–01 (9th Cir. 2004).

7    Plaintiffs filed a Motion for Leave to Serve a Sur-Reply Memorandum of Law [Dkt. 168]. Plaintiffs' motion is more aptly considered as a notice of supplemental authority or a request for judicial notice of the case, ⚑ *McCaskey v. Cont'l Airlines, Inc.*, 133 F. Supp. 2d 514, 521 (S.D. Tex. 2001). The Court takes judicial notice under Fed. R. Evid. 201 of *McCaskey* but **DENIES** Plaintiffs' motion for leave to file a sur-reply. Moreover, upon review, the Court finds that *McCaskey* is inapposite because the allegations regarding MedAire in that case differ significantly from the instant case.

---

End of Document                                    © 2023 Thomson Reuters. No claim to original U.S. Government Works.

2021 WL 735243
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

METAMORFOZA, D.O.O., Plaintiff,

v.

BIG FUNNY LLC, et al., Defendants.

19-CV-11743 (RA)
|
Signed 02/25/2021

**Attorneys and Law Firms**

Kristin Gabrielle Garris, William Robert Samuels, Warshaw Burstein, LLP, New York, NY, for Plaintiff.

Ali S. Razai, Paul A. Stewart, Knobbe Martens Olson & Bear LLP, Irvine, CA, Benjamin Anger, Knobbe Martens, San Diego, CA, for Defendant Big Funny, LLC.

Ali S. Razai, Knobbe Martens Olson & Bear LLP, Irvine, CA, Benjamin Anger, Knobbe Martens, San Diego, CA, for Defendants Big Funny FL LLC, Big Funny Corporation.

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

**\*1** This case arises from a trademark dispute between Plaintiff Metamorfoza D.O.O., which owns multiple businesses under the name "Museum of Illusions," and Defendants Big Funny LLC, Big Funny FL LLC, and Big Funny Corporation, which also own several businesses under the name "Museum of Illusions," as well as "Museum of 3D Illusions." Defendants have moved to dismiss this action on two grounds: lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2) and failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). In the alternative, Defendants have filed a motion to transfer this action to the United States District Court for the Central District of California. For the reasons that follow, the Court concludes that it lacks personal jurisdiction over Defendants and grants the motion to transfer.

BACKGROUND [1]

Plaintiff is an entity organized under the laws of Croatia with its principal place of business in Zagreb, Croatia. Am. Compl. ¶ 7. Defendant Big Funny Corporation is a Nevada Corporation. *Id.* ¶ 10. Big Funny Corporation operates through its two wholly owned subsidiaries, Big Funny, LLC (a California limited liability company with its principal place of business in Los Angeles) and Big Funny FL, LLC (a Florida limited liability company with its principal place of business in Miami). Graff Decl. ¶¶ 2, 7.

According to Plaintiff, in 2015, it opened its first Museum of Illusions in Zagreb, Croatia. Am Compl. ¶ 15. Over the following years, Plaintiff—either itself or through its licensees and franchisees—opened several more Museums of Illusions throughout Europe, Asia, and Canada. *Id.* ¶ 16. In September 2016, Plaintiff "began communicating with potential commercial partners" about opening a Museum of Illusions in New York, to be its first in the United States. *Id.* ¶ 26. On November 23, 2016, Plaintiff filed an application with the U.S. Patent and Trademark Office ("USPTO") to trademark its logo (hereinafter, "the design mark"). *Id.* ¶ 29. The design mark included the words "Museum of Illusions," but upon action of the USPTO, Plaintiff expressly disclaimed any exclusive right to the words themselves. *See* Razai Decl. Ex. 1 at 3 (USPTO's Office Action in response to Plaintiff's 2016 trademark application, requiring Plaintiff to "disclaim all the wording in the mark"); *id.* Ex 2 at 2 (Plaintiff's response, asserting that "[n]o claim is made to the exclusive right to use MUSEUM OF ILLUSIONS apart from the mark as shown"). Starting in September 2018, Plaintiff opened a series of "Museums of Illusions" in the United States, including in New York, Dallas, and Kansas City. Am. Compl. ¶¶ 43–44. In 2019, Plaintiff registered the name "Museum of Illusions" (hereinafter, "the word mark") on the USPTO's Supplemental Register. Razai Decl. Ex. 4 (USPTO's Office Action in response to Plaintiff's 2019 trademark application).

**\*2** On January 1, 2018, before Plaintiff opened its first United States location, Defendants opened their own "Museum of Illusions" in Los Angeles. Graff Decl. ¶ 3. Defendants later opened two more museums: a "Museum of 3D Illusions" in San Francisco, opened March 1, 2019, Am. Compl. ¶ 64, and a "Museum of Illusions" in Miami, opened December 1, 2019, Graff Decl. ¶ 7.

Defendants do not operate a museum in New York, nor do they do any business in New York. *Id.* According to the general manager of Defendants' Los Angeles museum, "Defendants are not incorporated in New York[,] Defendants

are not licensed to do business in New York[,] Defendants have no registered agent for service of process in New York[,] Defendants have no offices or employees in New York[,] Defendants own no property in New York[,] Defendants do not conduct business in New York[,] Defendants do not have contracts with New York entities[,] Defendants do not ship any goods to New York[, and] Defendants do not perform any services in New York." *Id.* ¶¶ 8–16. Defendants do, however, operate websites, through which customers—regardless of location—can purchase tickets to Defendants' Los Angeles, San Francisco, and Miami museums. Am. Compl. ¶ 5, 11 (https://laillusions.com/, https://sfillusions.com/, and https://miaillusions.com/). The tickets are received via email, and may only be redeemed in-person at Defendants' museums. Graff Decl. ¶ 5. Defendants also send marketing and promotional emails to customers. Am. Compl. ¶ 5. Some of these emails offer discounts on tickets to be purchased online, while others offer discounts on tickets to be purchased at Defendants' museums. *Id.* ¶ 84 (offering gift cards for sale online or in store); *id.* ¶ 85 (offering a 50% discount but only to customers who purchased their tickets at the front desk of the Los Angeles location); *id.* ¶ 86 (offering a 30% discount for those who mentioned the discount-code at the front desk of the Miami location). Defendants have sent promotional emails and sold tickets to persons who reside in New York. *See, e.g.,* Am. Compl. ¶¶ 79–87; Graff Decl. ¶ 17.

Plaintiff brought this suit against Defendants on December 23, 2019. Dkt. 1. Following Defendants' filing of a motion to dismiss, dkt. 27, Plaintiff filed an amended complaint on April 2, 2020, dkt. 33. Defendants responded with a second motion to dismiss on April 30, 2020. Dkt. 44. Following oral argument on February 2, 2021, the Court permitted Plaintiff to file a proposed second amended complaint. *See* Dkt. 62. Both parties were given the opportunity to be heard on the legal significance of the proposed amendments. Dkt. 63 (Plaintiff); Dkt. 64 (Defendants).

**LEGAL STANDARD**

On a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(2), "the plaintiff bears the burden of establishing that the court has jurisdiction over the defendant." *Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez,* 171 F.3d 779, 784 (2d Cir. 1999). "[W]here a court relies on pleadings and affidavits, rather than conducting a full-blown evidentiary hearing, the plaintiff need only make a *prima facie* showing that the court possesses personal

jurisdiction over the defendant." *Dorchester Fin. Sec, Inc. v. Banco BRJ, S.A.,* 722 F.3d 81, 84 (2d Cir. 2013) (internal quotation marks omitted). "All pleadings and affidavits are to be construed in the light most favorable to the plaintiff," *id.* (alterations adopted), but "[t]he plaintiff cannot rely merely on conclusory statements or allegations; rather, the prima facie showing must be 'factually supported,' " *Yellow Page Solutions, Inc. v. Bell Atlantic Yellow Pages Co.,* No. 00-CV-5663 (MBM), 2001 U.S. Dist. LEXIS 18831, 2001 WL 1468168, at *3 (S.D.N.Y. Nov. 19, 2001) (internal citations omitted).

**\*3** "In reviewing a motion to dismiss pursuant to [Rule] 12(b)(2), a court may look to evidence outside the pleadings." *Sandoval v. Abaco Club,* 507 F. Supp. 2d 312, 315 (S.D.N.Y. 2007); *see also* *Telebrands Corp. v. Del Labs., Inc.,* 719 F. Supp. 2d 283, 287 n. 3 (S.D.N.Y. 2010) ("The Court may properly take judicial notice of official records of the United States Patent and Trademark Office and the United States Copyright Office.").

**DISCUSSION**

**I. Defendants' Motion to Dismiss for Lack of Personal Jurisdiction**

To determine whether it has personal jurisdiction over Defendants, the Court engages in a two-step inquiry. First, "[b]ecause this is 'a federal question case where a defendant resides outside the forum state, ... [and the relevant] federal statute does not specifically provide for national service of process,' ... 'the forum state's personal jurisdiction rules' [apply]." *Marvel Characters, Inc. v. Kirby,* 726 F.3d 119, 128 (2d Cir. 2013) (quoting *PDK Labs, Inc. v. Friedlander,* 103 F.3d 1105, 1108 (2d Cir. 1997)) (alterations in original). The Court thus looks to New York State's long arm statute, which allows the exercise of personal jurisdiction over a non-domiciliary if:

> 1. [the defendant] transacts any business within the state or contracts anywhere to supply goods or services in the state; or 2. commits a tortious act within the state[;] ... or 3. commits a tortious act without the state causing

injury to person or property within the state ... if he (i) regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered, in the state, or (ii) expects or should reasonably expect the act to have consequences in the state and derives substantial revenue from interstate or international commerce....

N.Y. C.P.L.R. § 302(a). If personal jurisdiction exists under the state long arm statute, the Court "must [then] determine whether an exercise of jurisdiction ... is consistent with federal due process requirements." 🚩 *Bank Brussels Lambert*, 171 F.3d at 784.

Plaintiff asserts that personal jurisdiction exists under both C.P.L.R. §§ 302(a)(1) and 302(a)(3), yet fails to plausibly plead that the requirements of either provision are met. The Court thus concludes that it lacks personal jurisdiction.

### A. N.Y. C.P.L.R. § 302(a)(1)

Under § 302(a)(1), a court may exercise personal jurisdiction over a non-domiciliary defendant if that defendant "transacts any business within the state or contracts anywhere to supply goods or services in the state." N.Y. C.P.L.R. § 302(a)(1). To demonstrate that an individual "transacted business" within the meaning of the statute, "there must have been some 'purposeful activities' within the State that would justify bringing the nondomiciliary defendant before the New York courts." 🚩 *McGowan v. Smith*, 52 N.Y.2d 268, 437 N.Y.S.2d 643, 419 N.E.2d 321, 322 (N.Y. 1981). "Purposeful activities are those with which a defendant, through volitional acts, 'avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.' " 🚩 *Fischbarg v. Doucet*, 9 N.Y.3d 375, 849 N.Y.S.2d 501, 880 N.E.2d 22, 26 (N.Y. 2007). Because § 302(a)(1) is a "single act statute," proof of a single transaction in New York may suffice to invoke jurisdiction, so long as that transaction is sufficiently substantive and purposeful. 🚩 *Kreutter v. McFadden Oil Corp.*, 71 N.Y.2d 460, 527 N.Y.S.2d 195, 522 N.E.2d 40, 43 (N.Y. 1988). Ultimately,

though, "it is the quality of the defendants' New York contacts that is the primary consideration" when determining whether jurisdiction is appropriate under § 302(a)(1). 🚩 *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 62 (2d Cir. 2012).

**\*4** Plaintiff alleges that Defendants transacted business in New York by (1) "sen[ding] and continu[ing] to send, solicitations to at least one New York consumer," and (2) selling "tickets to at least one New York consumer." Pl. Mem. at 12. The Court will address each allegation in turn.

### 1. Sending Solicitations

Defendants allegedly sent numerous marketing emails to at least one New York resident who had previously purchased tickets to visit Defendants' museums. Am. Compl. ¶¶ 82–86. Although this Circuit has yet to articulate a clear rule for when email communications confer personal jurisdiction, in the context of other web-postings, judges in this District have held that "jurisdiction will lie only if the posting is intended to target or focus on internet users in the state where the cause of action is filed." 🚩 *Seldon v. Direct Response Techs.*, No. 03-CV-5381 (SAS), 2004 U.S. Dist. LEXIS 5344, 2004 WL 691222, \*4 (S.D.N.Y. 2004). Here, Plaintiff has pled no facts demonstrating that Defendants purposefully directed their email solicitations towards New York residents in particular. [2] Indeed, the emails at issue appear simply to be generic marketing emails sent to Defendants' entire customer mailing list, regardless of customer location. The sending of such generic emails is no more purposefully related to New York than it is to any other state or locality. The Court thus concludes that the sending of these marketing emails, as pled, is insufficient to support a finding of personal jurisdiction under C.P.L.R. § 302(a)(1).

### 2. Selling Tickets

Defendants have also sold museum tickets to purchasers in New York through their website. Am. Compl. ¶ 76. Unlike the sending of marketing emails discussed above, the sale of tickets presumptively involves the exchange of funds. Although the question as to whether this activity qualifies as "transacting business" in the State of New York is a closer one, these online ticket sales are also insufficiently tied to

the state to support a finding of personal jurisdiction under §
302(a)(1).

Plaintiff cites to several recent decisions of the courts of this
Circuit to support its contention that, through their online
ticket sales to New York residents, Defendants "purposefully
availed themselves of the privilege" of doing business in the
state. Pl. Mem. at 11–12 (citing *Rubin v. City of New
York*, No. 06-CV-6524 (HB), 2007 U.S. Dist. LEXIS 23003,
2007 WL 950088 (S.D.N.Y. Mar. 29, 2007) and *Novak v.
Overture Servs., Inc.*, 309 F. Supp. 2d 446 (E.D.N.Y. 2004)).
The facts of the cases on which Plaintiff relies, however, differ
materially from the facts of the instant case.

In *Novak v. Overture Servs., Inc.*, the defendant sold
products from a catalogue through its website, selling several
thousands of dollars' worth of goods to New York residents.
309 F. Supp. 2d at 455. Similarly, the plaintiff in *Rubin
v. City of New York* sold N.Y.P.D.-themed merchandize online,
including to some New York residents. 2007 WL 950088,
at *3. In each of those cases, physical goods were sold
and shipped into New York for presumable use within the
state. *Rubin*, 2007 WL 950088 at *3, 2007 U.S. Dist.
LEXIS 23003 at *3; *Novak*, 309 F. Supp. 2d at 455;
*see also Mattel, Inc. v. Procount Bus. Servs.*, 03-CV-7234
(RWS), 2004 U.S. Dist. LEXIS 3895, 2004 WL 502190, *2
(S.D.N.Y. Mar. 17, 2004) (finding personal jurisdiction where
a defendant "shipped merchandise into the State of New York
that was ordered by [the plaintiff] from its website"). Here,
in contrast, Defendants sold their customers a service that
could not be used within the state. Indeed, for the tickets sold
to have any value, Defendants' New York-based customers
would have to leave New York and visit one of Defendants'
California or Florida museums. No goods of Defendants ever
physically entered New York, nor did Defendants perform any
service within the state.

**\*5**  More germane to the instant case are decisions like
*DH Services, LLC v. Positive Impact, Inc.*, No. 12-
CV-6153 (RA), 2014 U.S. Dist. LEXIS 14753, 2014 WL
496875, *3 (S.D.N.Y. Feb. 5, 2014), in which the defendant
facilitated charitable donations through its website. *Id.
at *7*. Both this case and that involve the exchange of
funds between the defendant and New York residents, but in
neither was a good sent to the state or a service performed

within the state. Moreover, in both *DH Services* and the
instant case, the customer's location was inconsequential to
the transaction. For these reasons, the Court found personal
jurisdiction lacking in *DH Services* despite multiple New
York residents having made donations. *Id. at *17*.

Like in *DH Services*, the Court concludes that the
connection between Defendants' ticket sales and the State
of New York is too tenuous to "justify bringing the
nondomiciliary defendant before the New York courts."
*McGowan*, 437 N.Y.S.2d 643, 419 N.E.2d at 322. Plaintiff
has thus failed to carry its burden of plausibly pleading that
this Court has personal jurisdiction over Defendants pursuant
to C.P.L.R. § 302(a)(1).

## B. N.Y. C.P.L.R. § 302(a)(3)

Under § 302(a)(3), a court may exercise specific jurisdiction
over a non-domiciliary defendant if that defendant "commits
a tortious act without the state causing injury to person or
property within the state," so long as the defendant either (i)
"regularly does or solicits business, or engages in any other
persistent course of conduct, or derives substantial revenue
from goods used or consumed or services rendered, in the
state," or (ii) "expects or should reasonably expect the act
to have consequences in the state and derives substantial
revenue from interstate or international commerce." N.Y.
C.P.L.R. § 302(a)(3). "Jurisdiction pursuant to § 302(a)(3)(ii)
is predicated on five elements: '(1) [t]he defendant committed
a tortious act outside the state; (2) the cause of action arose
from that act; (3) the act caused injury to a person or
property within the state; (4) the defendant expected or should
reasonably have expected the act to have consequences in
the state; (5) the defendant derives substantial revenue from
interstate or international commerce.' " *Gucci Am., Inc. v.
Frontline Proc. Corp.*, 721 F. Supp. 2d 228, 241 (S.D.N.Y.
2010) (quoting *Sole Resort, S.A. de C.V. v. Allure Resorts
Mgmt., LLC*, 450 F.3d 100, 106 (2d Cir. 2006)). [3]

Plaintiff has failed to plausibly plead that Defendants
committed a tortious act. A plaintiff "need not actually prove
that defendant committed a tort" to establish jurisdiction
under § 302(a)(3), "but rather need only state a colorable
cause of action." *Sole Resort*, 450 F.3d at 106. To be

colorable, allegations must not be "inherently implausible."
*Bank Brussels Lambert v. Fiddler Gonzalez & Rodriguez*,
305 F.3d 120, 126 n.2 (2d Cir. 2002); *cf.* ⚠ *Nemeroff
v. Abelson*, 620 F.2d 339, 348 (2d Cir. 1980) ("A claim is
colorable ... when it has some legal and factual support,
considered in light of the reasonable beliefs of the individual
making the claim."). Here, it is clear from the face of the
complaint that Plaintiff's allegation of trademark infringement
is inherently implausible.

It is well established that "[r]ights in a trademark are
determined by the date of the mark's first use in commerce.
The party who first uses a mark in commerce is said to have
priority over other users." *Hana Fin., Inc. v. Hana Bank*,
574 U.S. 418, 419, 135 S.Ct. 907, 190 L.Ed.2d 800 (2015).
Defendants began using the mark in commerce when they
opened the "Museum of Illusions" in Los Angeles in January
2018. Am. Compl. ¶ 54. Plaintiff did not begin using the word
mark in commerce within the United States until nine months
later, when it opened the "Museum of Illusions" in New
York in September 2018. Razai Decl. Ex. 3 (Plaintiff's 2019
trademark application, reflecting this fact). Although Plaintiff
had used the word mark internationally before 2018, "[i]t is
well settled that foreign use is ineffectual to create trademark
rights in the United States." *La Societe Anonyme des
Parfums le Galion v. Jean Patou, Inc.*, 495 F.2d 1265, 1270
n.4 (2d Cir. 1974). And although Plaintiff asserts that it began
using the mark in the United States in September 2016—
when it began "communicating with potential commercial
partners ... about opening a ... museum in the United States,"
Am. Compl. ¶ 26—a mark is only considered to be used "in
commerce" when there are actual "goods sold and ... services
rendered." *Am. Express Co. v. Goetz*, 515 F.3d 156, 161 (2d
Cir. 2008). For these reasons, it is clear from the face of the
complaint that no trademark infringement has occurred here.
Plaintiff has therefore failed to plausibly plead a colorable
claim that Defendants committed a tort against it.

**\*6** Plaintiff has thus failed to carry its burden of plausibly
pleading that this Court has personal jurisdiction over
Defendants pursuant to C.P.L.R. § 302(a)(3).

## II. Plaintiff's Application for Additional Discovery

In the alternate, Plaintiff seeks leave to conduct jurisdictional
discovery. Pl. Mem. at 20. A plaintiff seeking jurisdictional
discovery bears the burden of establishing that it is necessary.

*Molchatsky v. United States*, 778 F. Supp. 2d 421, 438
(S.D.N.Y. 2011). When a plaintiff fails to identify a genuine
issue of jurisdictional fact, it is within the Court's discretion
to deny jurisdictional discovery. *Best Van Lines, Inc. v.
Walker*, 490 F.3d 239, 255 (2d Cir. 2007).

Plaintiff has failed to carry its burden. Plaintiff seeks
jurisdictional discovery to determine whether "Defendants
reap considerable income from visitors originating from
outside Los Angeles and Miami, and ... from states across the
U.S. and internationally." Pl. Mem. at 20. But as explained
above, C.P.L.R. § 302(a)(3)(ii) is not satisfied here because
Plaintiff cannot establish a colorable claim of trademark
violation, not because Plaintiff failed to show that "the
defendant derives substantial revenue from interstate or
international commerce." *Gucci Am., Inc.*, 721 F. Supp. 2d
at 241. For this reason, even if jurisdictional discovery did
uncover additional national and international ticket sales, it
would not remedy Plaintiff's failure satisfy New York's long
arm statute. Jurisdictional discovery is thus denied.

## III. Plaintiff's Application To File an Amended Complaint

Plaintiff seeks leave to file a second amended complaint. Pl.
Mem. at 22. Whether to grant or deny leave to amend is
committed to the "sound discretion of the district court," and
leave may be denied when amendment would prove futile.
*McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 200
(2d Cir. 2007). "Granting leave to amend is futile if it appears
that plaintiff cannot address the deficiencies identified by
the court and allege facts sufficient to support the claim."
*Panther Partners Inc. v. Ikanos Commc'ns, Inc.*, 347 F.
App'x 617, 622 (2d Cir. 2009).

Upon examination of Plaintiff's proposed second amended
complaint—filed with the Court's permission following oral
argument, Dkt. 62—the Court concludes that granting leave to
amend here would be futile. The primary difference between
the operative complaint and the proposed second amended
complaint comes from Plaintiff's new allegations of bad
faith. Plaintiff asserts that Defendants "tracked Plaintiff's
growth and expansion[,] ... knew that Plaintiff planned to
open a location in New York[,] ... [and] in bad faith hastily
created [their Los Angeles location] to jump into the U.S.
market ahead of Plaintiff." Dkt. 62 ¶ 56; *see also id.* ¶
3 (accusing Defendants of "bad faith"); ¶ 78 ("Defendants
have hijacked Plaintiff's name."). [4] Plaintiff also alleges that

Defendants have recently sought trademarks in Canada, the United Kingdom, Australia, and Russia, which it posits is evidence that Defendants seek to "hijack Plaintiff's name, mark, and reputation." *Id.* ¶¶ 107–21.

**\*7**  Even accepting these allegations as true, they do not elevate Plaintiff's claims from "inherently implausible" to "colorable." 🚩 *Bank Brussels Lambert*, 305 F.3d at 126 n.2. The Second Circuit's decision in 🚩 *Buti v. Impress Perosa, S.R.L.*, 139 F.3d 98 (2d Cir. 1998) is applicable here. In that case, the defendant operated a business in Italy that he sought to expand internationally. 🚩 *Id.* at 100. He was in negotiations to expand his business to New York when the plaintiff opened his own business by the same name in Florida. 🚩 *Id.* According to the defendant, the plaintiff knew of the defendant's business and "specifically chose" to give his business the same name "despite—or because of—that knowledge." 🚩 *Id.* at 106. The Court of Appeals for the Second Circuit found this fact to be of no import. Instead, it adopted the rule previously articulated by the Federal Circuit in 🚩 *Person's Co., Ltd. v. Christman*, that " 'knowledge of a foreign use does not preclude good faith adoption and use in the United States,' absent circumstances of a 'famous' mark or a 'nominal' use 'made solely to block the prior foreign user's planned expansion into the United States.' " 🚩 *Id.* at 106–07 (quoting 🚩 *Person's Co., Ltd. v. Christman*, 900 F.2d 1565, 1570 (Fed. Cir. 1990)). Here, Defendants' alleged use of the mark—opening, promoting, and operating a Museum of Illusions for nine months before Plaintiff entered the U.S. market—cannot be deemed to be merely "nominal." And Plaintiff has not alleged that its mark is "famous." Accordingly, Plaintiff's proposed allegations of bad faith do not change the Court's conclusion that it lacks personal jurisdiction over this action. Leave to amend is thus denied.

### IV. Defendants' Motion to Transfer to the Central District of California

Defendants seek in the alternate to have this case transferred to the Central District of California. Def. Mem. at 22. "When a district court concludes that it lacks personal jurisdiction over the defendant, it may transfer the action to another district court under 🚩 28 U.S.C. § 1406(a) if it concludes that doing so would be in the interest of justice." 🚩 *DH Servs.*, 2014 WL 496875, at \*16 (internal quotation marks omitted). A court enjoys "considerable discretion" when deciding whether transfer is appropriate. 🚩 *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 435 (2d Cir. 2005). In making this determination, the Second Circuit considers factors including whether the transferee court would have personal jurisdiction over the defendant or whether transfer would result in a hardship to either party. *See* 🚩 *Corke v. Sameiet M. S. Song of Norway*, 572 F.2d 77, 80 (2d Cir. 1978).

The Central District of California would have personal jurisdiction because it is the principal place of business for Defendant Big Funny LLC, Graff Decl. ¶ 2, and the place where Defendants' allegedly infringing activity occurred, Am. Compl. ¶ 54. *See* 🚩 *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 924, 131 S.Ct. 2846, 180 L.Ed.2d 796 (2011) (identifying a company's principal place of business as the "paradig[m]" basis for the exercise of general jurisdiction (quoting Brilmayer et al., A General Look at General Jurisdiction, 66 TEXAS L. REV. 723, 782 (1988)) (alteration in original)). Further, the Court sees no reason why litigating in California would cause undue hardship to an international entity of Plaintiff's size. For these reasons, the motion to transfer is granted.

### CONCLUSION

For the reasons set forth above, the Court concludes that it lacks personal jurisdiction over Defendants and grants the motion to transfer this action. Plaintiff's motion for jurisdictional discovery and for leave to amend are denied. The Clerk of Court is respectfully directed to terminate the motion pending at docket entry 44, and to transfer this action to the United States District Court for the Central District of California.

SO ORDERED.

**All Citations**

Slip Copy, 2021 WL 735243

## Footnotes

1    The Court draws the facts cited in this opinion from the following sources: the Amended Complaint ("Am. Compl."), Dkt. 33; the Declaration of Defendants' employee Margarita Graff, dated April 16, 2020 ("Graff Decl."), Dkt. 47; and the Declaration of Defendants' counsel Ali Razai, dated April 30, 2020 ("Razai Decl."), Dkt. 46; as well as the accompanying exhibits, Dkt. 46 Ex. 1–5.

2    Although Plaintiff alleges that Defendants "target[ed] consumers in this judicial district with multiple marketing and promotional communications," Am. Compl. ¶ 5, this conclusory allegation lacks factual support in the pleadings and the Court will not accept it as true, *see Kavanagh v. Zwilling*, 578 F. App'x. 24, 24 (2d Cir. 2014) ("We do not accept as true conclusions unsupported by the facts alleged, legal conclusions, bald assertions, or unwarranted inferences.").

3    Jurisdiction pursuant to C.P.L.R. § 302(a)(3)(i) is predicated on the defendant regularly conducting business in the state, which Plaintiff is not claiming here. *See* Pl. Mem. at 14 (asserting that jurisdiction exists under C.P.L.R. § 302(a)(3)(ii) without mention of § 302(a)(3)(i)). The Court thus confines its inquiry to C.P.L.R. § 302(a)(3)(ii).

4    Plaintiff also seeks to bolster its claims about marketing communications by including in the proposed second amended complaint additional examples of emails from Defendants. Dkt. 62 at ¶¶ 91–100. None of these newly produced emails change the Court's conclusion that they are simply generic marketing emails sent to Defendants' entire customer mailing list, regardless of customer location. *See supra.* They thus lend no strength to Plaintiff's argument for personal jurisdiction.

**End of Document**                                     © 2023 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2023 Thomson Reuters. No claim to original U.S. Government Works.    7

KeyCite Yellow Flag - Negative Treatment

Declined to Extend by   Leerar v. WOW Air EHF,   N.D.Cal.,   September 5, 2017

2012 WL 1506052

Only the Westlaw citation is currently available.

United States District Court,

N.D. Illinois, Eastern Division.

Pavel POLINOVSKY and Ilona Polinovsky, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

BRITISH AIRWAYS, PLC, Defendants.

No. 11 C 779.

|

March 30, 2012.

**Attorneys and Law Firms**

Daniel O. Herrera, Jennifer Winter Sprengel, Chicago, IL, Vladimir M. Gorokhovsky, Law Offices of Vladimir M. Gorokhovsky, Glendale, WI, Joseph Henry "Hank" Bates, III, Carney Williams Bates Pulliam & Bowman, PLLC, Little Rock, AR, for Plaintiffs.

Anthony U. Battista, Christopher R. Christensen, Michael J. Holland, New York, NY, Brent R. Austin, Matthew J. Caccamo, Michael Lee McCluggage, Chicago, IL, for Defendants.

*ORDER*

CASTILLO, J.

**\*1** Plaintiffs Pavel and Ilona Polinovsky ("Plaintiffs") bring this putative class action against defendant British Airways PLC ("BA") for breach of contract based on BA's alleged violation of Regulation No. 261/2004 of the European Parliament and European Council ("EU 261"), that was allegedly incorporated into BA's General Conditions of Carriage ("BA's Conditions of Carriage"). Plaintiffs purchased tickets from BA for transportation from Atlanta, Georgia, to Warsaw, Poland, via a connecting flight at Heathrow Airport in London, England. (R. 1, Compl.¶ 21.) Plaintiffs were scheduled to depart Atlanta on December 17, 2010 at 8:40 p.m. on BA Flight 226 and arrive in Warsaw, via their connecting flight from London, on December 18,

2010 at 3:45 p.m. (*Id.*) Approximately five hours prior to the scheduled departure of BA Flight 226, Plaintiffs allege that they were informed that BA Flight 226 was cancelled for an unspecified reason. (*Id.* ¶ 23.)

Currently pending before this Court is BA's motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). (R. 24, Def.'s Mot.) BA's motion asserts that it is entitled to a dismissal with prejudice for the following independent reasons: (1) the Airline Deregulation Act ("ADA") preempts Plaintiffs' state law breach of contract claim predicated upon the violation of EU 261; (2) the Montreal Convention exclusively governs Plaintiffs' right to damages arising from a delay in international air transportation and preempts claims for damages under state law; (3) BA has no legal or contractual duty to compensate Plaintiffs because, pursuant to the Air Transport Agreement between the United States and European Union and BA's Conditions of Carriage, EU 261 is not the "applicable law"; (4) even if EU 261 were to apply, Plaintiffs are not entitled to seek relief in the courts of the United States because they have not exhausted their administrative remedies in the European Union pursuant to EU 261; and (5) this Court's adjudication of Plaintiffs' breach of contract claim based on EU 261 would contravene principles of international comity. (*Id.*)

The arguments by BA to support a dismissal with prejudice have all been thoroughly addressed and rejected in a comprehensive opinion authored by this Court's esteemed colleague Judge Joan Humphrey Lefkow. *See* Giannopoulos v. Iberia Líneas Aéreas de España, S.A., No. 11–775, 2011 WL 3166159 (N.D.Ill. July 27, 2011). After giving the parties notice and an opportunity to brief the issue of "why this court should not fully adopt Judge Lefkow's opinion and deny the pending motion to dismiss" and accepting supplemental briefing and oral argument by the parties, this Court concludes that there is a meaningful reason to depart from Judge Lefkow's well reasoned legal analysis of the similar issues presented in this lawsuit.

The ADA was enacted to promote "maximum reliance on competitive market forces." Morales v. Trans World Airlines, Inc., 504 U.S. 374, 378, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992). To ensure that "[s]tates would not undo federal deregulation with regulations of their own[,]" Congress included a preemption provision within the ADA. *Id.* A claim is preempted by the ADA when (1) a state has enacted or enforced "a law that (2) 'relates to' airline

rates, routes, or services, either by expressly referring to them or by having a significant economic effect upon them."

*Iberia Líneas Aéreas de España*, 2011 WL 3166159 at *2 (citing *Travel All Over the World, Inc. v. Kingdom of Saudi Arabia*, 73 F.3d 1423, 1432 (7th Cir.1996)). "State common law qualifies as a provision having the force and effect of law for purposes of the first prong of the preemption analysis." *Id.* (citing *United Airlines, Inc. v. Mesa Airlines, Inc.*, 219 F.3d 605, 607 (7th Cir.2000)). Plaintiffs' common law breach of contract claim qualifies under the first prong of this analysis and because Plaintiffs did not address the second prong in their opposition brief, they have "apparently concede[d] that the second requirement is met." *Id.* at *2. Accordingly, Plaintiffs' claim is presumptively preempted and Plaintiffs can withstand dismissal only if the claim falls under a specific ADA exception.

**\*2** Plaintiffs prevailed in *Iberia Líneas Aéreas de España* because Judge Lefkow concluded that they had satisfied one of the narrow exceptions the Supreme Court carved out to ADA preemption in *American Airlines, Inc. v. Wolens*, 513 U.S. 291, 232–33 (1995). The *Wolens* exception to preemption applies only to breach of contract claims that are based on "the parties' bargain, with no enlargement or enhancement based on state laws or policies external to the agreement." *Id.* at 233. To find that Plaintiffs' breach of contract claim against Iberia was excluded from the application of the ADA preemption provisions, Judge Lefkow relied on express terms in Iberia's contract, which explicitly stated that Iberia would provide compensation "as established in EU 261." *Iberia Líneas Aéreas de España*, 2011 WL 3166159 at *1.

In her analysis, Judge Lefkow distinguished the situation involved in *Iberia Líneas Aéreas de España* from other cases in which air services contracts did not expressly incorporate a regulation: "Unlike generic references to 'applicable law' or arguments that certain federal regulations are implicitly part of every contract, in this case, Iberia specifically refers to complying with EU 261 in its conditions of contract." *Id.* Judge Lefkow concluded that Iberia "agreed to pay compensation *as established in EU 261* " and, thus, the Iberia situation is different from those cases in which courts previously found preemption under the ADA. *Id.* (emphasis in original). In the cases distinguished and discussed by Judge Lefkow (and relied upon by BA), the key factor was that the defendant airlines had promised to abide by applicable law without specifying which particular law or body of laws was

intended. This is exactly what occurred in BA's Conditions of Carriage, upon which Plaintiffs base their breach of contract claim.

Judge Lefkow distinguished the contract at issue in *Onoh v. Northwest Airlines, Inc.*, from the Iberia's contract on the basis that the defendant in *Onoh* "had not expressly incorporated the Schengen Agreements into its contract by mere reference to the need to comply with all applicable law." *Líneas Aéreas de España*, 2011 WL 3166159 at *3 (citing *Onoh*, 613 F.3d 596, 600–01 (5th Cir.2000)). Second, as to *McMullen v. Delta Air Lines, Inc.*, Judge Lefkow noted that the defendant airline "similarly only agreed to comply with any applicable law that [was] in conflict with its international contract of carriage," leading the district court to conclude that the defendant airline had not incorporated an outside law or regulation into its contract. *Líneas Aéreas de España*, 2011 WL 3166159 at *3 (citing *McMullen*, No. 08–1523, 2008 WL 4449587, at *5 (N.D.Cal. Sept.30, 2008), *aff'd*, 361 Fed. Appx. 757, 758 (9th Cir.2010)). Lastly, as to *Buck v. American Airlines, Inc.*, Judge Lefkow found that the distinguishing factor was that the regulation at issue "was not explicitly incorporated into the contract." *Líneas Aéreas de España*, 2011 WL 3166159 at *3 (citing *Buck*, 476 F.3d 29, 36–37 (1st Cir.2007)).

**\*3** For purposes of the *Wolens* exception, the language contained in BA's Conditions of Carriage is identical to the contract language found in *Onoh* and *McMullen*. In the event of a flight cancellation, BA promised passengers to provide them with "additional assistance, such as compensation ... if required to do so by any law which may apply." (R. 1, Compl., Ex. 2, General Conditions of Carriage ¶ 9b3.) This provision makes no explicit reference to EU 261, by name or otherwise. There is no question that BA's Conditions of Carriage do not expressly incorporate EU 261 and no provision of the contract ever mentions this regulation. Unlike the plaintiffs in *Líneas Aéreas de España*, the Polinovsky Plaintiffs have not and cannot identify any provisions in BA's Conditions of Carriage explicitly providing that BA "agreed to pay compensation *as established in EU 261.*" 2011 WL 3166159 at *3 (emphasis in original).

At oral argument, Plaintiffs' counsel took the position that the differences between the BA's Conditions of Carriage and the contract at issue in *Líneas Aéreas de España* were

inconsequential because Section 9b3 of BA's Conditions of Carriage, which addresses remedies for delays and cancellations, provides: "We will give you additional assistance, such as compensation, refreshments and other care and reimbursement if required to do so by any law which may apply. We will have no further liability to you." (*See* R. 49, Min. Entry; Hr'g Tr. at 7:5–24.) According to Plaintiffs, they construe BA's Conditions of Carriage to incorporate EU 261 because Section 9b3 tracks the language of EU 261's title very closely. (Hr'g Tr. at 8:8–19.) This is far from an enforceable promise to apply EU 261. Instead, this Court concludes that this is exactly the type of generic reference that Judge Lefkow concluded would not satisfy the *Wolens* exception. Thus, this Court concludes that Plaintiffs' breach of contact claim is preempted by the ADA.

Given this result, this Court sees no need to address the other independent reasons asserted by BA to obtain a dismissal of this lawsuit.

### CONCLUSION

For all the reasons stated herein, the motion by Defendant BA to dismiss Plaintiffs' complaint with prejudice (R. 24) is granted. The Clerk of the Court is directed to enter final judgment in favor of Defendant BA and against Plaintiffs.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 1506052

---

**End of Document**

© 2023 Thomson Reuters. No claim to original U.S. Government Works.