# EXHIBIT 2

# *Shapiro v. City of Glen Cove*

United States District Court for the Eastern District of New York

May 5, 2005, Decided ; May 5, 2005, Filed

CV 03-0280 (WDW)

**Reporter**
2005 U.S. Dist. LEXIS 43276 *; 2005 WL 1076292

MARILYN SHAPIRO, Plaintiff(s), -against- THE CITY OF GLEN COVE, ANTHONY MAURINO, DANIEL RUSSELL, ROBERT GRELLA, JOHN McDOUGAL, FRANK LOVIGLIO, GLENN SHUTT and CAROL WEISS a/k/a CAROL HORVATH, Defendant(s).

**Subsequent History:** Affirmed by *Shapiro v. City of Glen Cove, 2007 U.S. App. LEXIS 12138 (2d Cir., May 22, 2007)*

**Counsel:** **[*1]** Law Offices of Thomas F. Liotti, Garden City, NY, Thomas F. Liotti, Esq., Attorney for Plaintiff.

Crowe Deegan, LLP, Glen Cove, NY, Charles G. King, Esq., Attorney for Glen Cove Defendants.

Law Offices of Elan Wurtzel, P.C., Plainview, NY, Jomarie Licata, Esq., Attorney for Carol Weiss Horvath.

**Judges:** William D. Wall, United States Magistrate Judge.

**Opinion by:** William D. Wall

# Opinion

**MEMORANDUM & ORDER**

**WALL, Magistrate Judge:**

Before the court on consent of the parties are two motions for summary judgment, the first by the "Glen Cove defendants," that is, the City of Glen Cove, Anthony Maurino, Daniel Russell, Robert Grella, John McDougal, Frank Loviglio, and Glenn Shutt, and the second by defendant Carol Weiss-Horvath. At the times relevant to this action, Maurino was the Building Department Administrator and the Chief Code Enforcement Officer for Glen Cove; Russell was a member of the Glen Cove Code Enforcement Department; Grella, McDougal, Loviglio and Shutt were Glen Cove police officers, and Weiss-Horvath (hereinafter Horvath) was a private resident of Glen Cove. For the reasons set forth herein, both motions are granted, and reasonable attorney's fees are awarded **[*2]** to defendant Horvath for her defense of the *section 1983* claims against her. The trial scheduled for May 23, 2005 is cancelled.

**BACKGROUND**

The plaintiff, Marilyn Shapiro, alleges violations of her *Fourth Amendment* rights stemming from entry by the Glen Cove defendants and the media into a building located at 19 Eastland Drive, Glen Cove, New York, that occurred on January 18, 2000. She also alleges *Fourth Amendment* violations and state law trespass by defendant Carol Horvath onto that property. The facts underlying the complaint are unusual, to say the least.

2005 U.S. Dist. LEXIS 43276, *2

Shapiro owns the building at 19 Eastland Drive ("the building"), which had been damaged in a storm in December 1992. Shapiro Revised Rule 56.1 Stmt. in Opp. to Horvath Mtn. PP2&3. On January 18, 2000, Shapiro was not living in the unfinished building, although she calls it her home. *Id.* PP2-4. It is unclear whether she had lived in it prior to the 1992 storm. According to Shapiro, she was "in the process of restoring and renovating her house to her exact specifications," but construction had ceased in 1999 or 2000. *Id.* P3; Shapiro Revised Rule 56.1 Stmt. in Opp. to Glen Cove Defs. Mtn. P5; Glen Cove Defs' Rule **[*3]** 56.1 Stmt. P5. The building was not, however, unused, inasmuch as Shapiro housed her eleven dogs there. Shapiro Revised Rule 56.1 Stmt. in Opp. to Horvath Mtn. P4. Shapiro herself resided at 18 Eastland Drive with her friend, Richard Brito. Shapiro Revised Rule 56.1 Stmt. in Opp. to Glen Cove Defs. Mtn. P2; Shapiro Aff. in Opp. P6; Brito Aff., Glen Cove Defs.' Ex. 3, P1.

The facts regarding the interior condition of the building are not in material dispute, and, based on those facts, the building was not habitable at the time of the incident, although Shapiro herself does not agree with that conclusion. The Glen Cove defendants assert, *inter alia,* that it had no sinks, bathtubs, running water, heat, or electricity, that the floors were dirt, sand and/or earth, and that the building was infested with rats. Glen Cove Defs. 56.1 Stmt. PP2-4. Shapiro disputes some of these details, but acknowledges that the building had a second floor but no staircase, and that the upper floor could only be accessed by using a ladder, and that the "interior of the home had not yet been constructed." Shapiro Rule 56.1 Stmt. in Opp. to Glen Cove Defs. Mtn. P3. As to the lack of electricity and running **[*4]** water, she testified at her deposition that electricity could be accessed through the outlets, but that there was no switch-operated lighting, and that cold water could be drawn from valves in the garage when the pipes were opened. *See* Shapiro Dep. Tr., King Ex. 1, 80:18-81:12;76:3-17. She acknowledges the presence of rats in the building, stating that all houses near water have rats, and she had the premises exterminated after the events giving rise to this lawsuit. Shapiro Aff. in Opp. PP13-14. Notwithstanding the conditions in the building, Shapiro stated at her deposition that she could have lived there, although it would have been "hard" to do so. *Id.* 75:7-8. And, despite the condition of the building and the fact that she did not actually live there, Shapiro claims that she received her mail at that address, kept valuable papers there, and considered it her home. Shapiro Rule 56.1 Stmt. in Opp. to Glen Cove Defs. Mtn. P2; Shapiro Dep. Tr. 78:11-17.

Although there is no material dispute about the general condition of the building, the parties do disagree about some of the details about what happened there on January 18, 2000. Defendant Carol Horvath, a Glen Cove resident, **[*5]** states that while she was walking her dog near the building at approximately 7:30 a.m., she heard a dog "yelping and whimpering," and believed that the animal was in distress. Horvath 56.1 Stmt. PP1, 5-6. She then walked onto Shapiro's property to investigate the sounds, and allegedly looked through an open window, but never entered the building. *Id.* at PP7-9. Horvath states that, through the window, she saw a bucket of frozen water, [1] a puppy, and a dog with a cut on its head. She observed that the structure was vacant and there appeared to be no electricity. *Id.* at PP11-15. She then went home and called the Glen Cove Animal Lovers League, who advised her to call the police, which she did. She also called Newsday to "alert them to a possible story of cruelty and abuse to animals." *Id.* at PP17-19.

In response to Horvath's allegations, the plaintiff states that Horvath could not have **[*6]** looked through a window of the building, because all of the windows on the lower portion of the house were, on January 18, 2000, opaque. Shapiro 56.1 Stmt. in Opp. to Horvath Mtn. P8. In addition to Horvath, defendants Loviglio, McDougal and Russell also claim that they looked through either a window or a pane in a glass door on that day. McDougal Dep., Glen Cove Defs.' Ex. 7, 15:11-16; Loviglio Dep., Glen Cove Defs.' Ex. 6, 16:16-25; Russell Dep., Glen Cove Defs.' Ex. 2, 24:24:8 - 26:16. McDougal explained that it was hard to see through the windows, and defendant Russell described the windows as dirty, some of them mud-encrusted, but that at least one could be seen through. McDougal Dep. 17:4-5; Russell Dep. 24:14-19. Russell's description is consistent with Shapiro's claim that she painted the windows with an opaque wash to obscure the view, but not with her claim that the view would have been entirely obscured. Shapiro Dep. 42:16-44:11.

The court notes that there is little or no evidence other than Shapiro's claim that the view was completely obscured, and at least one of the pictures of the house annexed as Shapiro's Exhibit B demonstrate that an observer could

---

[1] By all accounts, including Shapiro's, January 18, 2000 was an extremely cold day. *See* Shapiro Dep. Tr. 26:9-14.

look through the **[*7]** panes of French doors to the other side of the house, although Shapiro has not indicated when the pictures were taken. In any event, the court finds the relative opacity of the windows to be immaterial to any of the issues relevant to the motions.

As to Horvath's allegation that the dogs were barking and whimpering, Mr. Brito states that they were not making any noise when he arrived at the building around 8:00 a.m. on January 18<th> to place bags of dog waste at the curb. That was, however, half an hour after Horvath was there, and thus immaterial to whether or not she heard barking and/or whimpering. Brito Aff. P2. As to Horvath's claim that she saw a dog with a cut on its face, Shapiro admits that one of her dogs did have a cut on its face, but states that it was "healing naturally," and, because it was only the size of an almond, would not have been visible to someone looking through a window of the house. Shapiro 56.1 Stmt. in Opp. to Horvath Mtn. P25; Brito Aff. P26, Shapiro Aff. in Opp. P12. This detail, like the others, is not material. Shapiro alleges that Horvath invaded her privacy "by looking, peering, viewing and peeping into her home," but does not allege that Horvath **[*8]** went into the building. Compl. P9. Thus, Horvath either saw things through the window or she didn't, but there were, in fact, dogs in the house, and one of them, who later had to be put down, did have a cut on its face. *See* Letter of Susan Jacobsen, DMV, annexed as part of Glen Cove Defs.' Ex. 5.

Shapiro's challenge to the details of Horvath's account of how she came to look into the building appears to be related to Shapiro's claim that Horvath's involvement was motivated by her "extreme dislike" for Shapiro and an "agenda to get" Shapiro. Shapiro 56.1 Stmt. in Opp. to Horvath Mtn. P32. As explained *infra,* however, Horvath's motivation is not relevant to the claims against her, and, even assuming that she was motivated by a dislike for Shapiro, she is not liable to Shapiro on that ground.

The Glen Cove defendants report that Horvath called the Glen Cove Police Department at 8:52 a.m. on January 18, 2000 to report the presence of dogs in a building that appeared abandoned, and that police officer defendants McDougal and Loviglio arrived there at about 9:00 a.m. Glen Cove Defs. 56.1 Stmt. at PP10 & 11. Sergeant Loviglio stated that he observed through a window in a glass door **[*9]** that the inside of the house appeared uninhabitable, and both officers reported hearing dogs barking inside. *Id.* at PP11-14; Loviglio Dep. Tr. 16:16-17:13; McDougal Dep. 15:11-16.

Finding a door unlocked in the rear, the officers opened it, and immediately smelled an odor described as "horrendous." Loviglio Dep., 17:2-3; 26:16-20. McDougal Dep. 18:12-15; 21:23-24. Loviglio testified that when they entered the building, they saw some dogs, along with rats and frozen water, and a ladder going up to a loft. Loviglio Dep. Tr. 27:16-28:6; McDougal Dep. 24:2-3. Loviglio further stated that, based on the smell, he and McDougal were investigating whether there was a dead body in the building. Loviglio Dep. 29:12-30:8; McDougal Dep. 21:23, 26:19. They soon decided to call the animal shelter, however, because they were not trained to handle dogs. Loviglio Dep. 31:9-14; McDougal Dep. 30:13-14.

They also called the Glen Cove Building Department, because, in Loviglio's opinion, the site was not "normal," with rats in plain view. Loviglio Dep. 32:11-18. Individuals from the animal shelter arrived around 10:00 a.m., and representatives of the Building Department/Code Enforcement, including **[*10]** defendant Russell [2], arrived later. Russell Dep. Tr., Ex. 2, 12:6-10. Defendant Shutt apparently came to the building sometime after Loviglio and McDougal, bringing a camera. *See* McDougal Dep. Tr. 34:11. It is unclear when, or even if, Defendant Grella ever arrived. Defendant Maurino did not go to the building on January 18, 2000. *See* Maurino Dep. Tr. 109:2-9. The eleven animals were removed from the building into the custody of the Glen Cove Animal Lovers League. The animal with the cut on its face had to be put down, and the other animals were put up for adoption. Shapiro Rule 56.1 Stmt. in Opp. to Glen Cove Defs. Mtn. P48.

---

[2] Other employees of the Building Department/Code Enforcement were also at the house, including Anthony Heinlein, Norberto Cruz and Neil McNaughton, but for reasons unknown to the court, they are not defendants in this action. See Inspection Reports annexed as part of Glen Cove Defs.' Ex. 5.

Shapiro alleges that "newspaper and television media representatives were invited to the **[\*11]** raid and permitted to remain in Marilyn's home throughout the carefully orchestrated raid, in violation of the *Fourth Amendment*." Compl. P18. She specifically alleges in the Complaint that the Glen Cove defendants "invited and permitted the media to ride along with the police and other departments," (Compl. PP20-22), but Horvath states that she is the person who called Newsday and told them of possible animal abuse at the property, an assertion that is accepted by Shapiro. Horvath Rule 56.1 Stmt. P19; Shapiro Revised Rule 56.1 Stmt. P19.

Shapiro was originally charged with eleven counts of violating *section 353 of New York Agricultural and Markets Law*, which pertains to the shelter of animals. *See* Ex. 10. Those counts were later amended to eleven counts of violations of *§ 240.20(7) of the New York Penal Law*, to which Shapiro pleaded guilty on September 12, 2000. *Id.* At her allocution, she admitted under oath that she had failed to provide proper medical attention, food and water for her eleven dogs at 19 Eastland Drive. Ex. 10 at 11. She was later sentenced to perform 750 hours of community service. Shapiro Dep. Tr. 63:10-14. She has not completed the 750 hours, claiming **[\*12]** that injuries sustained in an automobile accident in December 2001 have prevented her from doing so. *Id.* 63:23-65:21. Her injuries have not, however, prevented her from continuing to work full time as an administrative law judge. *Id.* 64:17-21.

The complaint was filed on January 16, 2003, alleging that defendant Horvath wrongfully entered Shapiro's property, invaded her privacy, and trespassed on her property. Compl. PP9&10. The complaint also alleges, pursuant to *section 1983*, that Horvath and the Glen Cove defendants violated Shapiro's *Fourth Amendment* rights by conducting a warrantless search and by allowing a media ride along. Compl. PP14 ff. The defendants answered, asserting various affirmative defenses and cross claims for indemnification.

## DISCUSSION

### A. Summary Judgment Standards

"'Summary judgment is appropriate where there are no genuine disputes concerning any material facts, and where the moving party is entitled to judgment as a matter of law.'" *Jamaica Ash & Rubbish Removal Co. v. Ferguson, 85 F. Supp. 2d 174, 180 (E.D.N.Y. 2000)* (quoting *In re Blackwood Assocs., L.P. 153 F.3d 61, 67 (2d Cir. 1998)* and citing **[\*13]** *Fed. R. Civ. P. 56(c)* and *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*). In deciding a summary judgment motion, the district court must resolve all ambiguities and draw all reasonable inferences in the light most favorable to the opposing party. *See Castle Rock Entm't, Inc. v. Carol Publ'g Group, Inc., 150 F.3d 132, 137 (2d Cir. 1998)*. If there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant, summary judgment is unavailable. *See Holt v. KMI-Continental, Inc., 95 F.3d 123, 128 (2d Cir. 1996)*. The applicable substantive law determines which facts are critical and which are irrelevant. *See Anderson v. Liberty Lobby, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*.

The trial court's responsibility is "'limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution.'" *B.F. Goodrich v. Betkoski, 99 F.3d 505, 522 (2d Cir. 1996)* (quoting *Gallo v. Prudential Residential Servs., L.P., 22 F.3d 1219, 1224 (2d Cir. 1994)*). **[\*14]** When, however, there is nothing more than a "metaphysical doubt as to the material facts," summary judgment is proper. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*. "Rather, there must exist 'specific facts showing that there is a genuine issue for trial' in order to deny summary judgment as to a particular claim." *Jamaica Ash & Rubbish, 85 F. Supp. 2d at 180* (quoting *Celotex, 477 U.S. at 322*).

A moving party may obtain summary judgment by demonstrating that little or no evidence may be found in support of the non-moving party's case. "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Marks v. New York Univ., 61 F. Supp. 2d 81, 88 (S.D.N.Y. 1999)*. Where, however, evaluation of the

non-movant's proof rests on the credibility of the non-movant versus the movant, a genuine issue exists and summary judgment cannot be granted. "Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in **[\*15]** order to evaluate their credibility, summary judgment is not appropriate." *See* Wright, Miller & Kane, *Federal Practice and Procedure,* Vol. 10A, § 2726 (quoting Advisory Committee Notes to 1963 amendment of *Rule 56(e)*).


**B. Rule 56.1 Statements**

Summary judgment motions in this district are subject not only to the standards applicable to *Fed. R. Civ. P. 56(c)*, but to the Local Rules for the United States District Courts for the Southern and Eastern Districts as well. *Local Civil Rule 56.1* requires that both the movant and the opponent on a summary judgment motion submit statements of the material facts as to which they contend there are or are not genuine issues to be tried. *Loc. Civ. R. 56.1(a)* & *(b)*. As revised effective January 6, 2004, *Local Rule 56.1* requires that "the papers opposing a motion for summary judgment shall include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and, if necessary, additional paragraphs containing a separate, short and concise statement of the material facts as to which it is contended that there exists a genuine issue to be tried.  **[\*16]**  "

The rule also provides that "[a]ll material facts set forth in the statement required to be served by the moving party will be deemed admitted unless controverted by the statement required to be served by the opposing party." *Loc. Civ. R. 56.1(c)*. And, each statement of material fact by a movant or opponent "must be followed by citation to evidence which would be admissible, set forth as required by *Federal Rule of Civil Procedure 56(e)*." *Loc. Civ. R. 56.1(d)*. The plaintiff originally filed one Rule 56.1 Statement in Opposition to both motions for summary judgment, and that statement did not comply with the requirement that paragraphs in opposition be correspondingly numbered. By order dated March 14, 2005, the plaintiff was directed to file two amended statements in compliance with the rule and she did so. The court now turns to the two motions for summary judgment.


**C. Claims Against Carol Weiss Horvath:**

**1.) Did Horvath act under color of state law?**

The plaintiff has asserted claims under *42 U.S.C. § 1983*, alleging that the search of her property was unreasonable and thus violated her rights under **[\*17]** the Fourth, Fifth and Fourteenth Amendments. Compl. P14. To prevail on her *section 1983* claims, the plaintiff must show that the defendants acted under color of state law and that they deprived her of a right or rights secured by the Constitution or laws of the United States. *See Palmieri v. Lynch, 392 F.3d 73, 78 (2d Cir. 2004)*. Here, there is no dispute that the Glen Cove defendants acted under color of state law. Carol Horvath, however, argues that, as a private party, she did not act under color of state law and thus cannot be found liable under *section 1983*. The court agrees.

"'[A] private party does not act under color of state law when she merely elicits but does not join in an exercise of official state authority.'" *Serbalik v. Gray, 27 F. Supp. 2d 127, 131-32 (N.D.N.Y. 1998)* (quoting *Auster Oil & Gas, Inc. v. Stream, 764 F.2d 381, 388 (5th Cir. 1985))* (additional citations omitted); *see also Ginsberg v. Healey Car & Truck Leasing, Inc., 189 F.3d 268 (2d Cir. 1999)* (summary judgment appropriate where plaintiff has not shown evidence of state action on part of private party); *Tarkowski v. Robert Bartlett Realty Co., 644 F.2d 1204, 1208 (7th Cir. 1980)* **[\*18]**  ("A private person does not conspire with a state official merely by invoking an exercise of the state official's authority.") "[U]nder certain circumstances, a private party's joint participation with a state official in a conspiracy to deprive him of his federal rights would constitute . . . [acts] 'under color' of law for purposes of *§ 1983*." *Serbalik, 27 F. Supp. 2d at 132* (citing *Lugar v. Edmondson Oil Co., 457 U.S. 922, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982)*(internal quotation marks and punctuation omitted). A plaintiff must, however, "'allege with at least some degree of particularity overt acts which defendant[] engaged in which were reasonably related to the promotion of the claimed conspiracy.'" *Id.* (quoting *Powell v. Workmen's Compensation Bd., 327 F.2d 131, 137 (2d Cir. 1964)*).

Shapiro raises no issues of material fact as to either joint participation or an alleged conspiracy. Shapiro claims that Horvath acted jointly with the Glen Cove defendants to deprive her of her *Fourth Amendment* rights, but she does not allege in the Complaint, even in conclusory terms, that Horvath "conspired" with the Glen Cove defendants, let alone allege overt acts **[\*19]** of conspiracy with some degree of particularity. Nor would the undisputed facts allow a reasonable jury to make such a finding. Horvath admits that she entered Shapiro's property outside of the building and subsequently called the Glen Cove Animal Lovers League. Horvath Rule 56.1 Stmt. P17. An employee of the animal shelter, Liz Prentiss, told Horvath to call the Glen Cove Police Department. *See id.;* Horvath Dep. 61:17-66:7. Horvath did call the Glen Cove Police and also called Newsday. *Id.* 66:6-7; 71:10. These acts do not establish a sufficient nexus between Horvath's private conduct and state action, nor do they suggest a conspiracy, and Shapiro's arguments to the contrary are devoid of merit.

Shapiro argues that when Horvath called the police, she referred to "Liz," and the police officer on the phone said "Liz from the animal shelter?" This, Shapiro continues, indicated the police officer's familiarity with Liz "on a first name basis." Pl.'s Mem. in Opp. at 11. How the police officer's familiarity with Liz Prentiss would demonstrate that Horvath was a state actor is a mystery. According to Shapiro, Horvath replied that "Liz said you'd go in there, showing that Horvath **[\*20]** had already discussed the issue with the animal shelter." *Id.* This, Shapiro argues, "implies that Horvath was directing the police to [Shapiro's] home under the color of authority of the animal shelter, a Glen Cove agency." *Id.* at 11-12. In other words, Shapiro argues that Horvath was somehow deputized by the animal shelter when the shelter employee told Horvath to call the police department. The court finds this argument to be entirely devoid of merit, indeed, frivolous. Horvath acted as a private individual calling in a complaint, and the other grounds that Shapiro advances for finding that Horvath engaged in state action do not change that inescapable conclusion.

Horvath relies, in her argument against a finding that she was a state actor, on *Ginsberg.* Horvath Mem. in Supp. at 4-6. *Ginsberg* found that where a "police officer exercises independent judgment in how to respond to a private party's legitimate request for assistance, the private party is not 'jointly engaged' in the officer's conduct so as to render it a state actor under *Section 1983*," and Horvath argues that here, the Glen Cove defendants exercised their independent judgment. *189 F.3d at 272* **[\*21]** (citing *Alexis v. McDonald's Restaurants, 67 F.3d 341, 351 (1st Cir. 1995)*). Shapiro distinguishes *Ginsburg* on the ground that the case stands for the proposition that "a private citizen cannot be held civilly liable under *Section 1983* when police officers exercise independent judgment in response to the citizen's *legitimate* complaint," and that here, the legitimacy of Horvath's complaint is suspect. *Id.* at 10-11 (emphasis in plaintiff's papers). In fact, any question of whether Horvath's complaint about Shapiro's dogs was legitimate was answered by Shapiro's admission under oath at her allocution that she had failed to provide proper medical attention, food and water for her eleven dogs at 19 Eastland Drive. Ex. 10 at 11. Moreover, there is no question that one of the dogs did have a serious cut on its face, precisely as Horvath observed, and had to be euthanized, although Shapiro maintains that the cut was exacerbated by the events on January 18, 2000, and that prior to that, it was healing "naturally," that is, "without any medical intervention" by a veterinarian. Shapiro 56.1 Stmt. in Opp. to Horvath Mtn. P25.

Shapiro next argues that Horvath "really **[\*22]** sought police assistance to redress a private dispute," because, as a Glen Cove property owner, Horvath was affected by a lawsuit Shapiro had initiated. Pl.'s Mem. in Opp. at 12. This, Shapiro claims, demonstrates Horvath's animus against Shapiro, such that the complaint to the police was motivated by a private dispute, not by any legitimate claim. As noted earlier, Horvath's complaint about the dogs was legitimate, as Shapiro's own sworn statement proves, and there is no evidence outside of Shapiro's own conjecture that Horvath sought the assistance of the Glen Cove defendants for her own ends rather than to seek aid for the dogs. In any event, whatever motivation Horvath may have had in calling in the complaint and alerting the media is irrelevant to the question of whether she was a state actor. Moreover, Shapiro has not pointed to any evidence of a "custom, practice or policy" on the part of any of the state actors to aid Horvath in pursuing her own ends, which might raise a question of fact. *See Ginsberg, 189 F.3d at 271.*

Nor does Horvath's call to the media render her a state actor. In calling Newsday, Horvath exercised her *First Amendment* rights, and there **[\*23]** is no evidence that she made that call in concert with the other defendants or as their agent, even if, as Shapiro contends, Horvath informed the police after the fact that she had called "Liz" to

report her call to Newsday. *See* Pl.'s Mem. in Opp. at 12. This does not, as Shapiro argues, show Horvath's "intent to organize public and private agencies in a concerted effort to deprive Marilyn of her *Fourth Amendment* rights." *Id.* It merely shows that a private citizen followed up on a complaint she had made.

All of the evidence here leads to the inevitable conclusion that the Glen Cove defendants exercised independent judgment in responding to a private party's legitimate request for assistance, and the private party, Horvath, was not jointly engaged in the Glen Cove defendants' conduct so as to render her a state actor under *section 1983*. The plaintiff has demonstrated no material issue of fact as to whether Horvath acted under color of state law to challenge that conclusion. Thus, summary judgment is granted to Horvath on all of the *section 1983* claims set forth in the complaint against her, and she is awarded reasonable attorney's fees in connection with those claims, as detailed **[*24]** *infra.*

**2.) The state law trespass claim against Horvath:**

Shapiro also claims that Horvath trespassed on her property in violation of state law. Horvath admits entering onto Shapiro's property and looking through a window. "Liability for civil trespass requires the factfinder to consider whether the person, without justification or permission, . . . intentionally entered upon another's property." *Long Island Gynecological Servs., P.C. v. Murphy, 298 A.D.2d 504, 504, 748 N.Y.S.2d 776 (2d Dep't 2002)*. The defense of justification, Horvath argues, "essentially requires that the harm avoided must clearly outweigh the harm done." *People v. Scutari, 148 Misc. 2d 440, 442, 560 N.Y.S.2d 943 (Nass. Cty. Dist. Ct. 1990)*. Horvath further argues that her entry onto Shapiro's property was justified because she entered it only in response to the sounds of the dogs' yelping and whimpering, which were sounds of "danger and distress," and that she did no harm to the property whatsoever. Horvath Mem. in Supp. at 9. Her limited entry onto the property, she continues, led to "the rescue and safety of animals that were inhumanely harbored and neglected," and the justification defense thus applies **[*25]** here. *Id.*

In *Scutari,* the court applied a justification defense in the context of a criminal trespass charge. Under *New York Penal Law § 35.05(2)*, the defense has two elements: "1. that the conduct was necessary as an emergency measure to avoid the imminent public or private injury which is about to occur through no fault of the defendants, and 2. that according to ordinary standards of intelligence and morality, avoiding such public or private injury is clearly more desirable than avoiding the harm sought to be prevented." *Scutari, 148 Misc. 2d at 442* (citing *N.Y. Penal Law § 35.05(2)*). The court explained that "the threat of imminent harm must clearly outweigh the harm done, and that the relevant introductory notes indicate that "the justification defense should be given the broadest possible scope." *Id.* (citing *People v. McManus, 67 N.Y.2d 541, 496 N.E.2d 202, 505 N.Y.S.2d 43 (1986)*).

Here, the plaintiff has not raised an issue of material fact as to Horvath's claim that she heard dogs barking and whimpering and thought they were in danger, and Horvath has established the "imminent private injury" requirement. And, **[*26]** according to ordinary standards of intelligence and morality, avoiding harm to animals is more desirable than avoiding the harm to be prevented, here, looking through Shapiro's window, a minimal trespass onto private property. There is no allegation that Horvath entered the building at 19 Eastway Drive or did any harm to Shapiro's property when she walked on it. And, despite Shapiro's argument to the contrary, her admission that the dogs had been improperly cared for supports Horvath's defense of justification, because the harm avoided - distress to the eleven animals- outweighs the harm done - a de minimis entry onto another's property.

Shapiro has suggested no "reasonable legal alternative" to the de minimis trespass committed by Horvath, and the court finds none. She believed that an animal might be in need of immediate help, and looked in the building to see if that was the case. She did not exacerbate the trespass by entering the building, but immediately turned to the reasonable legal alternative of calling the Animal League and the police. Under these circumstances, the court finds that the trespass was justified as a matter of law.

Shapiro argues that the outcome of the criminal **[*27]** action against her does not justify the means by which Horvath obtained the information she relayed to the police. The court does not agree. Shapiro questions the application of *Scutari,* a criminal trespass action, to this, a civil trespass claim. Pl.'s Mem. in Opp. at 10. The court recognizes that the justification defense arises in the criminal context, but finds no good reason not to apply the

2005 U.S. Dist. LEXIS 43276, *27

reasoning of *Scutari* in the civil context of this motion, and Shapiro has presented none. Thus, because the trespass was so minimal, with so little, if any, harm done, and because that minimal trespass was justified by all the circumstances, the court grants summary judgment to Horvath on the state law trespass claim.

**D. *Fourth Amendment* Claims against the Glen Cove Defendants:**

The plaintiff claims that the Glen Cove defendants violated her *Fourth Amendment* rights by "executing an unjustified, warrantless invasion on her home and property and by allowing the press and other media to ride along on the search and to remain in and on her property throughout the raid." Pl.'s Mem. in Opp. at 13. The defendants argue that no rights were violated and, in their motion papers, invoke **[*28]** the defense of qualified immunity. The court turns first to the unreasonable search claim.

**1.) Unreasonable Search**

The *Fourth Amendment* protects people from unreasonable searches. *Anobile v. Pelligrino, 303 F.3d 107, 119 (2d Cir. 2001)*. The touchstone of the *Fourth Amendment* is reasonableness. *Florida v. Jimeno, 500 U.S. 248, 250, 111 S. Ct. 1801, 114 L. Ed. 2d 297 (1991)*. "What a citizen is 'assured by the *Fourth Amendment* . . . is not that no government search of his house will occur' in the absence of a warrant or an applicable exception to the warrant requirement, 'but that no such search will occur that is unreasonable.'" *United States v. Lovelock, 170 F.3d 339, 343-44 (2d Cir. 1999)* (quoting *Illinois v. Rodriguez, 497 U.S. 177, 183, 110 S. Ct. 2793, 111 L. Ed. 2d 148 (1990)* and citing *Jimeno, 500 U.S. at 250*).

The unreasonableness of a search is "gauged in part by the degree of expectation of privacy and the intrusiveness of the search." *Anobile, 303 F.3d at 119* (citing *Lovelock, 170 F.3d at 345*). "'To determine reasonableness, the court must balance the intrusiveness of the search on the individual's *fourth amendment* interests **[*29]** against its promotion of legitimate governmental interests.'" *Id.* (quoting *Security and Law Enforcement Employees v. Carey, 737 F.2d 187, 201 (2d Cir. 1984)*). This court must thus look to the nature of Shapiro's *Fourth Amendment* interest in the property and any legitimate governmental interests that rendered the search reasonable.

**a.) Shapiro's *Fourth Amendment* Interest in the Property:**

The "capacity to claim the protection of the *Fourth Amendment* depends . . . upon whether the person who claims [it] . . . has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois, 439 U.S. 128, 143, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)*; *see also United States v. Fields, 113 F.3d 313, 322 (2d Cir. 1997)* ("The ultimate focus of *Fourth Amendment* analysis remains whether the defendant had a reasonable expectation of privacy in the place searched."). The claimant must demonstrate a subjective expectation of privacy that is objectively reasonable. *See United States v. Haqq, 278 F.3d 44, 47 (2d Cir. 2002)*. Shapiro claims that she had the highest level of legitimate expectation of privacy at 19 Eastway Drive because it was her home, **[*30]** and "[p]rotection of the home is the core of the *Fourth Amendment*." Pl.'s Mem. in Opp. at 13 (citing *Alderman v. United States, 394 U.S. 165, 89 S. Ct. 961, 22 L. Ed. 2d 176 (1969)*). The court agrees that "physical entry of the home is the chief evil against which the wording of the *Fourth Amendment* is directed," but finds that 19 Eastway Drive was not Shapiro's home on January 18, 2000, when the search occurred. *United States v. United States Dist. Court for the Eastern Dist. of Michigan, 407 U.S. 297, 313, 92 S. Ct. 2125, 32 L. Ed. 2d 752 (1972)*.

When asked to list the indicia of the property's status as her home at her deposition, Shapiro replied that her dogs, papers, photographs and seasonal clothing were there and that she spent most of her free time at the building, although she did not sleep, or rarely slept, there. Shapiro Dep. 77:13-78:17, 70:4-71:8. She also admitted that she did not eat there, the floors were covered with dirt and sand from various floodings (*id.* 72:13-22); there were no actual "rooms" in the building (74:10); no hot water (75:16); no sinks with running water, only valves in the garage that could be used to fill buckets with cold water (76:3-17); no working bathtub or shower, and, **[*31]** because there was no running water, no usable toilet (76:18-77:2); no refrigerator or carpets (77:3-6); no heat other than a kerosene heater (25:7-26:3); no stairs from the first to the second floor, no formal electrical system or lights that worked on switches, although, according to Shapiro, the outlets were working (50:20-21, 80:18-81:12); no bed other than an air mattress (82:3-9); and there were rats inside the building (Pl.'s Rule 56.1 Stmt. in Opp. to Glen Cove

2005 U.S. Dist. LEXIS 43276, *31

Defs. Mtn. P4). Shapiro defined a home as "a place where you are at peace and comfortable and [where] you want to be," and under that description, she identified 19 Eastway Drive as her home. *Id.* 78:11-17.

The court finds that while Shapiro may call the building her home and may subjectively consider it her home, it was not, as a matter of law, a "home" to anyone but Shapiro's eleven dogs, who do not enjoy *Fourth Amendment* protection. The property was a building site, for which Shapiro had obtained a building permit. Pl.'s Rule 56.1 Stmt. in Opp. to Glen Cove Defs. Mtn. P6. It was also a kennel, pursuant to Glen Cove City Code §§ 280-56(A) and 280-6, which provides that the "keeping of pet animals in excess of [*32] six of each kind shall constitute a kennel." *See* Ex. 5, "City Court Information," labeled GC46.

The fact that the building was not Shapiro's home does not, however, automatically lead to the finding that she lacked a reasonable expectation of privacy in regard to it. "[A] person can have a legally sufficient interest in a place other than his own home so that the *Fourth Amendment* protects him from unreasonable governmental intrusion into that place." *Rakas v. Illinois, 439 U.S. 128, 141-49, 99 S. Ct. 421, 58 L. Ed. 2d 387 (1978)*. As noted earlier, analysis of whether a *Fourth Amendment* claimant has a "legally sufficient interest," that is, whether she had a reasonable expectation of privacy, looks first to whether the claimant had a subjective expectation of privacy at the location, and next to whether society is prepared to find that expectation objectively reasonable. For purposes of this summary judgment motion, the court will assume that Shapiro had a subjectively held expectation of privacy at 19 Eastway Drive, and will focus on whether society is prepared to find Shapiro's expectation of privacy at 19 Eastway Drive to be objectively reasonable.

The inquiry is complicated by the highly [*33] unusual nature of the facts presented herein, facts that lend themselves to different phrasings of the issue. If one asks, for example, whether a person has an objectively reasonable expectation of privacy in a rat-infested construction site at which she boarded eleven dogs in sub-freezing weather but where she did not herself reside, one might expect a different answer than if the issue is phrased as whether the same person had an objectively reasonable expectation of privacy in a house with a beautifully finished exterior that was undergoing renovations necessitated by a storm seven years earlier. Semantics aside, however, there is little or no material dispute about the actual condition of the building and the use to which it was being put, and the questions of what level of privacy the owner of such a building could reasonably expect appears to be a novel one in this Circuit. [3]

[*34] Because the court has found that 19 Eastway Drive was not, on January 18, 2000, Shapiro's home, the inquiry must focus on *Fourth Amendment* analysis of non-residential locations. The facts herein demonstrate that the property at 19 Eastway Drive does not, however, fall squarely into any of the non-residential situations that have previously been considered in a *Fourth Amendment* context. The building was not curtilage (*see, e.g., United States v. Dunn, 480 U.S. 294, 300, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987)*), nor "open fields," (*see, e.g., Oliver v. United States, 466 U.S. 170, 104 S. Ct. 1735, 80 L. Ed. 2d 214 (1984)*) nor was it a commercial property (*see, e.g., New York v. Burger, 482 U.S. 691, 107 S. Ct. 2636, 96 L. Ed. 2d 601 (1987)*), nor an automobile (*see, e.g., United States v. Gagnon, 373 F.3d 230 (2d Cir. 2004)*). Shapiro herself was not a parolee (*see, e.g., United States v. Newton, 181 F. Supp. 2d 157 (E.D.N.Y. 2002)*) nor an overnight guest (*see, e.g., Minnesota v. Olson, 495 U.S. 91, 110 S. Ct. 1684, 109 L. Ed. 2d 85 (1990)*) nor a worker in a highly regulated industry (*see, e.g., Anobile v.*

---

[3] In *Peterson v. Kalmar, 1995 U.S. Dist. LEXIS 17211, *31 (N.D. Ill. Nov. 13, 1995)*, the court found that plaintiffs had a "legitimate expectation of privacy" in an unfinished house under construction, in which they had never resided, and that the law protecting that right was clearly established. Although the court did not specify that the expectation of privacy was equal to that in a home or if it was diminished, this court assumes that the *Peterson* court intended an undiminished expectation. That decision was based largely on a five factor test used in the Seventh Circuit, a test that is not used in the Second Circuit. To the extent that the ruling was based on Supreme Court precedent, the undersigned respectfully disagrees with *Peterson's* conclusions and declines to follow it, either as to the finding that the building site was entitled to the highest level of *Fourth Amendment* protection, or that such entitlement was clearly established. Further, a ruling by the Northern District of Illinois does not create "clearly established" law for defendants in this Circuit. In deciding whether a right was clearly established, the court must ask, *inter alia*, whether "the Supreme Court or the Second Circuit [had previously] affirmed the rule," not whether any court had. *Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998)*.

*Pelligrino, 303 F.3d 107 (2d Cir. 2001)*). Even though this unique set of facts does not fall into any **[*35]** of these areas, the reasoning used in regard to those non-residential situations can be applied here.

The central component of whether an individual may reasonably expect that a non-residential area should be treated as a home for *Fourth Amendment* purposes is "whether the area harbors the 'intimate activity associated with the sanctity of a man's home and the privacies of life.'" *United States v. Dunn, 480 U.S. 294, 300, 107 S. Ct. 1134, 94 L. Ed. 2d 326 (1987)* (quoting *Hester v. United States, 265 U.S. 57, 59, 44 S. Ct. 445, 68 L. Ed. 898 (1924)* (additional internal quotation and citation marks omitted). Shapiro has stated that she received mail, stored clothing, and kept papers and photographs at 19 Eastway Drive. While these are things that a person would do at her home, they could just as easily be done at a workplace or a post office box or safe deposit box or storage facility, and do not rise to the level of intimate activity intended by the Supreme Court. The same can be said of a location where a person houses her pets. Indeed, the undisputed facts reflect no "intimate activities" associated with the sanctity of home that were conducted at 19 Eastway Drive, and the court finds that Shapiro had no objectively **[*36]** reasonable expectation of the highest degree of privacy at that property. Applying the "intimate activities" standard, Shapiro had only a diminished expectation of privacy.

On the other hand, it has been held that demonstration of "dominion, control and an ability to exclude others from the place in question contributes to the expectation of a high level of privacy," and Shapiro arguably has demonstrated these three factors. *See Anobile, 303 F.3d at 120* (citing *Rawlings v. Kentucky, 448 U.S. 98, 105, 100 S. Ct. 2556, 65 L. Ed. 2d 633 (1980)*). The pictures of the house submitted by Shapiro support her claim that the exterior of the building was essentially complete, and she argues that it gave the external appearance of being an inhabited home. Nonetheless, it was not a home, and the totality of the circumstances here lead to the conclusion that although Shapiro had some expectation of privacy at the location, that expectation was significantly diminished.

The totality of circumstances here includes not only the absence of intimate activities at the location, but also the applicability of a Glen Cove City Code provision giving the Building Department Administrator the right to inspect **[*37]** the property. The Code provides that the Building Department Administrator (Maurino) has the powers "of a peace officer of the City, and in the discharge of his or her duties shall have authority, at any reasonable hour, to enter any premises, building or structure under construction or alteration." Glen Cove Defs. Rule 56.1 Stmt. P6; Glen Cove Defs.' Ex. 4, City of Glen Cove Code § 280-7. By applying for and accepting a construction permit, Shapiro implicitly accepted the City's supervision of the building site, including its right to inspect the property at any reasonable hour, thus diminishing her expectation of privacy at the site. *See Palmieri, 392 F.3d at 83*) (privacy expectation diminished where plaintiff "had applied for a construction permit and was on notice that the application process would involve some form of site inspection."); *see also Anobile, 303 F.3d at 120* (finding that notice contained in license applications informing licensees of the likelihood of a search gave rise to somewhat reduced expectation of privacy); *United States v. Newton, 181 F. Supp. 2d 157 (E.D.N.Y. 2002)*)(court analyzed extent to which parolees' **[*38]** acceptance of terms of release results in consent to searches of their residences or a diminished expectation of privacy at their residences, and cited *United States v. Knights, 534 U.S. 112, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001)*, for proposition that by agreeing to condition of probation that allowed for searches, probationer's expectation of privacy was significantly diminished). The same reasoning applies here, where Shapiro implicitly agreed to the Building Supervisor's inspections at any reasonable hour.

Thus, in evaluating Shapiro's *Fourth Amendment* claim, the court must determine whether the search was unreasonable by balancing her diminished expectation of privacy against the governmental interests at issue, and the court now turns to that balancing. *See Anobile, 303 F.3d at 119*.

**b.) Balancing Shapiro's Diminished Interests and the Countervailing Governmental Interests:**

The balancing of governmental interests against expectations of privacy has given rise to the development of several exceptions to the general rule that the *Fourth Amendment* prohibits warrantless searches, including the special needs exception and the exigent circumstances/emergency conditions exception. **[*39]** As with the analysis of the level of privacy afforded to non-residential areas, there is not a perfect fit of the cases applying these

exceptions to the unusual facts of this case, because they deal with searches of residences, not non-residential sites. The general reasoning in the exceptions cases can, however, be applied here.


**Maurino and Russell's Inspection of the Building Site**

The defendants argue that they had a right - a governmental interest - to inspect the building, a construction site, pursuant to the Glen Cove City Code, as discussed earlier. The balancing of a diminished expectation of privacy against the Building Department Administrator's express right to enter the premises to inspect for violations at any reasonable hour would inevitably result in a finding that the search was reasonable. Shapiro argues that she "expected that any inspection prior to the cessation of construction would be, as in the past, by appointment." Shapiro Rule 56.1 Stmt. in Opp. to Glen Cove Defs. Mtn. P6. Shapiro's expectation of notice, however, is not supported by any notice requirement in the Code provision. The provision, which put Shapiro on notice of the possibility of an inspection **[*40]** at any time, gave rise to a reduced expectation of privacy, and gave Building Department defendants Maurino [4] and Russell the right to be there. Shapiro's reduced expectation of privacy, balanced with the governmental interest of the Building Department in inspecting construction sites for such problems as rat infestation, and the right of the Building Department Administrator and, by implication, his agents, to enter the premises without prior notice to exercise that interest at any reasonable hour, all support a finding that the search by Russell was reasonable.


This line of argument might also be considered in the context of the special needs exception, although the defendants do not rely on that theory. "A warrantless inspection of a private dwelling by a municipal administrative officer without the consent of the owner is generally unreasonable absent specifically delineated circumstances. . . **[*41]** . However, searches pursuant to a regulatory scheme need not adhere to the usual requirements where special governmental needs are present." *Palmieri, 392 F.3d at 79-80* (internal citations and quotation marks omitted). "The circumstances in which a warrantless search of a private dwelling is deemed constitutional are narrow and specific," but here, there was no search of a private dwelling but of a building site, a situation in which there is a diminished expectation of privacy, and "[w]arrantless searches have regularly been allowed when they were conducted pursuant to some legislated regulatory scheme in situations in which there was found to exist a diminished expectation of privacy." *Id. at 79 n.3 & 79-80*. Here, the Building Department had a need to inspect the building site for serious violations, including the widespread presence of rats. Balancing that interest against the diminished expectation of privacy at the site, and the express provision in the City Code allowing for inspection at reasonable hours without notice, the court finds that, as to Maurino and Russell, the search was reasonable, and summary judgment is granted to them on the **[*42]** *Fourth Amendment* unreasonable search claim.


**The Police Officer Defendants' Search**

The police officer defendants argue that another exception to the ban on warrantless searches, the "emergency situation" doctrine as articulated in *People v. Mitchell, 39 N.Y.2d 173, 347 N.E.2d 607, 383 N.Y.S.2d 246 (1976)*, rendered their search of 19 Eastway Drive reasonable. Defs.' Mem. in Supp. at 13-16. This doctrine, which is sometimes viewed as another form of the "exigent circumstances" doctrine, and sometimes as a separate entity, has been applied to searches of homes, often in the context of the admissibility of evidence seized in warrantless searches or arrests made without a warrant. *See Mitchell, 39 N.Y.2d at 177* (citing cases); *Tierney v. Davidson, 133 F.3d 189, 196-97 (2d Cir. 1998)* (referring to the "'exigent circumstances' or 'emergency aid' exception" to the *Fourth Amendment's* warrant requirement); *see also United States v. Cervantes, 219 F.3d 882, 887-92 (9th Cir. 2000)* (distinguishing emergency doctrine as set forth in *Mitchell* from "traditional" test for warrantless searches requiring demonstration of both probable cause and exigent circumstances); **[*43]** *United States v. Bell, 357 F. Supp. 2d 1065, 1074-75 (N.D. Ill. Feb. 9, 2005)* (applying *Mitchell* emergency doctrine as an example of the exigent circumstances doctrine). The search herein was not of a home, nor was evidence seized, nor was anyone arrested, but the principles underlying the exception are useful in analyzing the reasonableness of the search.

---

[4] There is no allegation that Maurino actually appeared at the scene. He sent his employee, Russell, instead.

The emergency doctrine's requirements, as set forth in *Mitchell,* are: (1) the police must have reasonable grounds to believe that there is an emergency at hand requiring immediate assistance; (2) the primary motive of the search must not be to arrest or seize evidence; and (3) there must be a reasonable basis to believe that the search will assist in resolving the emergency. *39 N.Y.2d at 177-78.* The defendants argue that the three requirements are here met. The court finds that although this doctrine is not a perfect fit under these unusual facts, the essence of it does apply here, as part of the balancing of the diminished expectation of privacy and the governmental interests at stake. "'[P]olice officers may enter a dwelling without a warrant to render emergency aid and assistance to a person **[*44]** whom they reasonably believe to be in distress and in need of that assistance.'" *Tierney, 133 F.3d at 196* (quoting *Root v. Gauper, 438 F.2d 361, 364 (8th Cir. 1971)*) (additional citations omitted). "Courts must apply an objective standard to determine the reasonableness of the officer's belief." *Id.* (citing *Mincey v. Arizona, 437 U.S. 385, 392, 98 S. Ct. 2408, 57 L. Ed. 2d 290 (1978)*). And, this requirement "'must be applied by reference to the circumstances then confronting the officer, including the need for a prompt assessment of sometimes ambiguous information concerning potentially serious consequences.'" *Id. at 196-97* (quoting 3 Wayne LaFave, Search and Seizure § 6.6(a), at 391 (3d ed. 1996)).

Here, officers McDougal and Loviglio, the first officers to arrive at the scene [5], both testified that when they responded to Horvath's call of dogs in distress in an unoccupied building, they looked through the window and, based on what they saw, noted that the building was not a residential site. At that point, the police officers could have reasonably believed that they did not need a warrant to enter the building, which they could see was a construction site/abandoned **[*45]** house. Once they opened the unlocked back door, they were confronted with what they called a "horrendous" odor, and reasonably believed that they needed to investigate whether a dead body was in there and what role the dogs might be playing in the situation. In short, there were objectively reasonable grounds for the belief that there was an emergency requiring immediate intervention. No reasonable juror could find that police officers looking at and smelling the condition of 19 Eastway Drive, which was inhabited by an unknown number of dogs, would not reasonably believe that they needed to promptly investigate it. Moreover, there is no dispute that they were not primarily motivated by an intent to arrest or seize evidence, and the emergency was absolutely associated with the area or place to be searched. Thus, the three factors are satisfied.

 **[*46]** The plaintiff objects to the application of the emergency doctrine here, on the ground that a "911 tip is not itself sufficient to justify a warrantless entry into a home." Pl.'s Mem. in Opp. at 16 (citing *Kerman v. City of New York, 261 F.3d 229 (2d Cir. 2001)*); *see also Anthony v. City of New York, 339 F.3d 129 (2d Cir. 2003)* (distinguishing between insufficient anonymous 911 tip directing police to different location than that from which call was placed, and sufficient 911 call coming from the location to which the police responded). The plaintiff's argument must fail. First, the building was not a home. Next, the police did not base their belief that an emergency existed solely on Horvath's call, but on their own sensory experience at the building site - they saw an apparently abandoned interior, heard dogs barking, and smelled a strong and unidentified odor. The court finds that, under these circumstances, and balancing the plaintiff's diminished expectation of privacy against the governmental interest in promptly investigating an apparent emergency, that the search by the police officers was reasonable.

This is so even assuming that the officers' **[*47]** initial investigation through the windows was a trespass. Any trespass involved in looking through the windows was *de minimis,* and although "police observations made when trespassing are usually improper, it is not the trespass itself which renders them unlawful" for *Fourth Amendment* purposes. *United States v. Fields, 113 F.3d 313, 322 (2d Cir. 1997).* Under such circumstances, the "ultimate focus of *Fourth Amendment* analysis remains whether the [claimant] had a reasonable expectation of privacy in the place

---

[5] For all the motion papers and the Complaint show, McDougal and Loviglio may have been the only police officer defendants at the scene. Officer Shutt apparently brought a camera to the site at some point during the day (*see* McDougal Dep. Tr. 34:11), but the nature of Officer Grella's involvement, or whether he was even there, is not stated. "*Section 1983* imposes liability only upon those who actually cause a deprivation of rights, and thus, the 'personal involvement of [each defendant in alleged constitutional deprivations]' is a necessary element of a *Section 1983* claim." *Whiting v. Incorporated Village of Old Brookville, 79 F. Supp. 2d 133, 135-36 (E.D.N.Y. 1999).* Nonetheless, because the court finds that the police officer defendants are collectively entitled to summary judgment on several grounds, the extent of each individual police officer's involvement need not be determined.

searched." *Id.* Based on what they saw through the window and what they heard, it was reasonable for the officers to suspect an emergency situation serious enough to warrant the opening of the back door, which was unlocked. Once they opened that door and were confronted with the odor, they had further reason to believe that an emergency situation requiring prompt investigation existed.

Moreover, even if the officers lacked a basis for believing that a person was in need of emergency assistance at the site, there was ample reason to believe that the animals and or the property itself were in such need. *Mitchell* found that a warrantless search may be **[*48]** conducted under the emergency doctrine where there is a "substantial threat of imminent danger to either life, health or property." *39 N.Y.2d at 178.* Here, the police officers could have initially been unsure whether the animals in the building belonged to its owner or were wrongfully being kept there, thus representing a threat to the property itself. As to the threat to the animals themselves, the defendants rely on *People v. Rogers, 184 Misc. 2d 419, 708 N.Y.S.2d 795 (App. Term 2nd Dep't 2000),* for the proposition that police may rescue animals as well as people under the emergency exception doctrine in New York. *See* Defs.' Mem. in Supp. at 14-16. In *Rogers,* the Second Department noted *Mitchell's* holding that a warrantless search may be conducted under the emergency doctrine where there is a "substantial threat of imminent danger to either life, health or property." *184 Misc.2d at 420* (citing *Mitchell, 39 N.Y.2d at 178*). Because the protection of property is encompassed in the doctrine, the *Rogers* court found "no reason not to include therein the protection of animals which constitute property." *Id.* The court made its **[*49]** finding despite the fact that there was, at the time *Rogers* was decided, no authority in New York extending the doctrine to animals. The facts before it, the court concluded, "patently invite[d] such inclusion." *Id.* This court makes the same finding.

In *Rogers,* ASPCA officers looked through a pet shop window, saw dead animals, and heard "plaintive" barking from inside the store. "Based upon the dead animals and barking dog, it was highly probable that there were living creatures inside the store which required emergency medical attention." *Id. at 421.* The plaintiff here argues that *Rogers* is distinguishable from the instant facts, because in *Rogers* the police responded to a complaint that dead animals were visible through the front window of the store, and there were no dead animals visible through Shapiro's windows. The court finds that distinction irrelevant to the application of the doctrine. Although the officers saw no dead animals when they looked into the house, they did see dogs, rats and frozen water when they went into the house, and reasonably believed that there were animals in need of emergency help. And, the fact that they called the Animal **[*50]** League to assist them does not alter that conclusion.

As the court has noted throughout this analysis, although these odd facts do not fit perfectly into any *Fourth Amendment* jurisprudence, the rationales found in that jurisprudence compel the finding that the search was reasonable. And even if the search were found to be unreasonable and Shapiro's constitutional rights violated, the defendants are entitled to the entry of summary judgment on the basis of qualified immunity, as explained *infra,* on the grounds that the applicable law was not clearly established, and, even if it was, it was objectively reasonable for the defendants to believe that their actions were legal.

## 2. Qualified Immunity Defense Applied to the Unreasonable Search Claim:

The defense of qualified immunity "shields government officials from liability for civil damages as a result of their performance of discretionary functions, and serves to protect government officials from the burdens of costly, but insubstantial lawsuits." *Lennon v. Miller, 66 F.3d 416, 420 (2d Cir. 1995)* (citations omitted). The doctrine of qualified immunity is intended to strike a balance "'between the need, **[*51]** on one hand, to hold responsible public officials exercising their power in a wholly unjustified manner and, on the other hand, to shield officials responsibly attempting to perform their public duties in good faith from having to explain their actions to the satisfaction of a jury.'" *Locurto v. Safir, 264 F.3d 154, 162-63 (2d Cir. 2001)* (quoting *Kaminsky v. Rosenblum, 929 F.2d 922, 924-25 (2d Cir. 1991)*). Qualified immunity shields them from liability "'if their actions were objectively reasonable, as evaluated in the context of legal rules that were clearly established at the time.'" *Loria v. Gorman, 306 F.3d 1271, 1281 (2d Cir. 2002)* (quoting *Poe v. Leonard, 282 F.3d 123, 132 (2d Cir. 2002)* (internal quotation marks omitted)). "Qualified immunity is more than a simple defense -- it is 'an entitlement not to stand trial or face the other burdens of litigation, . . . an immunity from suit rather than a mere defense to liability; and like an absolute

2005 U.S. Dist. LEXIS 43276, *51

immunity, it is effectively lost if a case is erroneously permitted to go to trial.'" *Id.* (quoting *Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985)*). **[*52]**

Analysis of a qualified immunity defense requires a multi-stage inquiry. The first question is whether, "'taken in the light most favorable to the party asserting the injury, . . . the facts alleged show the officer's conduct violated a constitutional right.'" *Id.* (quoting *Saucier v. Katz, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001)*). If so, the court next asks whether the right claimed to have been violated was clearly established at the time it was infringed. *See id.* Where the right is clearly established, the next prong of the inquiry asks whether the defendants' conduct was still objectively reasonable given the circumstances. *See id.* Here, for all the reasons set forth above, this court has found that the defendants did not violate Shapiro's constitutional rights under the *Fourth Amendment*, and the inquiry could stop there. The court will nonetheless proceed to the next levels. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id. at 1281-82* (quoting *Saucier, 533 U.S. at 202*) (additional citations **[*53]** omitted). In other words, if a defendant violated a right, the court must "analyze the objective reasonableness of the [defendant's] belief in the lawfulness of his actions." *Id. at 1282* (citing *Poe, 282 F.3d at 133*). If he reasonably believed that his actions did not violate the plaintiff's rights, he is entitled to qualified immunity even if that belief was mistaken.

The court thus turns to the question of whether the right that Shapiro claims was violated was clearly established on January 18, 2000. "The matter of whether a right was clearly established at the pertinent time is a question of law." *Kerman v. City of New York, 374 F.3d 93, 108-09 (2d Cir. 2004)*. The first issue that the court must address is what right Shapiro claims was violated. She frames the issue as a violation of her rights based on an expectation of the highest level of privacy, that is, the level accorded to a home. Thus, one part of the analysis must look to whether, in January 2000, it was clearly established that a building such as Shapiro's was a home for *Fourth Amendment* expectation of privacy purposes. The second part of the analysis must ask whether, even if **[*54]** Shapiro had only a diminished expectation of privacy, it was clearly established in January 2000 that the search that took place was unconstitutional. The answer to both parts of the analysis is no - neither right was clearly established at that time.

For a right to be clearly established, "the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. In deciding whether a right was clearly established at the time of the relevant acts, the court must ask: "(1) Was the law defined with reasonable clarity? (2) Had the Supreme Court or the Second Circuit affirmed the rule? and (3) Would a reasonable defendant have understood from the existing law that the conduct was unlawful?" *Young v. County of Fulton, 160 F.3d 899, 903 (2d Cir. 1998)* (citing *McEvoy v. Spencer, 124 F.3d 92, 97 (2d Cir. 1997)*). Typically, the Second Circuit puts "significant weight on whether the law was governed by controlling precedent" in this Circuit. *Id.* Even in the absence of binding precedent, however, "a right is clearly established if 'the contours of the right [are] sufficiently clear that **[*55]** a reasonable official would understand that what he is doing violated that right . . . . The unlawfulness must be apparent." *Id.* (citing *Anderson v. Creighton, 483 U.S. 635, 640, 107 S. Ct. 3034, 97 L. Ed. 2d 523 (1987)*). "The question is not what a lawyer would learn or intuit from researching case law, but what a reasonable person in a defendant's position should know about the constitutionality of the conduct." *Id.*

As noted earlier, there is a dearth of factually analogous cases from the Second Circuit or the Supreme Court as to whether a building such as the one at 19 Eastway Drive should be considered a home entitled to the highest degree of privacy. The Second Circuit has stated that, because law develops through analogies, "'many decisions will apply general principles of constitutional law to facts that closely track, without being identical to, the facts of previous cases.'" *Lauro v. Charles, 219 F.3d 202, 215 (2d Cir. 2000)*(quoting *Anderson, 483 U.S. at 640*). Applying general principles of constitutional law to the facts of previous cases (although those facts did not closely track, and certainly were not identical to, the facts herein) this court **[*56]** found that the building cannot be considered a home. Although that conclusion could be found to be erroneous by an appellate court, it seems clear to this court that, at the very least, it was not clearly established that the building was a home and no reasonable defendant would have understood from the existing law that it was.

As to the question of whether it was clearly established that the search was unconstitutional even under a diminished expectation of privacy standard, this court reaches the same conclusion. In *Wilson v. Layne, 526 U.S.*

*603, 615, 119 S. Ct. 1692, 143 L. Ed. 2d 818 (1999)*, the Supreme Court held that although the general principle of the *Fourth Amendment* - "to preserve the right of privacy to the maximum extent consistent with reasonable exercise of law enforcement duties - . . . is well-established, that principle in itself is not enough to warrant a finding that any particular violation of the principle should be clear to a reasonable police officer." *See also Lauro v. Charles, 219 F.3d 202, 215 (2d Cir. 2000)* (analyzing *Wilson*). Of course, as the Second Circuit recognized in *Lauro,* liability for constitutional violations does not require that "'the **[*57]** very action in question has previously been held unlawful.'" Instead, as noted *supra,* because law develops through analogies, "many decisions will apply general principles of constitutional law to facts that closely track, without being identical to, the facts of previous cases," in order to determine whether a principle of law should have been apparent to government officials. *Lauro, 219 F.3d at 215* (quoting *Anderson, 483 U.S. at 640*). "If the unconstitutionality of an action is 'apparent' - when compared to actions previously held to be unlawful - because the same right is set forth in an earlier case with the specificity required by *Wilson,* qualified immunity is not appropriate." *Id.*

The "appropriate inquiry is, therefore, how closely analogous" the Glen Cove defendants' search of the building was when compared to searches involving significantly diminished expectations of privacy that had been held unconstitutional at the time the events took place, that is, in January 2000. Here, the unconstitutionality of the defendants' alleged acts was not apparent, because there is a void of factually analogous cases, and the principles underlying **[*58]** searches in other non-residential settings, as set forth in cases such as *Dunn,* strongly support a finding that the search was reasonable.

To repeat was has been said earlier, the building site at issue here falls into no category that has previously been analyzed for *Fourth Amendment* protection in this Circuit or by the Supreme Court, at least in any reported case that this court has found. 19 Eastway Drive was not commercial premises or a car or a barn or a part of the curtilage of Shapiro's home. When the officers who arrived at the house looked in, it was apparent to them that the house was not occupied even though dogs were there. When Officer Loviglio first looked through the window of the house, he observed that it appeared uninhabitable, and he was able to enter through a door that had been left unlocked. When he and officer McDougal opened the door, they smelled an offensive odor which further supported an inference that the building was not a home. They had no reason to believe that the full protection of the *Fourth Amendment* afforded to homes was applicable at 19 Eastway Drive, and there was no clearly established law that would have led to that belief. Whatever reasonable **[*59]** expectation of privacy Shapiro was entitled to at the premises under the *Fourth Amendment,* whether equal to that afforded to homes or at some diminished level, the court finds that the law was not clearly established at the time of the events, and the Glen Cove defendants are entitled to qualified immunity on the unreasonable search claim on that ground.

Further, even assuming for purposes of this motion that the building was entitled to full *Fourth Amendment* protection, the court finds that it was objectively reasonable for the police officers to believe that their actions were legal. "[W]hen the facts that bear on the circumstances are not in dispute, the issue of whether the defendants acted reasonably should be determined by the court on a motion for summary judgment." *Tierney v. Davidson, 133 F.3d 189, 194-95* (citing *Lennon v. Miller, 66 F.3d 416, 422 (2d Cir. 1995)* ("[I]n the absence of a material factual dispute, the question of whether it was objectively reasonable for the officers to believe that they did not violate the plaintiff's rights is a purely legal determination for the court to make.") There are no material disputes of fact as **[*60]** to the actions of the defendants for the purposes of the qualified immunity claim, and the issue is thus a purely legal one, to be determined by the court. *Id.* For all the reasons stated *supra,* the court finds that it was objectively reasonable for the police officers to believe that their actions were legal.

To recap those reasons: the ultimate question is whether the search was reasonable under the circumstances. Unreasonableness of a search is "gauged in part by the degree of expectation of privacy and the intrusiveness of the search." *Anobile, 303 F.3d at 119.* To determine reasonableness, "'the court must balance the intrusiveness of the search against its promotion of legitimate governmental interests.'" *Id.* (citing *Sec. and Law Enforcement Employees, 737 F.2d at 201*). "This balancing is done by considering an individual's expectation of privacy and the governmental interest under a 'totality of the circumstances' approach." *Id.* (quoting *United States v. Knights, 534 U.S. 112, 122 S. Ct. 587, 151 L. Ed. 2d 497 (2001)* & citing *Ohio v. Robinette, 519 U.S. 33, 117 S. Ct. 417, 136 L. Ed. 2d 347 (1996)*). Here, the degree of expectation of privacy was significantly lessened **[*61]** because the

2005 U.S. Dist. LEXIS 43276, *61

building was not a home, but a building site and kennel, and the defendants argue that there was a governmental interest in searching the property, based on the Glen Cove City Code and on the "emergency exception to the *Fourth Amendment*." Defs.' Mem. in Opp. at 13-16. Under all of these circumstances, the court finds that the police officer defendants had an objectively reasonable belief that they could enter the property without a warrant and stay as long as they needed to complete their work.

Thus, the court grants the Glen Cove defendants' motion for summary judgment as to the *Fourth Amendment* unreasonable search claim.

### 2.) The media ride-along claim:

Shapiro claims that her *Fourth Amendment* rights were also violated by a "media ride-along." Specifically, she alleges that media presence on her "property and inside her home during the . . . warrantless search constitutes a gross violation" of her *Fourth Amendment* rights. Pl.'s Mem. in Opp. at 18. Plaintiff cites to *Wilson* for the proposition that "it is a violation of the *Fourth Amendment* for police to allow the media to remain in someone's house when 'the presence of reporters inside the home [is] not **[\*62]** related to the objectives of the authorized intrusion.'" *Id.* at 19 (citing *Wilson*). In *Wilson,* the law enforcement defendants brought media personnel into the plaintiffs' home to observe and record the execution of an arrest warrant, and the plaintiffs, the parents of the man named in the warrant, claimed that their *Fourth Amendment* rights had been violated. *526 U.S. at 607-08*. The Court held that "it is a violation of the *Fourth Amendment* for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant." *Id. at 614*.

In the Complaint, Shapiro alleges both that the Glen Cove defendants invited the media into her property and that they permitted the media, including newspaper reporters and television or other video reporters, to enter into and remain in Shapiro's home, taking photographs and making notes for their stories. Comp. PP20-22. The photographs and notes were, she continues, "subsequently published in local, county and state newspapers." *Id.* P23. Further, the media were allegedly allowed **[\*63]** up into the second story to go through her personal possessions and belongings [6] and the Glen Cove defendants "directed the press and media" into the house. *Id.* PP24, 30. It is now undisputed that the Glen Cove defendants did not invite the media to Shapiro's property, but that Horvath did.

In their motion papers, the defendants argue that there is no admissible evidence of media presence, a claim that Shapiro disputes. She points to the deposition testimony of Richard Brito, the friend with whom she lives. He testified that, after the search, he "saw a Channel 12 brief report, cameras inside the house. There were also photographs by various print media showing pictures inside the house." Brito Dep. Tr., Ex. 3, 22:12-17. He also stated at his deposition that he was contacted by a reporter from Newsday who "talked about being inside the house." *Id.* 23:8-11. In **[\*64]** his Affidavit in Opposition to the motion, Mr. Brito states that he observed "the media and press going in and out of the plaintiff's home and wandering about the plaintiff's property." Brito Aff. in Opp. P2. He further states that he saw "at least 4 media concerns and 2 news trucks at and in and on the plaintiff's property." *Id.* P3. He alludes to a hand-drawn map of Shapiro's property that illustrates the "gathering of the media," but the court could not locate such a map in the record. *See id.*

At Brito's deposition, which took place on March 9, 2004, he testified that there were "reporters, TV, media trucks" at the building (Brito Dep. Tr., Def. Ex. 3, 7:2-3; 23:2-24:3) but that he "could not see from the outside of the building, identify a reporter going in and out of the house" (*id.* 24:14-16) and he could not specifically identify any media other than two media trucks with antennae on their roofs (*id.* 9:20-10:4). He also testified that he did not see anyone carrying video cameras into the house. *Id.* 38:7-18. He himself did not enter the building that day, other than to go there at 8:00 a.m. in the morning. *Id.* 11:4-18. Finally, he testified that he did **[\*65]** not believe that the Glen

---

[6] There is no evidence at all of this allegation in the record, and the court does not consider it in its analysis of the *Fourth Amendment* claims.

2005 U.S. Dist. LEXIS 43276, *65

Cove defendants had invited the media to the premises on January 18, 2000, but that Horvath had done so. *Id.* 25:18-23. Indeed, he believed that the police were put out by Horvath's contacting the media. *Id.* 25:23-26:2.

Also in the record are copies of photographs that appeared with media reports of the incident. One that appeared in Newsday on January 19, 2000 shows a picture of a dog in a crate, described as being taken from "a Glen Cove mansion." It does not depict any part of the interior of the building, and there is no way of telling where or when it was taken, other than that it was taken after the dog was caged for removal from the building. Defs.' Ex. 11. Another photo, which appeared in the Gold Coast Gazette in the Week of January 20, 2000 issue, shows defendant Jack McDougal holding one of the dogs "rescued from the house." It is unclear exactly when or where that photo was taken. *Id.* The third photo, also published in the Gold Coast Gazette, is almost entirely obscured in the copy that the court has before it, but the caption under it reads "To the right of the photo are two large wash basins were [sic] filled to the top with food.  **[*66]**  Other basins were filled with water, which froze. A black lab can be seen in the back." *Id.* While the caption suggests that the photo may have been taken inside the house, that cannot be ascertained, and the article that accompanies the photo describes the interior condition of the home primarily with quotes from defendant Maurino. *Id.* Moreover, the defendants maintain that the photo was taken not by the media, but by the police. Defs.' Mem. in Supp. at 18. There are no photos of Shapiro herself in the record, and none could have been taken on January 18, 2000 because she was not there.

Based on this record, the defendants assert that the plaintiff has not pointed to "one admissible fact" regarding the presence of media <u>in</u> her house. While the evidence on this issue is sparse, the court finds that Mr. Brito's sworn statements raise a material issue of fact as to whether media people were in the building. Although his statement about what the Newsday reporter said is hearsay, his statements about his own observations are not. And, although it would be desirable at this stage of the litigation for the plaintiff to have come forward with more tangible proof of the media presence,  **[*67]**  for example, copies of the alleged photographs of the house's interior or an affidavit from someone in the media with first-hand knowledge of their presence, Mr. Brito's statements suffice at this stage to raise a material issue of fact as to whether the media were actually present inside 19 Eastway Drive on January 18, 2000. That, however, does not end the inquiry.

Although there is an issue of material fact as to whether the media were present in the building, the court must also look to whether there is any issue of material fact as to the defendant's invitation of the media onto the premises or "direction" of the media as alleged in the complaint. The record is devoid of any evidence that they either invited or directed the media. Indeed, Horvath admits to having called Newsday, and the plaintiff has pointed to no admissible evidence to the contrary. The evidence that the police and the media were in the building at the same time is also extremely sparse, consisting primarily of Mr. Brito's testimony that the police seemed "put out" by the media's presence, which suggests to a slight degree contemporaneous presence in the building. Brito Dep. 25:23-26:2. Allowing the plaintiff **[*68]**  the inference that the media and the Glen Cove defendants were at the building at the same time, for purposes of this motion, the court will accept the plaintiff's allegation that media personnel were at 19 Eastway Drive, and will consider Shapiro's claim to be that a *Fourth Amendment* violation occurred because the Glen Cove defendants allowed the media to remain there unhindered and to photograph or videotape the premises, but will not consider the earlier allegations that the police invited or directed the media's activities in the building.

Assuming those facts, the court turns to the qualified immunity defense regarding this claim. The threshold issue is whether the defendants violated Shapiro's *Fourth Amendment* rights by allowing the media to remain in the building where Shapiro was not herself present and in which she had a diminished expectation of privacy. *Wilson* held that "it is a violation of the *Fourth Amendment* for police to bring members of the media or other third parties into a home during the execution of a warrant when the presence of the third parties in the home was not in aid of the execution of the warrant." *526 U.S. at 614*; *see also* *Hanlon v. Berger, 526 U.S. 808, 119 S. Ct. 1706, 143 L. Ed. 2d 978 (1999)* **[*69]**  (decided the same day as *Wilson,* and applying the holding in *Wilson* to media presence during the search of a 75,000 acre ranch). Here, of course, there was neither a home nor a warrant, but the Second Circuit has considered the applicability of *Wilson* to non-analogous media ride-along claims. In *Lauro,* the Court considered whether a staged "perp walk," arranged for the benefit of the press and that served no other law enforcement purpose, violated the *Fourth Amendment*. The Court determined that it did, looking to *Wilson* for guidance, and

2005 U.S. Dist. LEXIS 43276, *69

articulating the approach to be used when confronted, as here, with an alleged *Fourth Amendment* violation that has not been previously considered by the court.

The Second Circuit has found, in the context of a media ride-along claim, that a "*Fourth Amendment* examination . . . requires a contextualized reasonableness analysis that seeks to balance the intrusion on privacy caused by law enforcement against the justification asserted for it by the state." *Lauro, 219 F.3d at 209*. "[T]he *Fourth Amendment's* proscription of unreasonable searches and seizures 'not only . . . prevents searches and seizures that would **[*70]** be unreasonable if conducted at all, but also . . . ensures reasonableness in the manner and scope of searches and seizures that are carried out.'" *Id.* (quoting *Ayeni v. Mottola, 35 F.3d 680, 684 (2d Cir. 1994)*). Here, the media activity at Shapiro's building would be, if anything, an unreasonable seizure of images of the interior of the building, rather than a search. *See Caldarola v. County of Westchester, 343 F.3d 570, 574-75 (2d Cir. 2003)* (citing *Ayeni, 35 F.3d at 688-89*, for proposition that television crew's "video and sound recordings [of the execution of a search warrant] were 'seizures' under the *Fourth Amendment*.)) This court has already determined that the search of the building was reasonable and did not violate the plaintiff's *Fourth Amendment* rights, and must thus now consider whether the "seizure" of photographs by the media personnel that were allegedly allowed into the building by unspecified Glen Cove defendants was itself reasonable in the context in which the alleged seizure occurred. Put another way, the court must ask if the media's presence "intruded upon interests protected by the *Fourth Amendment*," and **[*71]** if it did, "was it nevertheless reasonable in light of legitimate law enforcement purposes?" *Lauro, 219 F.3d at 211*.

Here, any intrusion on Shapiro's privacy interests caused by the media was so minimal that it did not result in a violation of her *Fourth Amendment* rights. In *Lauro*, the Second Circuit recognized that the two relevant media ride-along cases prior to *Lauro*, that is, *Wilson* and *Ayeni v Mottola*, [7] a Second Circuit decision rendered in 1994, "emphasized the sanctity of the private home and the particular gravity the *Fourth Amendment* accords to governmental intrusions on that privacy," but cautioned that it is not the case that "the holdings in *Ayeni* and *Wilson* turned solely on the special status of the home, or that the *Fourth Amendment's* privacy protections end at the door of one's house." *Lauro, 219 F.3d at 211*. This is not to say, however, "that the place where police conduct occurs is irrelevant to our analysis of whether that conduct violates a privacy right under the *Fourth Amendment*. Far from it. But it cannot be determinative." *Id.* An individual is free from unreasonable governmental intrusion wherever **[*72]** he harbors a reasonable expectation of privacy, but "[o]f course, the specific content and incidents of this right must be shaped by the context in which it is asserted. . . . The question is whether in all the circumstances . . ., his right to personal security was violated by an unreasonable search and seizure." *Id.*

Considering context, the court is mindful **[*73]** that "[A]lthough the *Fourth Amendment* protects people, not places, . . . expectations of privacy can vary, depending on circumstances and location." *Caldarola, 343 F.3d at 575* (internal quotations and citations omitted). And, the "reasonableness of an individual's expectation of privacy will vary in accordance with the circumstances of a given seizure." *Id.* Absent here, as in *Caldarola*, is the "very high degree of privacy protection" afforded to a person in her home. *Id.* As explained in detail *supra*, Shapiro's expectation of privacy in the building was diminished, and, unlike the plaintiffs in *Ayeni, Wilson, Lauro*, and *Caldarola*, [8] she was not present during the media intrusion, and there were no pictures taken of her at all. The pictures in the record before the court are of the dogs and some water and food containers, subjects which do not rise to a level of

_____

[7] In support of her media ride-along claim, Shapiro also relies on *Hanlon v. Berger, 526 U.S. 808, 119 S. Ct. 1706, 143 L. Ed. 2d 978 (1999)*, a case decided on the same day as *Wilson. Lauro* did not discuss *Hanlon*, which applied the holding in *Wilson* that "police violate the *Fourth Amendment* rights of homeowners when they allow members of the media to accompany them during the execution of a warrant in their home." *526 U.S. at 810. Hanlon* involved media presence during the search of a 75,000 acre ranch at which the plaintiffs Mr. & Mrs. Berger, resided. Unlike Shapiro, the Bergers lived at the search site and were present during the search.

[8] As noted earlier, the residents of the large ranch searched in *Hanlon*, Mr. & Mrs. Berger, were also present during that search, although it is not clear whether they appeared in any of the pictures that were subsequently broadcast. *See Berger v. Hanlon, 129 F.3d 505 (9th Cir. 1997)*, *vacated and remanded, Hanlon v. Berger, 526 U.S. 808, 119 S. Ct. 1706, 143 L. Ed. 2d 978 (1999)*.

intrusion that violates Shapiro's rights to a constitutionally offensive degree. As *Lauro* explained, in *Ayeni,* the Second Circuit found that "obtaining and broadcasting images of the Ayenis in a humiliating situation . . . infringed on their *Fourth Amendment* privacy rights. **[*74]** " *Lauro, 219 F.3d at 211.* Here, there were no pictures taken of Shapiro. Moreover, there is no evidence at all that the defendants either invited the media to the premises or directed their activities, merely sufficient evidence for the purposes of this motion to raise a material issue of fact as to whether the defendants allowed the media to enter and/or remain in the building. Finally, the event that the media reported on was, unlike the perp walk in *Lauro,* not an "inherently fictional dramatization of an event that transpired hours earlier." *Id. at 213.*

Under all of these circumstances, the **[*75]** court is not convinced that Shapiro's *Fourth Amendment* rights were intruded upon to a degree that could result in a constitutional violation. Nonetheless, the court will assume that some intrusion of such rights occurred, and will weigh the minimal intrusion of allowing the media to cover the events at 19 Eastway Drive on January 18, 2000 against the possible justification for it.

In *Wilson,* the defendants argued that the important role of the press in informing the general public about criminal justice activities justified the media's presence in the Wilsons' home, an argument that the Court rejected. *See Wilson, 526 U.S. at 612-13.* The Court noted that while there is "certainly language in our opinions interpreting the *First Amendment* which points to the importance of 'the press' in informing the general public about the administration of criminal justice . . . the *Fourth Amendment* also protects a very important right, and in the present case it is in terms of that right the media ride-alongs must be judged. *Id.* The court ultimately found that the "need for accurate reporting on police issues in general bears no direct relation to the constitutional justification **[*76]** for the police intrusion into a home in order to execute a felony arrest warrant." *Id.* The Court in *Lauro,* applying this reasoning, noted that the "interests of the press, and of the public who might want to view perp walks, are far from negligible," but that any legitimate state interest in accurate reporting of a police event is "not well served by an inherently fictional dramatization of an event" that had occurred earlier." *Lauro, 219 F.3d at 213.* The stories and pictures relating to the events at Shapiro's house reported not a fabricated scene, but the investigation of a report of animal neglect that Shapiro herself later admitted, when, at her allocution, she stated that she had failed to provide proper medical attention, food and water for her eleven dogs. *See* Ex. 10 at 11.

In *Caldarola,* a County employee made a videotape of the arrest of several corrections officers, taping them walking in the Department of Corrections parking lot and in a car awaiting transportation to another site after their arrest. Later that day, the County held a press conference, showed the tape, and distributed it to the media. *343 F.3d at 572.* Analyzing **[*77]** these facts, the Second Circuit recognized that some events, such as the arrest of corrections officers on grand larceny charges, are "highly newsworthy and of great interest to the public at large," and that the government has an interest in allowing media coverage of such events to inform the public of its role in those events. *Id. at 576.* Divulging the arrests to the media, the court found, "enhances the transparency of the criminal justice system, and it may deter others from committing similar crimes. Furthermore, allowing the public to view images of an arrestee informs and enables members of the public who may come forward with additional information relevant to the law enforcement investigation." *Id.* The plaintiff in *Caldarola* argued that these grounds were rejected as legitimate governmental interests in *Wilson* and *Lauro* as "insufficient to overcome the privacy interests at issue" in those cases. *Id.* The *Caldarola* court distinguished *Lauro* on the ground that the perp walk in that case had been staged. *Id.* Here, as in *Caldarola,* the event that the media covered was not staged. And, significant to this case, the *Caldarola* **[*78]** court distinguished *Wilson* on the ground that the reasonable expectation of privacy enjoyed by the plaintiff in *Caldarola* was diminished, unlike the expectation of privacy at issue in *Wilson.* *Id. at 576-77.*

In *Wilson,* the court explained, the "Supreme Court determined that the substantial privacy interests of a person in his or her home outweighed the proffered government interests behind the media ride along. By comparison, the court found, the plaintiff's "expectation of privacy in the DOC parking lot is minimal and not comparable to that of an individual in his home which 'is to him as his castle and fortress, as well for his defence against injury and violence, as for his repose.'" *Id. at 577* (quoting *Wilson, 526 U.S. at 609*). "Because there was a minimal expectation of privacy in the parking lot," the *Caldarola* court concluded, and the conduct of the arresting officers did not

unreasonably exceed the scope of what was necessary to effectuate the arrest and to otherwise serve legitimate governmental purposes, this is not such a case." *Id.*

The same conclusion must be reached here, where "[t]he interests of **[*79]** the press, and of the public who might want to view" the rescue of animals from such an unusual site are "far from negligible, and there is "a legitimate state interest in accurate reporting of police activity." *Lauro, 219 F.3d at 213*. The highly unusual nature of the building, viewed in the context of its use and condition, along with the rescue of a large number of dogs from that location, was both newsworthy and of interest to the public. Moreover, because the defendants could reasonably have believed that Shapiro had no privacy interest in the building for all the reasons discussed *supra,* they had a legitimate government interest in allowing the media to exercise its *First Amendment* right to cover newsworthy events. "And, although it is possible for government actors to overstep the bounds of reasonableness in the course of a search or seizure, even when serving important government interests," that is not the case here. *Caldarola, 343 F.3d at 577*. As in *Caldarola,* there was here a "minimal expectation of privacy . . ., and the conduct of the . . . officers did not unreasonably exceed the scope of what was necessary to effectuate . . . **[*80]** [their search] and to otherwise serve legitimate government purposes." *Id.* Thus, even if the Glen Cove defendants did violate Shapiro's *Fourth Amendment* rights by allowing the media to photograph the interior of the house in which she had a diminished expectation of privacy, they served a legitimate government purpose that outweighed the minimal intrusion.

Moreover, even if there was no legitimate governmental purpose and the media's presence made the search overly intrusive, the court finds that the defendants are entitled to qualified immunity on the media ride-along claim because the law was not well established, or, if it was, it was objectively reasonable for the defendants to believe that allowing the media into the house did not violate Shapiro's rights. As noted earlier, the "relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Loria, 306 F.3d at 1281*. As also noted earlier, "[i]f the unconstitutionality of an action is 'apparent' - when compared to actions previously held to be unlawful - because the same **[*81]** right is set forth in an earlier case with the specificity required by *Wilson,* qualified immunity is not appropriate." *Lauro, 219 F.3d at 215*.

The "appropriate inquiry is, therefore, how closely analogous" the defendants' allowing media to enter and remain in the building is to actions by police that had been held unconstitutional at the time the events took place, that is, in January 2000. *Id. at 215-216*. Here, the unconstitutionality of the defendants' alleged acts was not apparent, because the relevant cases - *Wilson* and *Ayeni* - did not set forth with the requisite specificity the right to be free from media presence during a search of a building at which the claimant had only a diminished expectation of privacy and where the claimant was not present during the media intrusion. Both *Wilson* and *Ayeni* emphasized the violation of the plaintiffs in their homes, and, while *Lauro* held that the holdings of the earlier cases were not limited to the home, *Lauro* was decided after January 18, 2000 and cannot be considered in the inquiry into whether the law that they enunciate was "well-established." Thus, reasonable police officers **[*82]** could have construed *Wilson* and *Ayeni* as being applicable only to media presence in a home. Moreover, *Wilson, Hanlon* and *Ayeni* involved situations in which the government actors had expressly invited or arranged for the media to be present, which is not the case here. Further, in those cases the plaintiffs were themselves present at the site and personally subjected to the media intrusion, with the plaintiffs in *Wilson* and *Ayeni* [9] appearing in the photographs or video footage that the media took. The relevant cases are, in short, insufficiently analogous to the facts of this case to allow the court to find that "a reasonable police officer should clearly have been able to discern" that allowing the media to enter 19 Eastway Drive and record the events "infringed merely different aspects of the same previously defined constitutional right" enunciated in the earlier cases. *Lauro, 219 F.3d at 216*. Finally, even if the right that Shapiro alleges was violated was well-established in January 2000, we cannot say that the defendants were unreasonable for failing to reach that conclusion at the time, and they are entitled to qualified immunity on the **[*83]** media ride-along claim.

---

[9] It is unclear from the reported decisions whether Mr. or Mrs. Berger, the claimants in Hanlon, appeared in any of the broadcast media coverage, although they were taped by the media.

2005 U.S. Dist. LEXIS 43276, *83

**E. Municipality Liability**

Because a municipality can act only through its employees, the question of liability turns on whether it can be held liable for the unconstitutional acts of its employees. *Davis v. Lynbrook Police Dep't, 224 F. Supp. 2d 463, 477 (E.D.N.Y. 2002)*. It is axiomatic that where, as here, there are no unconstitutional acts by employees, there can be no municipal liability. Thus, summary judgment is granted to the City of Glen Cove on all claims against it.

**F. Attorney's Fees Pursuant to *Section 1988***

All defendants have prevailed on the claims against them in the *section 1983* action. Pursuant to *42 U.S.C. § 1988(b)*, a prevailing party is entitled to attorney's fees in civil rights litigation. A prevailing defendant, however, **[*84]** may be awarded such fees only where the plaintiff's action was "frivolous, unreasonable, or groundless." *Galvin v. State of New York, 2000 U.S. App. LEXIS 15051 (2d Cir. June 23, 2000)* (citing *American Federation of State, County & Municipal Employees v. Nassau County, 96 F.3d 644, 649-53 (2d Cir. 1996)*). Although the court finds that the claims against the municipal defendants do not meet that standard, the *section 1983* claim against defendant Carol Weiss Horvath does, and she is entitled to reasonable fees for her defense of the *section 1983* claim against her, although not for the trespass claim.

The award of fees is based on the plaintiff's frivolous, unreasonable and/or groundless claim that Horvath was a state actor. The court in *Serbalik* noted, in finding that the *section 1983* defendants in that case were not state actors, that both the plaintiff and his attorneys "should have undertaken a thorough investigation of the law as it applies to the facts of this case prior to commencing" a *section 1983* action. *27 F. Supp. 2d at 133 n.3.* That is especially true here, where the plaintiff is not only an attorney herself, but an administrative **[*85]** law judge. As in *Serbalik*, "[a]n analysis of the relevant caselaw would have revealed that the *section 1983* claims" against Horvath were meritless because she was not a state actor. *Id.* Like the plaintiff and his attorneys in *Serbalik*, Shapiro and her attorneys "are advised to review the obligations imposed upon attorneys by *Fed. R. Civ. P. 11* before asserting frivolous claims in the future."

Counsel for Horvath shall serve an application for reasonable attorney's fees and costs associated with the *section 1983* claims against Horvath on the plaintiff no later than two weeks from the date of this order. The plaintiff shall serve her opposition papers no later than two weeks after service of the motion papers, and Horvath shall electronically file the bundled application, including any reply papers, one week after service of Shapiro's opposition. The application must adhere to the standards for lodestar awards of attorney's fees set forth by the Second Circuit. *See, e.g., Cruz v. Local Union No. 3 of the IBEW, 34 F.3d 1148 (2d Cir. 1994)*; *New York State Ass'n for Retarded Children, Inc. v. Carey, 711 F.2d 1136 (2d Cir. 1983).* **[*86]**

The Clerk of the Court shall defer the entry of judgment until the attorney's fees application has been resolved.

Dated: Central Islip, New York

May 5, 2005

**SO ORDERED:**

/s/ William D. Wall

United States Magistrate Judge

**End of Document**

# *Badar v. Swissport USA, Inc.*

United States District Court for the Eastern District of New York

September 30, 2020, Decided; September 30, 2020, Filed

18-cv-06390 (DLI) (SMG)

**Reporter**
492 F. Supp. 3d 54 *; 2020 U.S. Dist. LEXIS 185392 **

CHAUDRY S. BADAR, ALIA DAVARIAR, MUHAMMAD SHAFQAT, BALQEES BADAR and BILAL BADAR, Plaintiffs, -against- SWISSPORT USA, INC. and PAKISTAN INTERNATIONAL AIRLINES, Defendants.

**Subsequent History:** Dismissed by *Badar v. Swissport USA, Inc., 2021 U.S. Dist. LEXIS 109213 (E.D.N.Y., June 10, 2021)*

**Counsel:** **[**1]** For Chaudhry Badar, Alia Davariar, Muhammad Shafqat, Balqees Badar, Bilal Badar, Plaintiffs: Jordan K. Merson, LEAD ATTORNEY, Merson Law PLLC, New York, NY; Giovanna Mabile Ferreira dos Santos, Merson Law, PLLC, New York, NY.

For Swissport USA, Inc., Defendant: Roberto Caruso, LEAD ATTORNEY, Fitzpatrick & Hunt, Pagano, Aubert, LLP, New York, NY.

For Pakistan International Airlines, Defendant: John Maggio, LEAD ATTORNEY, Chelsea Lyn Schell, Condon & Forsyth LLP, New York, NY.

For The Port Authority of New York and New Jersey, Cross Claimant: John Maggio, LEAD ATTORNEY, Chelsea Lyn Schell, Condon & Forsyth LLP, New York, NY.

**Judges:** DORA L. IRIZARRY, United States District Judge.

**Opinion by:** DORA L. IRIZARRY

# Opinion

**[*56]** **MEMORANDUM AND ORDER**

**DORA L. IRIZARRY, United States District Judge:**

Plaintiffs Chaudry S. Badar, Alia Davariar, Muhammad Shafqat, Balqees Badar and Bilal Badar (collectively, "Plaintiffs"), family members of decedent Nauman Badar, bring this action against Defendants Swissport USA, Inc. ("Swissport") and Pakistan International Airlines ("PIA") (collectively, "Defendants"), arising from Defendants' alleged mishandling and misplacement of Nauman Badar's remains. *See*, Am. Compl., Dkt. Entry No. 14. Before the **[**2]** Court are the parties' cross-motions for summary judgment pursuant to *Rule 56 of the Federal Rules of Civil Procedure*, and Plaintiffs' motion to strike affirmative defenses pursuant to *Rule 12(f) of the Federal Rules of Civil Procedure*. Defendants move for summary judgment on the grounds that the Montreal Convention exclusively governs the rights and liabilities of the parties to this action and, in the alternative, that there is insufficient evidence to support Plaintiffs' state law claims. *See*, Defs.' Mem. in Supp. of Mot. for S.J. ("Defs.' S.J. Mem."), Dkt. Entry No. 38. Plaintiffs move for partial summary judgment on the issue of liability as to their state law claims and to strike Defendants' affirmative defenses under the Montreal Convention. *See*, Mem. in Supp of Pls.' Mot. for S.J. ("Pls.' S.J. Mem."), Dkt. Entry No. 44 Ex. 2.

492 F. Supp. 3d 54, *56; 2020 U.S. Dist. LEXIS 185392, **2

For the reasons set forth below, Plaintiffs' motion to strike Defendant's affirmative defenses is denied. Plaintiffs' motion for partial summary judgment as to Defendant's liability for state law claims and Defendants' motion for summary judgment based on the Montreal Convention's preemption of state law claims are denied because the evidence currently in the record is inconclusive and precludes the Court from determining the threshold question as **[**3]** to whether the Montreal Convention exclusively governs the claims in this matter. An evidentiary hearing to determine this issue shall be scheduled.

## BACKGROUND

### I. Factual Background

The following facts are undisputed unless otherwise stated. All factual disputes are resolved, and all reasonable inferences are drawn, against the party whose motion is under consideration. On October 25, 2017, Nauman Badar (the "decedent") passed away unexpectedly at his apartment in Astoria, New York. Plaintiffs, the brothers, sister and parents of the decedent, decided to bury the decedent's body in Pakistan. Bilal Badar hired Muslim Funeral Services ("MFS") to collect the decedent's remains from the medical examiner's office, prepare the remains for burial, and arrange their transportation from New York to Pakistan. MFS arranged with PIA to transport the decedent's remains from New York's John F. Kennedy International Airport ("JFK") to Pakistan on PIA Flight 712 on October 28, 2017. Bilal Badar also was scheduled to travel to Pakistan on Flight 712, which was PIA's last scheduled flight to or from the United States, as they were no longer offering that service moving forward.

On October 28, 2017, PIA's **[**4]** cargo handling agent received the decedent's remains from MFS and transported the remains to the aircraft site and to Swissport, a company that provides cargo handling services. However, the decedent's remains, **[*57]** along with another set of remains, mistakenly were not loaded onto Flight 712. Instead, the remains were left on the tarmac, without climate control. When Bilal Badar arrived in Pakistan the following day, he learned that the remains had not been transported as scheduled. PIA representatives could not confirm their location at that time. Approximately 8-10 hours after the remains originally were scheduled to arrive in Pakistan, Plaintiffs were informed that they had been located at JFK. The remains were returned to MFS for storage. On November 1, 2017, MFS drove the remains to Maryland where decedent was buried. Notably, Arbab Hibutallah, PIA's Local Manager for North America, testified that the other set of remains left stranded at JFK ultimately were transported to Pakistan.

On November 9, 2018, pursuant to *28 U.S.C. § 1441(d)*, PIA removed this action from the Supreme Court of the State of New York, Queens County, to this Court on the basis that PIA is a "foreign state" or "agency or instrumentality **[**5]** of a foreign state" as defined by *28 U.S.C.§ 1603(b)*. On January 8, 2019, Plaintiffs filed the Amended Complaint. Am. Compl., Dkt. Entry No. 14. The Amended Complaint alleges causes of action for loss of sepulcher, negligence, gross negligence, negligence per se, negligent infliction of emotional distress, fraud, loss of services and breach of contract against PIA, Swissport and the Port Authority of New York and New Jersey ("Port Authority"). *Id.* Prior to the filing of the instant motions, the parties stipulated to the voluntary dismissal of the Port Authority, with prejudice. *See*, Stipulation, Dkt. Entry No. 32. In opposing Defendants' motion for summary judgment, Plaintiffs abandoned their claims for fraud and loss of services. *See*, Pls.' Opp'n to Defs.' Mot. for S.J. ("Pls.' Opp'n"), Dkt. Entry No. 40 at 3.

### II. The Montreal Convention

The Convention for the Unification of Certain Rules for International Carriage by Air, known as the Montreal Convention, governs the uniform system of liability for international air carriers. *See, Ehrlich v. Am. Airlines, Inc., 360 F.3d 366, 371 n.4 (2d Cir. 2004)*. "The Montreal Convention 'unifie[d] and replace[d] the system of liability that derives' from the Warsaw Convention, many provisions of the conventions are similar, and **[**6]** courts continue to evaluate provisions of the Montreal Convention using 'cases interpreting equivalent provisions in the Warsaw

Case 1:23-cv-04033-LJL    Document 218-2    Filed 12/05/23    Page 25 of 31

Page 3 of 9

492 F. Supp. 3d 54, *57; 2020 U.S. Dist. LEXIS 185392, **6

Convention.'" *LAM Wholesale, LLC v. United Airlines, Inc., 2019 U.S. Dist. LEXIS 56599, 2019 WL 1439098, at \*2 n.2 (E.D.N.Y. Mar. 31, 2019)* (alteration in original) (quoting *Hunter v. Deutsche Lufthansa AG, 863 F. Supp.2d 190, 205 (E.D.N.Y. 2012))*; *See also*, *Safa v. Deutsche Lufthansa Aktiengesellschaft, Inc., 42 F. Supp.3d 436 (E.D.N.Y. 2014)*, *aff'd*, *621 Fed. Appx.. 82 (2d Cir. 2015)* (summary order) ("[T]he Court may rely on precedent interpreting the Warsaw Convention's parallel provisions when addressing claims under the Montreal Convention" (citation omitted)).

The Montreal Convention "applies to all international carriage of persons, baggage or cargo performed by aircraft for reward." *Montreal Convention, Art I(1), May 28, 1999 (entered into force on Nov. 4, 2003) reprinted in S. Treaty Doc. No. 106-45, 1999 U.S.T. LEXIS 175, 1999 WL 33292734 (2000)*. "*[I]nternational carriage* means any carriage in which, according to the agreement between the parties, the place of departure and the place of destination, whether or not there be a break in the carriage or a transhipment, are situated . . . within the territories of two States Parties." *Id.*, Art. 1(2) (emphasis in original).

 **[\*58]**  The primary goal of the Montreal Convention is to "limit airline accident liability while protecting the rights of passengers and shippers utilizing international air carriage." *Seagate Logistics, Inc. v. Angel Kiss, Inc., 699 F. Supp.2d 499, 505 (E.D.N.Y. 2010)*. To that end, the Montreal Convention preempts state and federal **[\*\*7]**  claims that fall within its scope. *See, Best v. BWIA West Indies Airways Ltd., 581 F. Supp.2d 359, 362 (E.D.N.Y. 2008)* ("By its own terms, the treaty, where applicable, preempts the remedies of a signatory's domestic law, whether or not the application of the [Montreal] Convention will result in recovery in a particular case." (citing *El Al Israel Airlines, Ltd. v. Tseng, 525 U.S. 155, 161, 119 S. Ct. 662, 142 L. Ed. 2d 576 (1999)))*.


## LEGAL STANDARD


### I. Summary Judgment

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*. "In ruling on a summary judgment motion, the district court must resolve all ambiguities, and credit all factual inferences that could rationally be drawn, in favor of the party opposing summary judgment and determine whether there is a genuine dispute as to a material fact, raising an issue for trial." *McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 202 (2d Cir. 2007)* (internal quotations omitted). "When both sides have moved for summary judgment, each party's motion is examined on its own merits, and all reasonable inferences are drawn against the party whose motion is under consideration." *Chandok v. Klessig, 632 F.3d 803, 812 (2d Cir. 2011)* (citation omitted).

A genuine issue of material fact exists only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*. The nonmoving party may not rely on **[\*\*8]**  "[c]onclusory allegations, conjecture, and speculation." *Kerzer v. Kingly Mfg., 156 F.3d 396, 400 (2d Cir. 1998)*. Instead, the nonmoving party must affirmatively set out facts showing a genuine issue for trial. *Anderson, 477 U.S. at 248*. "Summary judgment is appropriate only '[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party.'" *Donnelly v. Greenburgh Cent. Sch. Dist. No. 7, 691 F.3d 134, 141 (2d Cir. 2012)* (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986))*. When considering cross-motions for summary judgment, a court "need not enter a judgment for either party." *Padberg v. McGrath-Mckechnie, 203 F. Supp.2d 261, 274 (E.D.N.Y. 2002))*.


### II. Motion to Strike Affirmative Defenses

*Rule 12(f) of the Federal Rules of Civil Procedure* allows courts to "strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." *Fed. R. Civ. P. 12(f)*. "A motion to strike an

492 F. Supp. 3d 54, *58; 2020 U.S. Dist. LEXIS 185392, **8

affirmative defense under *Rule 12(f)* . . . for legal insufficiency is not favored." *William Z. Salcer, Panfeld, Edelman v. Envicon Equities Corp., 744 F.2d 935, 939 (2d Cir. 1984)*, *vacated on other grounds*, 478 U.S. 1015, 106 S. Ct. 3324, 92 L. Ed. 2d 731 (1986))*. As a result, such a motion "will not be granted unless it appears to a certainty that plaintiffs would succeed despite any state of the facts which could be proved in support of the defense." *Id.*; *See also, Lipsky v. Commonwealth United Corp., 551 F.2d 887, 893 (2d Cir. 1976)* ("[C]ourts should not **[*59]** tamper with the pleadings unless there is a strong reason for so doing." (citations omitted)).

"Three prerequisites must be satisfied before a court may grant a motion to strike defenses." *F.D.I.C. v. Pelletreau & Pelletreau, 965 F. Supp. 381, 389 (E.D.N.Y. 1997)*. A plaintiff must show that: "(1) **[**9]** there must be no question of fact that might allow the defense to succeed; (2) there must be no substantial question of law that might allow the defense to succeed; and (3) the plaintiff must be prejudiced by the inclusion of the defense." *Solis v. Beacon Assocs. Mgmt. Corp. (In re Beacon Assocs. Litig.), 2011 U.S. Dist. LEXIS 90292, 2011 WL 3586129, at *1 (S.D.N.Y. Aug. 11, 2011)* (citation omitted).


## DISCUSSION

While the Court considers each parties' motion on its own merits, it notes that the cross-motions raise overlapping issues. Each motion concerns the applicability of the Montreal Convention to the instant dispute, specifically: (1) whether the Montreal Convention applies to the international transportation of human remains, and, if it does, (2) whether the Montreal Convention preempts Plaintiffs' state law claims. The motions each also concern the viability of Plaintiffs' state law claims.


## I. Plaintiffs' Motion to Strike Affirmative Defenses

As threshold matter, the Court must determine whether the Montreal Convention, which by its terms applies to the international transportation of "persons, baggage or cargo," applies to the international transportation of human remains. In support of their position that the Convention does not apply to human remains, Plaintiffs rely on *Tarar v. Pakistan Int'l Airlines, 554 F. Supp. 471 (S.D. Tex. 1982)*, as well as statements by Defendants' representatives **[**10]** that they do not treat human remains as ordinary cargo. *See*, Pls.' S.J. Mem. at 14-17.[1]

In *Tarar*, the plaintiffs contracted with defendant PIA to transport their relative's remains from the United States to Pakistan. *554 F. Supp. at 473-74*. As a result of PIA's "negligent and wrongful acts and omissions," the remains arrived in Pakistan more than four days later than they originally were scheduled to arrive. *Id. at 477-78*. Appearing to rely on the testimony of PIA's agents "that PIA does not consider human remains to be ordinary commercial goods," the *Tarar* court found, without meaningful elaboration, that "human remains are not 'persons, baggage, or goods' within the meaning of Article 1(1) of the Warsaw Convention." *Id. at 478*. Whereupon, the court concluded that the Warsaw Convention was inapplicable, but nonetheless proceeded to analyze whether the willful nature of PIA's conduct exempted it from the Warsaw Convention's limitations on liability. *Id. at 478-79*.

Defendants, relying on decisions from the U.S. Courts of Appeals for the Ninth and Third Circuits, respond that the weight of authority holds that human remains are "goods" within the meaning of the Warsaw Convention, and, thus, the Montreal Convention applies to the international transportation of human remains. **[**11]** *See*, Defs.' Opp'n at 4. In *Johnson v. American Airlines, Inc., 834 F.2d 721 (9th Cir. 1987)*, the Ninth Circuit, in reviewing *Tarar*, concluded that "[n]o case has squarely addressed the issue [of] whether human remains are 'goods' for purposes of the Convention:"

  **[*60]** "Dictum in [*Tarar, 554 F. Supp. at 478*], stated that human remains were not 'goods' for purposes of the Convention. *Id.* The court, however, noted only that both parties agreed that human remains were not 'goods.'

---

[1] Plaintiffs' memorandum in support of its motion for summary judgment does not contain page numbers. Accordingly, the Court has utilized the numbers assigned by the ECF system.

The court agreed with the parties without explaining why it did so. Moreover, whether or not the court agreed with the parties had no bearing on the ultimate resolution of the case. Under these circumstances, *Tarar*'s value as precedent is limited, and we decline to rely on it."

*Johnson, 834 F.2d at 723 n.2*.

Turning to the text of the Warsaw Convention, the Ninth Circuit interpreted Article 1, which "provides that the Convention applies 'to *all* international air transportation of passengers, baggage, and goods performed by aircraft for hire,'" "to mean that the Convention applies to *all* cases in which an aircraft is hired to transport someone or something on an international route." *Id. at 723* (emphasis in original). The court cautioned that, to "interpret the Convention in any other way would leave airlines unprotected by the Convention when they **[**12]** are hired to transport things that are not readily viewed as 'passengers,' 'baggage,' or 'goods,'" reasoning that the "signatories to the Convention would not have intended such a result." *Id.* Accordingly, the court held that human remains must be treated as "goods" for purposes of the Warsaw Convention. *Id.*

In *Onyeanusi v. Pan Am, 952 F.2d 788 (3d Cir. 1992)*, the Third Circuit noted that it was facing the "exact issue" the Ninth Circuit addressed in *Johnson*, that is, whether human remains are "goods" for the purposes of the Warsaw Convention. *See, Onyeanusi, 952 F.2d at 790-91*. Like the Ninth Circuit in *Johnson*, the Third Circuit in *Onyeanusi* expressed its disapproval of *Tarar*. *See, Onyeanusi, 952 F.2d at 791* ("Given the seemingly contradictory conclusions of *Tarar*, we find it to be of limited precedential value."). The court examined the meaning of "goods," noting that human remains can have significant commercial value, despite not typically being bought and sold like other goods. *Onyeanusi, 952 F.2d at 792*. Ultimately, the court found that a narrow reading of the term "goods" would frustrate the broad purposes of the Warsaw Convention, as "[t]o exclude human remains from the definitions of 'goods' would exempt a significant number of claims from the Convention, thus exposing air carriers to inestimable liability." **[**13]** *Id. at 792-93*. The Third Circuit thus agreed with the Ninth Circuit that human remains must be treated as "goods" for purposes of the Warsaw Convention. *Id.*

Plaintiffs attempt to distinguish *Johnson* and *Onyeanusi*, noting that the air waybill in *Johnson*, which contained the terms of the contract to ship the decedent's remains, labeled the remains as "goods." Plaintiffs also point to the statement in *Johnson* that "[o]nly if the funeral home had opted to declare an excess value for the remains could the plaintiffs expect to have the shipment treated as other than 'goods.'" *See, Johnson, 834 F.2d at 723-24*. Plaintiffs contend that, by contrast, here there was no analogous provision in the air waybill, and, thus, "[P]laintiffs had every reason to expect that the shipment of Nauman's body would be treated as other than 'goods.'" *See*, Pls.' S.J. Mem. at 16; Pls.' Opp'n at 12.

As an initial matter, *Tarar* was decided by a court of concurrent jurisdiction from a different circuit and, as such, is not binding precedent here. At best, it can be persuasive. However, as discussed by the Ninth Circuit in *Johnson* and the Third Circuit in *Onyeanusi*, *Tarar*'s value as precedent is limited given that court's lack **[*61]** of analysis. Like the Third and **[**14]** Ninth Circuits, this Court is not persuaded by the holding in *Tarar* and declines to follow it.

Moreover, Plaintiffs' arguments incorrectly focus on the labels affixed to the cargo, and the parties' supposed beliefs, rather than on the text of the Convention. Notably, the Ninth Circuit, independent of, and prior to, its discussion of the label on the air waybill, reached the conclusion that the signatories to the Warsaw Convention intended the term "goods" to include human remains. *See, Johnson, 834 F.2d at 723*. In any event, the air waybill for decedent's remains here contained both a Notice Concerning Carrier's Limitation of Liability and PIA's Conditions of Contract, each of which provide that the Montreal Convention may apply in the event of loss of, damage or delay to the cargo. Accordingly, Plaintiffs should have known that the shipment of the decedent's remains would be subject to the Montreal Convention.

Finally, the subjective expectations of the parties, such as the testimony of one of PIA's employees that PIA does not treat human remains as "ordinary cargo," does not control over the text of the Montreal Convention, particularly as the Convention "is to be so construed as to further its purposes to **[**15]** the greatest extent possible." *See, Benjamins v. British European Airways, 572 F.2d 913, 918 (2d Cir. 1978)*.

Case 1:23-cv-04033-LJL    Document 218-2    Filed 12/05/23    Page 28 of 31

Page 6 of 9

492 F. Supp. 3d 54, *61; 2020 U.S. Dist. LEXIS 185392, **15

Plaintiffs also rely on a statement in the *Onyeanusi* lower court opinion that there was "no evidence that [defendant] Pan Am considered human remains to be an extraordinary shipment or that it had adopted a casket handling policy in which a higher than ordinary degree of care would prevail." *Onyeanusi v. Pan Am. World Airways, Inc., 767 F. Supp. 654, 657 (E.D. Pa. 1990)*, *aff'd sub nom., Onyeanusi v. Pan Am, 952 F.2d 788 (3d Cir. 1992)*. Plaintiffs' reliance is misplaced. This statement by the district court was made in the context of discussing why the reasoning in *Tarar* "is not cogent." *Onyeanusi, 767 F. Supp. at 656*. Moreover, the Third Circuit's opinion did not include or address this statement and, as discussed above, focused instead on the meaning of the term "goods," and the broad purposes of the Convention, in concluding that human remains constituted "goods" as used in Article 1(1) of the Warsaw Convention.

The Court concurs with the Ninth and Third Circuits that the broader interpretation of the term "goods" to include human remains is a correct reading of Article 1(1) of the Warsaw Convention. However, the issue before the Court differs from that confronted in *Johnson*, *Onyeanusi* and *Tarar*, as the language "persons, baggage, or goods" in the Warsaw Convention was modified to read "persons, baggage **[**16]** or *cargo*" in the Montreal Convention. Thus, the Court must determine whether human remains are "cargo" within the meaning of the Montreal Convention.

"When interpreting a treaty, [courts] begin with the text of the treaty and the context in which the written words are used." *Volkswagenwerk Aktiengesellschaft v. Schlunk, 486 U.S. 694, 699, 108 S. Ct. 2104, 100 L. Ed. 2d 722 (1988)* (quotation marks and citations omitted); *See also, Brink's Ltd. v. S. African Airways, 93 F.3d 1022, 1027 (2d Cir. 1996)* ("Our interpretation of the Warsaw Convention must begin 'with the literal language.'" (quoting *Buonocore v. Trans World Airlines, 900 F.2d 8, 9 (2d Cir. 1990)))*. "Other general rules of construction may be brought to bear on difficult or ambiguous passages." *Schlunk, 486 U.S. at 700*. "If the words of the [treaty] are reasonably susceptible of only one interpretation, [the court's] task of interpretation ends there." *Ehrlich v. Am. Airlines, Inc., 360 F.3d 366, 375 [*62]  (2d Cir. 2004)* (internal quotations and citations omitted).

Beginning with the text of the treaty, while the Montreal Convention itself does not define "cargo," the term is generally defined to encompass any load conveyed by a vessel. *See, e.g., Black's Law Dictionary* (11th ed. 2019) (defining "cargo" as "the load of a vessel; the goods, merchandise, or whatever is conveyed in a ship or merchant vessel"); *Oxford English Dictionary* (defining "cargo" as "[t]he freight or lading of a ship, a ship-load."). "Cargo" is thus broader than "goods," and the inclusion **[**17]** of "cargo" in the Montreal Convention illustrates the signatories' intention to preserve the expansive interpretation of the Convention's scope. *See, e.g., Montreal Convention, Ltr. of Transmittal, 1999 U.S.T. LEXIS 175, 1999 WL 33292734, at *2* (characterizing the Montreal Convention as, "with respect to cargo, preserv[ing] all of the significant advances achieved by [the Warsaw Convention as amended by Montreal Protocol No. 4].")*; *Montreal Convention, Explanatory Note, 1999 U.S.T. LEXIS 175, 1999 WL 33292734, at *11* (describing Article 1(1) of the Convention as "essentially unchanged").

As discussed above, the Court concurs with the reasoning of the Ninth and Third Circuit's that human remains are "goods" within the meaning of the Warsaw Convention. Thus, as the term "cargo" is broader than, and inclusive of, the term "goods," the Court finds that the Montreal Convention similarly applies to the international transportation of human remains. Accordingly, Plaintiffs' motion to strike Defendants' affirmative defenses under the Montreal Convention is denied.

## II. Whether the Montreal Convention Exclusively Governs the Rights and Liabilities of the Parties

Having determined that the Montreal Convention applies to the international transportation of human remains, the Court considers next whether the Montreal Convention exclusively governs the rights and liabilities **[**18]** of the parties to this action, as Defendants contend in their motion for summary judgment.

*Article 29 of the Montreal Convention* provides:

"In the carriage of passengers, baggage and cargo, any action for damages, however founded, whether under this Convention or in contract or in tort or otherwise, can only be brought subject to the conditions and such

492 F. Supp. 3d 54, *62; 2020 U.S. Dist. LEXIS 185392, **18

limits of liability as are set out in this Convention without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights."

*Montreal Convention, Art. 29, 1999 U.S.T. LEXIS 175, 1999 WL 33292734, at \*38*. Thus, "the Montreal Convention preempts state and federal claims that fall within its scope." *LAM Wholesale, LLC, 2019 U.S. Dist. LEXIS 56599, 2019 WL 1439098, at \*2*; *Cf.*, *Fishman v. Delta Air Lines, Inc., 132 F.3d 138, 141 (2d Cir. 1998)* (holding that under the Warsaw Convention, "[a]ll state law claims that fall within the scope of the Convention are preempted'). Put another way, where one of the Convention's damage provisions applies, "the Convention provides the sole cause of action under which a claimant may seek redress for his injuries." *Seagate Logistics, Inc. v. Angel Kiss, Inc., 699 F. Supp.2d 499, 505 (E.D.N.Y. 2010)* (quoting *Weiss v. El Al Israel Airlines, Ltd., 433 F. Supp.2d 361, 365 (S.D.N.Y. 2006))*.

As relevant here, one of the Montreal Convention's damages provisions, Article 19, provides, that "[t]he carrier is liable for damage occasioned by delay in the carriage by air of **[\*\*19]** passengers, baggage or cargo." *Art. 19, 1999 U.S.T. LEXIS 175, 1999 WL 33292734, at \*35*. It is undisputed that Plaintiffs' claims involve the international shipment of the **[\*63]** decedent's remains with a departure in the United States and a destination in Pakistan, and that each country is a party to the Montreal Convention. The parties further agree that complete non-performance of a contract falls outside of the scope of Article 19. *See, e.g.*, Defs.' Mem. at 10; Pls.' S.J. Mem. at 14; *See also, Oparaji v. Virgin Atl. Airways, Ltd., 2006 U.S. Dist. LEXIS 68636, 2006 WL 2708034, at \*4 (E.D.N.Y. Sept. 19, 2006)*, *aff'd*, *258 F. App'x 374 (2d Cir. 2007)* ("The history of the Warsaw Convention indicates that the drafters of the Convention did not intend the word 'delay' in Article 19 to extend to claims . . . that arise from the total nonperformance of a contract." (quotation marks and citation omitted)). Accordingly, the issue before the Court is whether there was complete non-performance of the contract, or instead, as Defendants contend, a delay in the carriage of cargo. The Court finds that an evidentiary hearing is required prior to it making this legal determination.

Courts have held that a plaintiff's decision to secure substitute travel constitutes a delay in the carriage of passengers, baggage or cargo, and, thus, remains subject to Article 19. *See, e.g.,* **[\*\*20]** *Paradis v. Ghana Airways, Ltd., 348 F. Supp.2d 106, 114 (S.D.N.Y. 2004))*, *aff'd, 194 F. App'x 5 (2d Cir. 2006)* (summary order) (collecting cases). In *Paradis*, defendant Ghana Airways canceled a flight on which plaintiff was scheduled to travel. *348 F. Supp.2d at 108*. Ghana Airways's staff informed plaintiff that he should make arrangements with their office for alternate travel. *Id.* Plaintiff "feared being stranded if they spent their remaining cash on accommodations while waiting for Ghana Airways' next flight, scheduled for the following Friday, to leave, especially because they did not have guaranteed seats," and purchased a return ticket on another airline. *Id. at 109*. Plaintiff thereafter sued Ghana Airways for breach of contract, arguing "that his state law claim withstands the preemptive effect of the Conventions because he sues for non-performance of contract rather than for delay." *See, Id.*

The *Paradis* court held that "plaintiff fail[ed] to state a claim for relief that escapes the preemptive effect of [Article 19 of] the [Warsaw Convention and *Montreal Convention*]," as "a passenger cannot convert a mere delay into contractual non-performance by choosing to obtain more punctual conveyance." *Id. at 112*. The Second Circuit "affirmed the judgment essentially for the reasons stated in the opinion of the district court." **[\*\*21]** *Paradis, 194 F. App'x at 6*; *See also, Oparaji v. Virgin Atl. Airways, Ltd., 2006 U.S. Dist. LEXIS 68636, 2006 WL 2708034, at \*4 (E.D.N.Y. Sept. 19, 2006)*, *aff'd, 258 F. App'x 374 (2d Cir. 2007)* ("As in *Paradis*, [plaintiff] Oparaji's claim for damages occasioned by his missed flight are within the scope of Article 19; however, Oparaji's decision to secure substitute travel does not expose [defendant] Virgin Atlantic to liability under that article.").

In contrast, where a defendant fails to perform its obligation and fails to offer alternate transportation, a plaintiff's claims are not subject to the preemptive effect of Article 19. In *In re Nigeria Charter Flights Contract Litig., 520 F. Supp.2d 447 (E.D.N.Y. 2007)*, for example, defendant World Airways, Inc. ceased operations between Nigeria and the United States, canceling future flights and stranding passengers who had flown already the outbound legs of their round trips. *Id. at 450*. The court found that plaintiffs' claims were not preempted by Article 19 of the Warsaw Convention, because "plaintiffs have shown that World [Airways, Inc.] simply refused to fly them, without offering alternate transportation." *Id. at 454*.

Here, it remains unclear whether Plaintiffs chose to secure substitute travel for **[*64]** the decedent's remains or whether Defendants offered alternate transportation for the remains. Throughout their briefing, Defendants assert that Plaintiffs "demand[ed] the return of the decedent's remains," **[**22]** and that "[i]t was plaintiffs' decision to retrieve the remains from PIA and make alternate transportation arrangements." *See, e.g.*, Defs.' Mem. at 8. However, the evidence cited by Defendants in their briefing does not support these assertions. *See, Id.* (citing Bilal Badar Dep., Dkt. Entry No. 44 Ex. 9, Tr. 51:12-15; Hibutallah Aff. ¶ 6). For example, in deposition testimony repeatedly cited by Defendants, Bilal Badar was asked, "Why were your brother's remains buried in Maryland," and he answered, "The decision kind of came down to where it will be closest to family." Bilal Badar Dep., Dkt. Entry No. 44 Ex. 9, Tr. 51:12-15. Viewing the cited testimony in the light most favorable to Plaintiffs, Bilal Badar's statement does not refer to the decision to retrieve the remains from Defendants, but rather the decision as to where to bury the remains once burial in Pakistan became impossible.

Defendants rely also on the testimony of Arbab Hibutallah, PIA's Local Manager for North America that, sometime after the decedent's remains "did not travel as scheduled on Flight 712," he "was subsequently informed that the Badar family decided not to transport the decedent's remains to Pakistan, but **[**23]** rather intended to have a burial in the United States." *See*, Hibutallah Aff. ¶¶ 5-6. As with Bilal Badar, Hibutallah's affidavit could be read as referring to the decision made by the family about where to bury the remains after PIA refused to fly them, particularly as Flight 712 was PIA's last flight out of the United States. While not cited in Defendants' briefing, Arbab Hibutallah testified at his deposition that "Mr. Badar had advised that his brother's body should not be shipped to Pakistan as he was coming back, and he had decided by that time to bring him to USA." *See*, Dep. of Arbab Hibutallah, Dkt. Entry No. 36, Defs.' *Rule 56.1* Stmt. Ex. 5, Tr. 68:16-69:5. However, there also is evidence in the record that, after the decedent's remains were located on the tarmac, they were returned by Defendants to MFS "for storage." *See*, Pls.' S.J. Mem. at 9 & Ex. 15. Accordingly, the evidence in the record as to why and under what circumstances the remains were returned to MFS may shed light on whether there was delay or contractual non-performance by Defendants, a fact essential to determining the preemptive effect of *Article 19 of the Montreal Convention*.

Moreover, Plaintiffs contend that neither **[**24]** PIA nor Swissport gave the Badar family the option of sending the decedent's remains to Pakistan after the remains were found at JFK. *See*, Opp'n at 9. Plaintiffs testified accordingly: Bilal Badar testified that the only communication he received from PIA after the decedent's body was located was a call he received from PIA a few days after the burial, which he described as, "I'm with PIA, this is what happened, that's pretty much it." *See*, Bilal Badar Dep. Tr. 56:2-20. Balquees Badar testified that, after the decedent's remains were located at JFK, she was not aware of anyone from the airline giving the decedent's family the option to transport the remains to Pakistan. *See*, Balquees Badar Dep., Dkt. Entry No. 41 Ex. 2, Tr. 35:15-36:6. Finally, when Chaudhry Badar was asked whether the family was given the option to transport the decedent's remains to Pakistan, he stated, "there was nobody from PIA there. The operation of airline had stopped? That was the last flight, and there was no one there to deal with." *See*, Chaudry Badar Dep., Dkt. Entry No. 41 Ex. 1, Tr. 33:20-34:5.

The evidence does not support Defendants' assertions that Plaintiffs "demanded" **[*65]** the return of the remains to them **[**25]** and whether Plaintiffs did or did not make such a demand also is unclear. Moreover, Plaintiffs' testimony could support a finding that there was no offer of alternate transportation by Defendants. Also unclear is whether Defendants returned the remains to MFS for storage for the purpose of arranging alternate transportation for them.

On this record, there is insufficient evidence to enable the Court to decide the legal question of whether the Montreal Convention exclusively governs the rights and liabilities of the parties. Thus, an evidentiary hearing is required to develop the necessary facts to determine this threshold issue and the cross-motions for summary judgment are denied.

## CONCLUSION

For the reasons set forth above, Plaintiffs' motion to strike affirmative defenses is denied. The parties' cross-motions for summary judgment are denied without prejudice pending the Court's determination as to whether the

492 F. Supp. 3d 54, *65; 2020 U.S. Dist. LEXIS 185392, **25

Montreal Convention exclusively applies to the claims in this case. No later than November 1, 2020, the parties jointly shall submit a letter proposing dates on which the parties are available for an evidentiary hearing on the issue of whether the Montreal Convention exclusively **[**26]** governs the claims in this matter and outlining any documentary evidence they seek to introduce and witnesses they intend to have testify at the hearing with a very brief summary of their anticipated testimony.

SO ORDERED.

DATED: Brooklyn, New York

September 30, 2020

/s/ DORA L. IRIZARRY

United States District Judge

---

**End of Document**