UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

AARON ABADI,

        Plaintiff,

-against-

AMERICAN AIRLINES, INC., et al.,

        Defendants.

23 Civ. 04033 (LJL)

**DECLARATION OF MA. CLARA C. DE CASTRO IN SUPPORT OF PHIPPINE AIRLINES'S MOTION TO DISMISS**

Ma. Clara C. de Castro declares as follows pursuant to 28 U.S.C. § 1746:

1.      I am the Vice President for the Legal Affairs Department of Philippine Airlines, Inc. (PAL).  I submit this declaration to inform the Court of certain (a) points of Philippine law and regulation relating to its Covid pandemic response, and (b) a point of fact derived from PAL records, both in support of PAL's motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure.

2.      PAL is incorporated in the Republic of the Philippines with its principal place of business in Pasay City, Metro Manila, Republic of the Philippines.

3.      Mr. Abadi alleges in his Complaint that he had past or potential business dealings in certain countries named in his Complaint, and a related need to travel to those countries, but nowhere alleges having any past or potential business in the Philippines.  See Cmpl. ¶¶ 816, 831, 838; Cmpl. Exs. 78, 80.  In the approximate 15-month period from January 2019 until March

2020, when "Covid stated to get heavy," Mr. Abadi allegedly flew internationally only to end-point destinations in India, Israel and Saudi Arabia, Cmpl. ¶ 806; Cmpl. Ex. 78.

4. To my knowledge, PAL ran a search of its passenger records and found no instance where Mr. Abadi had traveled on PAL in the past eleven [11] years, which is as far back as we were able to search.

5. According to his Complaint, Mr. Abadi allegedly made email and online inquiries of PAL beginning in September 2021. Cmpl. ¶ 524. There is no allegation that he bought or attempted to buy a PAL ticket.

6. At that time, in terms of flights to and from the United States, PAL flew between Manila and each of Honolulu, Los Angeles, New York, and San Francisco. The same is true today, as reflected on PAL's website: https://www.philippineairlines.com/-/media/feature/timetable/231212-international-winter-as-of-dec12-2023.pdf. In particular, PAL did not fly to or from any city in New Jersey or Texas. Moreover, PAL flies no domestic United States routes between points in the United States, nor does it fly to any of the international destinations (save two) where Mr. Abadi alleges he has had, or possibly anticipates having in the future, business dealings—namely, the Dominican Republic, England, India, Israel, Saudi Arabia, Sudan, Sweden, Switzerland, or the United Arab Emirates. See Cmpl. ¶¶ 816, 831, 838; Cmpl. Exs. 78, 80. PAL flies from Manila to Saudi Arabia and the United Arab Emirates, but it is not plausible that Mr. Abadi, to get to those destinations from New York, would route through Manila, rather than flying directly via another airline.

7. Covid response in the Republic of the Philippines was primarily governed by its Inter-Agency Task Force for the Management of Emerging Infectious Diseases (IATF-EID) which was headed by no less the Cabinet Secretary of the Office of the President of the Republic

of the Philippines together with the Department of Health (DoH).  Other involved agencies included the  Department of Transportation (DoTr) and the Civil Aeronautics Board (CAB) which is mandated to regulate the economic aspects of air transportation and has general supervision, control, and jurisdiction over air carriers.

8. As effective during the period in and around September 2021, IATF-EID had categorized countries of departure into colored threat levels:  Green, Yellow and Red.  The United States was threat level Yellow.  See Attached Ex. A (IATF-EID Res. 141-B).  Passengers arriving from Yellow-classified countries were required to undergo a fourteen-day quarantine upon arrival, the first ten days of which were under observation in a quarantine facility, with the remainder to be completed under home quarantine in their respective local government units of destination.  See Attached Ex. B (IATF-EID Res. 136).  Passengers were also required to submit to a Reverse Transcription Polymerase Chain Reaction (RT-PCR) Covid test on the seventh day, and achieve a negative result.  *Id*.

9. Once the traveler-quarantine period ended, whether the individual could leave his or her residence depended on whether the location of that residence was within a granular area in a barangay (neighborhood) under quarantine lockdown as a result of a high infection/incidence rate.  By way of example, on December 24, 2021, a news outlet reported that there were quarantine lockdowns affecting eight barangays in the City of Manila, even though the rest of Metro Manila at that time remained on Alert Level 2 (a level not requiring a full quarantine lockdown).  The same news article reported that there were 21 areas across the Philippines under quarantine lockdown.  See Attached Ex. C (E. Tupas, "*8 Manila Areas under granular lockdown,*" The Philippine Star (Dec. 24, 2021)).

3

10. Even if a visitor (or citizen) was in an area where he or she was permitted to leave his or her residence, he or she was required to wear a facemask while outside of his or her residence. See Attached Ex. D (IATF-EID Res. 18); Ex. E (Omnibus Guidelines on the Implementation of Community Quarantine in the Philippines). Section 8(5) of the latter Omnibus Guidelines provided:

> All persons are mandated to wear face masks, earloop masks, indigenous, reusable, do-it-yourself masks, or face shields, handkerchiefs, or such other protective equipment or any combination thereof, which can effectively lessen the transmission of COVID-19, whenever they go out of their residences, pursuant to existing guidelines issued by the national government. Concerned [local government units] are hereby enjoined to issue the necessary executive order or ordinance to that effect, and to provide fair and humane penalties.

11. The only exceptions to this requirement exempted individuals at risk of suffocation (including children under two, persons with breathing problems, and persons who are unconscious or unable to remove their mask on their own), but those individuals were still required to wear well-fitted face shields instead. See Attached Ex. F (August 31, 2021, Department of Health Administrative Order No. 2021-0043, Omnibus Guidelines on the Minimum Public Health Standards for the Safe Reopening of Institutions). Specifically, section VI(A)(3)(a) and (d) of this Administrative Order stated:

> 3. **Personal Protective Equipment**. All concerned entities shall use the appropriate personal protective equipment (PPE) in their setting, and monitor implementation and compliance following DOH Department Memorandum No. 2020-0346, otherwise known as Advice on the Use of Masks During the COVID-19 Pandemic. PPE protocols shall include but shall not be limited to the following:
>
> a. All persons shall wear well-fitted face masks and face shields, if necessary, especially in public areas and enclosed spaces.
>
> …
>
> d. Individuals who are at risk of suffocation (children under the age of two, persons with breathing problems, persons who are unconscious, incapacitated, or otherwise unable to remove their mask on their own) are not recommended to

4

wear masks. As an alternative, they may wear well-fitted face shields instead. Per CDC recommendation, well-fitted face shields should wrap around the sides of the face and extend below the chin.

12.     Restrictions in areas involving public transportation were even more strict. Visitors and citizens who were otherwise permitted to travel were required to wear a facemask *and a face shield* in all areas involving public transportation.  This included airplanes, airports, trains, train stations, boats and boat terminals, and buses and bus stations.  See Attached Ex. G (Omnibus Public Transport Protocols/Guidelines covering Road Transport, Aviation, Maritime and Railways Sectors); Ex. H (Department of Transportation's Memorandum Circular No. 2020-014).

13.     Given these various restrictions under Philippine law and regulation, it is not plausible that Mr. Abadi had a bona fide intent to travel to the Philippines in or around September 2021.  As mentioned above, we have no record of him traveling on PAL previously. Moreover, even if Mr. Abadi could prove in this litigation an exemption under United States law from masking requirements in a United States airport and to board a plane there, he still would have been subject to masking requirements for the rest of his journey and while in the Philippines, or at the very minimum would been required at any time he was outside his place of residence to wear a well-fitted face shield (which he alleges he will not or cannot wear, see Cmpl. ¶¶ 270, 323, 435, 486, 645, 652).  He also would have been required to quarantine for 14 days before venturing outside his residence to engage in any business, making the Philippines a very unlikely place for him to conduct unspecified business meetings.

14.     Not surprisingly, these various restrictions under Philippine law and regulation had the effect of greatly diminishing air travel to and from the Philippines.  When international travel was first allowed following the advent of the COVID-19 pandemic, the CAB issued advisories, pursuant to IATF-EID resolutions, limiting daily international inbound passengers at

5

Manila's Ninoy Aquino International Airport ("MNL"). PAL was entitled to a portion of this daily limit. For the period September to October 2021, PAL only had 19 JFK-MNL flights (2.21 flights per week), compared to the 45 JFK-MNL flights (5.25 flights per week) it operated during the same period in 2019.

15. The Philippine Covid-related restrictions are amongst the most restrictive in the world and possibly longest period of effectivity. The lifting of the said Covid-related restrictions were very gradual as the objective of the Philippine government is to ensure public safety and public health. For example, it was only on November 16, 2021, that the DoTr lifted the requirement to wear a face shield over a face mask, leaving the face mask restriction in place. On September 12, 2022, Philippine President Marcos issued an executive order which made face masks voluntary in outdoor settings, particularly in open spaces, or non-crowded outdoor areas with good ventilation. See Ex. I (E.O. No. 3, s. 2022). However, wearing facemasks was still mandatory in indoor private or public establishments, including public transportation and outdoor settings where physical distancing could not be maintained. It was only on October 28, 2022 when President Marcos issued an executive order wherein wearing facemasks was made voluntary both in indoor and outdoor settings, but facemasks were still mandated in certain settings including public transportation. See Ex. J (E.O. No. 7, s. 2022). Finally, on July 21, 2023, President Marcos issued a proclamation lifting all Covid-related restrictions. See Ex. K (Proclamation No. 297, s. 2023). Following this proclamation, the Transportation Secretary announced on July 23, 2023, that face masks and physical distancing were no longer required in areas of public transportation.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 8, 2024 in Pasay City, Philippines

_____
Ma. Clara C. de Castro