UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

AARON ABADI,

              Plaintiff,

    -against-

AMERICAN AIRLINES GROUP, INC., *et al*.,

           Defendants.

---

23 Civ. 04033 (LJL) (JLC)

 

**MEMORANDUM OF LAW IN SUPPORT OF MOTION TO DISMISS BY
DEFENDANTS PHILIPPINE AIRLINES, INC. AND ASIANA AIRLINES, INC.**

 

**COVINGTON & BURLING LLP**
**620 Eighth Avenue**
**New York, New York  10018-1405**
**(212) 841-1000**

***Attorneys for Defendants Philippine***
***Airlines, Inc. and Asiana Airlines, Inc.***

## TABLE OF CONTENTS

Table of Authorities ................................................................................................................... ii

Preliminary Statement................................................................................................................. 1

Allegations, and Certain Additional Facts Relevant to Rule 12(b)(1) Motion ........................... 2

Argument ..................................................................................................................................... 5

I.      THIS COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE
        MR. ABADI HAS NOT PLAUSIBLY ALLEGED ANY ACTUAL CASE
        OR CONTROVERSY. ...................................................................................................... 5

II.     THERE IS NO PREDICATE FOR MR. ABADI'S CLAIMS BECAUSE HE
        HAS NOT ADEQUATELY ALLEGED THAT HE IS A "QUALIFIED"
        INDIVIDUAL WITH A RECOGNIZED DISABILITY. ................................................. 10

III.    MR. ABADI'S COMPLAINT SHOULD BE DISMISSED FOR FAILURE
        TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED. ......................... 18

Conclusion ................................................................................................................................. 24

# TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*Abbott Labs. v. Gardner*,
    387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)............................................6

*Adams v. Crestwood Med. Ctr.*,
    504 F. Supp. 3d 1263 (N.D. Ala. 2020)................................................................16

*Alexander v. Sandoval*,
    532 U.S. 275, 121 S. Ct. 1511, 149 L.Ed.2d 517 (2001)......................................20

*Already, LLC v. Nike, Inc.*,
    568 U.S. 85, 133 S.Ct. 721, 184 L.Ed.2d (2013).................................................6

*Ashcroft v. Iqbal*,
    556 U.S. 662, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)......................................18

*Auerbach v. Bd. of Educ.*,
    136 F.3d 104 (2d Cir.1998)..................................................................................6

*Babbitt v. United Farm Workers Nat'l Union*,
    442 U.S. 289, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979)..........................................6

*Bautista v. CytoSport, Inc.*,
    223 F. Supp. 3d 182 (S.D.N.Y. 2016)................................................................18

*Bell Atlantic Corp. v. Twombly*,
    550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)......................................19

*DaimlerChrysler Corp. v. Cuno*,
    547 U.S. 332, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006)......................................7

*Fawemimo v. American Airlines, Inc.*,
    751 F. App'x 16 (2d Cir. 2018) ......................................................................20-23

*Harty v. West Point Realty, Inc.*,
    28 F.4th 435 (2d Cir. 2022) ............................................................................9-10

*Health Freedom Defense Fund v. President*,
    71 F.4th 888 (4th Cir. 2022) ..............................................................................10

*Hentze v. CSX Transp., Inc.*,
    477 F. Supp. 3d 644 (S.D. Ohio 2020) ..........................................................16-17

*Kitchens v. NBME*,
    2023 WL 7167560 (E.D. Pa. Oct. 31, 2023)......................................................16

*Knaust v. City of Kingston*,
  157 F.3d 86 (2d Cir. 1998)......................................................................................7

*Lane v. Washington State Dep't of Corr.*,
  2019 WL 6686730 (W.D. Wa. Nov. 18, 2019)........................................................16

*Lewis v. Cont'l Bank Corp.*,
  494 U.S. 472, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990).......................................5-6

*Lopez v. Jet Blue Airways*,
  662 F.3d 593 (2d Cir. 2011)..................................................................................20

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)......................................5-6

*Morales v. Trans World Airlines, Inc.*,
  504 U.S. 374, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992)...................................20-23

*Pacific Gas & Elec. v. State Energy Res. Conservation and Dev. Comm'n*,
  461 U.S. 190, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983)..........................................6

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010)..................................................................................19

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998).........................................6

*Summers v. Earth Island Inst.*,
  555 U.S. 448, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009)............................................9

*TransUnion LLC v. Ramirez*,
  594 U.S. 413, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021)........................................9

*United States v. Probber*,
  170 F.3d 345 (2d Cir. 1999)....................................................................................9

*Velez v. Cloghan Concepts, LLC*,
  387 F. Supp. 3d 1072 (S.D. Cal. 2019)................................................................16

## Statutes

42 U.S.C. § 264(e) ...........................................................................................21-23

42 U.S.C. § 1983...................................................................................................19

42 U.S.C. § 1985...................................................................................................19

42 U.S.C. § 1986...................................................................................................20

42 U.S.C. § 12101 ................................................................................... 12-13

49 U.S.C. § 41705 ...................................................................................... 10

49 U.S.C. § 41713(b)(1) ........................................................................ 20-23

**Regulations**

14 C.F.R. § 382 ..................................................................................... 10-11

14 C.F.R. § 382.3 ....................................................................................... 11

14 C.F.R. § 382.11 ............................................................................... 10-11

28 C.F.R. § 35.104 ..................................................................................... 11

29 C.F.R. § 1630.2(h) ................................................................................ 11

86 Fed. Reg. at 8026-27 ........................................................................ 21-23

**Other Authorities**

Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition Text
  Revision (DSM-5 TR) ................................................................. 2, 13, 15-17

Diagnostic Classification of Mental Health and Developmental Disorders of
  Infancy and Early Childhood (DC:0-5) ....................................... 13-15

DOT, Notice of Enforcement Policy: Accommodation By Carriers of Persons
  With Disabilities Who Are Unable to Wear or Safely Wear Masks While on
  Commercial Aircraft ......................................................................... 12

EEOC, Enforcement Guidance on the ADA and Psychiatric Disabilities ............................... 15-16

Meg St-Esprit, *What is Sensory Processing Disorder?*, N.Y. Times, Apr. 17, 2000 .................... 13

SAMHSA, Impact of the DSM-IV to DSM-5 Changes on the National Survey of
  Drug Use and Health (2016) ............................................................ 17

TSA, Security Directive 1544-21-02D ..................................................... 12-13

Defendants Philippine Airlines, Inc. (PAL) and Asiana Airlines, Inc. (Asiana) submit this Memorandum of Law in support of their motion to dismiss Plaintiff Aaron Abadi's Complaint pursuant to Rules 12(b)(1) and 12(b)(6) of the Federal Rules of Civil Procedure.

## Preliminary Statement

Mr. Abadi does not allege that he has ever traveled on PAL or Asiana, either before the Covid pandemic began or after it ended; in fact, PAL and Asiana have no record of Mr. Abadi ever flying with them. Nor does Mr. Abadi allege that he previously had, or concretely planned to have in 2021 or early 2022, business dealings in the Philippines or in Korea, the destinations to which PAL and Asiana, respectively, fly from New York. Rather, Mr. Abadi alleges only that he made preliminary email inquiries to PAL and Asiana beginning in September 2021 stating an interest in flying and asking if he could fly without a mask (and did not receive responses that were satisfactory in his view).

Given this history and the lack of any tangible plans on Mr. Abadi's part, and particularly given the rigorous quarantine and masking requirements in the Philippines and Korea, any travel by Mr. Abadi to those destinations during the pandemic was entirely implausible, and his Complaint does not plausibly allege facts that might lead to a contrary result. Mr. Abadi therefore never had any ripe case or controversy with PAL and Asiana; relatedly, Mr. Abadi suffered no actual or imminent concrete "injury in fact" as a result of PAL's and Asiana's actions or inactions. Moreover, masking restrictions ended in the United States in April or May 2022, just seven or eight months after Mr. Abadi's first email inquiries to PAL and Asiana, and quarantine and masking restrictions in the Philippines and Korea also later ended. Thus, any potential cases or controversies with PAL and Asiana were over before they even began, and Mr. Abadi's claims are moot in addition to having never ripened. Mr. Abadi's claims therefore all fail for lack of Article III subject matter jurisdiction.

Mr. Abadi also has not adequately alleged that he has a recognized disability within the meaning of the Americans with Disabilities Act (ADA), which is a predicate for all of his claims. He claims to have "sensory processing disorder," but that is not a mental disorder that is generally recognized by the medical establishment in adults, and is not listed in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition Text Revision (DSM-5 TR).  Rather, it is a disorder that is recognized only in certain children.  Mr. Abadi's alleged disorder, moreover, is narrow and tailor-made; it constrained, at most, his activities in places where masks were required during the Covid pandemic.  Mr. Abadi does not plausibly allege that major life activities were substantially limited by his alleged disorder before or after the Covid pandemic, or even during the Covid pandemic outside of activities in places where masks were required.  Limitations on his activities were exactly coterminous with, and were triggered by, legal requirements to wear a mask.  But alleged impairments of such limited scope and duration are not disabilities recognized under the ADA caselaw.  All of Mr. Abadi's claims fail for this reason as well.

Finally, Mr. Abadi fails to state a cause of action for all of the reasons described in the briefing filed by other defendants in this case, which arguments are incorporated and adopted by PAL and Asiana.  *See*, *e.g.*, Dkt. 122, Dkt. 180, Dkt. 198, Dkt. 213, Dkt. 218, Dkt. 233, Dkt. 234-1, and Memorandum of Law to be filed on January 9, 2024 by Clyde & Co.

### Allegations, and Certain Additional Facts Relevant to Rule 12(b)(1) Motion

In his Complaint, Mr. Abadi sues 10 airlines headquartered in the United States, plus 36 airlines headquartered in 32 countries outside of the United States.  By his action, Mr. Abadi therefore implausibly alleges or suggests that he intended, during a short eight-month period at the height of Covid pandemic, to fly within and/or to 33 different countries, somehow creating a concrete case or controversy with 46 different airlines.

Two of the foreign airlines that Mr. Abadi sues are Defendants PAL and Asiana.  Defendant PAL is incorporated in the Republic of the Philippines with its principal place of business in Manila, Republic of the Philippines.  De Castro Decl. ¶ 2.  Defendant Asiana is incorporated in the Republic of Korea, with its principal place of business in Seoul, Republic of Korea.  Kim Decl. ¶ 2.

Mr. Abadi alleges that he had past or potential business dealings in certain named countries, and a related need to travel to those countries, but nowhere alleges having any past or potential business in the Republic of the Philippines or the Republic of Korea.  *See* Cmpl. ¶¶ 816, 831, 838; Cmpl. Exs. 78, 80.  In the approximate 15-month period from January 2019 until March 2020, when "Covid stated to get heavy," Mr. Abadi allegedly flew internationally only to end-point destinations in India, Israel and Saudi Arabia.  Cmpl. ¶ 806; Cmpl. Ex. 78.

Mr. Abadi has not taken a flight on PAL for at least the past 11 years (as far back as PAL was able to search).  De Castro Decl. ¶ 4.  Mr. Abadi has not taken a flight on Asiana in at least the past 5 years (as far back as Asiana was able to search).  Kim Decl. ¶ 4.  According to his Complaint, Mr. Abadi made email and online inquiries of PAL, and in parallel Asiana (and numerous other airlines), beginning in September 2021.  Cmpl. ¶¶ 524, 221.  There is no allegation that he bought, or offered or attempted to buy, a PAL or Asiana ticket.

At that time, in terms of flights to and from the United States, PAL flew between Manila and each of Honolulu, Los Angeles, New York, and San Francisco.  The same is true today, as reflected on PAL's website:  https://www.philippineairlines.com/-/media/feature/timetable/231212-international-winter-as-of-dec12-2023.pdf.  De Castro Decl. ¶ 6. For its part, Asiana flew between Seoul and each of Honolulu, Los Angeles, New York, San Francisco, and Seattle.  The same is true today, as reflected on Asiana's website: flyasiana.com/C/US/EN/booking/route.  Kim Decl. ¶ 6.  In particular, neither PAL nor Asiana flew

to or from any city in New Jersey or Texas; moreover, neither PAL nor Asiana files any domestic United States route between points in the United States. *Id.*, *op. cit.*

Neither PAL nor Asiana flies from New York directly to any of the international destinations where Mr. Abadi alleges he has had, or possibly anticipates having in the future, business dealings—namely, the Dominican Republic, England, India, Israel, Saudi Arabia, Sudan, Sweden, Switzerland, or the United Arab Emirates. *See* De Castro Decl. ¶ 6; Kim Decl. ¶ 6; Cmpl. ¶¶ 816, 831, 838; Cmpl. Exs. 78, 80. PAL flies from Manila to each of Saudi Arabia and the United Arab Emirates; so theoretically but implausibly, Mr. Abadi could fly on PAL from New York to Manila (17-hour flight), stay in the airport in Manila for a 4-plus-hour layover, and then fly from Manila to Dammam or Dubai (each a 10-hour flight), for a total of 31-plus hours. But plausibly, Mr. Abadi instead would take a flight from New York directly to Jeddah (11.5-hour flight) or to Dubai via Jeddah (17 hours including layover in Jeddah), thereby saving 14-20 hours. *See*, *e.g.*, flight schedules on saudia.com. Similarly, Asiana flies from Seoul to England and India; so theoretically but implausibly, Mr. Abadi could fly on Asiana from New York to Seoul (16-hour flight), stay in the airport in Seoul for a 19-21-hour layover, and then fly from Seoul to Delhi (9-hour flight), or Seoul to London (15-hour flight) for a total of 46 hours (Delhi) or 50 hours (London). But plausibly, Mr. Abadi instead would take a flight from New York directly to Delhi (14 hours) or London (7 hours), thereby saving 32-43 hours. *See*, *e.g.*, websites of multiple airlines serving those destinations directly from New York.

If, contrary to the allegations in his Complaint, Mr. Abadi in fact had had an actual intent to travel to the Philippines or Korea for business or pleasure in the fall of 2021 or the spring of 2022, he would have first needed to quarantine upon arrival for 14 days. De Castro Decl. ¶ 8; Kim Decl. ¶ 8. After his 14-day quarantine while outside any residence in Manila, Mr. Abadi would

have been able to travel only to areas not in lockdown, would have needed to wear a mask, and while in areas of public transportation would have needed also to wear a face shield in addition to a mask.  De Castro Decl. ¶¶ 9-10, 12.  In all areas outside his residence, even if Mr. Abadi were able to prove to the satisfaction of the Philippine authorities that he was at risk of suffocation by wearing a mask, he still would have been required to wear a face shield instead.  De Castro Decl. ¶ 11.  After his 14-day quarantine in Korea, Mr. Abadi would have needed to wear a mask in public indoor areas or crowded outdoor areas, including in areas of public transportation.  Kim Decl. ¶ 8. He would have been able to avoid a fine for not wearing a mask only if he could prove to the satisfaction of the Korean authorities that he had "a medical opinion that he has difficulty breathing when a mask is worn such as in the case of having a respiratory disease."  Kim Decl. ¶¶ 10-11.

Mr. Abadi alleges that mask restrictions in the United States were lifted in April or May 2022, *see*, *e.g.*, Cmpl ¶ 193, just seven or eight months after Mr. Abadi's first email inquiries to PAL and Asiana, Cmpl. ¶¶ 524, 221.  Mask restrictions in the Philippines and in Korea also are no longer in effect.  De Castro Decl. ¶ 15; Kim Decl. ¶ 13.

**Argument**

## I.    THIS COURT LACKS SUBJECT MATTER JURISDICTION BECAUSE MR. ABADI HAS NOT PLAUSIBLY ALLEGED ANY ACTUAL CASE OR CONTROVERSY.

Because federal courts may adjudicate only actual cases or controversies pursuant to Article III of the Constitution, "[t]o invoke the jurisdiction of a federal court, a litigant must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision."  *Lewis v. Cont'l Bank Corp.,* 494 U.S. 472, 477, 110 S.Ct. 1249, 108 L.Ed.2d 400 (1990).  In terms of injury, "the plaintiff must have suffered an 'injury in fact'— an invasion of a legally protected interest which is (a) concrete and particularized and (b) actual or imminent, not 'conjectural' or 'hypothetical.'"  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560,

112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). As for burden of proof, "[t]his triad of injury in fact, causation, and redressability constitutes the core of Article III's case-or-controversy requirement, and the party invoking federal jurisdiction bears the burden of establishing its existence." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 103-04, 118 S.Ct. 1003, 140 L.Ed.2d 210 (1998) (citation omitted).

The ripeness doctrine is designed to prevent adjudication of abstract disagreements and "turns on 'the fitness of the issues for judicial decision' and 'the hardship to the parties of withholding court consideration.'" *Pacific Gas & Elec. v. State Energy Res. Conservation and Dev. Comm'n,* 461 U.S. 190, 200-01, 103 S.Ct. 1713, 75 L.Ed.2d 752 (1983) (quoting *Abbott Labs. v. Gardner,* 387 U.S. 136, 149, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967)). If the alleged injury is not yet actual, it must at least be "imminent" or "certainly impending" (and in any event traceable to the defendant). *Babbitt v. United Farm Workers Nat'l Union,* 442 U.S. 289, 298, 99 S.Ct. 2301, 60 L.Ed.2d 895 (1979) (quotation marks and citation omitted). Without an actual or imminent, and traceable, injury, federal courts should not issue opinions "advising what the law would be upon a hypothetical state of facts." *Lewis,* 494 U.S. at 477 (quotation marks and citation omitted). "When the events alleged in a plaintiff's cause of action have not yet occurred, a federal court is precluded from exercising subject matter jurisdiction because a real case or controversy does not exist for purposes of Article III." *Auerbach v. Bd. of Educ.,* 136 F.3d 104, 108-09 (2d Cir. 1998).

The mootness doctrine likewise is designed to prevent adjudication of abstract disagreements where there is no longer any active case or controversy involving the plaintiff's particular legal rights. *Already, LLC v. Nike, Inc.*, 568 U.S. 85, 91, 133 S.Ct. 721, 184 L.Ed.2d 210 (2013) ("A case becomes moot—and therefore no longer a 'Case' or 'Controversy' for purposes of Article III—'when the issues presented are no longer 'live' or the parties lack a legally

cognizable interest in the outcome.' … No matter how vehemently the parties continue to dispute the lawfulness of the conduct that precipitated the lawsuit, the case is moot if the dispute 'is no longer embedded in any actual controversy about the plaintiffs' particular legal rights.'") (internal citations omitted). *See also DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 352, 126 S.Ct. 1854, 164 L.Ed.2d 589 (2006) ("The doctrines of mootness, ripeness, and political question all originate in Article III's 'case' or 'controversy' language, no less than standing does."); *Knaust v. City of Kingston*, 157 F.3d 86, 87 (2d Cir. 1998) ("As a threshold matter, we must decide whether intervening events have rendered Knausts' request for injunctive relief moot, for 'Article III of the Constitution limits this Court to consideration of appeals involving a live case or controversy.'") (internal citation omitted).

Here, Mr. Abadi has not plausibly alleged any concrete and particularized, actual or imminent injury fairly traceable to PAL or Asiana. The events about which Mr. Abadi might have a complaint have never occurred, and likely will never occur in the future. As such, there is no actual live case or controversy, with any possible controversy not yet being ripe, or alternatively being moot.

It is not at all plausible, as Mr. Abadi suggests or alleges in his Complaint, that in an eight-month period during the height of the Covid pandemic—between September 2021 when he sent email inquiries to PAL and Asiana, and April 2022 when mask restrictions in the United States were lifted—he somehow intended to fly on 46 different airlines, both within the United States and to 32 foreign countries. It is particularly implausible that Mr. Abadi ever had any actual intent to fly on PAL or Asiana. He does not allege that he made any effort actually to buy a ticket from PAL or Asiana in or after September 2021. In fact, Mr. Abadi has never flown on PAL or Asiana, whether before, during or after the pandemic. De Castro Decl. ¶ 4; Kim Decl. ¶ 4. And Mr. Abadi

has not alleged that he has ever had, or had tangible plans to have, business dealings in the Philippines or Korea.  *See* Cmpl. ¶¶ 816, 831, 838; Cmpl. Exs. 78, 80.  Routing through Manila or Seoul to travel to Mr. Abadi's regular business destinations would have entailed many extra hours if not days of travel, making those routes highly implausible.

In addition, if Mr. Abadi had traveled to Manila or Seoul, he would have been subject to masking requirements. De Castro Decl. ¶ 10 Kim Decl. ¶ 9.  In the Philippines, Mr. Abadi could have attempted to prove to the authorities that he was at risk of suffocation in order to avoid wearing a mask, yet he still would have been required to wear a face shield.  De Castro Decl. ¶ 11. Mr. Abadi does not allege that he obtained or made any effort to obtain a mask exemption under Philippine law, and in any event alleges in his Complaint that he cannot wear a face shield, Cmpl. ¶ 270, making a visit to the Philippines during the pandemic effectively impossible.  In Korea, there was no exception to the mask requirement *per se*, although Mr. Abadi could have attempted to avoid a fine by proving to the Korean authorities that he possessed a medical opinion that he has difficulty breathing when wearing a mask such as from a respiratory disease.  Kim Decl. ¶ 10. But Mr. Abadi does not allege that he obtained or made any effort to obtain a fine exemption from Korean authorities on such a basis.

On top of all of that, in both the Philippines and in Korea, Mr. Abadi would have been subject to a 14-day quarantine period before he would have been able to conduct any business (or personal travel), adding to the implausibility of him traveling to those destinations during the Covid pandemic.  In the eight-month period between September 2021 and April 2022, even assuming Mr. Abadi traveled continuously from place to place, and assuming he spent at least two weeks after quarantine in foreign locations requiring a two-week quarantine (and never tested

positive for Covid), mathematically he could have visited at most 8 such foreign countries, not the 32 he alleges or suggests in his Complaint that he intended to visit.

In short, Mr. Abadi has not plausibly alleged any concrete and particularized, actual or imminent injury fairly traceable to PAL or Asiana.  Even if Mr. Abadi outlined in his Complaint one or more legal infractions (and he has not), any potential future injury to Mr. Abadi traceable to PAL or Asiana is entirely contingent and based on a string of improbabilities.  *See Summers v. Earth Island Inst.*, 555 U.S. 448, 496, 129 S.Ct. 1142, 173 L.Ed.2d 1 (2009) (rejecting Article III standing based on speculative chain of possibilities); *United States v. Probber*, 170 F.3d 345, 349 (2d Cir. 1999) ("injuries [were] too speculative to satisfy the case-or-controversy requirement of Article III").  As the Supreme Court has made clear, "Article III grants federal courts the power to redress harms that defendants cause plaintiffs, not a freewheeling power to hold defendants accountable for legal infractions."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 427, 141 S.Ct. 2190, 210 L.Ed.2d 568 (2021) (internal quotation and citation omitted).

Here, in relation to PAL and Asiana, Mr. Abadi's preliminary interactions were akin to those of a "tester."  He has not plausibly alleged any concrete harm, and his testing is not sufficient to create an Article III case or controversy.  *See Harty v. West Point Realty, Inc.*, 28 F.4th 435, 443 (2d Cir. 2022) (applying *TransUnion*) (disabled plaintiff who claimed that hotel's website was not ADA-compliant, and that hotel thereby infringed his right to travel free from discrimination, did not have a concrete injury sufficient to create a justiciable Article III case or controversy when he was not actually seeking an accessible room at the hotel):

> Because Harty asserted no plans to visit West Point or the surrounding area, he cannot allege that his ability to travel was hampered by West Point Realty's website in a way that caused him concrete harm. … Harty therefore lacks standing to bring a suit for damages.  With respect to Harty's requests for prospective relief, although Harty alleges that "in the near future" he intends to "utilize the website to reserve a guest room," that is not sufficiently imminent to create an injury in fact. … "Such

'some day' intentions—without any description of concrete plans, or indeed even any specification of when the some day will be—do not support a finding of the 'actual or imminent' injury" that Article III requires.

*Id*. (citations omitted).  As in *Harty*, Mr. Abadi's claims are not ripe, and should be dismissed.

The potential events about which Mr. Abadi might have a complaint never occurred, and in any event likely will never occur in the future.  Mr. Abadi's claims therefore also are moot.  As Mr. Abadi alleges, mask restrictions in the United States were lifted in April or May 2022, *see*, *e.g.*, Cmpl ¶ 193, and no longer are in effect.  Mask restrictions in the Philippines and in Korea also are no longer in effect.  De Castro Decl. ¶ 15; Kim Decl. ¶ 13.  Mr. Abadi therefore is currently free to fly on PAL or Asiana without a mask, yet apparently has chosen not to.  The claims here should be dismissed as moot, as were the claims in *Health Freedom Defense Fund v. President*, 71 F.4th 888, 891-92 (4th Cir. 2022).

There is no actual live case or controversy between Mr. Abadi on the one hand, and PAL or Asiana on the other hand, with any possible controversy not yet being ripe, or alternatively being moot.  Mr. Abadi's Complaint therefore should be dismissed pursuant to Rule 12(b)(1) for lack of subject matter jurisdiction.

## II.    THERE IS NO PREDICATE FOR MR. ABADI'S CLAIMS BECAUSE HE HAS NOT ADEQUATELY ALLEGED THAT HE IS A "QUALIFIED" INDIVIDUAL WITH A RECOGNIZED DISABILITY.

Mr. Abadi has not adequately alleged that he is a "qualified" individual with a recognized disability, which is a predicate for all of his claims.

The Air Carrier Access Act (ACAA), 49 U.S.C. § 41705, prohibits discrimination against individuals who have a physical or mental impairment that substantially limits one or more major life activities.  The Department of Transportation (DOT) has promulgated rules defining the obligations of airlines under this law.  *See* 14 C.F.R. Part 382.  Under those rules, carriers may "not discriminate against any qualified individual with a disability, by reason of such disability."

14 C.F. R. § 382.11.  An "individual with a disability" is "any individual who has a physical or mental impairment that, on a permanent or temporary basis, substantially limits one or more major life activities, has a record of such an impairment, or is regarded as having such an impairment." 14 C.F.R. § 382.3.  A "qualified individual with a disability" is an individual with a disability:

>  (a) Who, as a passenger (referred to as a "passenger with a disability"),
>
>  > (1) With respect to obtaining a ticket for air transportation on a carrier, *offers, or makes a good faith attempt to offer, to purchase or otherwise validly to obtain such a ticket*;
>  >
>  > (2) With respect to obtaining air transportation, or other services or accommodations required by this Part,
>  >
>  > > (i) *Buys or otherwise validly obtains, or makes a good faith effort to obtain, a ticket* for air transportation on a carrier and presents himself or herself at the airport for the purpose of traveling on the flight to which the ticket pertains; and
>  > >
>  > > (ii) Meets reasonable, nondiscriminatory contract of carriage requirements applicable to all passengers; …

*Id.* (emphases added).  Mr. Abadi, in relation to PAL and Asiana, has not alleged that he bought, or made a good faith offer or effort to buy, a ticket for travel.  Mr. Abadi in fact has never bought a ticket on PAL or Asiana.  De Castro Decl. ¶ 4; Kim Decl. ¶ 4.  He therefore is not a "qualified" individual entitled to protection under the ACAA.

Beyond failing this threshold requirement, Mr. Abadi also has failed adequately to allege that he has a generally recognized disability.  Mr. Abadi alleges that he has a mental (not a physical) impairment.  Under the relevant ACAA regulations, a mental impairment means "Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities."  14 C.F.R. § 382.3.  This definition is modeled after the ADA, which defines a mental impairment in the same way as a mental or psychological disorder.  *See* 29 C.F.R. § 1630.2(h) and 28 C.F.R. § 35.104.

The DOT implemented certain masking exceptions based on these definitions, as reflected in its Notice of Enforcement Policy.  *See* DOT Notice of Enforcement Policy:  Accommodation By Carriers of Persons With Disabilities Who Are Unable to Wear or Safely Wear Masks While on Commercial Aircraft  (available at https://www.transportation.gov/sites/dot.gov/files/2021-02/Mask%20Notice%20Issued%20on%20Feb%205.pdf) (footnotes omitted) (emphases added):

> Pursuant to the Executive Order, on January 29, 2021, CDC issued an order directing conveyance operators, which includes airlines, to use best efforts to ensure that any person on the conveyance, such as an aircraft, wears a mask when boarding, disembarking, and for the duration of travel.  Recognizing that there are specific instances when wearing a mask may not be feasible, the CDC Order exempts several categories of persons from the mask mandate, including "a person with a disability who cannot wear a mask, or who cannot safely wear a mask *because of the disability as defined by the Americans with Disabilities Act* (42 U.S.C. 12101 et seq.)."  The Americans with Disabilities Act (ADA) defines a person with a disability to include a person who has a physical or mental impairment that substantially limits one or more major life activities.  To ensure that *only qualified persons* under the exemptions would be able to travel without a mask, the CDC Order permits operators of transportation conveyances, such as airlines, to impose requirements, or conditions for carriage, on persons requesting an exemption … .
>
> OACP notes that the definition of a person with a disability under the ADA is almost identical to the definition of a person with a disability under the Department's ACAA regulation. …
>
> In short, both the CDC Order and Part 382 permit airlines to require passengers to consult with the airline's medical expert and/or to provide medical evaluation documentation from the passenger's doctor sufficient to satisfy the airline that the passenger does, indeed, have *a recognized medical condition* precluding the wearing or safe wearing of a mask. …

The Transportation Security Administration issued a security directive (SD) along similar lines.  *See*  TSA  Security  Directive  1544-21-02D  (available  at https://www.tsa.gov/sites/default/files/SD%201544-21-02D.pdf)  (one  footnote  omitted) (emphasis added):

> F. This SD exempts the following categories of persons from wearing masks:
>
> 1. Children under the age of 2.

2. People with disabilities who cannot wear a mask, or cannot safely wear a mask, because of the disability as defined by the Americans with Disabilities Act (42 U.S.C. 12101 et seq.).[9]

[9] This is a narrow exception that includes a person with a disability who cannot wear a mask for reasons related to the disability; who, e.g., do not understand how to remove their mask due to cognitive impairment, cannot remove a mask on their own due to dexterity/mobility impairments, or cannot communicate promptly to ask someone else to remove their mask due to speech impairments or language disorders, or cannot wear a mask because doing so would impede the function of assistive devises/technology. *It is not meant to cover persons for whom mask-wearing may only be difficult.* …

More specifically, Mr. Abadi claims to have a mental disorder consisting of "sensory processing disorder" (SPD). But SPD is not a mental disorder generally recognized by the medical establishment, as evidenced by the fact that it is not cataloged and described in the Diagnostic and Statistical Manual of Mental Disorders, Fifth Edition Text Revision (DSM-5 TR). *See* DSM-5 TR (excerpts included in Appendix A to this memorandum, with SPD not appearing); Meg St-Esprit, *What is Sensory Processing Disorder?*, N.Y. Times, Apr. 17, 2000 ("S.P.D. is recognized in the Diagnostic Classification of Mental Health and Developmental Disorders of Infancy and Early Childhood, but not in the latest editions of the Diagnostic and Statistical Manual of Mental Disorders or the International Classification of Disease, which are the two most widely accepted diagnostic tools in the medical world.") (available at https://www.nytimes.com/2020/04/17/parenting/sensory-processing-disorder-kids.html).

As Ms. St-Esprit notes in her article, SPD is recognized as a disorder in the Diagnostic Classification of Mental Health and Developmental Disorders of Infancy and Early Childhood (DC:0-5), but only in children. *See* DC:0-5 at 40-45 (excerpts included in Appendix B to this memorandum):

**20 SENSORY PROCESSING DISORDERS**

Sensory processing disorders are diagnosed when the infant/young child demonstrates behaviors that are believed to reflect abnormalities in regulating sensory input. The behaviors cause distress or impair the infant's/young child's

functioning in daily activities. Sensory processing disorders affect individuals throughout infancy and early childhood, and there is evidence that these problems are stable in the first years of life.

There is now considerable empirical evidence that some infants/young children experience clinically significant and impairing responses to sensory stimuli that are independent of other psychopathological and neurodevelopmental conditions. These responses may be characterized by over-responsivity (e.g., heightened magnitude of response, faster latency of response, and slower habituation or recovery from response to sensory stimuli) … . The sensory abnormalities must occur in more than one context (e.g., home, child care, community settings) and may involve one or more sensory domains (e.g., tactile, visual, auditory, vestibular, olfactory, taste, the sense of position of joints or pressure on muscles [proprioceptive sensation], and the sensations from internal organs [interoception]). Failure to process or respond to sensory information in an age-typical manner is associated with impairments for the infant/young child and his or her family.

…

**20.1 Sensory Over-Responsivity Disorder**

…

**Diagnostic Algorithm**

All of the following criteria must be met.

A. The infant/young child displays a persistent and pervasive pattern of sensory over-responsivity that involves intense, negative reactions to one or more types of routine sensory stimuli (including tactile, visual, auditory, vestibular, olfactory, taste, proprioceptive, or interoceptive) in more than one context (e.g., home, child care, playground) and with different caregivers (if the infant/young child has more than one caregiver). The intensity of reactivity or the duration of reactivity is disproportionate to the intensity of the stimulus. Either criterion 1 or 2 below must be present:

> 1. The infant/young child shows intense emotional or behavioral responses when exposed to stimuli that evoke the sensation. The intensity and duration of the response are disproportionate to the intensity of the stimulus.

> 2. The infant/young child predictably tries to avoid contact with routine sensory stimuli that are aversive to him or her.

B. The infant/young child does not meet criteria for ASD. Symptoms are not better explained by Attention Deficit Hyperactivity Disorder.

C. Symptoms of the disorder, or caregiver accommodations in response to the symptoms, significantly affect the infant's/young child's and family's functioning in one or more of the following ways:

    1. Cause distress to the infant/young child;

    2. Interfere with the infant's/young child's relationships;

    3. Limit the infant's/young child's participation in developmentally expected activities or routines;

    4. Limit the family's participation in everyday activities or routines; or

    5. Limit the infant's/young child's ability to learn and develop new skills or interfere with developmental progress.

Age: The infant/young child must be at least 6 months old.

Duration: The pattern of sensory over-responsivity is present for at least 3 months.

…

**Course**

The course of Sensory Over-Responsivity Disorder is unknown. However, there is moderate stability in Sensory Over-Responsivity Disorder symptoms between 1 and 8 years old, and, on average, all young children show an increase in sensory over-responsivity behaviors between 1 and 3 years old.

Disability case law, and government enforcement policies, recognize that inclusion (or not) in the DSM-5 (previously DSM-4) is a trusted referent for whether a condition is a recognized and protected mental disability; inclusion, however, although generally necessary, is not sufficient, for a condition to be a recognized and protected disability. *See*, *e.g.*, EEOC, Enforcement Guidance on the ADA and Psychiatric Disabilities (available at https://www.eeoc.gov/laws/guidance/enforcement-guidance-ada-and-psychiatric-disabilities and 1997 WL 34622315) (footnotes omitted):

What is a "mental impairment" under the ADA?

The ADA rule defines "mental impairment" to include "[a]ny mental or psychological disorder, such as . . . emotional or mental illness."  Examples of "emotional or mental illness[es]" include major depression, bipolar disorder,

anxiety disorders (which include panic disorder, obsessive compulsive disorder, and post-traumatic stress disorder), schizophrenia, and personality disorders. The current edition of the American Psychiatric Association's Diagnostic and Statistical Manual of Mental Disorders (now the fourth edition, DSM-IV) is relevant for identifying these disorders. The DSM-IV has been recognized as an important reference by courts and is widely used by American mental health professionals for diagnostic and insurance reimbursement purposes.

Not all conditions listed in the DSM-IV, however, are disabilities, or even impairments, for purposes of the ADA. For example, the DSM-IV lists several conditions that Congress expressly excluded from the ADA's definition of "disability." While DSM-IV covers conditions involving drug abuse, the ADA provides that the term "individual with a disability" does not include an individual who is currently engaging in the illegal use of drugs, when the covered entity acts on the basis of that use. The DSM-IV also includes conditions that are not mental disorders but for which people may seek treatment (for example, problems with a spouse or child). Because these conditions are not disorders, they are not impairments under the ADA.

Even if a condition is an impairment, it is not automatically a "disability." To rise to the level of a "disability," an impairment must "substantially limit" one or more major life activities of the individual.

Numerous court decisions likewise refer to the DSM-5 to determine whether an alleged mental condition constitutes a recognized disability. *See*, *e.g.*, *Kitchens v. NBME*, 2023 WL 7167560, at *3 (E.D. Pa. Oct. 31, 2023); *Adams v. Crestwood Med. Ctr.*, 504 F. Supp. 3d 1263, nn.22, 26 (N.D. Ala. 2020); *Hentze v. CSX Transp., Inc.*, 477 F. Supp. 3d 644, 663 & n.2 (S.D. Ohio 2020); *Velez v. Cloghan Concepts, LLC*, 387 F. Supp. 3d 1072, 1075 (S.D. Cal. 2019); *Lane v. Washington State Dep't of Corr.*, 2019 WL 6686730, at *3 (W.D. Wa. Nov. 18, 2019). Without a listing in the DSM-5, nor any other supported allegation that sensory processing disorder is generally recognized by the medical establishment as a mental disorder in adults, Mr. Abadi has not adequately alleged a disorder that could be the foundation for a protected disability.

Mr. Abadi also fails at the next step in showing a protected disability because he does not adequately allege that his condition "substantially limits one or more major life activities." There is no allegation or suggestion that his condition substantially limited his major life activities before

the Covid pandemic, or afterward, or even during the Covid pandemic outside of activities in places where masks were required.  Rather, Mr. Abadi's alleged condition is tailor-made, and it constrained, at most, only his activities in places where masks were required during the Covid pandemic.  Alleged impairments of such limited scope and duration do not substantially limit major life activities and are not disabilities recognized under the ADA caselaw.

In *Hentze*, the plaintiff claimed anxiety in taking tests, but did not claim that he had a general learning disability that gave rise to the anxiety.  477 F. Supp. 3d at 652.  Mr. Hentze was diagnosed by a doctor as having a DSM-listed adjustment disorder with mixed emotional features, *id.* at 656, so unlike Mr. Abadi, he met the first requirement to establish a generally recognized disability.  (That disorder was previously coded 309.28 under the DSM-IV but is now coded F43.23 under the DSM-5.  *See* SAMHSA, Impact of the DSM-IV to DSM-5 Changes on the National Survey of Drug Use and Health, Table 3.19 (2016) (available at https://www.ncbi.nlm.nih.gov/books/NBK519704/table/ch3.t19/).)  However, notwithstanding Mr. Hentze's threshold success in establishing a recognized disorder, his disorder was found by the court to limit too narrowly his life activities, including because test taking was an occasional "externally imposed requirement"—a requirement that his job imposed from time to time— not something that Mr. Hentze undertook voluntarily in his everyday life.  477 F. Supp. 3d at 665; *see also id.* at 666 ("major life activity" that is allegedly "substantially limited" "must … be frequently recurring and touch a broad scope of a typical person's life").

The same is true for Mr. Abadi.  Mr. Abadi's alleged disability is not alleged to have substantially limited his major life activities before the Covid pandemic, nor is alleged to have substantially limited his major life activities after the pandemic.  Rather, his alleged disability only became relevant in limited circumstances during the pandemic—in specific locations and

17

situations where a government entity imposed a mask requirement. Mask wearing—and his purported disability against wearing a mask— did not affect Mr. Abadi's life except during narrow portions of his life when and where mask wearing was required. Mr. Abadi's alleged disability therefore differs, for example, from the condition of someone with a respiratory disease who has ongoing difficulty breathing as a result of that disease in his or her daily life, and for whom mask wearing could exacerbate the difficulty. By contrast, as far as the Complaint alleges, Mr. Abadi's alleged disability exactly matches and is coterminous with the mask requirements imposed by various governmental actors, and does not otherwise substantially limit Mr. Abadi's major life activities. It is thus too narrow to trigger disability protections under applicable law.

Because Mr. Abadi has not adequately alleged a protected disability, and such a disability is a predicate for all of his claims, all of his claims should be dismissed.

### III. MR. ABADI'S COMPLAINT SHOULD BE DISMISSED FOR FAILURE TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED.

"In considering whether a complaint states a claim upon which relief can be granted, the court begins by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth, and then determines whether the remaining well-pleaded factual allegations, accepted as true, plausibly give rise to an entitlement to relief." *Bautista v. CytoSport, Inc.*, 223 F. Supp. 3d 182, 187-88 (S.D.N.Y. 2016) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009)) (internal marks omitted). This is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 188 (quoting *Iqbal*, 556 U.S. at 679) (internal marks omitted). "Where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged— but it has not shown—that the pleader is entitled to relief." *Id.* (quoting *Iqbal*, 556 U.S. at 679) (internal marks omitted).

Mr. Abadi fails to state a claim against PAL and Asiana for all of the reasons stated in the briefing filed by other defendants in this case, which arguments are incorporated and adopted by PAL and Asiana.  *See*, *e.g.*, Dkt. 122, Dkt. 180, Dkt. 198, Dkt. 213, Dkt. 218, Dkt. 233, Dkt. 234-1, and Memorandum of Law to be filed on January 9, 2024 by Clyde & Co.  In short:

Counts One through Six apparently are asserted against certain Federal agency and official defendants, and are not asserted against PAL or Asiana.

Count Seven, asserting a claim under 42 U.S.C. § 1983, should be dismissed because Mr. Abadi was not allegedly deprived of any protectible rights under the Federal Constitution and laws, and most prominently but without limitation because there is no plausible allegation that PAL and Asiana, a Philippine and Korean airline respectively, in their brief email and online communications with Mr. Abadi, were somehow acting under color of the authority or laws of any of the States.

Count Eight, asserting a claim under 42 U.S.C. § 1985, should be dismissed because there is no underlying Section 1983 violation, because disabled persons are not a protected class under Section 1985 (and Mr. Abadi has not adequately alleged a protected disability), and most prominently but without limitation because there are no plausible allegations in the Complaint of any acts constituting a conspiracy.  The core teaching of *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) is that "an allegation of parallel conduct coupled with only a bare assertion of conspiracy is not sufficient" to allege a conspiracy.  *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 322 (2d Cir. 2010).  Here, Defendants' alleged parallel conduct plausibly arose from a common but uncoordinated desire to comply with the federally-required mask mandate.  Mr. Abadi alleges no facts plausibly demonstrating anything to the contrary.

Count Nine, asserting a claim under 42 U.S.C. § 1986, should be dismissed because it is time-barred, and most prominently but without limitation because of the lack of a viable underlying claim under Section 1985.

Counts Ten through Eighteen, asserting claims under the ACAA, should be dismissed because Mr. Abadi has not adequately alleged a recognized and protected disability, and most prominently but without limitation because there is no private right of action under the ACAA. *See Lopez v. Jet Blue Airways*, 662 F.3d 593, 597 (2d Cir. 2011) ("[T]he text and structure of the ACAA manifests no congressional intent to create a private right of action in a federal district court.") (citing *Alexander v. Sandoval*, 532 U.S. 275, 121 S. Ct. 1511, 149 L.Ed.2d 517 (2001)). Mr. Abadi in fact pursued administrative remedies under the ACAA through the DOT, including specifically with respect to Asiana. *See* Cmpl. ¶¶ 224-25.

Count Nineteen, asserting a claim under the Rehabilitation Act, apparently is not asserted against PAL and Asiana. *See* Cmpl. ¶ 1144. If it were, it should be dismissed because Mr. Abadi has not adequately alleged a recognized and protected disability, and most prominently but without limitation because he has not alleged, and could not plausibly allege, that PAL and Asiana, foreign airlines, received any financial subsidy from the United States federal government.

Count Twenty, asserting a claim under California's Civil Rights Act, should be dismissed because Mr. Abadi has not adequately alleged a recognized and protected disability, and most prominently but without limitation because any such claim is preempted by the Airline Deregulation Act (Deregulation Act). *See* 49 U.S.C. § 41713(b)(1) (preempting any state or local "law, regulation, or other provision having the force and effect of law related to a price, route, or service of an air carrier"); *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 384, 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); *Fawemimo v. American Airlines, Inc.*, 751 F. App'x 16, 18-19 (2d

Cir. 2018).  Any such claim also is preempted by the Federal Mask Mandate and the Public Health Service Act.  *See* 86 Fed. Reg. at 8026-27; 42 U.S.C. § 264(e).

Counts Twenty-One and Twenty-Two, asserting claims under New Jersey's Civil Rights Act, should be dismissed for the same reasons as Count Twenty, but also because there is no plausible allegation that Mr. Abadi's dealings with PAL or Asiana had any nexus whatsoever with New Jersey.  Neither PAL or Asiana even fly into or out of New Jersey.  De Castro Decl. ¶ 6; Kim Decl. ¶ 6.

Counts Twenty-Three through Twenty-Five, asserting claims under New York City's Human Rights Law, should be dismissed for the same reasons as Count Twenty.

Count Twenty-Six, asserting a claim under Texas's Civil Rights Laws, should be dismissed for the same reasons as Count Twenty, but also because there is no plausible allegation that Mr. Abadi's dealings with PAL or Asiana had any nexus whatsoever with Texas.  Neither PAL or Asiana even fly into or out of Texas.  De Castro Decl. ¶ 6; Kim Decl. ¶ 6.

Counts Twenty-Seven through Twenty-Nine, asserting various tort claims under the common law of Texas, New Jersey, New York and California, should be dismissed most prominently but without limitation as preempted by the Deregulation Act.  *See* 49 U.S.C. § 41713(b)(1); *Morales*, 504 U.S. at 384; *Fawemimo*, 751 F. App'x at 18-19.  All such claims also are preempted by the Federal Mask Mandate and the Public Health Service Act.  *See* 86 Fed. Reg. at 8026-27; 42 U.S.C. § 264(e).  Moreover, there is no plausible allegation that Mr. Abadi's dealings with PAL or Asiana had any nexus whatsoever with Texas or New Jersey.  Neither PAL nor Asiana even fly into or out of Texas or New Jersey.  De Castro Decl. ¶ 6; Kim Decl. ¶ 6.

Count Thirty, asserting a claim for breach of contract, apparently is not asserted against PAL and Asiana.  *See* Cmpl. ¶ 1253.  If it were, it should be dismissed because there is no plausible

allegation that Mr. Abadi ever entered into any contract with PAL or Asiana.  De Castro Decl. ¶¶ 4-5; Kim Decl. ¶¶ 4-5.

Count Thirty-One, asserting a claim for promissory estoppel, should be dismissed most prominently but without limitation as preempted by the Deregulation Act.  *See* 49 U.S.C. § 41713(b)(1); *Morales*, 504 U.S. at 384; *Fawemimo*, 751 F. App'x at 18-19.  Any such claim also is preempted by the Federal Mask Mandate and the Public Health Service Act.  *See* 86 Fed. Reg. at 8026-27; 42 U.S.C. § 264(e).  Moreover, there is no plausible allegation in the Complaint identifying any clear and unambiguous promise made by PAL or Asiana, directed to Mr. Abadi, that Mr. Abadi reasonably and foreseeably relied upon to his detriment.

Count Thirty-Two, asserting a claim for tortious interference with contract, apparently is not asserted against PAL and Asiana.  *See* Cmpl. ¶ 1280.  If it were, it should be dismissed because there is no plausible allegation identifying a contract to which Mr. Abadi was a party, which PAL or Asiana induced the counterparty to breach, without justification.

Count Thirty-Three, asserting a claim for injurious falsehoods, should be dismissed most prominently but without limitation as preempted by the Deregulation Act.  *See* 49 U.S.C. § 41713(b)(1); *Morales*, 504 U.S. at 384; *Fawemimo*, 751 F. App'x at 18-19.  Any such claim also is preempted by the Federal Mask Mandate and the Public Health Service Act.  *See* 86 Fed. Reg. at 8026-27; 42 U.S.C. § 264(e).  Moreover, there is no plausible allegation in the Complaint identifying any false statement made about Mr. Abadi by PAL or Asiana to a third party, which was published to the third party maliciously with an intent to harm Mr. Abadi, that a reasonably prudent person would have anticipated would harm Mr. Abadi.

Count Thirty-Four, asserting a claim for invasion of privacy, should be dismissed most prominently but without limitation as preempted by the Deregulation Act.  *See* 49 U.S.C.

§ 41713(b)(1); *Morales*, 504 U.S. at 384; *Fawemimo*, 751 F. App'x at 18-19.  Any such claim also

is preempted by the Federal Mask Mandate and the Public Health Service Act.  *See* 86 Fed. Reg.

at 8026-27; 42 U.S.C. § 264(e).  Moreover, there is no plausible allegation in the Complaint that

PAL or Asiana "forced" Mr. Abadi to disclose anything.  Rather, the Complaint alleges that in the

very first communications that Mr. Abadi initiated with PAL and Asiana, he volunteered certain

medical information, Cmpl. ¶¶ 220, 523, and later attached such information to his publicly filed

Complaint, Cmpl. Exs. 6-8.

Count Thirty-Five, asserting a claim for medical malpractice, is asserted only against the

"medical defendants" and not against PAL or Asiana.

Count Thirty-Six, asserting a claim for fraudulent misrepresentation, should be dismissed

most prominently but without limitation as preempted by the Deregulation Act.  *See* 49 U.S.C.

§ 41713(b)(1); *Morales*, 504 U.S. at 384; *Fawemimo*, 751 F. App'x at 18-19.  Any such claim also

is preempted by the Federal Mask Mandate and the Public Health Service Act.  *See* 86 Fed. Reg.

at 8026-27; 42 U.S.C. § 264(e).  Moreover, there is no plausible allegation in the Complaint

identifying with particularity any false statement made by PAL or Asiana, which Mr. Abadi

reasonably relied upon as true, to his detriment.  In fact, Mr. Abadi appears to allege throughout

his Complaint that he personally disbelieved the alleged statements about mask-wearing

requirements and benefits, thereby disproving any reliance on his part.

Count Thirty-Seven, asserting a claim for alleged infringement of a constitutional right to

travel, should be dismissed most prominently but without limitation because Mr. Abadi's

constitutional right was limited and not infringed, as explained in the memoranda filed by the other

defendants.  Moreover, Mr. Abadi indisputably has no constitutional right to travel to the

Philippines (on PAL) or to Korea (on Asiana), and in any event made no effort actually to purchase or offer to purchase a ticket to travel to either place.

Count Thirty-Eight apparently is asserted against certain Federal agency and official defendants, and is not asserted against PAL or Asiana.

Mr. Abadi's claims therefore should all be dismissed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure.

## Conclusion

For the reasons above, including those stated in the memoranda of law of the other defendants and incorporated here, this Court should dismiss Mr. Abadi's Complaint with prejudice.

Dated: New York, New York
       January 9, 2024

COVINGTON & BURLING LLP

By: s/ *David W. Haller*
     David W. Haller

620 Eighth Avenue
New York, New York 10018
Telephone: (212) 841-1000
Email: dhaller@cov.com

*Attorneys for Defendants Philippine Airlines, Inc. and Asiana Airlines, Inc.*

24